**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| Anthony Dyous, | ) | |
| Ling Xin Wu, | ) | |
| Vincenzo Lindia, | ) | |
| Taina Morales, | ) | |
| Carson Mueller, | ) | |
|     On behalf of themselves and | ) | Civil No.: 3:22-CV-1518-SVN |
|     all other persons similarly | ) | |
|     situated, | ) | |
|            Plaintiffs, | ) | |
|     v. | ) | |
| | ) | |
| Department of Mental Health and | ) | |
| Addiction Services, | ) | |
| Whiting Forensic Hospital, and | ) | |
| Psychiatric Security Review Board, | ) | |
| | ) | |
|          Defendants. | ) | March 3, 2023 |

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## I.   INTRODUCTION

1.    Unjustified isolation, segregation and institutionalization is discrimination based on disability and a violation of the Title II of the ADA and Section 504 of the Rehabilitation Act. Plaintiffs and the proposed Plaintiff Class are unnecessarily isolated, segregated and institutionalized at Whiting Forensic Hospital (WFH) by the Defendants.

2.    Plaintiffs and the proposed Plaintiff Class members are qualified individuals with a disability because they are all individuals with

1

disabilities who with or without reasonable modification to rules, policies, or practices meet the essential eligibility requirements for the receipt of services, or the participation in programs or activities, provided by the defendant Connecticut Department of Mental Health and Addiction Services (DMHAS) because they have received treatment at WFH, have recovered, stabilized, and progressed through treatment and assessments to the point that they no longer need hospital level of care, and can be reasonably accommodated and treated in a more integrated setting through DMHAS's community mental health services.

3.      There are approximately 150 total individuals who have been acquitted of criminal charges in Connecticut by reason of mental disease or defect ("acquittees") at WFH in Middletown, Connecticut at any one time. Approximately 100 acquittees have progressed from the WFH Maximum Security Service ("WFH Max") to the less restrictive Dutcher building at any one time. Currently, there are approximately 40 of these acquittees who are unnecessarily institutionalized and segregated at WFH because of the Defendants' failure to comply with the requirements of Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504" or "Rehab. Act"), and their respective implementing regulations. Each of these individuals is qualified for the

2

Defendants' system of community-based mental health services and supports. Each is able, and would prefer, to reside in a more integrated, community-based placement.

4.     This case is brought on behalf of a proposed Class under Fed. R. Civ. P. 23(a) and (b)(2), pursuant to the ADA and Section 504, to enforce the civil rights of institutionalized patients who are acquittees and are under the jurisdiction of Connecticut's Psychiatric Security Review Board ("PSRB") and in the custody of WFH to receive treatment, services and supports in the most integrated setting appropriate to meet their needs. Plaintiffs challenge neither their initial commitments nor request final discharge from the jurisdiction of the PSRB. Plaintiffs also do not seek any individualized relief from this Court. Rather, Plaintiffs seek only systemic declaratory and prospective injunctive relief for care, treatment and services in the most integrated setting during the term of their commitment.

5.     The Defendants, by their actions and inactions, and in violation of federal law, have caused the Named Plaintiffs and the Class they seek to represent, to live in WFH away from their family and friends as a result of unnecessary segregation. The Named Plaintiffs and the putative Class are not able to leave WFH to work or attend school, and are deprived of

3

the right to attend social, recreational or religious activities outside of WFH except for the occasional community outing. Instead, they have no option but to remain at WFH in order to receive mental health services.

6.    Despite their ability to handle and benefit from Connecticut's system of community-based mental health supports that are available to other individuals with disabilities, all of the Named Plaintiffs and the Class they seek to represent are experiencing or will experience unnecessary and prolonged institutionalization in violation of Title II of the ADA, 42 U.S.C. § 12132 *et seq*., and Section 504, 29 U.S.C. § 794 *et seq*.

7.    Named Plaintiffs and the members of the proposed Plaintiff Class have been legally acquitted of criminal charges in the Connecticut Superior Court, and therefore may not be punished and must be provided with treatment in the most integrated setting in accordance with the ADA and Section 504.

8.    Plaintiffs and the members of the proposed Plaintiff Class have all been committed to the jurisdiction of the PSRB and placed at WFH for treatment. The ADA requires Defendant PSRB to provide reasonable modifications in the administration of the PSRB's programs, services, and activities so that the Plaintiffs and members of the Plaintiff Class can receive mental health services in the most integrated setting in the

4

community to meet their needs. Likewise the ADA and Section 504 require that Defendant Connecticut Department of Mental Health and Addiction Services ("DMHAS") provide reasonable modifications in its policies, practices and/or procedures so that Plaintiffs and members of the Plaintiff Class can participate in Defendants' services, programs and activities, including receiving Defendants' mental health treatment in the most integrated setting appropriate to their needs.

9.    The PSRB, DMHAS, and WFH unnecessarily segregate Plaintiffs and the Plaintiff Class members long after they could be reasonably accommodated in a more integrated setting with reasonable modifications of the Defendants' community mental health programs, policies, and services.

10.    The PSRB has been required by state law since 1985 to make decisions regarding acquittees' treatment through community mental health services with a primary concern for the protection of society, resulting in a public safety mandate. Plaintiffs and the Plaintiff Class members seek enforcement of the integration mandate of Title II of the ADA and Section 504 and to enjoin contrary state law.

11.     The State of Connecticut's public safety mandate violates the integration mandate of Title II of the ADA and Section 504 and their respective implementing regulations.

12.     Defendants may not both excuse the Plaintiffs and the Plaintiff Class members of their criminal behavior because of their mental health conditions and at the same time punish them for invoking the mental health affirmative defense which resulted in that acquittal.

13.     Holding the Plaintiffs and the Plaintiff Class members longer than their present mental status requires a hospital level of care thereby unnecessarily segregating and isolating them, causes them to suffer irreparable harm and violates their rights under the ADA and Section 504 to receive reasonable modifications to Defendants' programs, policies and services so that they may live in the most integrated setting to meet their needs.

## II.     JURISDICTION & VENUE

14.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343.

15.     This action is brought pursuant to Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The Defendants are all public entities subject to Title II of the ADA

and receive federal financial assistance to operate mental health programs, services, and activities. This Court has jurisdiction over the claims under the ADA and § 504 pursuant to 42 U.S.C. § 12133 and 29 U.S.C. § 794a.

16.    Plaintiffs' request for declaratory relief is brought pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by 28 U.S.C. § 2202 and Rule 65 of the Federal Rules of Civil Procedure.

17.    Venue is proper under 28 U.S.C. § 1391 because all of the acts and omissions giving rise to the claims herein arose in the District of Connecticut.

## III.    THE PARTIES

### A. The Individual Named Plaintiffs

18.    Anthony Dyous is a 68-year-old man who is a Marine veteran honorably discharged after four years of service during the Vietnam War. He is an acquittee who was committed to the custody of the PSRB in 1985 and resides at the Dutcher building at WFH. Mr. Dyous is an individual with a mental impairment that substantially limits one or more of his major life activities, he has a record of such a disability, and he meets the

7

essential eligibility requirements to receive and to participate in Defendant DMHAS's community mental health services.

19. Vincenzo Lindia is a 56-year-old acquittee who has been institutionalized or incarcerated for much of his life. Mr. Lindia was committed to WFH under the jurisdiction of the PSRB in 1998 and currently resides at the Dutcher building at WFH. Mr. Lindia is an individual with a mental impairment that substantially limits one or more of his major life activities, he has a record of such a disability, and he meets the essential eligibility requirements to receive and to participate in Defendant DMHAS's community mental health services.

20. Taina Morales is a 34-year-old woman who is an acquittee and was committed to the jurisdiction of the PSRB on January 13, 2012 for ten years. Ms. Morales resides at the Dutcher building at WFH. Ms. Morales is an individual with a mental impairment that substantially limits one or more major life activities, she has a record of such a disability, and she meets the essential eligibility requirements to receive, and to participate in, Defendant DMHAS' community mental health services.

21. Carson Mueller is a 47-year-old man who is an acquittee and was committed to the jurisdiction of the PSRB on September 1, 2009 for sixty years.  Mr. Mueller resides at the Dutcher building at WFH.  Mr.

Mueller is an individual with a mental impairment that substantially limits one or more major life activities, he has a record of such a disability, and he meets the essential eligibility requirements to receive and to participate in Defendant DMHAS's community mental health services.

22.    Ling Xin Wu is a 33-year-old acquittee who was committed to the jurisdiction of the PSRB in 2014 for 35 years. He resides at the Dutcher building at WFH.  Mr. Wu is an individual with a mental impairment that substantially limits one or more major life activities, he has a record of such a disability, and he meets the essential eligibility requirements to receive and to participate in Defendant DMHAS's community mental health services.

## B. Defendants

### The Department of Mental Health and Addiction Services

23.    DMHAS is a public entity for purposes of Title II of the ADA, and it receives federal financial assistance for purposes of Section 504. DMHAS is a state agency that operates WFH and funds and operates a system of community-based residential services and supports.

**Psychiatric Security Review Board**

24.     The PSRB is a public entity as defined by Title II of the ADA.
The PSRB is an autonomous body within DMHAS for administrative
purposes.

25.     PSRB regulations define danger as "[d]anger to self or to
others," meaning the risk of imminent physical injury to others or self, and
also includes the risk of loss or destruction of the property of others.
Regs. Conn. Agencies-PSRB, Section 17a-582-2(a)(6).

26.     The State of Connecticut created the PSRB in 1985.  The
State maintains and operates DMHAS, the PSRB and WFH.   The
Governor appoints all the members of the PSRB who serve at his or her
pleasure.  The structure injects politics and disability discrimination into the
system, which delays the transition to the most integrated setting and
release of an acquittee for fear of some politically embarrassing or
wrongful act upon release.  Accurate prediction of future criminal conduct
of any Plaintiff or member of the Plaintiff Class is not possible and
therefore, out of an excess of caution premised upon no allowance for
uncertainty, the structure leads to over-institutionalization for political and
practical reasons.

**Whiting Forensic Hospital**

27.    WFH is a state-operated inpatient psychiatric facility of DMHAS, a public entity for purposes of Title II of the ADA, and it receives federal financial assistance for purposes of Section 504.

28.    WFH administers all the transition planning from the Whiting Maximum Security building to the Dutcher building, applies and administers WFH policies and practices regarding risk assessment and transition planning, and administers the privilege system regarding "Full Level 4" privileges and "Temporary Leaves."[1] WFH also files applications with the PSRB for temporary leave and conditional release.

29.    WFH is an accredited hospital within DMHAS.  WFH treats patients for health care needs.  WFH is not a prison and not part of the Department of Corrections.  WFH does not incarcerate inmates who have been convicted of crimes.

## IV.   CLASS ACTION ALLEGATIONS

30.    Pursuant to Rules 23(a)(1)-(4) and (b)(2) of the Federal Rules of Civil Procedure, the Named Plaintiffs bring this action as a class action on behalf of "all acquittees who (1) are, or will be in the future, committed

---

[1] The terms "Full Level 4" privileges and "Temporary Leave" are defined in detail below, at ¶¶ 63, 64 and 68.

to the jurisdiction of the PSRB, and (2) are assigned Full Level 4 privileges."[2] (also referred to herein as "a Full Level 4").

31.    This class is so numerous that joinder of all members is impractical.  There are approximately 150 acquittees under the jurisdiction of the PSRB, almost all of whom are slowly progressing towards receiving community mental health services from DMHAS or DMHAS-funded programs.  There are approximately 40 patients who meet the proposed Class definition.

32.    There are questions of law and fact common to all Class members, including, *inter alia*:

> a.  Whether Connecticut state law that requires the PSRB to consider the protection of society as a primary concern violates the ADA and Section 504's integration mandate.
>
> b.  Whether acquittees with "Full Level 4" privileges[3] are unnecessarily institutionalized at WFH and not provided treatment and services in the most integrated setting.

---

[2] The terms "Full Level 4" privileges" and "Temporary Leave" are defined in detail below, at ¶¶ 63, 64 and 68.

[3] The term "Full Level 4" privileges is defined in detail below, at ¶63.

c.  Whether DMHAS has a sufficient amount of community mental health services and supports so that all acquittees are timely served in the most integrated setting.

d.  Whether the Defendants discriminate against Class members based upon their disabilities by failing to reasonably modify their policies, practices, and procedures so that they can reside in the most integrated settings in the community to meet their needs.

33.    The Named Plaintiffs' claims are typical of the claims of the Class members.

34.    The Named Plaintiffs will fairly and adequately represent the interests of the class. The Named Plaintiffs will vigorously represent the interests of the unnamed Class members, and all members of the proposed Class will benefit from the efforts of the Named Plaintiffs. The Named Plaintiffs possess strong personal interest in the subject matter of the lawsuit.

35.    Plaintiffs are represented by counsel highly experienced in disability discrimination, mental health law, and representation of acquittees before the PSRB and in Superior Court. They also have extensive experience in class action litigation.  Counsel have the legal knowledge and resources to fairly and adequately represent the interests

of all class members in this action. Thus, Plaintiffs' counsel satisfy the requirements of Rule 23(g)(1).

36.     The proposed Class as defined is ascertainable as required by the United States Court of Appeals for the Second Circuit.

37.     Defendants have acted or refused to act on grounds generally applicable to the Plaintiff class, thereby making appropriate injunctive and declaratory relief with respect to the class as a whole under Rule 23(b)(2).

## V.     STATEMENT OF FACTS

### Structure and Numbers of Acquittees in the System

38.     WFH is Connecticut's only forensic psychiatric inpatient facility. WFH was separated from Connecticut Valley Hospital (CVH) on May 1, 2018 by Executive Order 63 signed on December 27, 2017.  WFH is comprised of two buildings, WFH Max and Dutcher.  WFH Max has five units of approximately 15 to 20 patients each.  Generally, Units 1, 2 and 3 are admissions units with patients ordered for competency restoration, but they also treat patients committed by order of the Probate Court pursuant to General Statutes § 17a-498 ("civil patients"), acquittees and transfers from the Connecticut Department of Corrections ("DOC").  Unit 1 is the only co-ed unit in WFH Max and therefore has women with a legal status of civil patients, competency restoration, acquittees and DOC transfers.

14

Units 4 and 6 are long-term male units of mostly acquittees.  Unit 5 has

one patient who is served by Unit 4 staff.  The total maximum census of

WFH Max is 91.

39.    DMHAS Agency Police provide police and security services at

both WFH Max and Dutcher.

40.    None of the Named Plaintiffs or the Plaintiff Class members

have been convicted of a crime leading to their commitment. One hundred

and fifty years of common law and state law have held that a civilized

society, operating under the rule of law, may not convict or punish a

person for an act for which they were unable, due to a mental health

condition, to form criminal intent, know the wrongfulness of their conduct

or control their conduct. To do so would be to criminalize the disability of

the person.

41.    Connecticut law provides for a plea of not guilty by reason of a

mental health condition, which state law labels as "because of mental

disease or defect."  Conn. Gen. Stat. § 53a-13.  It has provided for that

plea for over one hundred and fifty years by either common law or state

statute.

42.    The PSRB came into operation on July 1, 1985 in the wake of

the John Hinckley trial and the nationwide wave of state laws restricting

the mental health condition plea, more commonly known as not guilty by reason of insanity.  The PSRB was intended to provide regular, centralized and unitary review and supervision of acquittees as they progress through hospital treatment, recovery and community mental health treatment and discharge.  Conn. Gen. Stat. §§ 17a-580 through 17a-603.

43.    There are usually about three to thirteen new acquittees committed to the jurisdiction of the PSRB each year.  Prior to the establishment of the PSRB, all decisions regarding acquittees, including decisions regarding discharging an acquittee to reside in a more integrated setting, were made by the Superior Court with jurisdiction of the matter.

44.    There are generally approximately 150 acquittees under the jurisdiction of the PSRB at any one time.  The highest number of acquittees under the Board was 192 in 1993-1994.  The lowest number, other than the first year, was 143 in 2010-2011.

45.    The PSRB consists of an executive director, staff and a board of persons appointed by the governor who serve at the pleasure of the governor.  The board includes a psychiatrist, a psychologist, a person with experience in probation, a member of the public, a victim's advocate and an attorney.

46.     The PSRB is an autonomous body within the Department of Mental Health and Addiction Services for administrative purposes only. The PSRB is funded by the State of Connecticut from the State General Fund.

47.     In Fiscal Year ("FY") 2021/2022, there were 146 acquittees under PSRB jurisdiction: 19 were in WFH Max; 86 were in a non-maximum setting in Dutcher; 38 were on conditional release; and three had other statuses.

48.     The PSRB annual report states that that for FY 2021/2022 there were no arrests of any acquittee out on conditional release, characterized as "zero per cent criminal recidivism."

**Acquittee Progress through the PSRB and Superior Court**

49.     Once the Superior Court acquits a person of criminal charges by reason of a mental disease or defect, the Court orders the person committed to WFH for sixty days for an evaluation of their present mental health condition. The Court then holds a hearing and either commits and places the person or orders conditional discharge or discharge.  State law has for years required the Court to consider, as its primary concern, the protection of society.  Conn. Gen. Stat. § 17a-582.  State law covering acquittees has never required treatment of acquittees in the most

integrated setting.  In Public Act 22-45, Section 3, effective October 1, 2022, the law was amended slightly by providing that, in making the initial commitment decision, the "primary *concerns are* the protection of society *and the safety and well-being of the acquittee*, . . ." (new language in italics).

50.    No Named Plaintiff or member of the Plaintiff Class has been convicted of the acts for which they were committed, and therefore none may be punished.  The purpose of commitment following an insanity acquittal, like that of civil commitment, is to *treat* the individual's mental illness and protect him or her and society from imminent dangerousness. The committed acquittee is entitled to release as soon as his or her mental health condition has improved, <u>or</u> he or she is no longer imminently dangerous. The fact of the presence of a mental health condition and danger are both legal issues determined by a court.  A patient's confinement rests on the continuing mental health condition and a judicial determination of dangerousness. *Payne v. Fairfield Hills Hospital*, 215 Conn. at 683-84, 578 A.2d 1025.  *State v. Damone*, 148 Conn. App. 137, 170 (2014).

51.    Once an acquittee is committed and placed by the Superior Court, the PSRB holds an initial hearing pursuant to Conn. Gen. Stat. §§

17a-583 and 17a-584.  Since 1985, state law has required the PSRB to consider the protection of society as the primary concern in ordering the acquittee confined, conditionally released or discharged.  In Public Act 22-45, Section 4, effective October 1, 2022, this was amended slightly to, ". . .considering that its primary *concerns are* the protection of society *and the safety and well-being of the acquittee* . . ." (new language in italics), with the new consideration undefined.

52.    Upon information and belief, the Superior Court has only once in thirty-seven years conditionally released or recommended discharge of an acquittee at an initial hearing.  Acquittees are routinely committed and sent to WFH Max at their initial commitment hearing.

53.    Once an acquittee is committed to the jurisdiction of the PSRB and placed at WFH Max, the process generally follows a step-by-step, highly-structured process of progression through the system, regardless of whether a person may be treated in the most integrated setting or poses a direct threat.  The primary considerations of Defendants are correctional and public safety with no consideration of the patient's right to receive reasonable modifications of Defendants' policies, practices and/or procedures so that Plaintiffs and members of the proposed Plaintiff Class can participate in Defendants' programs, activities, and services, including

19

Defendants' community mental health services so that they can reside in the most integrated setting in the community.

54.    WFH has a PSRB liaison who is in regular contact with the executive director of the PSRB.  Conn. Gen. Stat. § 17a-596 requires that the PSRB operate and hold hearings in accordance with the Connecticut Administrative Procedures Act, including complying with the rules of evidence and rules of privileges as required by Conn. Gen. Stat. § 4-178.

55.    Most acquittees spend many years in WFH Max in the Whiting building.  After stabilization, cooperation with treatment, and mitigation and management of any substantial risk, the patient may request that WFH petition for transfer to Dutcher.

56.    While at Dutcher, patients, including Plaintiffs and members of the Plaintiff Class, receive services such as individual and group mental health therapy, and limited vocational services, among other activities and services.

57.    The patient cannot himself or herself petition the PSRB for a transfer to Dutcher.  Only WFH is authorized to petition the PSRB for a transfer to Dutcher.  Conn. Gen. Stat. § 17a-599(a).  Public Act 22-45, Section 8(c), effective October 1, 2022, provides an option for a superintendent's transfer from WFH Max to Dutcher after review by a

hospital risk management review committee and 48-hours advance notice to the PSRB.

**The Privilege System, Temporary Leaves and Conditional Release**

58.    Dutcher serves as a step-down inpatient psychiatric hospital level of care for acquittees transferring from WFH Max.  Dutcher has six units of approximately 20 to 24 patients each, with a maximum capacity of 138.  Patients in Dutcher work to consolidate treatment benefit and recovery, earn privilege level increases over time up to the highest level, Full Level 4 with five to six hours of on-grounds passes.  Only when an acquittee obtains a Full Level 4 will WFH consider an application to the PSRB for Phase 1 Temporary Leaves (day trips as provided for in Conn. Gen. Stat. § 17a-587).  If the patient strictly complies with all conditions of the Phase 1 Temporary Leave, WFH, after a period of months or years, applies to the PSRB for Phase 2 Temporary Leaves (several overnights in the community residential program and return to Dutcher part of the week; Temporary Leaves generally authorized by Conn. Gen. Stat. § 17a-587).[4] After many months or years on Phase 2 Temporary Leave, the PSRB or the acquittee may apply to the PSRB for conditional release (authorized by

---

[4] The terms "Full Level 4" and "temporary leave" are defined in detail below, at ¶¶ 63, 64 and 68.

§ 17a-588).   After many months or years on Phase 2 Temporary Leave,

WFH or the acquittee may apply to the Superior Court for full discharge

from the jurisdiction of the PSRB as authorized by Conn. Gen. Stat. § 17a-

593.

59.     The privilege level system applies to acquittees who have

transferred from WFH Max to the Dutcher building, a separate building on

the Connecticut Valley Hospital (CVH) campus known as the "Dutcher

Enhanced Security Service."  Notwithstanding the politics of the movement

of acquittees, "enhanced security service" actually means a lower level of

service where patients are eventually allowed on CVH campus without

direct staff supervision for fifty minutes at a time.

60.     WFH's Operational Policy and Procedure ("OPP") 5.6, Risk

Management, governs the procedure and method of review of privileges

for Dutcher patients. In order for a patient to gain more privileges, the

patient is required to submit a written request to the treatment team for an

increase in their privilege level.  Each treatment team has a weekly Levels

Meeting with the Consulting Forensic Psychiatrist (CFP).

61.     The determination of the Levels Meeting then goes to the

Hospital Review Committee and the Forensic Review Committee, both of which are comprised of WFH administrators and clinical leadership. (WFH OPP 5.6, IV.).

62.    The ever-present historical context of all privilege level decisions is the stabbing death of a nine-year-old girl, on the sidewalk in downtown Middletown in July 1989, after a patient walked off the CVH grounds and bought a knife after his psychiatrist refused to talk to him about adjusting his psychiatric medication.  DMHAS pulled all acquittees back from the community, regardless of each patient's individualized assessment of risk, direct threat and the most integrated setting appropriate to meet the needs of the individual.

63.    Privilege Levels of acquittees are governed by WFH OPP 2.17 once they transfer from WFH Max to Dutcher.  Under procedure 2.17, Privilege Levels range from "Level 1A" to "Full Level 4 with all pass times" ("Full Level 4").  Once a patient transfers to Dutcher they are usually given a Level 1A which means they are confined to the unit only, except for fresh air.  Once a patient orients to the new Dutcher unit and has no problems, the next level is Level 1B which means the patient is confined to the treatment unit, Dutcher courtyard and Dutcher dining hall. The next level is "Level 2" which grants the patient access to the entire inside of the

23

Dutcher building and the courtyard.  Level 3A provides for patient access

to the Dutcher building with a 1:6 staffing ratio and on CVH/WFH grounds

with a 1:3 staffing ratio.  Level 3B allows patients to go off CVH/WFH

grounds with 1:2 staffing and out on community trips with staff.  Level 4

allows patients to be in the building and on-grounds in their own custody

without staff.  Level 4 starts with one hour of on grounds pass for fifty

minutes.  The patient must sign out and come back to the unit and sign

back in every hour.  Full Level 4 includes various hour-long passes from 9

a.m. to 7 p.m.  Each of these levels must be reviewed and approved by

the treatment team, CFP and the FRC.  The FRC includes WFH

administrative and clinical leadership.  Any failure to comply with the rules

frequently results in a decrease in privilege level and the need to start

over.

64.     Once a patient successfully maintains a Full Level 4 for a

significant period of time, from months to over a year, the treatment team

starts the slow process of transition planning for temporary leaves (TL).

TL is the process provided for in Conn. Gen. Stat. § 17a-587.  For the last

37 years, patients have not been allowed by statute to request TL.  Only

WFH was authorized to petition for a TL to the PSRB.  As of October 1,

2022, however, patients now have authority to apply for their own TL pursuant to Public Act 22-45, Section 7.

65.     Every single step after privilege level 3: 3B, 4L, 4 with pass times, temporary leave and conditional discharge, must go through the detailed risk management steps in WFH OPP 2.17 and 5.6.  Those steps are: 1) WFH Daily Morning Report; 2) Treatment Team review and recommendation; 3) CFP review; 4) Hospital Review Committee; 5) FRC; 6) PSRB hearings for transfers to Dutcher, temporary leave or conditional release; and, finally, (7) the Superior Court for petitions for discharge from the jurisdiction of the PSRB.

66.     The privilege level system is profoundly dehumanizing and robs each patient of their dignity and respect.  More importantly, it deprives patients of their right to liberty, freedom of movement and freedom of association and, in doing so, for purposes of Plaintiffs' claims in this lawsuit, violates the ADA and Section 504.  The privilege level system is subject to abuse by staff who get into a personality conflict or power play with some patients. Staff assert the privilege system as a clinical tool, but it is often a tool of oppression and violates each patient's civil rights.

**WFH Initiation and PSRB Supervision of Transition and Temporary Leaves**

67.    WFH rarely starts transition planning until the patient attains a Full Level 4 privilege level. The transition planning entails choosing a catchment area, a geographic area of the state with mental health community services, preparing and sending a clinical packet to the local mental health authority (LMHA) and community services provider, and obtaining the agreement of the provider to accept the patient.  DMHAS contracts do not obligate providers to accept patients; therefore, this process can take months to over a year to accomplish. Once accepted by the LMHA and the community provider, WFH sets up one or more visits to the LMHA and the community service provider, which can take several months.  Finally, WFH must draft a TL plan, which routinely takes months to draft, review, and approve. Only when the months to years-long process is completed does WFH apply for approval from the PSRB, which then sets a hearing and may or may not approve the TL plan as proposed.

68.    Currently, WFH treatment teams, at the insistence of and in collaboration with the PSRB, regularly break temporary leaves into Phase 1 and Phase 2 TLs.  Phase 1 and Phase 2 TLs are a creature of the PSRB, not the TL statute, § 17a-587.  Phase 1 TL is day trip temporary leave to a community provider for groups and social club activities from

26

one to five days a week.  Phase 2 TL is overnight temporary leave into residential services of a community services provider.  Phase 2 TL usually starts with one overnight and progresses to up to seven days over night.

69.   At each step, the patient must get the approval of the treatment team, the CFP, the FRC and finally an order from the PSRB after a hearing attended by a state's attorney and a victim statement.

70.   Unnecessary delays in starting transition planning, the TL planning process and implementation of TL, and the overall failure of Defendants to provide reasonable modifications to their policies, practices and/or procedures so that Plaintiffs and members of the Plaintiff Class can participate in Defendants' community mental health programs, services and activities result in Plaintiffs' unnecessary institutionalization, segregation, and denial of treatment in the most integrated setting.

**Conditional Release**

71.   After a sustained period of successful Phase 1 Day TL and Phase 2 Residential Overnight TL, an acquittee can apply for conditional release (CR) pursuant to Conn. Gen. Stat. § 17a-588.  If a conditional release is recommended by the treatment team, CFP and the FRC, the PSRB will hold a hearing and determine whether to order a conditional release into what is usually very restrictive and highly supervised

community residential services.  In making this determination, the PSRB does not consider whether the acquittee can be served in a more integrated community setting with a reasonable modification of laws, regulations, policies and procedures. The PSRB also makes this determination without considering whether the acquittee can handle and benefit from placement in a more integrated setting in the community or whether the acquittee does not oppose such a placement.

72.    In instances where the PSRB does order the conditional release, it places numerous detailed restrictions and conditions on the acquittee, any violation of which will often result in revocation of the CR. Unnecessary delays in starting transition to conditional release, the CR planning process and implementation of CR result in the Plaintiffs' unnecessary institutionalization, unnecessary segregation, and denial of treatment in the most integrated setting.

**DMHAS-Administered Community Services**

73.    DMHAS has created and operates a community mental health system that provides a wide array of community-based mental health services including, for example, medication management, residential services and supports, case management, individual and group therapy, vocational services, and peer supports.  Although there is a broad range of

community mental health services, they are in short supply which in turn, results in delays in transitioning Plaintiffs and members of the Plaintiff Class from WFH to a more integrated setting in the community to meet their needs. Consequently, Class Members do not transition to the community at a reasonable pace.

74.     DMHAS's community mental health service system is essentially a privatized system of non-profit community providers which contract with DMHAS for the provision of community mental health services and supports. No private non-profit provider is contractually required by to accept any individual WFH acquittee patient for TL or CR. The community mental health system also includes DMHAS-operated LMHAs.

75.     Many of the private non-profit community service provider contracts are for millions of dollars, but none of the providers are *required* by contract to accept any individual acquittee from WFH.

76.     The DMHAS contract system which allows for a right of refusal is exacerbated by inadequate funding and thus inadequate capacity for community residential service providers which in turn results in unnecessary institutionalization and segregation of the Plaintiffs and members of the Plaintiff Class.

77.     The DMHAS community services system's lack of capacity and privatized right of refusal results in unnecessary institutionalization of acquittees in state-operated inpatient psychiatric hospitals.

78.     State law does not allow, let alone require, WFH, PSRB or the Superior Court to ensure that each Plaintiff and member of the Plaintiff Class is receiving treatment in the most integrated setting.

**Plaintiffs' Attempt to Resolve the Plaintiffs' Claims with Defendants Prior to Filing**

79.     On March 23, 2022, Plaintiffs, through their counsel, made a written request to Defendants in a twelve-page letter that they reasonably accommodate all acquittees; increase capacity in DMHAS mental health community services and supports; provide acquittees timely movement through the PSRB system in the most integrated setting; and provide for reasonable modifications to the PSRB's policies, procedures, and practices so that qualified individuals with disabilities can participate in the State's community-based mental health services.

80.     Defendants did not address Plaintiffs' demands.  They failed, and continue to fail, to bring their practices, polices and system into compliance with Plaintiffs' and the Plaintiff Class members' rights under the ADA and the Rehabilitation Act.

## VI.   THE NAMED PLAINTIFFS

### Plaintiff Anthony Dyous

81.    Plaintiff Anthony Dyous has been recommitted four times by the Superior Court upon petition of the State's Attorney and recommendation of the PSRB pursuant to General Statutes § 17a-593(c).

82.    Mr. Dyous resides on Dutcher North 2, has been a Full Level 4 with all pass times for over two years, has had no instances of seclusion and restraint for years, no assaults on staff or peers for many years, is clinically stable off psychiatric medication and consistently and successfully works a job at the hospital.

83.    Because Mr. Dyous resides at WFH, he has very few, if any, meaningful opportunities to go anywhere, to participate in community religious, leisure, and recreational activities, or to interact with individuals without disabilities (except for hospital staff).

84.    The most integrated setting for Mr. Dyous would be his own apartment in the community with services and community supports from the Department of Veterans Affairs.  Mr. Dyous has been recently diagnosed with Stage IV cancer.  WFH initially denied his request for temporary medical leave while he engages in daily chemotherapy and radiation therapy, which he sought especially because he will be immuno-

31

suppressed from the treatments and COVID continues to cause multiple quarantines of his unit, DN2.

85.    On August 1, 2022, WFH reversed its position and agreed to notify the PSRB of its intent to transfer Mr. Dyous to the Cottage on CVH grounds during his cancer treatment.  Mr. Dyous was at the Cottage for approximately two weeks but then returned to Dutcher where he currently resides.

86.    Mr. Dyous does not need a psychiatric inpatient hospital level of care and has not for years, if not decades.

87.    Mr. Dyous can handle and benefit from a community placement.  Community placement is appropriate for Mr. Dyous because he is behaviorally and psychiatrically stable, has not taken any psychiatric drugs for more than five (5) years, and his treatment team at WFH has determined that he has satisfied the criteria to be assigned a full level four privilege level and, with reasonable modifications of Defendants' policies, programs, and services, Mr. Dyous can be served in an integrated setting in the community.

88.    Mr. Dyous does not oppose community-based treatment. He wants to live in the community. He very much wants the opportunity to

receive treatments in the community, and once again have the opportunity to engage in an array of community-based living activities.

89.    Mr. Dyous is a qualified individual with a disability. Mr. Dyous has a mental impairment that substantially limits one or more of his major life activities including his ability to think and communicate, he has a record of such a disability, and he meets the essential eligibility requirements to receive and participate in Defendant DMHAS' community mental health services.  Mr. Dyous is entitled to reasonable modifications to receive community mental health services in the most integrated setting necessary to meet his needs.

90.    Mr. Dyous could successfully reside in community residential services with reasonable modifications of the Defendants' programs, policies, and practices.

91.    Mr. Dyous does not have any pending state court actions regarding his commitment to the jurisdiction of the PSRB.

**Plaintiff Vincenzo Lindia**

92.    The PSRB confined Mr. Lindia in WFH Max for almost 20 years, with several unsuccessful transitions up to Dutcher. The PSRB authorized his transfer to Dutcher in 2018.  Since 2018, he has done well in

Dutcher, working his way to Full Level 4 privilege status that authorizes unescorted grounds passes throughout the day for fifty minutes at a time.

93.    Mr. Lindia has consistently engaged in treatment, and he now has a job on campus as part of the vocational program.

94.    Mr. Lindia has been in transitional temporary leave planning for over a year.  His TL planning has been delayed because River Valley Services, the state-operated local mental health authority for the Middletown catchment area, stated that they do not have any openings for services for him.  The DN2 social worker, who recently retired, has applied to several other catchment areas to find community services for Mr. Lindia. Mr. Lindia is currently on a waiting list for community residential services at Adla House and for community mental health services at Connecticut Mental Health Center in New Haven.

95.    Mr. Lindia does not need a psychiatric hospital inpatient level of care.

96.    Because Mr. Lindia resides at WFH, he has very few, if any, meaningful opportunities to go anywhere, to participate in community religious, leisure, and recreational activities, or to interact with individuals without disabilities, except for hospital staff.

97.    Mr. Lindia could successfully reside in community residential services with reasonable modifications of the Defendants' programs, policies and practices.

98.    The most integrated setting for Mr. Lindia is a group home level of care.

99.    Mr. Lindia can handle and benefit from a community placement.  Community placement is appropriate for Mr. Lindia because he has consistently engaged in treatment, including taking his medication and working at his job on the hospital campus as part of the hospital's vocational program.  Mr. Lindia's WFH treatment team also assigned him a full Level 4 privilege level on November 26, 2019 and he has maintained those privileges ever since that time, which means that he can have unescorted grounds passes on the hospital campus throughout the day for fifty minutes at a time.  With reasonable modifications of Defendants' policies, programs, and services, Mr. Lindia can be served in an integrated setting in the community.

100.  Mr. Lindia does not oppose community-based treatment. He wants to live in the community. He very much wants the opportunity to work in the community and have the opportunity to engage in an array of community-based living activities.

101.   Mr. Lindia is a qualified individual with a disability. Mr. Lindia has a mental impairment that substantially limits one or more of his major life activities such as his ability to talk and think, he has a record of such a disability, and he meets the essential eligibility requirements to receive and participate in Defendant DMHAS' community mental health services. Mr. Lindia is entitled to reasonable modifications to receive community mental health services in the most integrated setting necessary to meet his needs.

102.   Mr. Lindia does not have any pending state court actions regarding his commitment to the jurisdiction of the PSRB.

**Plaintiff Taina Morales**

103.   Taina Morales is a 34-year-old woman committed to the jurisdiction of the PSRB on January 13, 2012 for ten years.  Ms. Morales was recommitted by the Superior Court upon motion of the State's Attorney and recommendation of the PSRB for an additional two years in May 2022. Ms. Morales was in WFH Max from 2012 to 2016.  Female acquittees are confined on WFH Unit 1, the only unit in Max with both male and female patients, the majority of whose patients are committed for competency restoration, not acquittees.  Ms. Morales was transferred from WFH Unit 1 to Dutcher on May 10, 2016.  Ms. Morales obtained a Full Level 4 privilege level in April 2021.  WFH started TL planning in February 2022.  On

December 2, 2022, the PSRB granted WFH's application for Phase 1 TL for

Ms. Morales consisting of one day a week of community mental health

services at River Valley Services, about 100 yards to the north of the

Dutcher building on the grounds of CVH.  She is to be in the custody of WFH

staff at all times.

104.  Because Ms. Morales resides at WFH, she has very few, if

any, meaningful opportunities to go anywhere, to participate in community

religious, leisure, and recreational activities, or to interact with individuals

without disabilities, except for hospital staff.

105.  Ms. Morales does not need a hospital level of care.

106.  The most integrated setting for Ms. Morales is supportive

housing or a group home level of care.

107.  Ms. Morales can handle and benefit from a community

placement. Community placement is appropriate for Ms. Morales because

she actively participates in her treatment, including taking the medications

that her doctor has prescribed and participating in therapy at the hospital.

Ms. Morales' WFH treatment team also assigned her a full Level 4 privilege

level in April of 2021, which means that she can have unescorted grounds

passes on the hospital campus throughout the day for fifty minutes at a time.

With reasonable modifications of Defendants' policies, programs, and

37

services, Ms. Morales can be served in an integrated setting in the community.

108.   Ms. Morales does not oppose community-based treatment. She wants to live in the community. She very much wants the opportunity to work in the community and have the opportunity to engage in an array of community-based living activities.

109.   Ms. Morales is a qualified individual with a disability Ms. Morales has a mental impairment that substantially limits one or more of her major life activities such as her ability to think and to communicate, has a record of such a disability, and she meets the essential eligibility requirements to receive and participate in Defendant DMHAS' community mental health services.  Ms. Morales is entitled to reasonable modifications to receive community mental health services necessary to meet her needs.

110.   Ms. Morales does not have any pending state actions challenging her commitment to the PSRB.

**Plaintiff Carson Mueller**

111.   Mr. Mueller was committed to the jurisdiction of the PSRB on September 1, 2009, over thirteen years ago.

112.   Mr. Mueller has been in psychiatric remission for many years, has a Full Level 4 with all pass times and was granted temporary leave by the PSRB in 2019.

113.   Mr. Mueller currently resides on Dutcher South 3. Mr. Mueller was granted Phase 1 day TL to Torrington, Connecticut in April of 2019.

114.   Mr. Mueller temporarily paused his TL due to problems with transportation, the addition of another patient requiring a stop in Waterbury and behavioral problems of the other patient during the trip.

115.   The PSRB, without a motion, without a request fro WFH or the state's attorney, contrary to the professional clinical judgment of the DS3 treatment team and the CFP, and without notice or hearing, terminated his Phase 1 TL by Memorandum of Decision (MOD) after its October 9, 2020 hearing.  Mr. Mueller has been forced to start over with his TL planning.

116.   Because Mr. Mueller resides at WFH, he has very few, if any, meaningful opportunities to go anywhere, to participate in community religious, leisure, and recreational activities, or to interact with individuals without disabilities, except for hospital staff.

117.   Mr. Mueller does not need a psychiatric inpatient hospital level of care.

118.   Mr. Mueller can handle and benefit from a community placement.  Community placement is appropriate for Mr. Mueller because he has been clinically stable since 2019.  Mr. Mueller's WFH treatment team also assigned him a full Level 4 privilege level in April of 2019 and he has maintained those privileges ever since that time, which means that he can have unescorted grounds passes on the hospital campus throughout the day for fifty minutes at a time.  With reasonable modifications of Defendants' policies, programs, and services, Mr. Mueller can be served in an integrated setting in the community.

119.   Mr. Mueller does not oppose community-based treatment. He wants to live in the community. He very much wants the opportunity to work in the community and have the opportunity to engage in an array of community-based living activities.

120.   Mr. Mueller is a qualified individual with a disability. Mr. Mueller has a mental impairment that substantially limits one or more of his major life activities such as his ability to think and to communicate, he has a record of such a disability, and he meets the essential eligibility requirements to receive and participate in Defendant DMHAS' community mental health services. Mr. Mueller is entitled to reasonable modifications to receive community mental health services necessary to meet his needs.

40

121.   Mr. Mueller does not have any pending state court actions regarding his commitment to the jurisdiction of the PSRB.

**Plaintiff Ling Xin Wu**

122.   Mr. Wu was committed to the jurisdiction of the PSRB on September 25, 2014, over eight years ago.

123.   Mr. Wu was in WFH Max for two years and transferred to Dutcher in May 2016.  He quickly made his way to a Full Level 4.  He was a Full Level 4 for almost two years before the PSRB finally granted his Phase 1 TL in January 2019, after a long wait for community services from Capitol Region Mental Health Center.

124.   Mr. Wu was successfully and safely participating in his Phase 1 day TL when it was discovered that a WFH staff person had borrowed $200 from him. The WFH staff-person then borrowed $300 more from Mr. Wu.  The WFH staff person sent Mr. Wu a gift card in an attempt to pay the loans back. Other staff intercepted his mail, opened it, and confiscated the gift card. WFH staff reported the incident to the PSRB and his Phase 1 TL was put on hold.

125.   The PSRB recommended that Mr. Wu get a conservator of the estate.  Mr. Wu now has a voluntary conservator of the estate.

126.   The PSRB's withdrawal of his TL status was unjustified and entirely out of proportion to his role as a <u>victim</u> of illegal and unethical actions by WFH's staff.  Since March 2020, due to the pandemic, state retirements, and staffing shortages, Capitol Region Mental Health Center does not have the staff to provide Phase 1 day TL's for Mr. Wu.

127.   Mr. Wu now has to start over with a new catchment area and the process will take at least another year to start over on a new TL plan.

128.   Because Mr. Wu resides at WFH, he has very few, if any, meaningful opportunities to go anywhere, to participate in community religious, leisure, and recreational activities, or to interact with individuals without disabilities, except for hospital staff.

129.   Mr. Wu does not need an inpatient psychiatric hospital level of care.

130.   The most integrated setting for Mr. Wu is supportive housing in the community.

131.   Mr. Wu can handle and benefit from a community placement. Community placement is appropriate for Mr. Wu because he actively participates in his treatment and is clinically stable.  Mr. Wu's WFH treatment team also assigned him a full Level 4 privilege level, which means that he can have unescorted grounds passes on the hospital

campus throughout the day for fifty minutes at a time.  Additionally, Mr. Wu's WFH treatment team recommended to the PSRB that he be permitted to leave the hospital to go out on temporary leaves overnight in the community, but the PSRB rejected this recommendation. With reasonable modifications of Defendants' policies, programs, and services, Mr. Wu can be served in an integrated setting in the community.

132.  Mr. Wu does not oppose community-based treatment.  He wants to live in the community. He very much wants the opportunity to work in the community and have the opportunity to engage in an array of community-based living activities.

133.  Mr. Wu is a qualified individual with a disability. Mr. Wu has a mental impairment that substantially limits one or more of his major life activities such as his ability to think and to communicate, he has a record of such a disability, and he meets the essential eligibility requirements to receive and participate in Defendant DMHAS' community mental health services. Mr. Wu is entitled to reasonable modifications to receive community mental health services necessary to meet his needs.

134.  Mr. Wu does not have any pending state court actions regarding his commitment to the jurisdiction of the PSRB. Mr. Wu filed a pro se *habeas corpus* petition in the Superior Court of Connecticut Judicial

District of Middlesex on February 17, 2021.  Mr. Wu was unable to successfully prosecute the case *pro se* and was unable to obtain counsel and assumed the case was dismissed after not hearing anything for twenty-two months.  On or about December 23, 2022, Mr. Wu received a notice from the Court for a hearing regarding his failure to obtain counsel or fill out paperwork with the Office of the Public Defender.  On January 10, 2023, Mr. Wu filed a withdrawal of the action, which was accepted by the Court.

### Plaintiffs Have Suffered, and are Continuing to Suffer, Irreparable Harm

135.   Absent injunctive relief from the Court enjoining Defendants from applying state law rather than federal anti-discrimination law, the named Plaintiffs and members of the Plaintiff Class will continue to suffer irreparable harm as a result of being unnecessarily institutionalized and segregated and other disability discrimination.

136.   Plaintiffs have no adequate remedy at law.

### VII.     LEGAL CLAIMS

### Count 1:  The Americans with Disabilities Act - Violations of the ADA's Integration Mandate

137.   Plaintiffs incorporate by reference all previous paragraphs into this Count.

44

138.   Plaintiffs are members of the Class and are all qualified individuals with disabilities under Title II of the ADA, 42 U.S.C. § 12131 *et seq*. and all meet the essential eligibility requirements to receive and participate in Defendant DMHAS' community mental health services.

139.   Under federal regulations promulgated by the United States Department of Justice implementing Title II of the ADA, "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

140.   Defendants are public entities within the meaning of the ADA. The Named Plaintiffs and the Plaintiff Class members qualify for and would benefit from community support services available from Connecticut's community-based mental health service system.

141.   The Named Plaintiffs and members of the putative Plaintiff Class do not oppose community placement.

142.   Although community programs are the most integrated settings appropriate to meet their needs, the Plaintiffs remain unnecessarily institutionalized at WFH.  By denying Plaintiffs and the Plaintiff Class with access to existing community programs, by failing to provide them with reasonable modifications to their policies, practices, and/or procedures,

and by requiring them to be unnecessarily confined in a segregated institutional setting in order to receive the care that they require, Defendants discriminate against Plaintiffs and the Plaintiff Class on the basis of their disabilities in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d).

143.  These failures violate 42 U.S.C. §§ 12132 and 12201(d), 28 C.F.R. §§ 35.130(b)(3), (d), and (e)(1), *Olmstead v. L.C. by Zimring*, 527 U.S. 581, 607 (1999).

144.  It would not fundamentally alter Defendants' programs, services, or activities to provide the Plaintiffs and the Plaintiff Class with the services necessary to allow them to live in the community.

### Count 2: Section 504 of the Rehabilitation Act - Violations of the Rehabilitation Act's Integration Mandate

145.  Plaintiffs incorporate by reference all previous paragraphs into this Count.

146.  Plaintiffs are members of the class and are all qualified individuals with disabilities under Section 504, 29 U.S.C. § 794.

147.  Federal regulations under Section 504 require that any federally funded program or activity "shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 41.51(d).

46

148.   Defendants DMHAS and WFH are federally-funded programs and activities within the meaning of the Rehabilitation Act.

149.   The Named Plaintiffs and the Plaintiff Class members qualify for, and would benefit from, community support services available from Connecticut's community-based mental health service system.  Although community programs are the most integrated settings appropriate to meet their needs, the Plaintiffs and members of the Plaintiff Class remain institutionalized at WFH. By denying Plaintiffs and the Plaintiff Class with timely access to existing community programs, by failing to reasonably modify their policies, practices and/or procedures, and by requiring them to be unnecessarily confined in segregated institutional settings in order to receive the care that they require, Defendants DMHAS and WFH discriminate against Plaintiffs and the Plaintiff Class on the basis of their disabilities in violation of 29 U.S.C. § 794 and 28 C.F.R. § 41.51(d).

150.   These failures violate 29 U.S.C. § 794(a), 28 C.F.R. § § 41.51(d), *Olmstead v. L.C. by Zimring*, 527 U.S. 581, 607 (1999).

151.   It would not fundamentally alter Defendants' programs, services, or activities to provide the Plaintiffs and the Plaintiff Class with the services necessary to allow them to live in the community.

**Count 3: Integration Mandate under Title II of the ADA - The public safety mandate in state law that requires the PSRB to consider the safety of society as a primary concern violates Title II of the ADA.**

152.   Plaintiffs incorporate by reference all previous paragraphs into this Count.

153.   Prior to determining whether a person constitutes a "direct threat" to the health and safety of others and thereby can be excluded from participation in, and access to, a public entity's programs, services and activities, a public entity is required, to "make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk," as required by Title II of the ADA's "direct threat" regulation, 28 C.F.R. § 35.139(b).

154.   In violation of the Title II of the ADA and its implementing regulations, Defendant PSRB makes its decisions whether the Plaintiffs and Plaintiff Class Members will be permitted transition to the community by considering the State law public safety mandate but without making an individualized assessment, based on reasonable judgment that relies on

48

current medical knowledge or on the best available objective evidence, to

ascertain: the nature, duration, and severity of the risk; the probability that

the potential injury will actually occur; and whether reasonable

modifications of policies, practices, or procedures or the provision of

auxiliary aids or services will mitigate the risk as required by Title II of the

ADA and its implementing regulations.

155.  By failing to implement the requirements of the integration

mandate of Title II of the ADA and failing to make an individualized

assessment, based on reasonable judgment that relies on current medical

knowledge or on the best available objective evidence, to ascertain: the

nature, duration, and severity of the risk; the probability that the potential

injury will actually occur; and whether reasonable modifications of policies,

practices, or procedures or the provision of auxiliary aids or services will

mitigate the risk, Defendants unnecessarily segregate the Plaintiffs and

the members of the Plaintiff Class by reason of their disabilities.

156.  These failures violate 42 U.S.C. §§ 12132 and 12201(d), 28

C.F.R. §§ 35.130(b)(3), (d), and (e)(1), *Olmstead v. L.C. by Zimring*, 527

U.S. 581, 607 (1999).

157.  It would not fundamentally alter Defendants' programs,

services, or activities to provide the Plaintiffs and the Plaintiff Class with

the services necessary to allow them to live in the community.

**Count 4: Title II of the ADA:  Defendants unnecessarily institutionalize Plaintiffs and the Plaintiff Class by failing to ensure adequate community mental health supports and services necessary to provide treatment, supports and services in the most integrated setting.**

158.  Plaintiffs incorporate by reference all previous paragraphs into this Count.

159.  Defendants discriminate against the Plaintiffs and members of the Plaintiff Class by reason of their disability by unnecessarily segregating them in institutions in violation of Title II of the ADA and its implementing regulations.

160.  Defendants have failed to assess and plan for the need for the discharge of the Plaintiffs and the Plaintiff Class members and to provide them essential mental health services in the most integrated setting.

161.  These failures violate 42 U.S.C. §§ 12132 and 12201(d), 28 C.F.R. §§ 35.130(b)(3), (d), and (e)(1), *Olmstead v. L.C. by Zimring*, 527 U.S. 581, 607 (1999).

162.  It would not fundamentally alter Defendants' programs, services, or activities to provide the Plaintiffs and the Plaintiff Class with the services necessary to allow them to live in the community.

**Count 5: Section 504 of the Rehabilitation Act: DMHAS unnecessarily institutionalizes Plaintiffs and the Plaintiff Class by failing to ensure adequate community mental health supports and services necessary to provide treatment, supports and services in the most integrated setting.**

163.   Plaintiffs incorporate by reference all previous paragraphs into this Count.

164.   Defendants have discriminated against the Plaintiffs and members of the proposed Plaintiff Class "on the basis of handicap" by unnecessarily segregating them in institutions in violation of Section 504 and its implementing regulations.

165.   Defendants have failed to assess and plan for the need for the discharge of the Plaintiffs and the Plaintiff Class members and to provide them essential mental health services in the most integrated setting.

166.   These failures violate 29 U.S.C. § 794(a), 28 C.F.R. § § 41.51(d), *Olmstead v. L.C. by Zimring*, 527 U.S. 581, 607 (1999).

167.   It would not fundamentally alter Defendants' programs, services, or activities to provide the Plaintiffs and the Plaintiff Class with the services necessary to allow them to live in the community.

**Count 6: Title II of the ADA - Defendants fail to make reasonable modifications to ensure that qualified acquittees can have timely access to services needed for them to live in the most integrated setting.**

168.   Plaintiffs incorporate by reference all previous paragraphs into this Count.

169.   Title II of the ADA requires that public entities make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, including the unnecessary segregation or institutionalization of people with disabilities unless the public entity can demonstrate that such modifications would fundamentally alter the nature of the service, program or activity. 28 C.F.R. §35.130(b)(7).

170.   Defendants have failed to make reasonable modifications to their programs, services, and activities to ensure that qualified acquittees, such as the Named Plaintiffs and members of the Plaintiff Class can have timely access to services needed for them to live in the most integrated setting.

171.   Defendants force all plaintiffs to strictly comply with the system of WFH Max, Dutcher, privilege system, Phase 1 TL, Phase 2 TL, CR and discharge, without consideration of, and regardless of whether they can be

provided with reasonable modifications in order to safely receive services in the most integrated setting in the community.

172.   These failures violate 42 U.S.C. §§ 12132 and 12201(d), 28 C.F.R. §§ 35.130(b)(3), (d), and (e)(1), *Olmstead v. L.C. by Zimring*, 527 U.S. 581, 607 (1999).

173.   It would not fundamentally alter Defendants' programs, services, or activities to provide the Plaintiffs and the Plaintiff Class with the services necessary to allow them to live in the community.

**Count 7: Section 504 of the Rehabilitation Act – Defendants DMHAS and WFH fail to make reasonable modifications to ensure that qualified acquittees can have timely access to services needed for them to live in the most integrated setting.**

174.   Plaintiffs incorporate by reference all previous paragraphs into this Count.

175.   Defendants DMHAS and WFH have failed to make reasonable modifications to their programs, services and activities to ensure that qualified acquittees can have timely access to services needed for them to live in the most integrated setting.

176.   Defendants DMHAS and WFH force all plaintiffs to strictly comply with the system of WFH Max, Dutcher, privilege system, Phase 1 TL, Phase 2 TL, CR and discharge, regardless of whether they can be

provided with reasonable modifications in order to safely receive services in the most integrated setting in the community.

177.   These failures violate 29 U.S.C. § 794(a), 28 C.F.R. § § 41.51(d), *Olmstead v. L.C. by Zimring*, 527 U.S. 581, 607 (1999).

178.   It would not fundamentally alter Defendants' programs, services, or activities to provide the Plaintiffs and the Plaintiff Class with the services necessary to allow them to live in the community.

**Count 8: Title II of the ADA - Connecticut engages in discriminatory methods of administration in violation of Title II of the ADA.**

179.   Plaintiffs incorporate by reference all previous paragraphs into this Count.

180.   Regulations implementing Title II of the ADA provide that a "public entity may not, directly, or indirectly or through contractual or other arrangements, utilize criteria or other methods of administration: (1) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (2) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities…" 28 C.F.R. § 35.130(b)(3).

181.   Defendants have developed and utilize criteria and methods of administration of Connecticut's mental health system, including the PSRB, that have the tendency and effect of subjecting the Plaintiffs and the members of the Plaintiff Class to unnecessary and unjustified segregation on the basis of their disability by, *inter alia*, failing to reasonably modify Defendants' service system to avoid discrimination against qualified acquittees with mental health disabilities in violation of 42 U.S.C. § 12132 and 28 U.S.C. § 35.1 30(b)(3).

182.   Defendants exclude acquittees from access to the services and supports that they need to reside in integrated, community settings, in violation of Title II of the ADA and Section 504.

183.   Defendants have failed to adopt methods of administration of its mental health system that are necessary for acquittees to live in the most integrated setting appropriate, including failures to:

> a. conduct regular or ongoing analyses of the adequacy, sufficiency, and availability of residential, mental health treatment, and mental health providers and support services, and to effectively identify any service gaps or deficiencies that impede the prompt transition of qualified acquittees to community-based placement and services;

b.  develop and implement a plan to effectively address service

gaps that impede the prompt transition of qualified

acquittees from WFH and prevent the unnecessary

readmission of acquittees to WFH; and

c.  develop additional provider capacity and support to meet

the needs of qualified acquittees at WFH.

d.  require private non-profit community mental health

providers to accept qualified acquittees for community

mental health services.

184.  These failures violate 42 U.S.C. §§ 12131 *et seq*. and

12201(d), 28 C.F.R. §§ 35.130(b)(3), (d), and (e)(1), *Olmstead v. L.C. by

Zimring*, 527 U.S. 581, 607 (1999).

185.  It would not fundamentally alter Defendants' programs,

services, or activities to provide the Plaintiffs and the Plaintiff Class with

the services necessary to allow them to live in the community.

**Count 9: Section 504: Methods of Administration**

186.  Plaintiffs incorporate by reference all previous paragraphs into

this Count.

187.  Section 504's implementing regulations prohibit recipients of

federal financial assistance from "utiliz[ing] criteria or methods of

administration ... (i) [t]hat have the effect of subjecting handicapped persons to discrimination on the basis of handicap; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons." 28 C.F.R. § 41.5 1(b)(3); 45 C.F.R. § 84.4(b).

188.   The Defendants' DMHAS and WFH criteria and methods of administering their system of mental health services for persons with mental health disabilities subject the Named Plaintiffs and the Plaintiff Class to illegal discrimination and unnecessary segregation in violation of Section 504 and its implementing regulations.

189.   These failures violate 29 U.S.C. § 794(a), 28 C.F.R. §§ 41.51(d), 41.51(b)(3)(i); 45 C.F.R. § 84.4(b)(vii)(2), *Olmstead v. L.C. by Zimring*, 527 U.S. 581, 607 (1999).

190.   It would not fundamentally alter the Defendants' programs, services, or activities to provide the Named Plaintiffs and the Class with the services necessary to allow them to live in the community.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Take jurisdiction of this matter.

2.      Certify this case as a class action pursuant to Fed. R. Civ. P. 23(a)(1)-(4) and 23(b)(2) and appoint the undersigned Plaintiffs' attorneys as Class counsel.

3.      Declare that Defendants violated Plaintiffs' and the Class members' rights under the Americans with Disabilities Act.

4.      Declare that Defendants violated Plaintiffs' and the Class members' rights under Section 504 of the Rehabilitation Act.

5.      Issue permanent injunctions restraining the Defendants, their successors in office, agents, employees and assigns, and all persons acting in concert with them, from:

> a. Failing to provide appropriate, integrated community services and supports for all class members, consistent with their individual needs;
>
> b. Failing to make reasonable modifications to the rules and requirements regarding the eligibility for and administration of Connecticut's community-based mental health services, supports and programs which exclude Plaintiffs and the Class from the services and supports needed to reside in more integrated community-based settings;

    c.  Failing to provide equal access to community-based mental health services to all eligible Class members based on their individual needs and medical necessity, and without regard to arbitrary funding or service caps or waiting list requirements;

    d.  Discriminating against the Plaintiffs and Plaintiff Class members with mental health disabilities by failing to provide them with community-based mental services and supports in the most integrated setting appropriate to their needs

6.    Order permanent injunctive relief against Defendants directing them to:

    a.  Ensure Defendants apply state statutes and laws, policies, practices and methods of administration in a manner that complies with Title II of the ADA and Section 504, including a requirement that each Plaintiff and Plaintiff Class member receives treatment and services in the most integrated setting and, ensure that where in conflict, that federal anti-discrimination law control over state law.

    b.  Incorporate the ADA and the Rehabilitation Act's "direct threat" review of risk so as to ensure that each Plaintiff and

member of the Plaintiff Class is being provided reasonable accommodation and reasonable modification to the Defendants' programs, policies and practices so as to ensure that the Plaintiffs and the members of the Plaintiff Class are receiving treatment in the most integrated setting.

c. Reasonably modify the State's community services system so that each Plaintiff and member of the Plaintiff Class is being treated and receiving services in the most integrated setting within ninety days of reaching a Full Level 4.

d. Reasonably modify the privilege level policy and the risk management policy so that Plaintiffs and members of the Plaintiff Class are moving through WFH at a pace that ensures treatment in the most integrated setting.

7.      Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205 and 29 U.S.C. § 794a.

8.      Grant such other relief which is necessary and proper to protect the federal rights of the Plaintiffs.

DATED this 3rd day of March, 2023.

Respectfully submitted,

s/Kirk W. Lowry (#ct 27850)
Legal Director

60

Connecticut Legal Rights Project
CVH – Beers Hall 2nd Floor
P.O. Box 351 – Silver Street
Middletown, CT 06457
(860) 262-5017
Fax: (860) 262-5035
klowry@clrp.org

s/Kathleen M. Flaherty (#ct19344)
Kathleen M. Flaherty
Executive Director
Connecticut Legal Rights Project
CVH-Beers Hall 2nd Floor
P.O. Box 351 – Silver Street
Middletown, CT 06457
(860) 262-5033
Fax: (860) 262-5035
kflaherty@clrp.org

s/Deborah Dorfman
Deborah Dorfman, Juris No.: 442946
(application for admission *pro hac vice*
pending)
Executive Director
Disability Rights Connecticut
846 Wethersfield Road
Hartford, CT  06114(860) 469-4463
Fax: (860)296-0055
deborah.dorfman@disrightsct.org

s/Sheldon Toubman
Fed. Bar # ct08533
Sheldon Toubman
Litigation Attorney
Disability Rights Connecticut
846 Wethersfield Road
Hartford, CT 06114
(475)345-3169
Fax: (860)296-0055
sheldon.toubman@disrightsct.org

61