## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANTHONY DYOUS, ET AL., | : | CIVIL NO. 3:22-CV-01518-SVN |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF MENTAL HEALTH | : | |
| AND ADDICTION SERVICES, ET AL., | : | |
| *Defendants.* | : | APRIL 17, 2023 |

## <u>DEFENDANTS' MEMORANDUM OF LAW</u>
## <u>IN SUPPORT OF THEIR JOINT MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>

The Court must dismiss this case pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6). The Court lacks subject matter jurisdiction over Plaintiffs' Complaint based upon the following grounds: 1) Eleventh Amendment Immunity; 2) a federal habeas corpus petition is plaintiffs' exclusive remedy; 3) Plaintiffs lack standing; 4) Mootness; and 5) Federal Court Abstention under the *Younger* doctrine. Plaintiffs' Complaint must also be dismissed pursuant to 12(b)(6) for failure to state a claim under the Americans with Disability Act (ADA) and Section 504 of the Rehabilitation Act.

## BACKGROUND

In their Amended Complaint, Plaintiffs try to portray themselves just like the civilly, voluntarily committed patients in *Olmstead v. L.C. by Zimring*, 527 U.S. 581 (1999), but they are not. Instead, during state court criminal proceedings, each Plaintiff has effectively admitted they committed a serious crime and avoided incarceration when they elected to avail themselves of the affirmative defense permitted under Conn. Gen. Stat. § 53a-13. In Connecticut, criminal defendants can elect to plead not guilty by reason of mental disease or defect under Conn. Gen. Stat. § 53a-13. "In such a case, the defendant effectively admits his commission of the crime, and

1

bears the burden of establishing the affirmative defense of mental disease or defect." *Sastrom v. Mullaney*, 286 Conn. 655, 663 (2008) (Cleaned up). Plaintiffs are acquittees. At plaintiffs' criminal trials, the State proved beyond a reasonable doubt that they committed the elements of their charged offenses. Thus, acquittees have engaged in serious and dangerous conduct; however, they were acquitted because of their mental disease or defect at the time they committed these offenses. *State v. Dyous*, 307 Conn. 299, 328 (2012); Conn. Gen. Stat. §§ 53a-13 and 17a-580.[1]

"A verdict of not guilty by reason of mental disease or defect establishes two facts: (1) the person committed an act that constitutes a criminal offense; and (2) he committed the act because of his mental illness. . . Thus, unlike a civilly committed inmate, an acquittee has proven to the fact finder that his mental disease or defect caused him to commit a crime, thereby establishing a legal nexus between the acquittee's mental illness and the criminal act." *State v. Long,* 268 Conn. 508, 540 (2004), *cert denied*, 543 U.S. 969 (2004). Now, Plaintiffs, who elected the Conn. Gen. Stat. § 53a-13 affirmative defense to their criminal charges, seek to challenge the statutory mechanism that is in place for committing them to the Psychiatric Security Review Board (PSRB), confining them at a mental health facility, evaluating their need for continued commitment, and for treating them.

Defendants are the PSRB, a statutorily created and governed board; the Connecticut Department of Mental Health and Addiction Services (DMHAS), the state agency that administers contracts for community-based mental health services; and Whiting Forensic

---

[1] Conn. Gen. Stat. § 17a-580 provides in relevant part: "'Acquittee' means any person found not guilty by reason of mental disease or defect pursuant to section 53a-13."

Conn. Gen. Stat. § 53a-13(a) provides, "[i]n any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

Hospital (WFH), the wholly state-funded DMHAS facility at which courts ordered Plaintiffs to receive treatment.

Plaintiffs are unlike the plaintiffs in *Olmstead*. Significantly, the U.S. Supreme Court discussed in *Jones v. United States,* 463 U.S. 354, 362 (1983), that an important difference between civilly committed patients and acquittees is that "the acquittee himself advances insanity as a defense and proves that his criminal act was a product of his mental illness" and thus justifies the different commitment standard used for each group. *Jones*, at 367. *See also State v. Harris*, 277 Conn. 378, 385 n. 11 (2006). In civil commitment proceedings, the state probate court must find by clear and convincing evidence that the individual is mentally ill and dangerous. *Addington v. Texas,* 441 U.S. 418, 432-33 (1979); *see also* Conn. Gen. Stat. §§ 17a-497(a) and 17a-498(c). After a criminal defendant has successfully asserted his defense under Conn. Gen. Stat. § 53a-13, like Plaintiffs in this case, the Superior Court conducts a hearing to assess the acquittee's mental state and to determine whether the acquittee should be committed to the PSRB. Conn. Gen. Stat. § 17a-582. In this proceeding, the acquittee has the burden of proving by a preponderance of the evidence that they should be discharged. *Id.*

The Superior Court can order an acquittee conditionally released or committed to the custody of the PSRB for a period that does not exceed the maximum sentence that could have been imposed if the acquittee had been convicted of the offense. Conn. Gen. Stat. § 17a-582(e)(1). The Superior Court may recommit acquittees to the PSRB when their initial term of commitment expires. Conn. Gen. Stat. § 17a-593. When an acquittee's maximum term of commitment to the PSRB is expiring, the State's Attorney may petition the Superior Court for an order of recommitment. Under this procedure, the State's Attorney has the burden of proving by clear and convincing evidence that the acquittee is mentally ill and dangerous. *State v. Metz*, 230

Conn. 400, 425 (1994). *See also State v. Foster*, 217 Conn. App. 476 (2023) (providing a detailed discussion of process and holding, among other things, that an acquittee is not similar to a civilly committed inmate under the equal protection analysis). Plaintiffs have been committed and/or recommitted to PSRB custody, and the PSRB has ordered each Plaintiff confined at WFH. (Ex. 1, Affidavit of Heather Nolan ("Ex. 1, Nolan Aff.", ¶¶ 6-7 )).

**The PSRB**

The PSRB is established pursuant to Conn. Gen. Stat. § 17a-581 and charged with custody over acquittees. The PSRB is comprised of a psychiatrist, a psychologist, a person experienced in the probation process, an attorney, a victim advocate and a member of the public. Conn. Gen. Stat. § 17a-581(b). The PSRB is an expert board that is responsible for monitoring the confinement, temporary leave, conditional release and discharge of acquittees. Conn. Gen. Stat. §§ 17a-581, § 17a-584; Connecticut Joint Standing Committee Hearing, Judiciary, Pt. 5, 1985 Sess., pp. 1500, 1512-1514 and 1518-1520 (April 1, 1985). Additionally, the PSRB advises the court when acquittees are ready for discharge. Conn. Gen. Stat. § 17a-593(d). Only the Superior Court can order acquittees discharged from the PSRB's jurisdiction. Conn. Gen. Stat. § 17a-593. In monitoring each acquittee, the PSRB: reviews service providers' periodic reports; holds mental status review hearings; and determines the level of treatment, supervision, and placement necessary to ensure that an acquittee does not endanger himself or the community during his commitment. Conn. Gen. Stat. §§ 17a-583, 17a-584, 17a-585, 17a-586, 17a-592, and 17a-599.

Whenever the PSRB holds a hearing concerning an acquittee's discharge, conditional release, temporary leave or confinement, the PSRB makes an individualized assessment of the acquittee's psychiatric disability to the extent that the acquittees' release would constitute a

danger to themselves or others and whether the acquittee could be adequately controlled with supervision and treatment as a condition of release. *See* Conn. Gen. Stat. § 17a-580(3), (9), (10), and (11); § 17a-582(e)€; § 17a-584; § 17a-587; § 17a-588; § 17a-592; § 17a-594; and § 17a-596.[2]

## Plaintiffs were Charged with Committing Various Crimes, Acquitted under Conn. Gen. Stat. § 53a-13 and Committed to the PSRB

In 1983 Plaintiff Dyous hijacked a bus carrying forty-seven people by stating that he was armed with a bomb and nerve gas. *Dyous v. Comm'r of Mental Health & Addiction Servs.*, 324 Conn. 163, 166 (2016). Plaintiff Dyous then ordered the bus driver to drive to a bank. *Id.* Next, Plaintiff Dyous moved some of the passengers from the bus into the bank where he held them hostage. *Id.* He then contacted the state police and demanded to speak with a news reporter so that he could be interviewed about a perceived threat to national security. *Id.* In 1985, the Superior Court committed Plaintiff Dyous to the PSRB, for a period of time not to exceed twenty-five years after he was acquitted by reason of mental disease or defect of the charges of

---

[2] Connecticut General Statutes § 17a-596 provides, in relevant part: "(a) Prior to any hearing by the board concerning the discharge, conditional release, temporary leave or confinement of the acquittee, the board, acquittee and state's attorney may each choose a psychiatrist or psychologist to examine the acquittee. The results of the examination shall be in writing and filed with the board, and shall include, but not be limited to, an opinion as to whether the acquittee is a person with psychiatric disabilities . . . to the extent that the acquittee's release would constitute a danger to himself or others and whether the acquittee could be adequately controlled with treatment as a condition of release. . . .

"(b) The board shall **consider all evidence available to it that is material, relevant and reliable regarding the issues before the board**. Such evidence may include but need not be limited to, the record of trial, the information supplied by the state's attorney or by any other interested party, including the acquittee, **and information concerning the acquittee's mental condition and the entire psychiatric and criminal history of the acquittee**.

"(d) . . . At any hearing before the board, the acquittee shall have all the rights given a party to a contested case under chapter 54. In addition to the rights enumerated in chapter 54, the acquittee shall have the right to appear at all proceedings before ethe board, except board deliberations, and to be represented by counsel, to consult with counsel prior to the hearing and, if indigent to have counsel provided, pursuant to provisions of chapter 887, without cost. At any hearing before the board, copies of documents and reports considered by the board shall be available for examination by the acquittee, counsel for the acquittee and the state's attorney. Psychiatric or psychological reports concerning the acquittee that are in the possession of the board shall not be public records, as defined in section 1-200, except that information in such reports relied on by the board or used as evidence concerning the discharge, conditional release, temporary leave or confinement of the acquittee shall not be confidential. . . ." (Emphasis added.).

two counts of kidnapping in the first degree, two counts of threatening and one count of carrying and sale of dangerous weapons. Several times the State's Attorney has petitioned the Superior Court under Conn. Gen. Stat. § 17a-593 for his recommitment and the petitions have been granted. On March 18, 2022, Mr. Dyous was recommitted to the PSRB for a period not to exceed five years. (Ex . 1, Nolan Aff., ¶7(a)).

In 2014, Plaintiff Wu was committed to the PSRB on September 25, 2014, for a period of thirty-five years by the Hartford Superior Court after he was acquitted by reason of mental disease or defect of the charges of assault in the first degree, manslaughter in the first degree, reckless driving and reckless endangerment in the first degree. (Ex. 1, Nolan Aff., ¶7(b)).

In 1988, Plaintiff Lindia was committed to the PSRB for up to thirty-five years by the New London Superior Court after he was acquitted by reason of mental disease or defect on the charges of arson in the first degree, criminal mischief in the first degree and five counts of reckless endangerment in the first degree. (Ex. 1, Nolan Aff., ¶ 7(c)).

On January 13, 2012, Plaintiff Morales was committed to the PSRB for a period not to exceed ten years by the New Haven Superior Court after she was acquitted by reason of mental disease or defect on the charges of assault in the first degree. Plaintiff Morales, through her attorney, has extended her PSRB commitment until July 12, 2024. (Ex. 1, Nolan Aff., ¶ 7(d)).

In 2009, a three-judge panel found that Plaintiff Muller strangled Denise Mueller with the intent to cause her death and less than ten days later, he committed arson in the third degree and caused destruction of a residence. *State v. Mueller*, 2009 Conn. Super. LEXIS 3237 (Sept. 1, 2009) at *2; (Ex. 1, Nolan Aff., ¶7(e)). The three-judge panel then acquitted Plaintiff Mueller by reason of mental disease of these crimes and committed him to the custody of the PSRB for a period not to exceed sixty years. *Id.*

## FACTS ALLEGED IN THE COMPLAINT

Plaintiffs allege that the most integrated setting for them is in the community and that they do not require hospital inpatient care. (Amended Complaint [Doc. No. 29, hereinafter "Complaint"] ¶¶ 86, 95, 105, 117, 129). Plaintiffs do not allege specific facts supporting these generalized, conclusory allegations. Plaintiffs all allege the following facts: because of their confinement at WFH, they, "ha[ve] very few, if any, meaningful opportunities to go anywhere, to participate in community religious, leisure, and recreational activities, or to interact with individuals without disabilities, except for hospital staff" (Complaint, ¶¶ 83, 96, 104, 116, 128); they can handle and benefit from living in the community (Complaint, ¶¶ 87, 99, 107, 118, 131); they do not oppose community-based treatment and they want to live in the community (Complaint, ¶¶ 88, 100, 108, 119, 132).

All Plaintiffs, except for Plaintiff Dyous, allege that: they "very much want[ ] the opportunity to work in the community and have the opportunity to engage in an array of community-based living activities." (Complaint, ¶¶ 100, 108, 119, 132). Plaintiff Dyous alleges that "he very much wants the opportunity to receive treatments in the community, and once again have the opportunity to engage in an array of community-based living activities." (Complaint, ¶88).

All Plaintiffs, except Plaintiff Mueller, allege that the most integrated setting for each are as follows: for Plaintiff Dyous "his own apartment in the community with services and community supports from the Department of Veterans Affairs" (Complaint, ¶ 84); for Plaintiff Morales, supportive housing or a group home level of care (Complaint, ¶ 106); for Plaintiff Lindia, a group home (Complaint, ¶ 98); for Plaintiff Wu, supportive housing in the community. (Complaint, ¶ 130). Plaintiff Mueller does not identify the most integrated setting for himself.

# ARGUMENT

## I. LEGAL STANDARD FOR A MOTION TO DISMISS

Defendants file this Motion pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). "A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 416-17 (2d Cir. 2015) (quotation marks and citation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). To meet that burden, a plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue" and the court "need not 'credit a complaint's conclusory statements without reference to its factual context.'" *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 & 146 (2d Cir. 2011) (Per Curiam), *cert denied*, 568 U.S. 1229 (2013) quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Where a defendant files a Rule 12(b)(1) motion, the court "may refer to evidence outside the pleadings" to decide the motion. *Id*. at 146. Although the court accepts all material factual allegations in the complaint as true, it cannot draw inferences from the complaint favorable to the plaintiff or rely on conclusory statements in the complaint. *See, e.g.*, *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) , citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).

To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (internal quotation marks omitted). This Court must "accept as true all factual allegations and draw from them all reasonable inferences; but [it is] not required to credit

conclusory allegations or legal conclusions couched as factual allegations." *Id*. (internal quotation marks omitted).

## II. ELEVENTH AMENDMENT IMMUNITY BARS ALL PLAINTIFFS' ADA CLAIMS AGAINST DEFENDANTS AND ALL SECTION 504 CLAIMS AGAINST THE PSRB

### A. ALL PLAINTIFFS' ADA CLAIMS, COUNTS ONE, THREE, FOUR, SIX AND EIGHT ARE BARRED BY ELEVENTH AMENDMENT IMMUNITY

Counts one, three, four, six and eight must be dismissed for lack of subject matter jurisdiction because they are ADA claims that are barred by the Eleventh Amendment. *See Atlantic Healthcare Benefits Trust v. Googins*, 2 F.3d 1, 4 (2d Cir. 1993), *cert denied*, 510 U.S. 1043 (1994) (Eleventh Amendment immunity "affects . . . subject matter jurisdiction"); *see also Williams v. Marinelli*, 987 F.3d 188, 196 (2d Cir. 2021).

Under the Eleventh Amendment, states are immune from suits brought against them in federal court by citizens of the same state or other states. *Papasan v. Allain*, 478 U.S. 265, 276 (1986). The immunity also extends to any "state entity that is an 'arm of the state' . . . ." *Deposit Ins. Agency v. Superintendent of Banks*, 482 F.3d 612, 617 (2d Cir. 2007) (internal quotation marks and citations omitted). "This jurisdictional bar applies regardless of the nature of the relief sought." *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100 (1984); *see also* Edelman v. Jordan, 415 U.S. 651, 668-69 (1974) (money damages barred); *Cory v. White*, 457 U.S. 85, 90-91 (1982) (injunctive relief barred); *Atlantic Healthcare Benefits Trust*, 2 F.3d at 4 (declaratory relief barred).

In the present case, the State Defendants unquestionably are "arms of the state" entitled to assert Eleventh Amendment immunity. *See Santiago v. New York State Dep't of Correctional Services*, 945 F.2d 25, 28 n.1 (2d Cir. 1991); *In re Deposit Ins. Agency*, 482 F.3d at 617.

Eleventh Amendment immunity, however, is "not absolute." *Id.* It does not apply if (1) Congress properly and explicitly abrogates it by statute; (2) the state voluntarily waives it; or (3)

the claim falls within the exception established in *Ex parte Young*, 209 U.S. 123 (1908), for claims against state officials acting in their official capacities seeking prospective injunctive relief. *See In re Deposit Ins. Agency*, 482 F.3d at 617.

Exceptions two and three do not apply to Plaintiffs' ADA claims. The State has not voluntarily waived its immunity, and the exception recognized in *Ex parte Young* does not apply because Plaintiffs brought this lawsuit against state agencies rather than against state officials acting in their official capacities. *See McNiece v. Connecticut*, 692 Fed. App'x. 655 (2d Cir. 2017), *cert denied*, 138 S.Ct. 334 (2017). In *McNiece*, the Second Circuit Court affirmed the District Court's dismissal of Plaintiff-prisoner's ADA claim seeking injunctive relief against the State Department of Correction based in part on the State's sovereign immunity. *Id.* at 656.

As to the first exception to Eleventh Amendment immunity, Plaintiffs' claims do not satisfy the abrogation exception under *Tennessee v. Lane*, 541 U.S. 509 (2004). In *Tennessee v. Lane*, the U.S. Supreme Court addressed the question of whether sovereign immunity under the Eleventh Amendment barred actions for monetary damages and equitable relief under Title II of the ADA against state governments. The Court ruled narrowly, finding only that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Id.* at 533-534. Indeed, the Court expressly declined to rule broadly stating that "nothing in our case law requires us to consider Title II, with its wide variety of applications, as an undifferentiated whole." *Id.* at 530. Thus, *Lane* established a rule that if there is no fundamental right at issue, sovereign immunity remains intact and there is no Title II claim.

The holding in *Lane* has been further refined by the Supreme Court's decision in *United States v. Georgia*, 546 U.S. 151 (2006). In *United States v. Georgia*, the Court explained that the

abrogation inquiry should be evaluated on a "claim-by-claim basis", and that not all cases against a state should be permitted to proceed in federal court simply because a plaintiff alleges a violation of Fourteenth Amendment rights. *Id.* at 159.

Under the test announced in *Georgia*, for a district court to find that the State's sovereign immunity has been validly abrogated, the lower courts must determine: (1) if the state violated Title II; (2) if the actions that formed the basis of the Title II violation actually violated the Fourteenth Amendment; and (3) in the event that the misconduct violated Title II but not the Fourteenth Amendment, whether Congress' "purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id. at 159.*

Plaintiffs' claims do not satisfy the tests set forth in *Georgia* and *Lane*, because they fail to allege facts adequate for *prima facie* showing of an ADA violation and they have not alleged a Fourteenth Amendment claim.[3] The Second Circuit has held that "Congress's abrogation of [a defendant's] Eleventh Amendment immunity to [a plaintiff's] Title II claim is valid if [the defendant] violated (1) Title II and (2) [the plaintiff's] right to substantive due process." *Bolmer v. Oliveira*, 594 F.3d 134, 148 (2d Cir. 2010). Therefore, "if plaintiff cannot state a Title II claim, the court's sovereign immunity inquiry is at an end." *Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 152 (2d Cir. 2013). In this case, the Plaintiffs fail to allege facts that establish that State Defendants violated their rights protected under the ADA. *Id.* Accordingly, the Court need not proceed to steps two and three under *Georgia* at 159.

### 1. Plaintiffs Fail to State an ADA Claim

Fundamentally, Plaintiffs have not asserted actionable claims under the ADA because it is Plaintiffs' status under § 53a-13, not Plaintiffs' alleged disabilities that are the bases for their

---

[3] As a matter of law, Plaintiffs cannot assert a Fourteenth Amendment Violation. *See State v. Foster*, 217 Conn. App. 476 (2023).

so-called discrimination. Title II of the ADA prohibits discrimination against qualified individuals with disabilities. It provides in relevant part: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. 12132.

To allege an ADA violation, Plaintiffs must show that 1) they are qualified individuals with disabilities; 2) DMHAS, WFH and the PSRB are entities subject to the ADA; and 3) Plaintiffs were denied the opportunity to participate in or benefit from DMHAS's, WFH's and the PSRB's services, programs, or activities or that the Defendants otherwise discriminated against Plaintiffs <u>by reason of their disabilities</u>. *See Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)); *Richter v. Connecticut Judicial Branch*, 2014 U.S. Dist. LEXIS 40571 at *4-18 (D. Conn. Mar. 27, 2014) aff'd, 600 F. App'x 804 (2d Cir. 2015).

Plaintiffs conflate multiple theories of disability discrimination within individual ADA counts as follows: 1) Counts One, Three, Four, Six and Eight, Plaintiffs generally allege the Defendants unjustifiably institutionalizing them in violation of the ADA's integration mandate and *Olmstead* (Complaint, ¶¶ 143, 144, 156, 157, 161, 162, 172, 173, 184, 185); 2) Counts One, Three, Four, Six and Eight, Plaintiffs allege that Defendants engage discriminatory methods of administration (Complaint, ¶¶ 143, 156, 161, 172, 184); 3) Counts One, Six and Eight Plaintiffs allege Defendants fail to make a reasonable modifications to their policies, practices and/or procedures (Complaint, ¶¶ 142, 168-73, 181); and 4) Count Three, Plaintiffs allege Defendants fail to comply with the direct threat regulation, 28 C.F.R. § 35.139(b) (Complaint, ¶¶ 152-157).

As set forth below, Plaintiffs fail to state an ADA claim in each count on all theories of discrimination.

> **a.** **Plaintiffs Fail to Allege Any Facts Showing that They are "Qualified Individuals" under the ADA (Counts One, Three, Four, Six and Eight) and Thus Cannot State a Claim under Any Theory of Discrimination**

Plaintiffs fail to allege facts demonstrating that they are a "qualified individual" for two reasons. First, Plaintiffs are under the purview of the PSRB and confined at WFH because they elected to avail themselves of § 53a-13 status in criminal proceedings and have admitted to committing serious crimes. Second, Plaintiffs have not alleged that the State's treatment professionals (or *any* treatment professional) have determined that community-based treatment is appropriate for them.

A plaintiff may demonstrate discrimination under the ADA through an integration mandate claim. *Frank v. Sachem Sch. Dist.*, 84 F. Supp. 3d 172, 185 (E.D.N.Y. 2015), *aff'd*, 633 F. App'x 14 (2d Cir. 2016). Plaintiffs attempt to assert an integration mandate claim but do not allege facts showing they are "qualified individuals" under the ADA.[4] The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the relevant benefit." 42 U.S.C. § 12131.

To support an integration mandate claim, Plaintiffs must also allege that (1) the State's treatment professionals determined that community-based treatment is appropriate for Plaintiffs; (2) Plaintiffs do not oppose such treatment; and (3) the community-based treatment placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with similar disabilities. *Davis v. Shah*, 821 F.3d 231, 262 (2d. Cir. 2016);

---

[4] Defendants do not concede that Plaintiffs have sufficiently alleged that they are disabled within the meaning of the ADA.

*Olmstead*, 527 U.S. at 607. The first criterion is a necessary corollary to a "qualified individual" requirement under the ADA. *Buchanan v. Maine*, 469 F.3d 158, 174 (1st Cir. 2006). This is so because "a State may rely on the reasonable assessment of its own professionals in determining whether a patient meets the requirements for a particular treatment program. That is because, in part, 'courts normally should defer to the reasonable medical judgments of public health officials.' *Sch. Bd. of Nassau County* v. *Arline*, 480 U.S. 273, 288 (1987)." *Buchanan*, 469 F.3d at 174.

In *Olmstead* the Supreme Court recognized that the "unjustified institutional isolation of persons with disabilities is a form of discrimination" if people with mental disabilities must relinquish community participation but people without mental disabilities need not. *Olmstead*, 527 U.S. at 558. In sum, *Olmstead* held that a state cannot only provide institutionalized treatment options for individuals with mental health disabilities as a form of treatment for individuals seeking treatment for mental health disabilities. *Olmstead* did not, among other things, eliminate the requirement that an individual be a qualified individual to establish an ADA violation.

In this case, Plaintiffs attempt to liken their situation to that of the *Olmstead* plaintiffs. However, unlike the *Olmstead* plaintiffs, Plaintiffs are under the purview of the PSRB because they have admitted to committing crimes and they have availed themselves of the § 53a-13 status. Plaintiffs are not punished when they are committed to the PSRB. *State v. Dyous*, 198 Conn. App. 253, 262 (2020). Instead, the PSRB oversees Plaintiffs' treatment and protects Plaintiffs and society. *Id.* At its core, Plaintiffs seek to be treated like civilly committed patients even though Plaintiffs are subject to an entirely different commitment process that is permitted under the constitution. *Jones,* 463 U.S. at 362; *Harris*, 277 Conn. at 385 n.11.

In addition, Plaintiffs fail to allege, nor can they, that the State's treatment professionals (or *any* treatment professional) have determined that community-based treatment is appropriate for them. Instead, Plaintiffs allege that they are qualified individuals with a disability and that they meet the essential eligibility requirement to receive and participate in Defendant DMHAS's community mental health services because "they have recovered, stabilized, and progressed through treatment and assessments to the point that they no longer need hospital level of care. . .". (Complaint, ¶ 2) *See also* (Complaint, ¶¶ 89, 101, 109, 120, 133, 138, which Plaintiffs incorporate by reference into all nine counts). Notably absent from this allegation is that any of Plaintiffs' treatment professionals have determined that they are appropriate for community-based treatment.

Moreover, Plaintiffs advance the novel argument that this Court should hold that Plaintiffs have satisfied *Olmstead's* first prong because each Plaintiff's treatment team has granted Plaintiffs Full Level 4 privileges. (Complaint, ¶¶ 30, 82, 87, 92, 99, 103, 107, 112, 118, 123, 131) (Prayer for Relief, ¶ 6(c), "Order permanent injunctive relief against Defendants directing them to…[r]easonably modify the State's community services system so that each Plaintiff and member of the Plaintiff Class is being treated and receiving services in the most integrated setting within ninety days of reaching a Full Level 4."). No precedent permits Plaintiffs to alter *Olmstead*'s pleading requirements. Accordingly, Plaintiffs fail to allege facts to support their legal conclusion that they are "qualified" for community-based treatment, and they cannot state an ADA claim.

### b. Plaintiffs Fail to Sufficiently Plead *Olmstead's* Third Prong and Therefore Plaintiffs' *Olmstead* Claims in Counts One, Three, Four, Six and Eight Must Be Dismissed

Plaintiffs also fail to sufficiently plead *Olmstead's* third prong, i.e., that Plaintiffs' community-based placement can be reasonably accommodated taking into account the resources available to the state and the needs of others with similar disabilities. *Olmstead*, 527 U.S. at 607. "The third prong of this [*Olmstead*] test operates on a burden-shifting paradigm; once the plaintiff articulates a reasonable accommodation, the burden shifts to the State to show that the requested relief would 'fundamentally alter' the nature of the program." *Duffy v. Velez*, No. CIV. 09-5539, U.S. Dist. LEXIS 10537 at *2 (D.N.J. Feb. 8, 2010) (quoting *Frederick L. v. Dep't of Public Welfare*, 364 F.3d 487, 492 n.4 (3d Cir. 2004)); *see Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002*), cert denied,* 537 U.S, 1104 (2003); *Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 323. Plaintiffs do not plead any facts to suggest that their community-based placement can be reasonably accommodated taking into account the resources available to the State and the needs of others with similar disabilities.

### c. Plaintiffs Fail to Sufficiently Plead a Denial of a Reasonable Accommodation/Modification Claim (Counts One,[5] Six and Eight[6])

An alleged failure to modify/accommodate claim may be asserted to demonstrate ADA discrimination. *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009). To support a reasonable

---

[5] Count One, ¶ 142, Plaintiffs assert, "By denying Plaintiffs and the Plaintiff Class with access to existing community programs, *by failing to provide them with reasonable modifications to their policies, practices, and/or procedures . . . .* Defendants discriminate against Plaintiffs and the Plaintiff Class on the basis of their disabilities in violation of 42 U.S.C. § 12132 and 28 CFR § 35.130(d)."

[6] Count Eight, ¶ 181, Plaintiffs assert, "Defendants have developed and utilize criteria and methods of administration of Connecticut's mental health system, including the PSRB, that have the tendency and effect of subjecting the Plaintiffs and the members of Plaintiff Class to unnecessary and unjustified segregation on the basis of their disability by, *inter alia*, failing to reasonably modify Defendants' service system to avoid discrimination against qualified acquittees with mental health disabilities in violation of 42 U.S.C. § 12132 and 28 U.S.C. [sic] § 35.130(b)(3).

accommodation/modification claim under Title II of the ADA, "plaintiffs must establish that their disabilities were a substantial cause of their inability to obtain services." *Tardif v. N.Y.*, 991 F.3d 394, 405 (2d Cir. 2021) (cleaned up). Once a disabled individual requests an accommodation, the accommodation should not be denied without an individualized inquiry into its reasonableness. *Wright*, 831 F.3d at 78. Where the issue is not whether plaintiff was denied services because of plaintiff's disability, but instead whether the services provided for the plaintiff's disability were adequate, such a claim is not cognizable under the ADA. *Id*. Even if Plaintiffs satisfied the first prong of a *prima facie* ADA claim, which they do not, Plaintiffs do not properly state a failure to accommodate/modify claim.

Fundamentally, Plaintiffs have not even alleged that they requested a specific accommodation or modification for their disabilities. Plaintiffs alleged that prior to filing their Complaint, Plaintiffs' counsel, Disability Rights Connecticut (DRCT) and Connecticut Legal Rights Project (CLRP), sent a letter to Defendants (Complaint, ¶¶ 79, 80). However, the letter does not reference any named Plaintiff or make individualized accommodation requests addressed to the individual Plaintiffs' particular disability and/or limitations. Instead, the letter is more fairly characterized as DRCT and CLRP's assertion that DMHAS, WFH and the PSRB are violating the integration mandate under the ADA, Section 504 and *Olmstead*. (Ex. 2, Affidavit of Vanessa Cardella ("Ex. 2, Cardella Aff." ¶ 20, Ex. A)).

The accommodation or modification Plaintiffs really seek is to eliminate from consideration Plaintiffs' criminal conduct admissions. The ADA does not expressly or impliedly provide for such accommodation or modification. An example of a reasonable accommodation/modification is wheelchair accessibility to a courthouse because a citizens' right to access the courts is not dependent upon their ability to walk into the court. *Harris v. Mills*, 572

F.3d 66, 74-75 (2d Cir. 2009). Unlike a citizen in a wheelchair seeking access to the courthouse, whatever accommodation/modification Plaintiffs seek for their disability, or the limitations caused by their disability is not obvious.

Plaintiffs have effectively admitted to committing crimes under a statutory provision that allowed them to do so. It is that status—Conn. Gen. Stat. § 53a-13—that puts them within the purview of the PSRB and WFH process that they challenge. Any modification or accommodation request necessarily pertains to their status of being under the PSRB's custody and not just an individual with a mental health disability seeking services. Plaintiffs must "establish that their disabilities were a substantial cause of their inability to obtain services." *Tardiff*, 991 F.3d at 405 (cleaned up).

In addition, there must be a nexus between the alleged disability and the requested accommodation or modification. *Rogers v. Roosevelt Union Free Sch. Dist.*, 553 Fed. App'x. 88, 89 (2d Cir. 2014) (*unpublished.)* (ADA Title I claim alleging failure to accommodate failed inter alia because no nexus between plaintiff's disability and requested accommodation); *see also*, *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995); *Kloth-Zanard v. Malloy*, 2016 U.S. Dist. LEXIS 133986 (D. Conn. Sept. 29, 2016). Plaintiffs' Complaint generally seeks modifications/accommodations that relate to their Conn. Gen. Stat. § 53a-13 status, and not to their alleged disabilities.

For example, to the extent Plaintiffs claim that the reasonable modification they seek is to modify or eliminate the "public safety mandate," the modification is not tied to their disability. (Count Three, ¶¶ 153-155.). The public safety mandate addresses the fact that acquittees admitted committing a crime. Conn. Gen. Stat. § 53a-13; *see also Sastrom*, 286 Conn. at 662-63. The Superior Court committed each Plaintiff to the PSRB "to treat the individual's mental

illness and protect him and society from his potential dangerousness." *State v. March*, 265 Conn. 697, 715-16 (2003); *see also Payne v. Fairfield Hills Hosp.*, 215 Conn. at 675, 683-84 .

In Count Six, generously read, Plaintiffs request that the PSRB and WFH modify the "system of WFH Max, Dutcher, privilege system, Phase 1 TL, Phase 2 TL, CR and discharge" (hereinafter referred to collectively as "Step System" so that Plaintiffs can "have timely access to services needed for them to live in the most integrated setting." (Complaint, Count 6, ¶¶ 170-171; ¶ 168, incorporating ¶¶ 53-72.) Plaintiffs do not specify how the Step System should be modified. Instead, they generally allege that the Step System delays their access to an integrated setting.

Just like with the "public safety mandate," Plaintiffs are subject to the Step System because: they have admitted to committing crimes; they elected to plead not guilty pursuant to Conn. Gen. Stat. § 53a-13; the Superior Court ordered their commitment to the PSRB; and the PSRB ordered their confinement to WFH. The ADA prohibits discrimination based upon disability, not any other status.

Plaintiffs have not pleaded any facts regarding the specifics of their disabilities or individualized requests for modification/accommodation. Plaintiffs generally allege that Defendants discriminate against purported Class members by "failing to reasonably modify their policies, practices, and procedures so that they can reside in the most integrated settings in the community to meet their needs." (Complaint, ¶ 32(d and ¶¶ 8 and 9). In their Prayer for Relief, Plaintiffs seek an injunction against all Defendants that restrain them from "[f]ailing to make reasonable modifications to the rules and requirement regarding the eligibility for and administration of Connecticut's community-based mental health services. . ." (Complaint, Prayer

for Relief, ¶ 5(b)).[7] These allegations and requested accommodations are so vague that they fail to articulate what the accommodation/modification would entail or how it would accommodate Plaintiffs' disabilities. As a matter of law, Plaintiffs fail to state a reasonable accommodation/modification claim under the ADA.

In the alternative, to the extent the Plaintiffs may argue that the "modification" they seek is that once WFH treatment teams determine that Plaintiffs may have Full Level 4 privileges that the Plaintiffs should be placed in a community setting within ninety days, this request would amount to a fundamental alteration to Connecticut's statutory scheme for committing and overseeing criminal defendants who elect the Conn. Gen. Stat. § 53a-13 affirmative defense to criminal charges. Such a modification would eviscerate the PSRB's authority to determine when an acquittee may receive community-based treatment under temporary leave and conditional release. (Prayer for Relief, ¶ 6(c)).

### d. Even if Plaintiffs Alleged They are "Qualified Individuals" with a Disability, Plaintiffs Fail to State an ADA Claim in Count Three

Plaintiffs fail to state a claim that the "public safety mandate" contained in Conn. Gen. Stat. §§ 17a-582 and 17a-584 violates the ADA. (Complaint, ¶¶ 10, 11, 32(a), 49-51, 53 Count 3, ¶¶ 152-157). Plaintiffs generally allege that the PSRB and Superior Court decisions that consider the public's safety as a primary concern violate the ADA's "direct threat" regulation, 28 C.F.R. § 35.139(b). (Complaint, Count 3 ¶¶ 153 to 155).

The "direct threat" regulation does not remove the "qualified individual" requirement nor is it a test for determining whether conduct violates the ADA. Rather, it is an affirmative defense

---

[7] Plaintiffs also request a permanent injunction that: 1) directs Defendants to "[r]easonably modify the State's community services system so that each Plaintiff and member of the Plaintiff Class is being treated and receiving services in the most integrated setting within ninety days of reaching a Full Level 4" (Prayer for Relief, ¶ 6(c); and 2) directs Defendants to "[r]easonably modify the privilege level policy and the risk management policy so that Plaintiffs and members of the Plaintiff Class are moving through WFH at a pace that ensures treatment in the most integrated setting." (*Id*. at ¶6(d)).

that "excuses States from complying with the ADA with respect to disabled people who pose a 'direct threat' to others, as long as the States make these determinations using comprehensive 'individualized assessments.'" *Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.*, 796 F.3d 293, 301 (3d Cir. 2015). *See also Wood v. Md. DOT*, 732 Fed. App'x. 177, 181 (4th Cir. 2018). Thus far, Defendants have not filed an answer or affirmative defenses to Plaintiffs' Complaint and instead file the present Motion to Dismiss as permitted by Fed. R. Civ. P. 12(b). Nonetheless, in the event Defendants fail to satisfy their burden on any affirmative defense they may assert, it will not provide Plaintiffs an additional claim that Defendants violated the ADA.

### e. Plaintiffs Fail to State an ADA Claim Based Upon an Alleged Violation of 28 C.F.R. § 35.130(e)(1) as Alleged in Counts One, Three, Four, Six and Eight

In Counts One, Three, Four, Six and Eight, Plaintiffs generally allege that Defendants violate 28 C.F.R. § 35.130(e)(1). This section provides: "Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept." This regulation is not a test for determining whether Defendants' conduct violates the ADA. Instead, this section makes clear that disabled individuals may choose not to accept "an accommodation, aid, service, opportunity, or benefit provided under the ADA." *Id.*

In *Olmstead*, the plurality cited to 35 C.F.R. § 35.130(e)(1) in support of its holding that disabled persons who are qualified to receive community-based treatment, but who do not want it, may not have it imposed upon them. *Id*. at 601-02. Plaintiffs do not even allege that any Defendants required them to accept "an accommodation, aid, service, opportunity or benefit provided under the ADA or this part" that Plaintiffs "choose[] not to accept." 35 C.F.R. §

35.130(e)(1). Accordingly, Plaintiffs fail to state a claim that Defendants violate 35 C.F.R. § 35.130(e)(1) and the ADA.

### f. Plaintiffs Fail to State a Claim of Discriminatory Methods of Administration under the ADA (Count Eight)

*Olmstead* did not establish that state governments are subject to "standard of care" in their provision of "medical services . . . or that the ADA requires States to provide a certain level of benefits to individuals with disabilities." 527 U.S. at 630 n.14. Instead, *Olmstead* requires "that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Id.*

Count Eight generally alleges that all Defendants have failed to adopt methods of administration of its mental health system that are needed for Plaintiffs to live in the most integrated setting appropriate. However, Plaintiffs identify only alleged insufficient methods of administering the community-based health services. (Complaint, ¶¶ 183(a) through (d)). These allegations are limited to DMHAS, as Plaintiffs identify DMHAS as the only Defendant that "operates a system of community-based residential services and supports." (Complaint, ¶ 23). Accordingly, Plaintiffs fail to state an ADA claim based upon methods of administration against WFH and the PSRB.

To the extent Plaintiffs may argue that WFH and the PSRB's privilege system and risk assessment (Complaint, ¶¶ 58-61, 63-65, 68-72) are discriminatory methods of administration, this claim fails as well. "[T]he central purpose of the ADA and § 504 of the Rehabilitation Act is to assure that disabled individuals receive "evenhanded treatment" in relation to the able-bodied." *Doe v. Pfrommer*, 148 F.3d 73, 83 (2d Cir. 1998). An ADA claim that does not challenge illegal discrimination against the disabled, but instead challenges the substances of the services provided to the person, is legally insufficient. *See Id.* at 84. The ADA does not "appl[y]

to claims regarding the quality of mental health services." *Maccharulo v. N.Y, State Dept. of Corr. Servs.*, 2010 U.S. Dist. LEXIS 73312, at *7 (S.D.N.Y. July 21, 2010). "Where medical treatment is at issue, it is typically the disability itself that gives rise to, or at least contributes to the need for services" and thus the ADA and Section 504 "prohibits discrimination against a disabled individual only where the individual's disability is unrelated to, and thus improper to consideration of, the services in question." (cleaned up.) *Tardif*, 991 F.3d at 405-06. The ADA and Section 504 "'do[] not create a cause of action based on a [disability] that is directly related to providing the very services at issue.'" *Id.* (quoting *Cushing v. Moore*, 970 F.2d 1103, 1109 (2d Cir. 1992).

Based upon the foregoing, Plaintiffs' assertion that the privilege system and risk assessment process are discriminatory methods of administration are legally insufficient claims. Plaintiffs assert these as an end-run around to the ADA's prohibition that claims challenging the sufficiency of medical services provided to them may not be challenged under the ADA. Accordingly, Plaintiffs claims are legally insufficient and must be dismissed.

**B. ELEVENTH AMENDMENT IMMUNITY BARS ALL PLAINTIFFS' SECTION 504 CLAIMS AGAINST THE PSRB**

The PSRB does not receive any federal financial assistance (Ex. 2, Cardella Aff., ¶ 14) and, therefore, the PSRB has not waived its sovereign immunity and may not be sued under Section 504. Accordingly, Eleventh Amendment immunity bars all Plaintiffs' Section 504 claims against the PSRB, which includes, Counts Two, Five, Seven, and Nine. *See also* Plaintiffs' Prayer for Relief, ¶4 whereby Plaintiffs request a declaration that "Defendants violated Plaintiffs' and the Class members' rights under Section 504 of the Rehabilitation Act."

Section 504 only abrogates the immunity "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). *U.S. Dep't of Transp. v. Paralyzed Veterans of*

*Am.*, 477 U.S. 597, 605 (1986). A State and its arms can "avoid Section 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others." *Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir. 2000) (*en banc*), *cert denied*, 533 U.S. 949 (2001).

There are three ways that a State entity may waive its immunity to suit under Section 504. *T.W. v. N.Y. State Bd. of Law Exam'rs*, 996 F.3d 87, 93 (2d Cir. 2021). "First, the entity may *directly* request and receive federal financial assistance that is conditioned on Section 504 coverage. Second, the entity may be a 'program or activity' of a 'department, agency, special purpose district, or other instrumentality of a State or of a local government,' 'any part of which' receives federal aid. 29 U.S.C. § 794(b). And finally, the entity may *indirectly* receive federal financial assistance through *another* entity that requests and receives the Federal financial assistance in the first instance and then *extends* that money to the non-requesting entity." *Id.* at 93. The PSRB has not waived its immunity to suit in any of these three ways. The PSRB includes the affidavits of PSRB's Executive Director, Vanessa Cardella and DMHAS's Chief Financial Officer, Cheryl Arora, in support of the PSRB's Eleventh Amendment immunity under Section 504.

### 1. The PSRB Does Not Directly Receive Federal Financial Assistance

At no time has the PSRB directly requested or received any federal financial assistance. (Ex. 2, Cardella Aff., ¶ 14). The PSRB's funding comes exclusively from the state's general fund. The State's and the PSRB's 2022-23 budgets demonstrate this. Office of Policy and Management, *Governor Lamont's February 2021 Budget Proposal for the FY 2022-2023 Biennial Budget*, (2021), at https://tinyurl.com/mtbb7xwv. In 2022, the PSRB's allocated budget was approximately three hundred twenty-two thousand dollars ($322,000), of which two hundred ninety-seven thousand dollars ($297,000) were for "personal services" defined as compensation

for the services of officials and employees of the state, and twenty-five thousand dollars ($25,000) were for "other expenses," defined as payment for services secured by contract, for all supplies, materials, and equipment not normally regarded as capital items, and all expenditures not properly assignable to other standard accounts. *Id.* at 45, 73. The PSRB neither directly requests nor directly receives federal financial assistance as contemplated by Section 504.

### 2. The PSRB is not a "Program or Activity" of a Department, Agency, Special Purpose District or Other Instrumentality which Receives Federal Funds

The PSRB is not a "program or activity" as defined in 29 U.S.C.S. § 796 (b)(1)(A). It is not an operation of a "department, agency, special purpose district or other instrumentality of a state or of a local government" any part of which receives federal financial assistance. *See* 29 U.S.C. § 794. To the extent that Plaintiffs may argue that the PSRB is a program, activity or operation of DMHAS (an entity that receives federal financial assistance), Second Circuit precedent establishes that the PSRB is a separate entity from DMHAS.

In *T.W.,* the Second Circuit assessed whether three units of the Unified Court System should be characterized as separate departments or a single department. The Second Circuit considered each unit's budget, management, and role within the judiciary. *T.W.*, 996 F.3d at 99. "With separate operating budgets (even if these budgets are ultimately presented together in a unified budget to the Legislature), administration, and roles within the judiciary, these three units are best viewed as separate departments." *Id.* at 100. In evaluating these factors, the PSRB clearly is separate from DMHAS.

First, the PSRB was established by our state's legislature in 1985 as "an autonomous body within the Department of Mental Health and Addiction Services *for administrative purposes only*." Conn. Gen. Stat. § 17a-581(a) (emphasis added). Neither this establishing statute nor any other state law make the PSRB a program or activity of DMHAS. When one state

agency is assigned to another for administrative purposes only, the latter shall perform tasks such as record keeping, reporting, and related administrative and clerical functions. Conn. Gen. Stat. § 4-38f(b)(1). The PSRB functions are independent from DMHAS, and the PSRB exercises its authority "*without approval or control of*" DMHAS. Conn. Gen. Stat. § 4-38f(a)(1) (emphasis added).

Second, just as the three units in *T.W.* submitted their separate operating budgets as a unified budget, the statute requires the PSRB's budget request to be submitted within DMHAS's budget as a separate part of the budget, and DMHAS must submit the PSRB's budget exactly as the PSRB prepared and submitted it to DMHAS. *See* Conn. Gen. Stat. § 4-38f(b)(4).

The state agencies now submit their budgetary requests electronically via the Automated Budget System. (Ex. 3, Affidavit of Cheryl Arora ("Ex. 3, Arora Aff."), ¶ 10). In fulfilling DMHAS's obligation to perform certain administrative duties for the PSRB, DMHAS assists in the administrative preparation and submission of the PSRB's budget, with the PSRB's Executive Director's review and approval. (*Id.* at ¶ 8-9). The Automated Budget System requires DMHAS's budget to be submitted separately. (*Id.* at ¶ 11). DMHAS does not dictate PSRB's budgetary requests and does not influence or control the budget. (*Id.* at ¶ 12). The PSRB's budget is a state appropriation separate and apart from DMHAS. (*Id.* at ¶14).

Third, the PSRB and DMHAS do not share any officers or governing officials; rather, they are independent and separately created agencies with different organizational structures and different roles. The PSRB's composition is dictated by statute, and its members are appointed by the governor. Conn. Gen. Stat. § 17a-581. Acquittees who the Superior Court orders confined or conditionally released are committed to the PSRB for a maximum term of commitment. Conn. Gen. Stat. § 17a-582(e)(1). Thereafter, the PSRB is responsible for, inter alia, conducting

periodic hearings to review the status of the acquittee, and conducting hearings related to acquittees' discharge, conditional release, temporary leave, or confinement. Conn. Gen. Stat. §§ 17a-583 to 17a-585.

By contrast, DMHAS is headed by a commissioner appointed by the governor. Conn. Gen. Stat. § 17a-450(a). DMHAS is charged with "promot[ing] comprehensive, client-based services in the areas of mental health treatment and substance abuse treatment and to ensure the programmatic integrity and clinical identity of services in each area." Conn. Gen. Stat. 17a-450(b). In fulfilling its respective statutory obligations, DMHAS has no authority over the PSRB and cannot makes policy or program decisions for the PSRB. (Ex. 2, Cardella Aff., ¶ 18.) The two agencies are associated only insofar as DMHAS is required to perform certain administrative functions for the Board. *Id*. at ¶ 7; (Ex. 3, Arora Aff., ¶ 6). The PSRB is not a "program or activity" of DMHAS. Instead, it is merely housed within DMHAS for *administrative purposes only*.

### 3. The PSRB Does Not Indirectly Receive Federal Financial Assistance Through Another Entity

The Second Circuit, in *Bartlett v. N.Y. State Bd. of N.Y. L. Exam'rs*, 156 F.3d 321 (1998), *vacated*, 527 U.S. 1031 (1999), *remanded to* 226 F. 3d 69 (2000), examined how a state entity may waive its Eleventh Amendment immunity by indirectly receiving federal financial assistance from another state entity. The Second Circuit's analysis in *Bartlett*, demonstrates that the PSRB does not indirectly receive federal funding from DMHAS.

In *Bartlett*, two state agencies that received federal funds issued vouchers to handicapped bar exam applicants. *Id.* at 330. The bar applicants then submitted the vouchers to the Board and the Board  accepted the vouchers as payment for the bar examination. *Id*. Next, the Board submitted the accepted vouchers to one of the two state agencies in exchange for payment,

causing the federal funds received by the two agencies to be funneled or extended to the Board. *Id.* The Second Circuit held that even though there was no evidence that the Board elected to accept federal funds, it was immaterial to whether the Board waived Eleventh Amendment immunity because it received the federal funds by extension. *Id.*

In contrast, the PSRB does not receive any federal funds from DMHAS. Based on the statutory requirement that DMHAS perform certain administrative functions for the PSRB, the two independent agencies entered into an administrative agreement to delineate precisely what administrative functions DMHAS provides to the PSRB, and this agreement is reviewed and renewed annually. (Ex. 2, Cardella Aff., ¶¶ 9-10).

While it is true that there exists an agreement between DMHAS and the PSRB that DMHAS shall provide funds for certain operating expenses, those funds cannot be distributed from the federal funds DMHAS receives. (Ex. 3, Arora Aff., ¶ 19). DMHAS's receipt of federal funds typically involves an application process, receipt of notice of an award, and periodic reporting requirements that must be satisfied to ensure that the funds were expended solely for the approved purposes. (*Id*. at ¶ 16). In other words, DMHAS may only use federal funds for the specific purpose for which they are received, which usually is for client services. (*Id*. at ¶ 17). In the event the PSRB exhausts all its budget appropriations for "other expenses" before the fiscal year ends, on behalf of the PSRB, DMHAS can purchase items that are administrative in nature (e.g. office supplies, postage, data processing supplies and equipment) for PSRB's use. (*Id*. at ¶ 18). DMHAS pays for the items out of DMHAS's General Fund budget appropriation or from the State's Capital Equipment Fund. (*Id*. at ¶ 20). DMHAS does not receive federal funds earmarked for administrative purposes or administrative expenses that can be used for the PSRB's benefit. (*Id*. at ¶ 24). This earmarking process ensures that federal funds are not being

used by DMHAS for purposes other than those intended—any federal funds for administrative purposes or expenses are tied to specific federally funded project and can only be used to fulfill the objectives of that identified project. (*Id*. at ¶¶ 22-23).

The operating expenses that DMHAS incurs on behalf of the PSRB are distinguishable from the clear extension of *federal funds* from two state agencies to the Board in *Bartlett*. *Bartlett*, 156 F.3d at 330. No such extension has ever occurred from DMHAS to the PSRB, not only because DMHAS has never directly given money, nor extended money to the PSRB, but also because any expenses incurred on behalf of the PSRB are purely for administrative purposes and thus the money is appropriated from the State's General Fund, not federal funds granted to DMHAS. (Ex.3, Arora Aff., ¶ 21).

Accordingly, the Plaintiffs' Section 504 claims against the PSRB must be dismissed as they are barred by Eleventh Amendment immunity.

## II. <u>A FEDERAL HABEAS CORPUS PETITION IS PLAINTIFFS' EXCLUSIVE REMEDY</u>

The Plaintiffs seek release from custody. Through artful pleading, however, they avoid using those words. Rather than ask for release, they allege that they are not treated in the "most integrated setting." "The preamble to the Attorney General's Title II regulations defines 'the most integrated setting appropriate to the needs of qualified individuals with disabilities' to mean 'a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible.'" *Olmstead* at 592. In other words, Plaintiffs seek release into the community. For the reasons set forth below, they must pursue their release through a habeas corpus action. As a result, the entire Complaint must be dismissed on this ground.

All named Plaintiffs were charged with committing serious criminal offenses. Because of its unique character, an insanity acquittal carries potential consequences. Here, the Connecticut

Superior Court committed all named Plaintiffs to the jurisdiction of the PSRB after a hearing. Conn. Gen. Stat. § 17a-582(e). The "confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not 'punishment' for a crime. The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness.' *Jones v. United States*, 463 U.S. 354, 368–69, 103 S.Ct. 3043, 3052, 77 L.Ed.2d 694 (1983)." *Payne*, 215 Conn. 675, 683–84 (1990). Nevertheless, a State may adopt procedures that presume the acquittee's continued dangerousness and that envisage a diminished risk that a person will be committed who is not mentally ill. *Metz*, 230 Conn. at 414 (1994) citing *Jones*, 463 U.S. at 364-67. The Superior Court can order the Plaintiffs' discharges; Conn. Gen. Stat. §§ 17a-582(h) and 17a-593; and certain decisions of the PSRB may be appealed to the Superior Court. Conn. Gen. Stat. § 17a-597. Indeed, Conn. Gen. Stat. §§ 17a-580 through 17a-603 set forth a comprehensive procedural system governing the commitment and discharge of acquittees.

### A.  **Challenges to Custody Must be Brought by Habeas Corpus**

In this action for a declaratory and injunctive relief, Plaintiffs seek a determination that Defendants have denied them the right to receive treatment in the "most integrated setting." These allegations support only one reading—Plaintiffs ask the Court to find that their restriction to the grounds of WFH is unlawful. Given that they challenge the lawfulness of their custody, their claims can only be raised by way of an application for habeas corpus relief under 28 U.S.C.

§ 2254.[8] "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

State prisoners must use the remedy of habeas corpus "when they seek to invalidate the duration of their confinement—either directly through an injunction compelling speedier release or indirectly through a judicial determination that necessarily implies the unlawfulness of the State's custody." *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005). The Supreme Court has recognized that federal habeas corpus review applies to persons in state custody even if their custody is not based upon a criminal conviction. *Duncan v. Walker*, 533 U.S. 167, 176 (2001). Here, the Plaintiffs' claims fall squarely within "this traditional scope of habeas corpus." *Preiser*, 411 U.S. at 487. Indeed, just like state prisoners, state insanity acquittees repeatedly have used § 2254 to attack their commitments. *See Francis S. v. Stone*, 221 F.3d 100 (2d Cir. 2000) (insanity acquittee challenged the constitutionality of a state court order of recommitment under § 2254); *Ernst J. v. Stone*, 452 F.3d 186 (2d Cir. 2006); *Miller v. Angliker*, 848 F.2d 1312 (2d Cir. 1988); *Duperry v. Kirk*, 563 F.Supp.2d 370 (D.Conn. 2008); *Warren v. Harvey*, 472 F.Supp. 1061 (D.Conn. 1979).

Indeed, the Second Circuit recently held that Plaintiff Dyous' exclusive remedy to challenge his commitment to the PSRB and confinement at WFH is a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *Dyous v. Psychiatric Sec. Review Bd.*, 708 Fed. App'x. 39, 40 (2018). This holding applies to Plaintiffs' present complaint and request for declaratory and injunctive relief under the ADA and Section 504.

---

[8] 28 U.S.C. § 2254 provides in relevant part: "Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

"[W]hen a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Preiser*, 411 U.S. at 500. *See also Muhammad v. Close*, 540 U.S. 749, 750 (2004) ("Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus"); *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998) ("any claim by a prisoner attacking the validity or duration of his confinement must be brought under the habeas sections of Title 28 of the United States Code"); *Wolf v. Diaz*, Case No. 2:20-cv-0206 KJM DB P, 2020 U.S. Dist. LEXIS 175866 at *2 (E.D. Cal. September 24, 2020) ("The Ninth Circuit has held that an ADA claim challenging the validity or duration of confinement is also subject to *Preiser*"). "The Declaratory Judgment Act does not . . . provide an independent jurisdictional basis . . . and 'may not be used as a substitute for habeas corpus . . . or other such procedures.'. . ." *Laird v. Mackay*, No. 10-396-MO, 2010 U.S. Dist. LEXIS 94266 (D.Ore. September 9, 2010). In other words, "a prisoner cannot bring a civil action seeking a declaratory judgment in order to obtain his release." *Jackson v. Scalia*, 780 F.Supp. 2d 81, 83. *See also Rooney v. Sec'y of the Army*, 405 F.3d 1029 (D.C. Cir. 2005); *Abdel-Whab v. United States*, 175 Fed.App'x. 528 (3d Cir. 2006); *United States v. Gutierrez*, 116 F.3d 412, 415 (9th Cir. 1997); *United States ex rel. Bennett v. Illinois*, 356 F.2d 878, 879 (7th Cir. 1966), *cert denied*, 384 U.S. 946 (1966); *Wilson v. Walker*, No. CIV S-07-2752 GEB EFB P, 2010 U.S. Dist. LEXIS 10868(E.D. Cal February 8, 2010); *Benson v. State Bd. of Parole & Prob.*, 384 F.2d 238, 240 (9th Cir. 1967), *cert denied*, 391 U.S. 594 ("the Declaratory Judgment Act may not be used as a substitute for 'habeas corpus, coram nobis or other such procedures'").

Indeed, "a declaratory judgment action may only lie where the plaintiff seeks monetary damages or other relief that would not directly impact his or her sentence or duration of commitment." *Dyous*, 708 Fed.App'x. at 40. Simply stated, if a plaintiff seeks a "judicial ruling that his confinement is contrary to law . . . he is directly and unambiguously challenging his confinement." *Id.* at 41. When doubt exists as to whether a challenge must be brought by way of a habeas action, the First Circuit asks whether the relief requested "can be fairly described as a quantum change in the level of custody." (Citation omitted.) *Heath v. Hanks*, 433 F.Supp.3d 221, 225 (D.N.H. 2019). Thus, for example, a civilly committed plaintiff's request for a transfer "to a less restrictive environment for his mental health treatment" constituted "a quantum change" and was required to be brought via a habeas corpus action. *Id.*

### B. <u>The Complaint Challenges the Fact and Duration of Plaintiffs' Custody</u>

Plaintiffs challenge the fact and duration of their custody in their Complaint. Numerous federal courts have extended *Preiser's* reasoning to claims for injunctive and declaratory relief brought under the ADA and Section 504. *See, e.g.*, *Bogovich v. Sandoval*, 189 F.3d 999, 1002 (9th Cir. 1999) ("There is no reason to believe that ADA claims should be treated any differently than § 1983 claims when examining whether a prisoner's case should have been brought under habeas corpus."); *Heath v. Hanks*, 433 at 224 (holding that *Preiser* barred ADA claims for injunctive relief whereby plaintiff requested the court to order defendants "to place him in a least restrictive environment necessary to achieve the purposes of [mental health] treatment."); *Beam v. Madigan*, No. 16-cv-1211-MJR, 2017U.S. Dist. LEXIS 24047, at *6 (S.D. Ill. Feb. 21, 2017) (holding that *Preiser* barred "claims that certain defendants violated the ADA and Rehabilitation Act by failing to release him from confinement, in that they are unlawfully depriving him of his 'right to uninstitutionalized care' and to the 'least restrictive environment possible'); *Clemons v. Williams*, No. 2:14-cv-02195-APG-NJK, 2016U.S. Dist. LEXIS 41155, at *3 (D. Nev. Mar. 29,

2016) ("Clemons's ADA claim is essentially a challenge on the duration of his confinement, which is the exclusive province of habeas corpus petitions, not civil claims.").

Plaintiffs claim that they "are unnecessarily isolated, segregated and institutionalized at Whiting Forensic Hospital (WFH) by the Defendants." (Complaint, ¶ 1). The named Plaintiffs all reside at the Dutcher building at WFH. (Complaint, ¶¶ 18-22). Thereafter, they allege that they "are not able to leave WFH to work or attend school, and are deprived of the right to attend social, recreational or religious activities outside of WFH except for the occasional community outing" and "would prefer, to reside in a more integrated, community-based placement." (*Id*. ¶¶ 5, 3). One of the questions they seek to resolve through this litigation is "[w]hether acquittees with 'Full Level 4' privileges are unnecessarily institutionalized at WFH and not provided treatment and services in the most integrated setting." (*Id.* ¶ 32). Thus, they challenge their continued placement at WFH and ask the Court to declare that they should be released into the community.

They submit that they are entitled to live in the "most integrated setting" which they define as "an apartment in the community"; "a group home"; or "supportive housing in the community."[9] (Complaint, ¶¶ 84, 98, 106, and 130). They further assert that "[a]lthough community programs are the most integrated settings appropriate to meet their needs, the Plaintiffs remain unnecessarily institutionalized at WFH." (Complaint, ¶¶ 142, 149). Ultimately, they maintain that federal law dictates that they be released into the community. Such a request constitutes a "quantum change in the level of custody." *Heath*, 433 F.Supp.3d at 225. It does not

---

[9] The Complaint does not identify "the most integrated setting" for Plaintiff Mueller. Nevertheless, it does allege that "Mr. Mueller does not oppose community-based treatment. He wants to live in the community. He very much wants the opportunity to work in the community and have the opportunity to engage in an array of community-based living activities." (Complaint, ¶ 119).

merely seek an improvement in their current living conditions. Rather, it constitutes a seismic change in the nature, duration, and limits of that custody.

In summary, although they avoid using the word "release," Plaintiffs request a "judicial ruling that [their] confinement is contrary to law." *Dyous*, 708 Fed.App'x. at 41. In this case, they posit that provisions of the ADA and Section 504 of the Rehabilitation Act outweigh state law pertaining to insanity acquittees. They ask the Court to find that Defendants' alleged failure to arrange for them to be treated "in the most integrated setting"—i.e., out in the community—is unlawful. Indeed, in their Prayer for Relief, Plaintiffs seek injunctive relief directing that Defendants "[r]easonably modify the State's community services system so that each Plaintiff and member of the Plaintiff Class is being treated and receiving services *in the most integrated setting within ninety days of reaching a Full Level 4*." (Emphasis added.) (Prayer for Relief, ¶ 6(c)). Thus, they attack the fact and duration of their custody. As a result, they must proceed by way of an application for writ of habeas corpus under 28 U.S.C. § 2254. For this reason, the entire complaint must be dismissed.

## III.  PLAINTIFFS LACK STANDING

Plaintiffs lack standing because they have not alleged any facts, much less the kind of specific facts that Article III requires, to establish that they have suffered an injury-in-fact from any of Defendants' actions.

"Three elements comprise the irreducible constitutional minimum' of standing: the individual initiating the suit must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *United States v. Smith*, 945 F.3d 729, 736 (2d Cir. 2019) (quotation marks omitted). Plaintiffs bear the "burden to prove [their] standing by pointing to specific facts" that

satisfy each of these three requirements. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 n.4 (2013). That burden requires Plaintiffs to "demonstrate standing for each claim he seeks to press" and "for each form of relief" that he seeks. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quotation marks omitted).

Importantly for purposes here, conclusory allegations of harm are not enough to satisfy these elements; "'[w]hile the standard for reviewing standing at the pleading stage is lenient, a plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing.'" *Robinson v. Sessions*, 721 F. App'x 20, 23 n.3 (2d Cir.), *cert. denied*, 138 S. Ct. 2584 (2018) (Summary Order), (quoting *Baur v. Veneman*, 352 F.3d 625, 636-37 (2d Cir. 2003)); *see also, e.g., Murphy v. Lamont*, No. 3:20-CV-0694 (JCH), 2020 U.S. Dist. LEXIS 13696, at *10-13 (D. Conn. Aug. 3, 2020) (dismissing challenge to COVID orders for lack of standing because allegations of harm were "conclusory" and "vague," and thus insufficient to satisfy Article III). Further, although the Court "must accept as true all material factual allegations in the complaint," it cannot "draw inferences from the complaint favorable to plaintiff[ ]." *N.S.*, 386 F.3d at 110.

## A. Plaintiffs Fail to Allege an Injury in Fact

Plaintiffs ground their entire complaint on the incorrect claim that the ADA and Section 504 prohibit institutionalization. It is on this foundation that Plaintiffs erroneously argue that they have a right to receive "mental health treatment" in the community. Neither the ADA, Section 504 nor *Olmstead*, prohibit confining Plaintiffs at WFH; instead, these laws prohibit the "unjustified" institutionalization of persons with mental disabilities. *Olmstead*, 527 U.S. at 597. The Superior Court was justified when it committed Plaintiffs to the PSRB. Similarly, the PSRB's decisions regarding each acquittees' confinement at WFH were justified. Indeed, when

Plaintiffs pleaded Conn. Gen. Stat. § 53a-13 affirmative defense, they all admitted that they committed crimes for which they were charged. *Sastrom*, 286 Conn. at 662-63. The Superior Court ordered each Plaintiff's commitment to the PSRB after they were found not guilty of committing their crimes by reason of mental disease and defect, and the Court determined that Plaintiffs' mental condition and level of dangerousness required their commitment to the PSRB.

As discussed, *supra,* pp. 13-15, Plaintiffs fail to allege that any treatment professional has determined that they are appropriate for community-based treatment. Accordingly, Plaintiffs do not have a legal right to community-based treatment, and they fail to plead an injury in fact.

Although not binding on this court, *Summers v. Louisiana*, 2022 U.S. Dist. LEXIS 174446 (M.D.La. Sept. 27, 2022) is instructive. In *Summers*, one of the plaintiffs, Mr. Summers, was charged with second degree murder and was found not guilty by reason of insanity ("NGRI"). After the NGRI finding, the state court committed him to Eastern Louisiana Mental Health System ("ELMHS"). *Id.* at *7. Mr. Summers and other plaintiffs requested reasonable accommodations including the following: adequate funding for the state Louisiana Department of Health ("LDOH"); the development of an outpatient treatment program; training of the LDOH staff on accommodating patients with disabilities and ongoing assessment of Plaintiffs' needs as individuals with a disability; release from ELMHS while the outpatient treatment program is developed; and an order that defendants comply with the ADA and Section 504 "which would enhance their ability for accelerated release from ELMHS." *Id.* at *10 n.3.

The *Summers* Court held that plaintiff had not alleged that he was qualified for release in the community (where he could receive community-based treatment) because he failed to allege that any treatment professional determined plaintiff was appropriate for community placement and no state court had found him eligible for community release. *Id.* *63-65. The Court

concluded that Mr. Summers' complaint only alleged a future injury that failed to satisfy standing requirements. *Id.* at *72.

As in *Summers*, Plaintiffs alleged injury is purely speculative. Plaintiffs fail to allege that any treatment professional has recommended that they may be safely treated in the community. As discussed, *supra*, pp. 13-15, Plaintiffs fail to allege they qualified for community-based treatment and do not have a legally protected right to be released into the community. Accordingly, Plaintiffs similarly lack standing to assert an ADA, Section 504 and *Olmstead* claim against the PSRB, DMHAS and WFH.

## B. Plaintiffs Lack Standing to Sue DMHAS and WFH for Injunctive or Declaratory Relief

Plaintiffs also lack standing to sue for declaratory or injunctive relief against DMHAS and WFH because they fail to plead facts showing that it is likely that the requested relief will redress their alleged "injury." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The party invoking the court's authority must make "a showing that there is a 'substantial likelihood that the relief requested will redress the injury claimed.'" *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 450 (2d Cir. 2014) (quoting *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 75 n.20, (1978)); *Steel Co. v, Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

DMHAS and WFH do not have the legal authority to provide Plaintiffs temporary leave or conditional release from WFH or discharge them from WFH and place them in the community. None of the Plaintiffs allege that the PSRB granted them conditional release or temporary leave that permits them to be treated exclusively in the community**.** Nor do they allege

that the Superior Court has ordered their discharge from the PSRB's jurisdiction. An acquittee may only be released into the community after the PSRB has granted the acquittee temporary leave or conditional release; or the Superior Court has ordered the acquittee discharged from the PSRB's jurisdiction. Conn. Gen. Stat. §§ 17a-583, 17a-584, 17a-587, 17a-588 and 17a-593. Thus, none of the relief Plaintiffs seek against DMHAS and WFH will redress Plaintiffs' alleged "injury".

## IV. MOOMOOTNESS

Plaintiffs' claims should be dismissed for mootness because they are based on amended statutes. Even "Constitutional challenges to statutes are routinely found moot when a statute is amended, or unripe when proposed regulatory amendments are pending." *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 61 (2d Cir. 1992) (cleaned up).[10] "The argument for mootness would seem to be even stronger when the challenged statute has expired and a new statute, endeavoring to remedy the defect of the old one, has been enacted." *Chrysafis v. Marks*, 15 F.4th 208, 213 (2d Cir. 2021).

In this case, Plaintiffs' claims are based at least in part on their assertions that Conn. Gen. Stat. §§ 17a-582 and 17a-584 violate the ADA and/or the Rehabilitation Act which Plaintiffs incorporate into all nine counts. See Complaint, ¶¶ 49, 51. Pursuant to § 17a-582, the Superior Court is authorized to conduct a hearing and determine whether it should order an acquittee confined or conditionally released. Conn. Gen. Stat. § 17a-582(e). Connecticut General Statutes § 17a-584 governs the factors that the PSRB must consider when considering the discharge, conditional release, or confinement of an acquittee. Conn. Gen. Stat. § 17a-584.

---

[10] Some courts dismiss the case for lack of standing instead of mootness when a statute is amended. *See id*. (citing *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1208-09).

As of October 3, 2022, Conn. Gen. Stat. §§ 17a-582 and 17a-584 were substantially revised. *See* P.A. 22-45 §§ 3[11] and 4.[12] Before § 17a-582's revision, the Superior Court's statutory concern was limited to "the protection of society." However, after the revision, the Court's dual primary concerns <u>are the safety and well-being of the acquittee</u> <u>and</u> the protection of society. *Id*. No Plaintiff has alleged that he or she has gone through a court hearing under the revised statute. Plaintiffs have not, and cannot, allege how the revised statute will be implemented in practice and instead simply characterize the statute as "amended slightly." (Complaint, ¶ 51.) A plain reading of the amendment reveals that Plaintiffs' characterization is inaccurate. It is entirely speculative to assume that Defendants (and the Superior Court) will apply the statute in a manner that will violate the ADA or the Rehabilitation Act.

Connecticut General Statutes § 17a-584, like § 17a-582, was substantially revised to require the PSRB to consider as its primary concerns, the safety and well-being of the acquittee and the protection of society. P.A. 22-45 § 4. No Plaintiff has alleged that he or she has gone through a PSRB hearing under the revised statute. Instead, Plaintiffs allege that the statute was "amended slightly." (Complaint, ¶ 51). Here again, Plaintiffs have not, and cannot, allege facts

---

[11] "At the hearing, the court shall make a finding as to the mental condition of the acquittee and, considering that its primary [concern is] <u>concerns are</u> the protection of society <u>and the safety and well-being of the acquittee</u>, make one of the following orders:. . . ". P.A. 22-45 ¶ 3.

[12] "At any hearing before the board considering the discharge, conditional release or confinement of the acquittee, except a hearing pursuant to section 17a-592 or subsection (d) of section 17a-593, the board shall make a finding as to the mental condition of the acquittee and, considering that its primary [concern is] concerns are the protection of society <u>and the safety and well-being of the acquittee</u>, shall do one of the following:
(1) If the board finds that the acquittee is a person who should be discharged, it shall recommend such discharge to the court pursuant to section 17a-593, <u>as amended by this act</u>.
(2) If the board finds that the acquittee is a person who should be conditionally released, the board shall order the acquittee conditionally released subject to such conditions as are necessary to prevent the acquittee from constituting a danger to himself or others.
(3) If the board finds that the acquittee is a person who should be confined, the board shall order the person confined in a hospital for psychiatric disabilities or placed with the Commissioner of Developmental Services for custody, care and treatment." P.A. 22-45 ¶ 4.

showing how the revised statute will be implemented in practice and can only speculate about its impact.

Finally, like the statutes above, effective October 1, 2022, the temporary leave statute, Conn. Gen. Stat. § 17a-587 was fundamentally amended to allow an acquittee, or person acting on the acquitee's behalf, to apply to the PSRB for an order of temporary leave. P.A. 22-45 § 7(b). Here again, Plaintiffs base their request for relief on a statute which has been amended. *See* Complaint, ¶¶ 58, 64, 65, 67, 68, 70, 71, 74, 94, 103, 112-15, 123-24, 126, 127, 131, 171, 176 that are incorporated into all counts. Again, it is entirely speculative to make any assumptions regarding this amended statute's impact on Plaintiffs.

For these reasons, Plaintiffs' claims are moot and should be dismissed.

## V. *YOUNGER* **ABSTENTION DOCTRINE PRECLUDES THIS COURT FROM INTERFERING WITH PLAINTIFFS' ONGOING STATE PROCEEDINGS THAT REVIEW PLAINTIFFS' COMMITMENT IN WHICH THE STATE HAS AN INTEREST IN ENFORCING**

Plaintiffs ask this Court to interfere with how Defendants review and oversee commitment and community integration. This Court cannot assert jurisdiction to provide the injunctive and declaratory relief that Plaintiffs seek under the *Younger* abstention. *Younger v. Harris,* 401 U.S. 37 (1971).

*Younger* abstention seeks to guard against "unacceptable interference with [] ongoing state proceeding." *Kirschner v. Klemons*, 225 F.3d 227, 238 (2d Cir. 2000). In *Younger*, as further refined by the Supreme Court's decision in *Sprint Comms., Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013), "a district court must dismiss [a] federal action if it involves ongoing: (1) state criminal prosecutions, (2) civil proceedings that are akin to criminal prosecutions, or (3) civil proceedings that implicate a State's interest in enforcing the orders and judgments of its courts." *Davis v. Baldwin*, 594 F. App'x 49, 51 (2d Cir. 2015) (quotation marks omitted).

The PSRB commitment proceedings fall into the second and/or third categories. A New York district court recently held that an acquittee recommitment proceedings fall within the second *Younger* category—civil proceedings that are akin to criminal prosecutions. *See Justice v. Woodlock*, Docket No. 9:13-CV-252 (NAM/TWD), 2015 U.S. Dist. LEXIS 2877, at *5 (N.D.N.Y. Jan. 12, 2015). The court explained that although recommitment proceedings are civil in nature, "they are more akin to a criminal prosecution than are most civil cases" because they apply "only to those who have been found to be not responsible of a crime by reason of mental disease or defect." *Id.* In addition, the "process begins when a state criminal prosecution concludes with a verdict or plea of not responsible by reason of mental disease or defect" at which time a process of evaluation and review similar to Connecticut's process begins. *Id. See also Davy v. Comm'r of Mental Health*, 2019 U.S. Dist. LEXIS 89072 (E.D.N.Y. May 28, 2019); and *Jones v. Cuomo,* 2017 U.S. Dist. LEXIS 171706 *2 (W.D.N.Y. 2017) similarly holding.

Irrespective of whether the state commitment proceedings fall into the second or third categories, *Younger* precludes asserting jurisdiction. The PSRB's oversight and review of Plaintiffs' commitment terms constitute ongoing state court proceedings. Plaintiffs themselves describe that process in their Complaint. (Complaint, ¶¶ 41, 49-51, 57-8, 64-5, 68, 71). Specifically, the process begins when a state court finds an acquittee not guilty of criminal charges by reason of mental disease or defect. Conn. Gen. Stat. §§ 53a-13 and 17a-580. Next, the state court orders the acquittee committed to the custody of DMHAS who confines the acquittee at a state hospital for examination. Conn. Gen. Stat. § 17a-582. DMHAS then submits a report about the examination to the state court, who holds a hearing to determine whether the acquittee should be confined, conditionally released, or discharged. Conn. Gen. Stat. § 17a-582(e) and (f). When making that determination, the state court considers whether the acquittee "is so violent as

to require" confinement under conditions of maximum security. Conn. Gen. Stat. § 17-599. If the state court determines that the acquittee should be confined or conditionally released, it commits the acquittee to the jurisdiction of the PSRB and specifies a maximum term of commitment. Conn. Gen. Stat. §§ 17a-582 (e), 17a-583.

Throughout the entire term of commitment, acquittees remain under the jurisdiction of the PSRB. (Complaint, ¶ 65); *see also* Conn. Gen. Stat. § 17a-582 (h); *see also Payne*, 215 Conn. at 682 n.5. The PSRB monitors the confinement, conditional release, and temporary leaves of acquittees. Conn. Gen. Stat. § 17a-584. For example, the PSRB performs an initial hearing to review the acquittee's status within 90 days to determine whether the acquittee should be conditionally released, confined, or recommended for discharge to the state court. Conn. Gen. Stat. §§ 17a-583 and 17a-584. The PSRB reviews each acquittee's status at least every two years by conducting a hearing to determine whether their condition warrants a change in confinement, conditional release, temporary leave or if the acquittee should be recommended for discharge. Conn. Gen. Stat. § 17a-585.

Before the expiration of the acquittee's term of commitment, the acquittee may apply directly to the state court once every six months for release from the PSRB's jurisdiction, Conn. Gen. Stat. § 17a-593(a), and the PSRB may recommend discharge to the state court on its own accord at any time. Conn. Gen. Stat. § 17a-593. *See Harris*, 277 Conn. at 383; *Long*, 268 Conn. at 520. The authority to discharge an acquittee from the PSRB's jurisdiction rests exclusively with state courts.

The process described above constitutes ongoing state proceedings for the purposes of *Younger* abstention. *See Sastrom v. Berger,* Docket No. 3:03-CV-671(DJS), 2004 U.S. Dist. LEXIS 1692, at *7 (D.Conn. Feb. 9, 2004) ("Neither party contests the existence of an ongoing

state proceeding. . . ."); *see also Griest v. Norristown State Hosp.*, Docket No. 96-CV-8495, 1997 U.S. Dist. LEXIS 16320, at *26 (E.D. Penn. Oct. 16, 1997) ("[T]he initial order of involuntary commitment and subsequent annual review of plaintiff's status by the Chester County Court pursuant to Pennsylvania's Mental Health Procedures Act . . . constitute an ongoing state judicial proceeding to which the plaintiff is a party.").

If this Court grants the Plaintiffs the relief they seek, it would require interference with Plaintiffs' ongoing state proceedings because this Court would have to modify the way that state court and the PSRB oversee acquittees' commitments. For example, this Court could not enjoin Defendants from "failing to provide appropriate, integrated community services and supports for all class members, consistent with their individual needs" without involving itself in Defendants' determinations about what supports and services are appropriate for each Plaintiff. (Prayer for Relief ¶ 5(a). Similarly, this Court cannot order Defendants to modify the community-based mental health services systems "so that each Plaintiff and member of the Plaintiff Class is being treated . . . in the most integrated setting within ninety days of reaching a Full Level 4" without interfering in the PSRB's determination of whether and to what extent Plaintiffs are eligible for conditional release and temporary leave so that they may exclusively receive community-based mental health services. *Id.* ¶ 6.c.

This case also satisfies the third *Younger* category because enforcement of the commitment terms concerns an undeniably important state interest—administration of the state's criminal justice system by treating acquittees and protecting the "general public." *See Sastrom v. Psychiatric Sec. Review Bd.*, 291 Conn. 307, 324-25 (2009). The Connecticut Supreme Court has said that "[t]he purpose of [an acquittee's] commitment is to treat the individual's mental illness and protect him and society from his potential dangerousness." *March*, 265 Conn. at 715

(citation and internal quotation marks omitted). To protect those interests, the state has enacted the statutory scheme that governs commitment and enables the administration of criminal justice appropriate for acquittees. *See Hansel v. Town Court*, 56 F.3d 391, 393 (2d Cir. 1995), *cert denied,* 516 U.S. 1012 (1995) ("[I]t is axiomatic that a state's interest in the administration of criminal justice within its borders is an important one.") (citation omitted).

Accordingly, this Court must decline to interfere under the *Younger* abstention doctrine.

## VI.  THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE ADA AND SECTION 504 AND MUST BE DISMISSED PURSUANT TO 12(b)(6)

The standards adopted by the ADA and Section 504 are generally equivalent, thus Courts treat claims under these statutes identically. *Davis*, 821 F.3d at 259. As argued, *supra* pp. 9-23 (11th Amendment Failure to State a Claim section) and pp. 35-39 (Plaintiffs' Lack Standing), Plaintiffs fail to state a claim under the ADA. Accordingly, for these same reasons, Plaintiffs fail to state a claim under Section 504 and therefore all claims must be dismissed.

## CONCLUSION

For all of the foregoing reasons, the Court should grant this Motion and Dismiss this case in its entirety with prejudice.

Respectfully submitted,

DEFENDANTS,

WILLIAM TONG
ATTORNEY GENERAL

DEFENDANTS,
DEPARTMENT OF MENTAL HEALTH
AND ADDICTION SERVICES AND
WHITING FORESNIC HOSPITAL


BY:    */s/ Rosemary M. McGovern*
       Rosemary M. McGovern
       Assistant Attorney General
       Federal Bar No. ct19594
       165 Capitol Avenue
       Hartford, CT  06106
       Tel: (860) 808-5210
       Fax: (860) 808-5385
       rosemary.mcgovern@ct.gov


BY:    */s/ Shawn L. Rutchick*
       Shawn L. Rutchick
       Assistant Attorney General
       Federal Bar No. ct24866
       165 Capitol Avenue
       Hartford, CT 06106
       Tel: (860) 808-5210
       Fax: (860) 808-5385
       shawn.rutchick@ct.gov

       DEFENDANT,
       PSYCHIATRIC SECURITY REVIEW
       BOARD

       */s/ Tanya DeMattia*
       Tanya DeMattia
       Assistant Attorney General
       Federal Bar No. ct14966
       165 Capitol Avenue
       Hartford, CT 06106
       Tel: (860) 808-5210
       Fax: (860) 808-5385
       tanya.demattia@ct.gov

46

*/s/ Alina Bricklin-Goldstein*
Alina Bricklin-Goldstein
Assistant Attorney General
Federal Bar No. ct31266
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5210
Fax: (860) 808-5385
alina.bricklin-goldstein@ct.gov

*/s/ Jo Anne Sulik*
Jo Anne Sulik
Senior Assistant State's Attorney
Federal Bar No. ct15122
Civil Litigation Bureau
Office of the Chief State's Attorney
300 Corporate Place
Rocky Hill, CT 06067
Tel: (860) 258-5887
Fax: (860) 258-5968
joanne.sulik@ct.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2023, a copy of the foregoing was electronically filed.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.

*/s/ Rosemary M. McGovern*
Rosemary M. McGovern
Assistant Attorney General

**EXHIBIT 1 -  AFFIDAVIT OF HEATHER NOLAN**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANTHONY DYOUS, ET AL, | : | CIVIL NO. 3:22-CV-01518-SVN |
| *Plaintiff,* | : | |
| | : | |
| V. | : | |
| | : | |
| DEPARTMENT OF MENTAL HEALTH, | : | |
| AND ADDICTION SERVICES, ET AL., | : | |
| *Defendants.* | : | APRIL____, 2023 |

## AFFIDAVIT OF HEATHER NOLAN

I, Heather Nolan, having been sworn, deposes and says:

1. I am over eighteen years of age and believe in the obligation of an oath.

2. The foregoing statement is based upon my personal knowledge.

3. I am presently employed as the Director of Social Services at Whiting Forensic Hospital.

4. Whiting Forensic Hospital ("WFH") is an inpatient psychiatric treatment facility of the State of Connecticut Department of Mental Health and Addiction Services ("DMHAS").

5. WFH is comprised of two buildings: Whiting and Dutcher. Whiting is a maximum-security psychiatric treatment facility. Dutcher is an enhanced security psychiatric treatment facility.

1

6. The Psychiatric Security Review Board ("PSRB") ordered Plaintiffs Anthony Dyous, Vincenzo Lindia, Taina Morales, Carson Mueller, Ling Xin Wu confined at Dutcher.

7. I have reviewed WFH records regarding each plaintiff and their records reveal the following that:

   a. On March 18, 2022, the Superior Court recommitted Mr. Dyous to the PSRB for a period not to exceed five years.

   b. In 2014, the Hartford Superior Court committed Plaintiff Wu to the PSRB for a period of thirty-five years after he was acquitted by reason of mental disease or defect of the charges of assault in the first degree, manslaughter in the first degree, reckless driving and reckless endangerment in the first degree.

   c. In 1988, the New London Superior Court committed Plaintiff Lindia to the PSRB for up to thirty-five years after he was acquitted by reason of mental disease or defect on the charges of arson in the first degree, criminal mischief in the first degree and five counts of reckless endangerment in the first degree.

   d. In 2012, the New Haven Superior Court committed Plaintiff Morales to the PSRB for a period not to exceed ten years after she was acquitted by reason of mental disease or defect on the charges

of assault in the first degree. Plaintiff Morales, through her attorney, has consented to extending her PSRB commitment until July 12, 2024.

    e. In 2009, a three judge panel of the Superior Court committed Mr. Muller to PSRB for a period not to exceed sixty years.

8.    I have read the foregoing statements and they are true to the best of my knowledge and belief.


                    *Heather Nolan*
                    Heather Nolan
                    Director of Social Services
                    Whiting Forensic Hospital


STATE OF CONNECTICUT      )
                      :   ss. Middletown
COUNTY OF MIDDLESEX     )

Sworn and subscribed before me on this __13th__ day of April, 2023.

> ANEISHA HAWTHORNE
> Notary Public, Connecticut
> My Commission Expires Dec. 31, 2024

                    *[signature]*
                    Notary Public
                    Commissioner of the Superior Court

**EXHIBIT 2 - AFFIDAVIT OF VANESSA CARDELLA**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

ANTHONY DYOUS, ET AL,           :      CIVIL NO. 3:22-CV-01518-SVN
*Plaintiff,*                    :

                           :

v.                              :

                           :

DEPARTMENT OF MENTAL HEALTH,     :
AND ADDICTION SERVICES, ET AL.,  :
*Defendants.*                    :      APRIL 12, 2023

## <u>AFFIDAVIT OF VANESSA CARDELLA</u>

I, Vanessa Cardella, am over the age of eighteen, understand the obligations of an oath and having been duly sworn, state as follows:

1. I make this Affidavit based on my personal knowledge and understand that it will be submitted to the Court in connection with the above-captioned case in support of Defendants' Motion to Dismiss.

2. I am the current Executive Director of the Psychiatric Security Review Board ("PSRB" or "the Board") and have been since February 26, 2021.

3. The PSRB is charged with jurisdiction over acquittees, including being responsible for monitoring confinement, conditional release, and discharge of acquittees. Conn. Gen. Stat. § 17a-584.

4. The PSRB provides the Superior Court with expertise and advice on acquittees' readiness for discharge from the Board's jurisdiction. Conn. Gen. Stat. § 17a-593(d).

5. As the Executive Director of the PSRB, I am responsible for the Board's day-to-day operations, including receiving and maintaining the records of acquittees committed to the Board, facilitating and assisting at the Board's hearings, and drafting and signing the Board's decision.

6. I am aware of the federal lawsuit brought by acquittees Anthony Dyous, Ling Xin Wu, Vincenzo Lindia, Taina Morales, and Carson Mueller.

7. The PSRB is within the Department of Mental Health and Addiction Services ("DMHAS") for administrative purposes only, which means that DMHAS is required to perform certain administrative tasks for the PSRB.

8. It is my understanding that small agencies like the PSRB are assigned to larger agencies for administrative purposes because it is inefficient and not cost-effective for each agency to employee personnel to perform certain administrative duties, when such duties can be performed by the personnel of one agency, for both agencies.

9. After becoming PSRB's Executive Director, I became aware of an administrative agreement between the PSRB and DMHAS which outlines what administrative functions the PSRB can expect DMHAS to provide to the PSRB.

10. Pursuant to my review of the PSRB's records, the agreement has existed since 1986, and it is reviewed and renewed annually.

11. One of the administrative duties DMHAS performs for the PSRB is the annual submission of the PSRB's budgetary request.

12. DMHAS neither determines the PSRB's budgetary requests nor influences or controls how the appropriated funds get spent.

13. The PSRB's budget is allocated exclusively from the State's General Fund.

14. The PSRB neither directly requests, nor directly receives, federal financial assistance.

15. The PSRB neither requests federal funds from DMHAS, nor does it receive federal funds from DMHAS.

16. The PSRB neither requests that DMHAS expend federal funds on the PSRB, nor does DMHAS actually expend federal funds on the PSRB.

17. DMHAS has no authority over the operations of the PSRB.

18. DMHAS does not, and cannot, make policy or programmatic decisions for the PSRB.

19. On March 23, 2022, I received a copy of a 12-page letter from Disability Rights Connecticut and Connecticut Legal Rights Project regarding "Right of Acquittees to Receive Services in the Most Integrated Setting Per Federal Law." A true and accurate copy of this letter is attached hereto as **Exhibit A**.

20. I have read the foregoing statements and they are true to the best of my knowledge and belief.

Vanessa Cardella
Executive Director of Psychiatric Security
Review Board Connecticut

STATE OF CONNECTICUT )

                                   ss. HARTFORD

COUNTY OF HARTFORD )

Sworn and subscribed before me on this ⁴⁄ day of _April_ 2023.

_____

Notary Public
Commissioner of the Superior Court

4

# EXHIBIT A - CARDELLA AFFIDAVIT



*By Electronic Mail*

March 23, 2022

William Tong
Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
([Attorney.General@ct.gov](mailto:Attorney.General@ct.gov))

Commissioner Nancy Navarretta
Department of Mental Health and Addiction Services
410 Capitol Avenue
PO Box 341431
Hartford, CT 06134
([Nancy.Navaretta@ct.gov](mailto:Nancy.Navaretta@ct.gov))

Chair Sheila Hennessey
c/o Vanessa Cardella, Executive Director
Psychiatric Security Review Board
505 Hudson Street
Hartford, CT 06106
(Vanessa.Cardella@ct.gov)

**Re: Right of Acquittees to Receive Services in the Most Integrated Setting Per Federal Law**

Dear Attorney General Tong, Commissioner Navarretta, and Chair Hennessey:

The Connecticut Legal Rights Project and Disability Rights Connecticut write to assert our clients' rights to receive mental health supports and services in the most integrated setting and in a timely manner in accordance with standards required by Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504). We represent individuals who have been found not guilty by reason of mental disease or defect ("acquittees"), have been committed by the Superior Court to the jurisdiction of the Psychiatric Security Review Board ("PSRB"), and currently are residing in Whiting Forensic Hospital ("WFH"). Our clients assert four violations of their rights to be free from disability discrimination under the ADA, Section 504, and their respective implementing regulations. Specifically, these violations, as described below, include: 1) failing to provide sufficient

**Cardella Affidavit, Ex. A**

community-based provider capacity to provide acquittees with supports and services in the most integrated setting when, with the needed and appropriate supports and services, they are no longer a danger to self or others; 2) failing to reasonably modify policies, practices and procedures so that acquittees can receive forensic mental health services in the most integrated settings; 3) engaging in discriminatory methods of administration in operating its mental health system; and 4) applying the "public safety" mandate of the Connecticut statute regarding the PSRB in a way which violates the ADA.

Although the unlawful State practices and legal interpretations we describe in this letter have been well known to you and other State officials, there has been little or no effective action to remediate the problems. The dire situations facing our clients have most recently been highlighted by the legislatively-appointed CVH-Whiting Task Force ("Task Force"). The Task Force's final report describes the serious shortcomings with the PSRB, Whiting Forensic Hospital, and the State's system for responding to cases involving acquittees. Among its other recommendations, the Task Force calls for the abolition of the PSRB; abolition of recommitments; elimination of the PSRB from transfers from WFH Maximum Service to Dutcher Service; and enhancement of community services to ensure that patients are determined to be ready for transition leave and conditional leave in a timely manner.[1] The Legislature's Public Health Committee voted on February 14, 2022 to advance a concept bill that would implement some of the recommendations of the Task Force.[2] A public hearing on Raised Bill No. 450 is scheduled for March 28, 2022.

The circumstances we describe below violate federal law and must be promptly remedied. We include several demands for action that are necessary to ensure that acquittees are afforded their right to receive services in the most integrated setting possible, to end illegal discrimination based on disability, and to bring the State into compliance with the ADA.

**I.  Our Clients and Connecticut's Forensic Mental Health System for Individuals Found Not Guilty by Reason of a Mental Health Condition.**

      **A. How the State's forensic mental health system illegally fails acquittees.[3]**

The individuals we represent have been left behind in efforts to reform the criminal legal system in Connecticut.[4] Once a court finds a defendant to be not guilty by reason of mental disease or defect, responsibility for acquittees is shared by two entities –the PSRB and DMHAS. The PSRB

---

[1] https://www.cga.ct.gov/ph/tfs/20190426_CVH%20Whiting%20Task%20Force/CVH%20Whiting%20Final%20Report.pdf.

[2] https://www.cga.ct.gov/2022/TOB/S/PDF/2022SB-00450-R00-SB.PDF.

[3] We acknowledge that DMHAS has struggled to administer WFH as a hospital and not as a correctional institution. DMHAS has described the process as a "pendulum swing" between corrections and hospital.
See "Evolution of Forensic Services in Connecticut," Michael Norko and Madelon Baranoski, IRCC Conference, New Haven, CT, May 14, 2015.

[4] Acquittees are qualified individuals with disabilities pursuant to 28 C.F.R. § 35.108 in that they have "emotional or mental illness," 28 C.F.R. § 25.108(b)(1); have a record of such a disability; and/or are regarded as having such a disability.  Acquittees' disabilities substantially limit one or more major life activities and are listed as types of disabilities afforded coverage by the ADA.  28 C.F.R. § 35.108(d)(2(iii)(K).  Acquittees' disabilities should be considered in their un-medicated state.  28 C.F.R. § 35.108(d)(4)(i).

**Cardella Affidavit, Ex. A**

and DMHAS are each "public entities" within the meaning of the ADA[5] and, therefore, subject to the obligations and responsibilities in Title II.

In reality, State law treats acquittees with the worst aspects of two worlds – the criminal legal system and the forensic mental health system. Acquittees have not been convicted of a crime; state and federal law command that the State may not punish them. Nevertheless, acquittees are continuously punished through arbitrary, coercive enforcement of arbitrary rules which bear no relationship either to the acquittees' treatment needs or to public safety and through their unjustified continued involuntary institutionalization after they are ready for discharge.

Despite the fact that they have been determined by a court to be not guilty/not criminally responsible as a result of their mental health condition, acquittees are treated as convicted criminals. Unlike convicted individuals, however, they are discriminated against based on their disabilities because, among other things, they do not have the benefit of a fixed-term sentence with a chance for good time credits, probation or parole. Moreover, the acquittee is often pressured into a plea related to the maximum charge or charges. Some acquittees have been committed for 120-year terms.

At the same time, they experience the worst of institutional mental health confinement: patients are not convicted but are treated and regarded as a "dangerous criminally insane persons," subject to involuntary treatment orders, and often arbitrary seclusion, restraints, show of force, use of force, DMHAS Police enforcement of criminal laws, strip searches, and contraband searches. They are required to comply with every staff request, under video surveillance. They only slowly, if ever, make their way from WFH Maximum Security to medium security at the Dutcher building. Advancement along the hospital's byzantine privilege level system is equally slow and arduous. Acquittees have little to no privacy or confidentiality and some PSRB hearings which include discussions of their mental health conditions, their behavior and their treatment are even broadcast on television. The PSRB often makes treatment and medication suggestions while providing almost no due process in hearings that play out more as treatment team meetings than due process hearings.

### B. The slow, illegal process to temporary leave, conditional discharge and discharge.

When a court commits an acquittee to the jurisdiction of the PSRB, the PSRB causes the acquittee to be institutionalized at WFH, the state's forensic mental health facility operated by DMHAS.[6] They are usually first placed in maximum security at WFH. Although acquittees are in the physical custody of DMHAS, many of the restrictions imposed on them during their confinement are at the discretion of the PSRB or in consultation between WFH and the PSRB.

Most importantly for our clients' claims stated herein, the PSRB also decides when and under what conditions an acquittee may be prepared for temporary leave (or "TL") and conditional

---

[5] Title II of the Americans with Disabilities Act applies to all programs, services and activities of public entities. 42 U.S.C. § 12132; 28 C.F.R. § 35.102(a). Public entities are defined as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; . . ."
[6] Connecticut General Statutes § 17a-584. In the case of an acquittees with intellectual disabilities, some, but not all, are placed in the custody of the Commissioner of Connecticut Department of Developmental Services (DDS).

**Cardella Affidavit, Ex. A**

release from WFH. Only WFH may petition for temporary leave. The acquittee is not authorized to file a request for temporary leave. There are two ways an acquittee may be allowed to receive mental health treatment in the community. The first is temporary leave, which means the acquittee may leave WFH for treatment in the community temporarily. Temporary leave starts with one day during the day only and progresses to seven days and overnights. The acquittee remains a patient at WFH during temporary leaves. Conditional release status means that the acquittee lives in a community setting under conditions set by the PSRB. If the acquittee successfully completes the journey through temporary leave and conditional release, the PSRB may recommend to a court that the acquittee be discharged from PSRB jurisdiction. Usually, the acquittee must file a motion for discharge with the Superior Court. Only the Superior Court may discharge an acquittee from the jurisdiction of the PSRB.

The process for an acquittee to advance toward discharge is very lengthy and complex. It takes almost all acquittees many years to be recommended by the WFH treatment team, Forensic Review Committee and the Consulting Forensic Psychiatrist to even begin the journey toward discharge. An acquittee must first be recommended for transfer from WFH Max to Dutcher, a less secure building, where discharge planning may begin.

WFH Max and Dutcher have complex privileges systems. Before the discharge process can begin in earnest, acquittees must earn their way up the privilege levels to a "full Level 4"[7] which requires extended clinical stability and almost perfect sustained behavior. After many months and years of treatment and unit rules compliance, acquittees then wait many more months or even years to even start transition planning for a Phase 1 temporary leave.[8] Delays continue as the search for community-based programs begins and then almost inevitably stalls.

Then, finally, if an acquittee is recommended for temporary leave (the first concrete phase of the discharge process), the DMHAS system of community services and supports is so inadequately resourced that an acquittee often waits many more months, or even years, before a community service provider has the service capacity to accept and agrees to serve the individual. The state's failure to provide sufficient community-based forensic mental health services to allow a person who is no longer dangerous to be served on temporary leave and/or conditional release constitutes discriminatory unnecessary institutionalization in violation of the ADA.

This is so because there is an egregious shortage of community supports and services for acquittees who are ready for temporary leave and conditional release. Typically, when acquittees are informed that their clinical staff recommend that they are ready for Temporary Leave planning, they are asked to pick a catchment area. However, due to lack of provider capacity,

---

[7] Level 4 privileges are detailed in the Whiting Forensic Hospital Operational Procedure Manual Section I, Chapter 2, Procedure 2.7 Dutcher Service: Patient Privilege Levels. Level 4 privileges are the highest level of privileges and allow patients to be in their own custody within the Dutcher Building, between Dutcher and other buildings and on grounds without staff. Full Level 4 privileges mean Level 4 and all allowed pass times. Pass times are usually for 50-55 minutes and require the patient to return to the unit, sign in and sign back out for each pass time hour.

[8] Phase 1 TL is a temporary leave to a community provider during the day, usually from 9 a.m. to 2 p.m. Phase 1 TL's progress from anywhere from one day a week to five days a week. Phase 2 TL is authorized by the PSRB after successful management of Phase 1 TL's and progresses to overnight residential services with a TL community provider. Phase 2 TL's progress up to seven days a week and lead to Conditional Release (CR). Condition release is discharge from WFH and full-time community residential services and supports.

**Cardella Affidavit, Ex. A**

forensic community providers in many catchment areas have told inquiring acquittees that they are not accepting new clients and that the waiting list may be months or even more than a year.

Acceptance by a provider is just the beginning of the discharge process. As its name implies, the leave is only temporary and may be (and often is) revoked –for meaningless technical violations of the PSRB's TL order in its Memorandum of Decision issued as to that individual or through no fault of the acquittee but due entirely to errors by the provider or systemic problems in DMHAS's community provider system.

"Conditional release," the next concrete step to full discharge, is likewise just what its name implies – conditioned on terms and conditions imposed, and potentially and often revoked, by the PSRB.

Many acquittees serve their entire commitment term (almost always the maximum sentence to which they could have been sentenced for the most serious crime for which they are charged) and then are subjected to **recommitment** terms of many more years—sometimes well beyond any sentence they could have received had they been convicted.

> **C. Our clients' experiences are representative of illegal institutionalization due to the failures of the State to provide them the most integrated services to which they are entitled.**

Our clients and others like them have been subjected to all of the system's illegal and discriminatory actions, policies, and procedures faults. Moreover, we have represented and are aware of other acquittees who are at risk of these discriminatory actions.  For instance:

**Client #1**: C1 is a 56 year-old acquittee who has been institutionalized or incarcerated for much of his life.  C1 was committed to WFH under the jurisdiction of the PSRB in 1998. The PSRB confined C1 in Whiting Maximum Security for almost 20 years, with a few failed transitions up to Dutcher. The PSRB again ordered his transfer to Dutcher in 2018. He has done well in Dutcher, worked his way to a full level four privilege status which authorizes unescorted grounds passes throughout the day for fifty minutes at a time.  At Dutcher and before at WFH, C1 has consistently engaged in treatment and he now has a job on campus as part of the vocational program.

A year ago, C1's treatment team determined that he is clinically stable and ready for temporary leave.  Over a period of many months the WFH treatment team decision was exhaustively reviewed by the WFH Forensic Review Committee and the DMHAS Consulting Forensic Psychiatrist.[9] These reviews have needlessly delayed C1's discharge for months. Finally, after years of clinical stability and exhaustive and repetitive internal reviews, the treatment team's recommendation was approved and C1 was instructed by the treatment team to choose a catchment area for a local mental health authority (LMHA) and community providers for

---

[9] The Whiting Forensic Review Committee is made up of the Chief Executive Officer, DMHAS Chief of Forensic Services, Whiting Chief Medical Officer, Service Medical Director for Whiting, Service Medical Director for Dutcher, Program Manager for Whiting and Program Manager for Dutcher.  DMHAS has a Forensic Services Division which includes Forensic Psychiatry Services staffed by forensic psychiatrists operating under a contract with Yale University out of the Office of the Commissioner.

**Cardella Affidavit, Ex. A**

temporary leave planning. C1 chose the Middletown catchment area. A social worker contacted River Valley Services, the LMHA for Middletown, but was told that it has no openings for forensic community services and has a long waiting list. The LMHA could not predict when there might be an available opening for C1. C1 must now chose to wait or pick another catchment area and start the process over. Either way, he faces unknown further needless delays.

**Client # 2**: C2 is a 40-year-old acquittee. C2 was committed to the jurisdiction of the PSRB ten years ago. C2 spent three years in Whiting Maximum Security Service and transferred to Dutcher in 2015. C2 worked his way to a full Level 4 with six pass times in 2016. He has maintained that status for six years through to the present. C2's treatment team, Consulting Forensic Psychiatrist, the Forensic Review Committee and the PSRB all approved C2 for temporary leave in January 2020. He began going out on temporary leave to a day program with Community Mental Health Affiliates (CMHA), a DMHAS-funded program in New Britain, Connecticut. Due to his excellent progress, C2 worked up to 3 days a week TL after only a few weeks. However, in the first week of March 2020 C2's temporary leaves were suspended through no fault of his own due solely to a combination of a lease non-renewal and funding reduction experienced by CMHA. DMHAS and CMHA bear full responsibility for this failure. The WFH treatment team told C2 he had to find a new catchment area and provider in order to re-start temporary leaves. C2's progress to discharge had been halted and he was needlessly and illegally returned to a segregated setting on a full-time basis. The WFH treatment team told C2 it would take more than a year to get a new TL plan in place. In 2021, C2 was finally granted conditional release in January 2022 after being denied community services for over a year.

**Client # 3**: C3 is a 32-year-old acquittee in Dutcher Service at WFH committed to the jurisdiction of the PSRB in 2014 for 35 years. C3 was in WFH Maximum Security Service for two years and transferred to Dutcher in May 2016. C3 quickly made his way to a full level 4. He was a full level 4 for almost two years before the PSRB finally granted his Phase 1 TL in January 2019, after a long wait for community services from Capitol Region Mental Health Center. C3 was successfully and safely participating in his Phase 1 day TL when it was discovered that a WFH staff person had borrowed $200 from him, was fired, and then borrowed more money from him. The WFH staff person sent C3 a gift card to pay the loan back and other staff intercepted his mail, opened it, and confiscated the gift card. WFH staff reported the incident to the PSRB and his Phase 1 TL was put on hold and he was ordered to get a conservator of the person. He was blamed by WFH for the illegal actions of WFH's own staff and then punished by the PSRB for being a victim of the staff's theft. The PSRB's withdrawal of his TL status was unjustified and entirely out of proportion to his role as a victim of illegal and unethical actions by WFH's staff. The order that he get a conservator of the person is both illogical and outside the jurisdiction and competence of the PSRB. Since March 2020, due to the pandemic, state retirements, and staffing shortages, Capitol Region Mental Health Center does not have the staff to provide Phase 1 day TL's for C3.

The experience of Clients 1, 2 and 3 are typical of those of other acquittees. Moreover, it is likely that these will be the same experiences of people who are at risk of being re-institutionalized at WHF.

**II. The State Has Abrogated Its Legal Responsibilities Under Title II of the ADA by Failing to Ensure That There is Sufficient Provider Capacity to Serve Acquittees in the Most Integrated Settings.**

The ADA specifies that discrimination against people with disabilities includes "segregation" and "institutionalization." 42 U.S.C. § 12101(a)(3), (5).  A public entity violates Title II of the ADA when it segregates people with disabilities in public or private facilities or promotes the segregation of people with disabilities in such facilities through its planning, system design, funding choices, or service implementation.  *See, e.g.*, 28 C.F.R. § 35.130(d). Section 504 has similar requirements.

Connecticut operates and maintains significantly inadequate capacity in the provision of forensic mental health community services.  Consequently, qualified acquittees remain unnecessarily segregated and institutionalized at WFH and others living in the community are at risk of re-institutionalization—resulting in disability discrimination in violation of Title II of the ADA.  42 U.S.C. § 12132; 28 C.F.R. § 35.130(d); *Olmstead v. L.C.*, 527 U.S. 581 (1999); *Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003); and *Messier v. Southbury Training School*, 562 F. Supp. 2d 294 (D. Conn. 2008).  Although the State has a community-based forensic mental health system in place, it has consistently and utterly failed to allocate sufficient financial and other resources to alleviate this problem.[10]

Although the PSRB decides when and how temporary leave and conditional release will take place, temporary leave, conditional release and discharge to community mental health residential programs and other mental health services and supports are a program, service and activity of DMHAS. In short, the PSRB decides and DMHAS provides.

It is, therefore, DMHAS's legal responsibility to ensure adequate capacity and the stability of forensic community supports and services so that acquittees are not unnecessarily institutionalized when they are appropriate for and can benefit from discharge from WFH.

> **A.  Connecticut has failed to make reasonable modifications to ensure that qualified acquittees can have timely access to services needed for them to live in the most integrated setting.**

The ADA requires that public entities make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, including the unnecessary segregation or institutionalization of people with disabilities, unless the public entity can demonstrate that such modifications would fundamentally alter the nature of the service, program, or activity.  28 C.F.R. § 35.130(b)(7); *see also Olmstead*, 527 U.S. at 597 (holding that unjustified isolation is discrimination).

---

[10] We appreciate that the Governor's budget proposal has included recommended expenditures, using both state and federal resources, to support additional discharges from Whiting (along with other DMHAS inpatient facilities) and expansion of forensic mental health services and supports in the community.  However, that expansion seems to be targeted only to competency restoration patients, and not those under the jurisdiction of the PSRB.

**Cardella Affidavit, Ex. A**

In order for Connecticut to comply with its obligation under Title II to make reasonable modifications for acquittees, it must reasonably modify its policies, procedures, and practices to ensure an appropriate service array and system capacity, in order to provide sufficient community services and timely access to those services to enable qualified acquittees to live in the most integrated setting appropriate to their needs. When acquittees' temporary leaves and conditional releases are delayed due to lack of community services, that delay results in unnecessary institutionalization. Unnecessary institutionalization is discrimination and violates Title II of the ADA. Connecticut must also modify its policies, procedures, and practices to conduct effective monitoring, oversight, and training to ensure that its forensic mental health system meets its intended goals. Currently, Connecticut is failing to meet these requirements and consequently is discriminating against qualified acquittees based upon their disabilities.

**B.** **Connecticut engages in discriminatory methods of administration in violation of Title II of the ADA.**

A state's methods of administration "[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination," 28 C.F.R. § 35.130(b)(3), also violate Title II of the ADA. Connecticut engages in discriminatory methods of administration by excluding acquittees from access to the services and supports that they need to reside in integrated, community settings, in violation of 42 U.S.C. § 12132, 28 C.F.R. §§ 35.130(b)(3) and (d), and *Olmstead*, 527 U.S. at 607.

Additionally, Connecticut has failed to adopt methods of administration of its forensic mental health system that are necessary for acquittees to live in the most integrated setting appropriate, including failures to:

(a) conduct regular or ongoing analyses of the adequacy, sufficiency, and availability of residential, mental health treatment, and forensic mental health providers and support services, and to effectively identify any service gaps or deficiencies that impede the prompt transition of qualified acquittees to community-based placement and services;

(b) develop and implement a plan to effectively address service gaps that impede the prompt transition of qualified acquittees from WFH and prevent the unnecessary readmission of acquittees to WFH; and

(c) develop additional provider capacity and support to meet the needs of qualified acquittees at WFH.

These failures violate 42 U.S.C. §§ 12132 and 12201(d), 28 C.F.R. §§ 35.130(b)(3), (d), and (e)(1), *Olmstead*, 527 U.S. at 607, and Section 504 of the Rehabilitation Act, 29 U.S.C § 794.

**C.** **The public safety mandate in state law for the decisions of PSRB (and Superior Court) violate the ADA, at least as it is interpreted by the PSRB.**

The Connecticut Supreme Court has unequivocally articulated the purpose of commitment of acquittees:

> The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. . .As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness. . .

*Payne v. Fairfield Hills Hosp.*, 215 Conn. 675, 683-84, 578 A.2d 1025 (1990).

Despite this declaration, Connecticut statutes require the PSRB to make all decisions considering acquittees with its *primary* concern the protection of society. Connecticut General Statutes §§ 17a-582(e), 17a-584, and 17a-593(g). This provision, at least as interpreted by PSRB, violates the ADA because it discriminates against acquittees by not providing them with services in the most integrated setting and failing to apply the ADA's direct threat regulations. Indeed, PSRB often interprets these state statutes to require that public safety be the paramount or only concern.

The United States Constitution's Supremacy Clause, Article VI, states that federal law is the supreme law of the land. State laws that conflict with federal law must yield. The ADA and the Rehabilitation Act require states to make reasonable modifications to laws and policies and practices which violate the ADA and the Rehabilitation Act. 42 U.S.C. § 12132; 29 U.S.C. § 794; 28 C.F.R. § 35.130(b)(7); 28 C.F.R. § 41.51.

At least as interpreted by PSRB, Connecticut state law requiring the PSRB to make decisions by considering the safety of society as the primary, paramount or only concern violates Title II of the ADA. The ADA requires that persons with disabilities receive services in the most integrated setting. Public safety may, in certain circumstances, be a consideration in the determination of what is the most integrated setting. However, it may not be the primary, paramount or only factor.

The ADA has two provisions that provide for the consideration of safety of the public and others. The Department of Justice (DOJ) regulations enforcing Title II of the ADA set forth the permissible considerations regarding public safety that provides, as follows:

> A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

28 C.F.R. § 35.130(h).

The DOJ Title II regulations also specifically provide for consideration of an individual who presents a direct threat to others in 28 C.F.R. § 35.139. "Direct threat" is defined as, "a significant risk to the health or safety of others that cannot be eliminated by modification of

**Cardella Affidavit, Ex. A**

policies, practices or procedures, or by the provision of auxiliary aids or services as provided in § 35.139." 28 C.F.R. § 35.104. The DOJ's direct threat regulation provides:

> (a) This part does not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others.

> (b) In determining whether an individual poses a direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current     medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

DMHAS and the PSRB are not in compliance with these federal regulations, because they interpret state law as requiring that considerations of public safety are primary without regard to the consideration of safety set forth in that federal regulation, and indeed that it be the primary, paramount or only concern. The state's laws for transition, temporary leave, conditional release, and discharge, as interpreted by DMHAS and PSRB, do not consider an acquittee's **federal civil right** to receive programs, services and activities in the most integrated setting unless they are a direct threat to others, as defined in the ADA.  That unbalanced, ultra-cautious interpretation of the statute violates the ADA and must be stricken, absent a dramatically different interpretation of it by the state agencies.

Nowhere in federal law is a state or its mental health agency authorized to compromise or subjugate a qualified individual with a disability's right timely to receive community supports and services pursuant to the ADA's integration mandate under a state statute requiring a public entity to consider public safety as primary relative to all other interests or laws.  Public safety may be a valid consideration, and even may be viewed as "primary," but only if that is understood within the confines of and pursuant to the standards in the ADA. Neither DMHAS nor the PSRB look at public safety or whether an acquittee poses a direct threat in accordance with the requirements of the ADA. These public agencies apparently fail to ascertain what the ADA requires:

> 1) the nature, duration, and severity of the risk;
> 2) the probability that the potential injury will actually occur; and,
> 3) whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

State PSRB statutes requiring the PSRB to give primary concern to public safety may include an individualized assessment of an acquittee's present mental status and risks to others in the community, but, at least as interpreted by DMHAS and the PSRB, they ignore the duration and severity of risk, any estimate of the probability that actual physical injury will occur to another person, and any consideration of  modifications, reasonable accommodations or provision of auxiliary aids or services to mitigate the identified risks, all of which are required by the ADA.

**Cardella Affidavit, Ex. A**

The consideration of the individual risk of dangerousness is often subjugated to a vague consideration that, whatever the risk of dangerousness, public safety cannot be **guaranteed**, a standard that clearly does not comport with the ADA, and therefore the person is held in the hospital.

State law, at least as administered by DMHAS and PSRB, requires that the PSRB use an illegal and unnecessarily ultra-risk averse standard to consider public safety as the primary concern. That standard violates the ADA and results in decisions to unnecessarily institutionalize acquittees. In addition, the DMHAS forensic community supports and services system lacks capacity to ensure timely transition to community supports and services when the patient is recommended and approved for such community programs and services by the PSRB.

**Necessary Immediate Remedial Actions**

In order to remediate the above-discussed violations of the ADA, on behalf of our clients, we request that the State immediately take the following steps:

1) Develop and implement a plan to significantly increase forensic mental health provider capacity to ensure that qualified individuals with disabilities can timely transition from WFH to live in the most integrated settings to meet their needs in the community.

2) Develop and implement a process that provides for reasonable modifications to the PSRB's policies, procedures, and practices so that qualified individuals with disabilities can participate in the State's community based forensic mental health services.

3) Adopt regulations which interpret the term "primary" in Connecticut General Statutes §§ 17a-582(e), 17a-584, and 17a-593(g) to be fully consistent with ADA regulations regarding public safety.

We ask that you work with us to formally administer forensic community services and interpret the state statutes so as to apply the consideration of public safety in a way which comports with the ADA or, if you believe that is not possible within existing statutes, to work with us this session to amend those statutes so that they will comply with the requirements of federal law.

We request a meeting no later than April 4, 2022 to discuss our clients' concerns and, if possible, to reach a mutual agreement on steps to bring state law, practices and procedures into compliance with the ADA. If we cannot reach a mutually agreed resolution to these issues, CLRP and DRCT will have no choice but to bring legal action to enforce our clients' rights.

**Cardella Affidavit, Ex. A**

**EXHIBIT 3 - AFFIDAVIT OF CHERYL ARORA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANTHONY DYOUS, ET AL,<br>*Plaintiff,* | : | CIVIL NO. 3:22-CV-01518-SVN |
| | : | |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF MENTAL HEALTH,<br>AND ADDICTION SERVICES, ET AL.,<br>*Defendants.* | :<br>:<br>: | APRIL /3, 2023 |

### <u>AFFIDAVIT OF CHERYL ARORA</u>

I, Cheryl Arora, am over the age of eighteen, understand the obligations of an oath and having been duly sworn, state as follows:

1. I make this Affidavit based on my personal knowledge, and understand that it will be submitted to the Court in connection with the above-captioned case in support of Defendants' Motion to Dismiss.

2. I am the Chief Financial Officer of the Department of Mental Health and Addiction Services ("DMHAS") and have been since February 25, 2022.

3. As the Chief Financial Officer of DMHAS, I am responsible for administering the fiscal operations of the agency including budget preparation and management, accounting and financial reporting and analysis.

4. I am aware of the federal lawsuit brought by acquittees Anthony Dyous, Ling Xin Wu, Vincenzo Lindia, Taina Morales, and Carson Mueller.

5. The PSRB is assigned to DMHAS for administrative purposes only, pursuant to statute.

6. Pursuant to the statutory mandate, DMHAS performs certain administrative tasks for the PSRB.

7. One of the administrative duties DMHAS performs for the PSRB is the annual submission of the PSRB's budgetary request.

8. DMHAS assists in the administrative preparation of PSRB's budget request.

9. Once prepared, the budget request is reviewed and approved by Vanessa Cardella, Executive Director of the PSRB.

10. Upon approval, DMHAS submits PSRB's budget request to the Office of Policy and Management electronically via the Automated Budget System.

11. DMHAS's budget request is also submitted via the Automated Budget System, but separately from PSRB's submission.

12. At no time does DMHAS dictate or influence the PSRB's budgetary requests.

13. DMHAS does not control PSRB's budget once appropriated, though it does process transactions on the PSRB's behalf to spend the funds (e.g, processing payroll, handling purchase orders and invoices) and handles asset management, monthly financial report, and expenditure projections.

14. PSRB's budget appropriation is separate and apart from that of DMHAS.

Respectfully,

CONNECTICUT LEGAL RIGHTS PROJECT

/s/

Kathy Flaherty
Executive Director

/s/
Kirk Lowry
Legal Director


DISABILITY RIGHTS CONNECTICUT

/s/
Deborah A. Dorfman
Executive Director/Attorney

/s/
Sheldon Toubman
Litigation Attorney


cc:
Hon. Ned Lamont
Chief of Staff Paul Mounds
Chief Operating Officer Michele Gilman
Commissioner Deidre Gifford
Senate President Martin Looney
Senate Minority Leader Kevin Kelly
House Speaker Matthew Ritter
House Minority Leader Vincent Candelora
Chairs and Ranking Members of Public Health, Judiciary and Appropriations Committees:

| | |
|---|---|
| Senator Mary Daugherty Abrams | Representative Craig Fishbein |
| Senator Saud Anwar | Senator Catherine Osten |
| Representative Jonathan Steinberg | Representative Toni Walker |
| Senator Tony Hwang | Senator Craig Miner |
| Senator Heather Somers | Representative Mike France |
| Representative William Petit | |
| Senator Gary Winfield | |
| Representative Steven Stafstrom | |
| Senator John Kissel | |

**Cardella Affidavit, Ex. A**

15. DMHAS is the recipient of federal funds, but the PSRB is not.

16. To receive federal funds, DMHAS has to apply for funding, receive notice of an award of funding, and subsequently must comply with periodic reporting requirements to ensure that federal funds are only being expended for approved purposes.

17. DMHAS may only use federal funds for the specific purpose for which they are received, which usually is for client services.

18. If the PSRB exhausts all of its budget appropriations for "Other Expenses" before the fiscal year ends, DMHAS can purchase items that are administrative in nature (e.g. office supplies, postage, data processing supplies and equipment) for the PSRB's use.

19. DMHAS does not, and cannot, use any federal funds it has received to pay for any of PSRB's administrative expenses.

20. Any DMHAS purchases for PSRB's use, are made either from DMHAS's General Fund budget appropriation (for, e.g., office supplies or postage) or from the state's Capital Equipment Fund (for data processing supplies and equipment to be used by the PSRB).

21. DMHAS's "Other Expenses" account is funded through a state General Fund appropriation and not from federal funds granted to DMHAS.

22. Any time DMHAS receives federal funds for administrative purposes or administrative expenses, the funds are tied to that specific federally funded project, and can only be used to fulfill the objectives of that identified project.

23. The earmarking of federal funds ensures that federal funds are not being used by DMHAS for purposes other than those intended.

24. DMHAS does not receive federal funds earmarked for administrative purposes or administrative expenses, that can be used for PSRB's benefit.

25. DMHAS has neither directly given, nor extended, money to the PSRB.

26. I have read the foregoing statements and they are true to the best of my knowledge and belief.

Cheryl Arora
Chief Financial Officer
Department of Mental Health and
Addiction Services

STATE OF CONNECTICUT      )
                                    ss. HARTFORD
COUNTY OF HARTFORD        )

Sworn and subscribed before me on this __13__ day of _April_ 2023.

Notary Public
Commissioner of the Superior Court