# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANTHONY DYOUS, LING XIN WU, VINCENZO LINDIA, TAINA MORALES, CARSON MUELLER, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Civil Action No. 3:22-CV-1518-SVN |
| v. | |
| DEPARTMENT OF MENTAL HEALTH AND ADDICTION SERVICES WHITING FORENSIC HOSPITAL, and PSYCHIATRIC SECURITY REVIEW BOARD, | May 30, 2023 |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**Table of Contents**

I.   INTRODUCTION ................................................................................................ 1

II.  LEGAL STANDARD FOR A MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6)
     AND 12(B)(1).................................................................................................. 4

III. CONGRESS HAS ABROGATED THE SOVEREIGN IMMUNITY OF THE
     DEFENDANTS FOR CLAIMS UNDER TITLE II OF THE ADA AND THE REHAB
     ACT................................................................................................................ 5

     A. Plaintiffs' Title II ADA Claims in Counts One, Three, Four, Six and   Eight are Not
     Barred by Sovereign Immunity.................................................................................5

     B. Plaintiffs' Claims are Not Barred by Sovereign Immunity Because All Claims are
     Sufficiently Pled and State a Claim Upon Which Relief Can be Granted.....................11

IV.  PLAINTIFFS HAVE STATE TITLE II ADA CLAIMS......................................11

     A. Title II of the ADA-Statutory Overview..............................................................11

     B. The Integration Mandate Under the ADA and Rehab. Act....................................14

     C. Defendants' Attempt to Argue that No Integration Mandate Claim Has Been
        Stated is Unavailing.......................................................................................17

        1.  Plaintiffs need not allege that the State's professionals or any treatment
            professional have determined that community-based treatment is appropriate
            for them to state an *Olmstead* claim..........................................................19

        2.  Plaintiffs are not required to plead that their community placement "could
            be accomplished taking into account the resources available to the state
            and the needs of others with similar disabilities.".......................................22

     D. Plaintiffs Have Sufficiently Pled Denial of Reasonable Accommodations/
        Modifications................................................................................................23

     E.  Plaintiffs Have Alleged Facts Sufficient to State Their ADA Methods of
         Administration Claim Under the ADA and Rehab. Act........................................26

V.   PLAINTIFFS' AMENDED COMPLAINT DOES NOT MAKE ANY CLAIMS
     AGAINST THE PSRB FOR VIOLATIONS OF THE REHAB. ACT.......................27

VI.  A FEDERAL HABEAS PETITION IS NOT PLAINTIFFS' ONLY REMEDY
     AS THEY HAVE REMEDIES UNDER THE ADA AND REHAB. ACT...................27

VII. PLAINTIFFS HAVE STANDING TO BRING CLAIMS UNDER THE ADA
     AND REHAB. ACT...........................................................................................32

     A.   Plaintiffs Have Suffered Injury-In-Fact..........................................................33

     B.   Plaintiffs Have Standing to Bring Claims Against DMHAS and WFH.............   36

VIII. PLAINTIFFS' CLAIMS ARE NOT MOOT.......................................................38

IX.  THE COURT SHOULD NOT ABSTAIN FROM THIS CASE UNDER THE
     YOUNGER ABSENTION DOCTRINE..............................................................38

X.   CONCLUSION................................................................................................40

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amidax Trading Corp. v. S.W.I. F.T.S.C.R.L.*,
671 F.3d 140, 145 (2d. Cir. 2011)(per curium) ........................................................5

*APWU v. Potter*,
343 F.3d 619, 627 (2d. Cir. 2003)..........................................................................5

*Baur v. Veneman.*,
352 F. 3d 625, 631 (2d Cir. 2003)..........................................................................32

*Beam v. Madigan*,
Case No. 16-cv-1211-MJR, 2017 WL 679950 (S.D. IL, Feb. 21, 2017 ..........................28, 29

*Bell v. Kirk*,
No. (X02)CV0040025555, 2005 WL 1089285 (Conn. Supr. March 31, 2005)(unpublished op.) ...............................................................................................8

*Bell Atlandtic Corp. v. Twombly*,
550 U.S. 544,579, 592 (2007)................................................................................4

*Bogovich v. Sandoval*,
189 F.3d 999 (9th Cir. 1999) ............................................................................28, 29

*Borkowski v. Valley Cent. Sch. Dist.*,
63 F.3d 131, 138 (2d Cir. 1995)............................................................................24

*Buchanan v. Maine*,
469 F.3d 158, 174 (1st Cir. 2006)..........................................................................19

*Chance v. Armstrong*,
143 F.3d 698, 701 (2d Cir. 1998)............................................................................5

*City of Arlington v. Fed. Commc'ns Comm'n.*,
569 U.S. 290, 296 (2013)....................................................................................16

*Cleburne v. Cleburne Living Center, Inc.*,
473 U.S. 432, 1055 S.Ct. 3249, 872 Ed.2d 313 (1985) ...............................................7

*Clemons v. Williams*,
Case No. 2:14-cv-02195-APG0NJK (March 29, 2016)............................................28, 29

*Davis v. Shah,*
    821 F.3d 231, 262-63 (2d Cir. 2016) ....................................................................17

*Day v. District of Columbia,*
    894 F.Supp.2d 1, 23-24 (D.D.C. 2012).................................................................19

*Disability Advocates v. Paterson,*
    598 F.Supp.2d 289, 320 (E.D.N.Y. 2009) ....................................................16, 17

*Duffy v. Velez,*
    Civ. No. 0905539, 2010 WL 503037 (D.N.J. Feb. 8, 2010)................................23

*Dyous v. Psychiatric Sec. Rev. Bd.*
    708 Fed. App'x. 39, 40 (2d Cir. 2018)................................................................28

*Davy v. Comm'r of Mental Health,*
    19-cv-2074(BMC), 2019 WL 2269968 (E.D.N.Y. May 8, 2016) .........................39

*Doe v. Hogan,*
    Civ. No. H88-239 (EBB) (D. Conn.) ......................................................................8

*Easley v. Snider,*
    36 F.3d 297, 300 (3rd Cir. 1994) .........................................................................13

*Foucha v. Louisiana,*
    504 U.S. 71, 80 (1992) .......................................................................................2, 7

*Frederick L. v. Dep't of Public Welfare,*
    157 F.Supp.2d 509, 540 (E.D. Pa. 2011) ............................................................20

*Frederick L. v. Dep't of Public Welfare,*
    364 F.3d 487 (3d Cir. 2004)............................................................................ 23-24

*Fulton v. Goord,*
    591 F.3d 37, 43 (2d Cir. 2009)........................................................................13, 23

*Heath v. Hanks,*
    433 F.Supp. 3d 221 (D.N.H. 2019)................................................................28, 29

*Helen L. v. DiDario,*
    46 F.3d 325, 331 (3d Cir. 1995)......................................................................12, 13

*Henderson v. Thomas,*
    289 F.R.D. 506 (M.D. Ala. 2012) .........................................................................18

*Henrietta D. v. Bloomberg,*
    331 F.3d 261, 276 (2d Cir. 2003)............................................................13, 23, 24

*Jones v. United States*,
    463 U.S. 354 (1983),.................................................................................1, 2, 18

*Joseph S. v. Hogan*,
    561 F. Supp.2d 280, 2008 WL 24036998 (E.D.N.Y., May 23, 2008)..............................19, 22

*Justice v. Woodlock*,
    No. 9:13-cv-252 (NAM/TWD), 2015 WL 145643 (N.D.N.Y, Jan. 12, 2015) ......................38

*Kathleen S. v. Dep't of Pub. Welfare*,
    10 F.Supp.2d 460, 471(E.D.N.Y 1998) .............................................................15

*Lovely H. v. Eggleston*,
    841 F.Supp. 2d 1199 (D.Or. 2012) ..................................................................18

*Lane v. Kitzhaber*,
    235 F.R.D. 248, 261 (S.D.N.Y. 2006) ..............................................................18

*Mahoney v. Lensick*,
    213 Conn. 548 (1990) ..................................................................................8

*Mary Jo C. v. N.Y. State and Loc. Ret. Sys.*,
    707 F.3d 144, 163-65 (2d Cir. 2013) .............................................................25, 39

*Mental Disability Law Clinic v. Hogan*,
    No. CV-06-6320(CPS)(JO), 2008 WL 4104460, (E.D.N.Y Aug. 28, 2008)) ..................22, 23

*Messier v. Southbury Training Sch.*,
    183 F.R.D. 350 (D. Conn. 1998)..................................................................16, 23

*Moore v. PaineWebber, Inc.*,
    189 F.3d 165, 169, n. 3 (2d Cir. 1999) .............................................................5

*New York State Assoc. for Retarded Childern v. Carey*,
    393 F.Supp. 715 (E.D.N.Y. 1975) ..................................................................7

*Neal v. Shimoda*,
    131 F.3d 818, 824 (9th Cir. 1977) ................................................................28

*Nunes v. Mass Dep't. of Corr.*,
    422 U.S. 593 (1975).................................................................................13

*O'Connor v. Donaldson*,
    179 F.R.D. 185 (W.D. Tex. 1998) ..................................................................7

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999)..........................................................................*passim*

*Pa. Prot. & Advocacy, Inc. v. Pa Dep't. of Pub. Welfare*,
    402 F3d 374, 379 (3d Cir. 2005).............................................................16

*Penn. Dept. of Corrections. v. Yeskey*,
    524 U.S. 206 (1998).....................................................................2, 17

*Prieser v. Rodriguez*,
    411 U.S. 475 (1973)..........................................................................28

*Rodriguez v. Mitchell*,
    252 F.3d 191, 198 (2d Cir. 2001).........................................................30

*School Bd. of Nassau Co. v. Arline*,
    480 U.S. 273, 288 (1987)....................................................................19

*Sec'y of Pub. Welfare v. Idell S.*,
    516 U.S. 813 (1995)..........................................................................12

*Shehadi v. Cusson*,
    No. 3:18-cv-00360(MPS), 2018 WL 11451327 (D. Conn April 11, 2013)...........................8

*Shehadi v. State of Connecticut*,
    No. FBT-cv-18-6072211-5, 2018 WL 11451327,(Conn. Super. 2018) .........................8

*Sheppard v. Beeman*,
    18 F.3d 147 (2d Cir. 1994)....................................................................5

*State of Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut*,
    706 F. Supp. 2d 266 (D. Conn. 2010)..................................................15, 36

*Summers v. Louisiana*,
    2022 WL 4490161 (MD. La. Sept. 27, 2022).........................................37

*Summers v. Louisiana*,
    Dec. 1, 2022, No. 22-30763, 2022 WL 4490161 (MD. La. Sept. 27, 2022) ................37

*Sprint Comm., Inc. v. Jacobs*,
    571 U.S. 69 (2013)............................................................................38

*State v. Foster*,
    217 Conn. App. 476 (2023) ...............................................................11

*State v. Foster*,
    346 Conn. 920 (2023)........................................................................11

*State v. Harris*,
    277 Conn. 378 (Conn. 2006)...............................................................18

*Steimel* v. *Wernert*,
  823 F/3d 902, 911 (7th Cir. 2016) .........................................................................15

*Tennessee v. Lane*,
  541 U.S. 509 (2004)..........................................................................6, 7, 8, 9

*Tennessee v. Lane*,
  2003 WL 22733906 (Appellate Brief) ............................................................9, 10

*Townsend v. Quasim*,
  328 F. 3d 511 (9 th Cir. 2003) .............................................................................23

*United States v. Georgia*,
  546 U.S. 151 (2006).............................................................................................9

*Vinson v. Thomas*,
  288 F.3d 1145 (9th Cir. 2002) ............................................................................23

*Wolf v Diaz*,
  Case No. 2:20-cv-0206 KIM BBP, 2020 U.S. LEXIS 175866, at *2 (E.D. Cal.
  Sept. 24, 2020) ...................................................................................................28

*Wyatt v. Stickney*,
  325 F.Supp. 781 (M.D. Ala. 1971) ......................................................................7

*Youngberg v. Romeo*,
  457 U.S. 307, 315-16 (1982) .............................................................................2, 7

*Younger v. Harris*,
  401 U.S. 37 (1971).........................................................................................38, 40

**Statutes**

28 U.S.C. § 2254.............................................................................................29, 30

29 U.S.C. § 794.................................................................................................1, 2

42 U.S.C. § 1983..................................................................................................28

42 U.S.C. § 12101(a)(2)-(3)................................................................................12

42 U.S.C. § 12101(a)(3)......................................................................................13

42 U.S.C. § 12101(a)(5)......................................................................................13

42 U.S.C. § 12101(a)(7)......................................................................................12

42 U.S.C. § 12101(b)(1) ........................................................................................................12

42 U.S.C. § 12102(1)(A)........................................................................................................19

42 U.S.C. § 12102(4) ...............................................................................................................2

42 U.S.C. § 12131 ...............................................................................................................1, 13

42 U.S.C. § 12132 .................................................................................2,13,14, 16, 26, 27

42 U.S.C. § 12134(a) ............................................................................................................16

42 U.S.C. § 12202 .....................................................................................................................6

42 U.S.C. § 12208 .....................................................................................................................2

CT Gen. Stat. §17a-498(c) ....................................................................................................3

CT Gen. Stat. §§ 17a-506(a) ................................................................................................3

CT Gen. Stat. §53a-13 ......................................................................................................3, 17

CT Gen. Stat. §§ 17a-580-603 ...........................................................................................40

CT Gen. Stat. §17a-582 ...............................................................................................1, 33, 40

CT Gen. Stat. 17a-584 ...........................................................................................34, 37, 38, 40

CT Gen. Stat. §17a-585 ...................................................................................................34, 40

CT Gen. Stat. §17a-586 ........................................................................................................34

CT Gen. Stat. 17a-587 ....................................................................................................18, 34

CT Gen. Stat. 17a-588 ....................................................................................................18, 34

CT Gen. Stat. §17a-592 ........................................................................................................34

CT Gen. Stat. §17a-593 ...................................................................................1, 18, 33, 34, 40

CT Gen. Stat. §17a-593(c) ...................................................................................................11

CT Gen. Stat. 17a-594 ..........................................................................................................34

CT Gen. Stat. §17a-599 ........................................................................................................34

**Regulations**

28 C.F.R. Part 35..................................................................................................................16

28 C.F.R. Part 35, App. B at 693 ........................................................................16

28 C.F.R. § 35.130(b)(3)..................................................................15, 26, 27

28 C.F.R. § 35.130(b)(7)................................................................................23

28 C.F.R. § 35.130(d) ...................................................................14, 15, 16

28 C.F.R. § 35.150(d) .....................................................................................2

28 C.F.R. § 41.51(b)(2)................................................................................15

28 C.F.R. § 41.51(b)(3)................................................................................15

28 C.F.R. § 41.51(d) ..............................................................................2, 15

45 C.F.R. § 84.4(b)(2)................................................................................15

45 C.F.R. § 84.4(b)(4)................................................................................15

**Rules**

Fed. R. Civ. P. 12(b)(6).......................................................................4, 5, 10, 11

Fed. R. Civ. P. 12(b)(1)...........................................................................4, 5, 10

**Other Authorities**

S. Rep. No. 101-116, at 20 (1989) .................................................................12

H.R. Rep. No. 101-485, pt. II, at 50 (1990)...................................................12

Statement of Dept. of Justice Enforcement of the Integration Mandate of Title II
     of the ADA and Olmstead v. L.C. ..................................................................20, 21

## I.      INTRODUCTION

Plaintiffs have affirmatively pled and stated claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq*., and Section 504 of the Rehabilitation Act of 1973 (Rehab Act), 29 U.S.C. § 794. The Court has jurisdiction to hear all of Plaintiffs' claims and therefore Defendants' Motion to Dismiss (MTD) should be denied.  Plaintiffs' claims are not barred by Eleventh Amendment immunity; Plaintiffs have stated a claim for which relief can be granted on all counts; federal *habeas corpus* is not Plaintiffs' exclusive remedy; Plaintiffs all clearly have an injury-in-fact and have standing to request declaratory and injunctive relief; Plaintiffs' claims are not moot; and the Court should not abstain from hearing Plaintiffs' federal civil rights claims.

"Society may not excuse a defendant's criminal behavior because of his insanity and at the same time punish him for invoking an insanity defense." *Jones v. United States*, 463 U.S. 354, 369 fn. 18 (1983). Plaintiffs assert their federal civil rights under Title II of the ADA and the Rehab Act requesting treatment, within the confines of their commitment to the jurisdiction of the Psychiatric Security Review Board (PSRB), in the most integrated setting. Plaintiffs do not challenge their initial commitment by the Superior Court pursuant to Conn. Gen. Stat. § 17a-582 or the duration of the commitment, and do not request release or final discharge from the jurisdiction of the PSRB pursuant to Conn. Gen. Stat. § 17a-593. Defendants' MTD is based on assertions neither pled nor asserted by Plaintiffs. Instead, Plaintiffs claim that, during their commitment to the PSRB's jurisdiction and while in the custody of the Commissioner of the Department of Mental Health and Addiction Services (DMHAS), Defendants have violated, and continue to violate, their rights under the ADA and the Rehab Act to timely individual assessments and participation in Defendants' transition planning services so that they can timely transition to and receive treatment in the most integrated setting. Am. Complt., ¶¶ 2, 6, 9, 28, 32(c), 73-78.

Many putative class members are delayed in receiving transition services and services in the community due to Defendants' discriminatory policies, procedures and practices. *See id*., ¶¶ 6, 9, 55, 62, 173-77, 183(d) To that end, Plaintiffs seek *only* systemic remedies, including reasonable modifications to Defendants' policies, practices and procedures, including changes to Defendant DMHAS' administration of its community mental health service system to both expand capacity and prevent providers from discriminating against the Plaintiffs and the Plaintiff class members so that they can timely transition from Whiting Forensic Hospital to a community placement once such transition has been deemed appropriate. *Id*., ¶¶ 26, 32, 37, 73-77, Prayer for Relief, ¶ 6.

Neither Title II of the ADA, nor the Rehab Act, exclude acquittees from their broad coverage. Both Acts cover all qualified individuals with disabilities who have been, among other things, denied by state or local governments of the benefits of community mental health programs, services and supports in the most integrated setting. 42 U.S.C. § 12132, 28 C.F.R. § 35.150(d); 29 U.S.C. § 794, 28 C.F.R. § 41.51(d); and *Olmstead v. L.C. by Zimring*, 527 U.S. 581 (1999). Congress knew how to exclude coverage in the ADA and did so, excluding people with myopia mitigated by ordinary eyeglasses and transvestites. *See* 42 U.S.C. § 12102(4)I(i) and (ii); and 42 U.S.C. § 12208. Congress excluded neither prisoners nor acquittees from the ADA or Rehab Act. *See Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206 (1998). Title II of the ADA fully applies to a state's department of corrections and those in its custody who *have* been convicted and may be punished. In addition, the Supreme Court has often repeated the legal principle that, since acquittees have *not* been convicted, they may not be punished, implying a broader construction of civil rights coverage and protection for them. *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *Jones*, 463 U.S. at 369; and *Youngberg v. Romeo*, 457 U.S. 307, 315-316 (1982).

2

Plaintiffs do not portray themselves as having a civil legal status like plaintiffs in *Olmstead*, as claimed by Defendants.[1]  Plaintiffs clearly and consistently characterize their legal status as acquittees who have been committed by the Superior Court to the jurisdiction of the PSRB and to the custody of the Commissioner of DMHAS.  *See* Am. Complt. at ¶¶ 3,7,12, 40–43, 47, 49–72.  They have not been convicted of, or "admitted to," any "crimes."  Nevertheless, Defendants baldly assert that, "[i]nstead, during state court criminal proceedings, each Plaintiff has effectively admitted they committed a serious crime and avoided incarceration when they elected to avail themselves of the affirmative defense permitted under Conn. Gen. Stat. § 53a-13." MTD at p. 1.

This assertion betrays a fundamental mischaracterization of a plea of not guilty by reason of mental disease or defect pursuant to Conn. Gen. Stat. § 53a-13.[2]  Defendants seem to assert that an acquittee has "admitted" to a "crime" and avoided incarceration by some less-than-valid legal loophole.  Such an assertion effectively seeks to criminalize the disability of the Plaintiffs.  The determination was made by *a* judge or jury in a state court criminal proceeding that the person with a mental disease or defect lacked sufficient capacity to appreciate the wrongfulness of one's conduct or to control one's conduct due to the mental disease or defect.  The Defendants' assertion of guilt and admission of crime, apart from being inaccurate, is irrelevant, because even people who are convicted of crimes and are punished and sent to prison have rights under the ADA and the Rehab Act.[3]

---

[1] Defendants state on page 1 of their brief that, "In their Amended Complaint, Plaintiffs try to portray themselves just like the civilly, voluntarily committed patients in *Olmstead v. L.C. by Zimring*, 527 U.S. 581 (1999), but they are not."  "Voluntarily committed" is an oxymoron.  A patient in a state hospital may have a legal status of "voluntary" or "committed," but not voluntarily committed.  A voluntary patient in Connecticut obtains that legal status by virtue of Conn. Gen. Stat. § 17a-506(a).  A civilly committed patient is committed, in most instances, pursuant to Conn. Gen. Stat.§ 17a-498(c).

[2] A small number of states provide for a "guilty, but mentally ill" plea, but not Connecticut.

[3] Defendants' assertion, that Plaintiffs have "avoided incarceration when they elected to avail themselves of the affirmative defense" of not guilty by reason of mental disease or defect, also is inconsistent with the actual experience of Plaintiffs and almost all members of the proposed Plaintiff Class members. Although technically they are not "incarcerated," in the sense of being placed in the custody of the Department of Corrections, Plaintiffs experience is

3

Defendants assert that acquittees "effectively admit [] commission of the crime."  This assertion betrays an inaccurate characterization of "crime."  Acquittees admit to the conduct of the underlying event, but not to a "crime," as they lacked, and are recognized to have lacked, the requisite criminal responsibility as a matter of law.  They are *acquitted* of the crime for this reason and committed to the PSRB for the purpose of treatment and safety related to their mental health condition and dangerous conduct that is a manifestation of that mental health condition.

Defendants' mischaracterization of Plaintiffs as criminals who have all admitted to serious crimes and should be punished seems to imply that the Title II ADA/Rehab Act civil right to treatment in the most integrated setting somehow does not apply to acquittees. This argument is profoundly wrong.  Plaintiffs are qualified individuals with disabilities who should be treated with dignity and respect as patients with federal civil rights to receive mental health treatment in the most integrated setting.  Such treatment will benefit acquittees as patients and ultimately result in a safer society.

## II. LEGAL STANDARD FOR A MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6) AND 12(B)(1)

Defendants have brought their motion to dismiss Plaintiffs' Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1). When a defendant challenges the sufficiency of a claim by a 12(b)(6) motion, the court must assume the truth of all factual allegations made in the complaint and construe those allegations in favor of plaintiffs. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 572, 592 (2007). A complaint need not set forth detailed factual allegations, rather it must only plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. A

---

no less a deprivation of liberty, and in many ways more of a deprivation, than those actually convicted of crimes and punished with incarceration; the most fundamental of which is that acquittees can be held in a psychiatric hospital *forever*.  Acquittees refer to this as having a discharge plan to a coffin.

4

court may dismiss the suit only where it is "beyond doubt that plaintiffs can prove no set of facts to support their claim." *Chance v. Armstrong*, 143, 698, 701 (2d Cir. 1998).  Furthermore "[t]his rule applies with particular force where the plaintiff[s] alleg[e] civil rights violations." *Id.*; *see also Sheppard v. Beerman*, 18 F.3d 147 (2d Cir. 1994) (same).

The standards governing motions to dismiss "under 12(b)(1) and 12(b)(6) are identical." *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169 n.3 (2d Cir. 1999). In resolving Defendants' Rule 12(b)(1) motion, the Court must accept as true all uncontroverted facts alleged by DRCT and must draw all reasonable inferences in its favor.  *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam).

Moreover, "[t]he court may not dismiss a complaint unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Id*. (quotations omitted). But, under this provision only, the Court can consider evidence outside the pleadings and resolve factual disputes by reference to that evidence. *See APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003).

Defendants have failed to meet their burden to demonstrate that Plaintiffs' Complaint should be dismissed under either Fed. R. Civ. P. 12(b)(6) or 12(b)(1) and, thus, their motion should be denied.

### III. CONGRESS HAS ABROGATED THE SOVEREIGN IMMUNITY OF THE DEFENDANTS FOR CLAIMS UNDER TITLE II OF THE ADA AND THE REHAB ACT

*A.  Plaintiffs' Title II ADA Claims in Counts One, Three, Four, Six and   Eight are Not Barred by Sovereign Immunity*

In both the original 1990 Americans with Disabilities Act and the 2008 Americans with Disabilities Amendments Act, Congress specifically provided that:

A State shall not be immune under the eleventh amendment to the Constitution

5

> of the United States from an action in Federal or State court of competent
> jurisdiction for a violation of this chapter. In any action against a State for a
> violation of the requirements of this chapter, remedies (including remedies both
> at law and in equity) are available for such a violation to the same extent as such
> remedies are available for such a violation in an action against any public or
> private entity other than a State.

42 U.S.C. § 12202.

In *Tennessee v. Lane*, 541 U.S. 509 (2004), the Supreme Court held that Title II of the

ADA was a valid exercise of § 5 of the Fourteenth Amendment for a claim of discriminatory denial

of access to a courthouse in Tennessee.  The Supreme Court reiterated that "This enforcement

power, as we have often acknowledged, is a 'broad power indeed.' (citation omitted). It includes

'the authority both to remedy and deter violation of rights guaranteed [by the Fourteenth

Amendment] by prohibiting a somewhat broader swath of conduct, including that which is not

itself forbidden by the Amendment's text.' (citation omitted)." *Id.* at 518.  The Court reiterated

that, "We have thus repeatedly affirmed that 'Congress may enact so-called prophylactic

legislation that proscribes facially constitutional conduct, in order to prevent and deter

unconstitutional conduct. (citations omitted.)" *Id*.

Furthermore, the Court in *Lane* stated that "When Congress seeks to remedy or prevent

unconstitutional discrimination, § 5 authorizes it to enact prophylactic legislation proscribing

practices that are discriminatory in effect, if not intent, to carry out the basic objectives of the

Equal Protection Clause." *Id.* at 519. The Court then articulated that Congress' prophylactic

legislative power is not without limit:

> Congress' § 5 power is not, however, unlimited.  While Congress must have a wide
> berth in devising appropriate remedial and preventative measures for
> unconstitutional actions, those measures may not work a 'substantive change in the
> governing law.' (Citation omitted.)  In *Boerne*, we recognized that the line between
> remedial legislation and substantive redefinition is 'not easy to discern,' and that
> 'Congress must have wide latitude in determining where it lies.' (Citation omitted.)
> But we also confirmed that 'the distinction exists and must be observed,' and set
> forth a test for so observing it: Section 5 legislation is valid if it exhibits 'a

congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'

*Id.* at 520.

After laying out the basic constitutional framework for the determination of whether Title II of the ADA is appropriate § 5 legislation, the Court analyzed whether Title II is a congruent and proportionate response to unconstitutional deprivations of fundamental rights.  The Court reviewed this history of discrimination against people with disabilities and found a number of violations by the States:

> The historical experience that Title II reflects is also documented in this Court's cases, which have identified unconstitutional treatment of disabled persons by state agencies in a variety of settings, including unjustified commitment, *e.g., Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); the abuse and neglect of persons committed to state mental health hospitals, *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); and irrational discrimination in zoning decisions, *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The decisions of other courts, too, document a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system, public education, and voting. Notably, these decisions also demonstrate a pattern of unconstitutional treatment in the administration of justice.

*Id.* at 524-25.

There are other examples of unconstitutional treatment of patients at state psychiatric hospitals. *See e.g., Wyatt v. Stickney*, 325 F. Supp. 781 (M.D. Ala. 1971) (right to treatment); *New York State Association for Retarded Children v. Carey*, 393 F. Supp. 715 (E.D.N.Y. 1975) (failure to provide treatment and abuse and neglect of institutionalized patients); *O'Connor v. Donaldson*, 422 U.S. 563 (1975) (right of civilly committed patient to liberty if mentally ill but not dangerous); *Foucha v. Louisiana*, 504 U.S. 71 (1992) (right of acquittee to liberty even if dangerous but not mentally ill).

A sample of a few Connecticut cases alleging constitutional violations against institutionalized patients are: *Doe v. Hogan*, No. 88-239 (EBB) (D. Conn. 1988) (alleging unconstitutional denial of access to courts); *Mahoney v. Lensink*, 213 Conn. 548 (1990) (issue on appeal was state statutory patients' bill of rights; plaintiff also asserted constitutional liberty deprivation resulting from death by suicide, failure to treat, unsafe conditions of confinement and failure to monitor); *Bell v. Kirk*, No. (X02) CV044002555S, 2005 WL 1089285 (Conn. Super. 2005)(unpublished op.) (restraint death at Whiting Forensic Hospital (WFH)); and *Shehadi v. State of Connecticut*, No. FBT-CV-18-6072211-S (Conn. Super. 2018) (claims of WFH acquittee including unconstitutional abuse and neglect against the State and hospital); *Shehadi v. Cusson, et al.*, No. 3:18-cv-00360 (MPS) (D. Conn. 2018) (WFH acquittee claims including unconstitutional abuse and neglect by state actor staff).  A culture of criminalizing the disability of acquittees, seeing them as worthy of punishment and as escaping criminal responsibility for their acts, as also suggested in Defendants' motion to dismiss asserting that Plaintiffs have "admitted to crimes," may well have been a factor in the abuse of Mr. Shehadi.[4]  It is disappointing that so little change in that culture has occurred. These cases demonstrate a long, relentless and pervasive history of constitutional violations against people with disabilities, both civil patients and acquittees, in Connecticut state psychiatric hospitals.

Nineteen years ago, the State of Connecticut signed on to an *amici* brief in *Tennessee v. Lane* supporting the abrogation of Eleventh Amendment immunity under the ADA. The brief stated: "Although the states more typically advocate the application of Eleventh Amendment immunity, this case is different. Because of the vital public policy underlying the landmark ADA

---

[4] *Shehadi v. State* of Connecticut resulted in a settlement of $9 million.  Besides the civil rights litigation involving acquittee Shehadi, the State criminally prosecuted and convicted nine WFH staff and DMHAS terminated or accepted resignations of approximately 50 staff.

legislation, in particular Title II, and because of the central role of the states in providing the public services, programs and activities subject to Title II, the amici curiae States, consistent with the obligation of their respective attorneys general to protect the public interest, file this amici curiae brief." *Tennessee v. Lane*, 2003 WL 22733906 (Appellate Brief).  Amici, including the Attorney General of Connecticut, concluded that there was a clear history of constitutional violations by the states against people with disabilities, including in the provision of public services and programs, warranting such abrogation:

> For example, the record before Congress included the United States Commission on Civil Rights' report, *Accommodating the Spectrum of Individual Abilities* (1983), which details the history of state institutionalization and other policies that were applied in a discriminatory manner against people with disabilities. *Id*. at 32-37.  These state practices often were unconstitutionally based on 'irrational fears or ignorance, traceable to the prolonged social and cultural isolation' of people with disabilities.

*Amici* Brief at 6.  *Amici* States also wrote that, "As Justice Marshall declared: 'A regime of *state-mandated* segregation. . .emerged that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow." *Id.*  Amici specifically addressed historic state conduct towards patients in state mental hospitals. "The legislative record includes various examples of state conduct devoid of any rational basis: . . .it heard that state mental hospitals misused medications to punish and restrain their disabled, institutionalized patients; it heard that such hospitals subjected their patients to abusive treatment and inhumane conditions; ..." *Id.* at 6-7.  The Court should hold the State of Connecticut to the statements in its Amici Brief made to the United States Supreme Court in *Tennessee v. Lane*.

Defendants rely on *United States v. Georgia*, 546 U.S. 151 (2006), to argue that the Plaintiffs do not meet the test for abrogation because of failure to allege facts adequate for a prima facia ADA Title II violation and failure to allege a Fourteenth Amendment claim. MTD at 11.  In *Georgia*, the unanimous Court held that a prisoner with paraplegia in a state prison who alleged

abuse, neglect, and constitutionally deficient conditions of confinement in violation of the Eighth Amendment may bring a damages claim against the State under Title II of the ADA and sovereign immunity is validly abrogated.  The plaintiff filed his own *pro se* complaint that included many allegations that (at least preliminarily) did not reach the level of an Eighth Amendment violation. The Court's order vacated the Eleventh Circuit's affirmance of the District Court's dismissal of the Plaintiff's ADA Title II claims as barred by sovereign immunity.  The Supreme Court accepted only that issue and reversed and remanded, holding that sovereign immunity *was* abrogated for some of the Plaintiffs' ADA Title II claims.

Defendants also assert that Plaintiffs' complaint fails to state an ADA Title II claim and therefore they have sovereign immunity.  Defendants do not attempt to provide any sovereign immunity analysis under *Lane*, reflecting the States' *Amici* Brief in *Lane*, and instead unnecessarily formulate a Fed. R. Civ. P. 12(b)(6) failure to state a claim analysis as a basis for sovereign immunity and assert Fed. R. Civ. P. 12(b)(1) lack of jurisdiction. If the state proves that Plaintiffs' complaint fails to state an ADA Title II claim, the Court does not need to reach the sovereign immunity issue.  In any event, Defendants make no claim that Plaintiffs, all of whom have been detained in a state institution for from ten to over thirty-four years, are *not* being deprived of their constitutional liberty and right to treatment in the least restrictive setting. Defendants do not deny that Congress unequivocally expressed its intent to abrogate sovereign immunity, that Congress acted pursuant to a valid grant of constitutional authority, or that Title II of the ADA is congruent and proportional legislation to remedy the long history of constitutional violations by the states against people with disabilities in state institutions, as detailed in the *Lane* brief joined in by the State of Connecticut.

Finally, Defendants cite *State v. Foster*, 217 Conn. App. 476 (2023), in support of their claim that, as a matter of law, Plaintiffs in this case, a Title II ADA and Rehab Act civil rights case in federal court, cannot assert a Fourteenth Amendment violation.  The Connecticut Supreme Court has granted review of the Court of Appeals' decision, and therefore the Court of Appeals decision in *State v. Foster* is not a final decision.  *See* 346 Conn. 920 (2023).  In any event, *Foster* in no way limits Plaintiffs' claims in this case, nor does it affect the abrogation of sovereign immunity.[5]

B.  *Plaintiffs' Claims are Not Barred by Sovereign Immunity Because All Claims are Sufficiently Pled and State a Claim Upon Which Relief Can be Granted*

In their Amended Complaint, Plaintiffs allege ADA claims against Defendants including: Count 1: Violations of the ADA's Integration Mandate (¶¶ 137-144); Count III: Failure to Reasonably Modify Defendants policies, practices, or procedures before determining that a Plaintiff is a dangerous contrary to the ADA and its "direct threat" regulation (¶¶ 152-157); Count IV: Violations of the ADA's integration mandate due failure to ensure and plan for sufficient community-based mental health services in the most integrated setting (¶¶ 158-162); Count VI: Failure to reasonably modify policies, practices, or procedures to avoid discrimination based on Plaintiffs' disabilities (¶¶ 168-173); and Count VIII Discriminatory methods of administration (¶¶ 179-185). Defendants ask the Court to dismiss Plaintiffs' ADA claims under Fed. R. Civ. P. 12(b)(6), incorrectly asserting that Plaintiffs have failed to state ADA claims. For the reasons stated below, Defendants' request should be denied.

## IV. PLAINTIFFS HAVE STATED TITLE II ADA CLAIMS

A.      *Title II of the ADA-Statutory Overview*

---

[5] *Foster* is an appeal from a Superior Court order granting recommitment under Conn. Gen. Stat. § 17a-593(c), not an ADA-Rehab Act civil rights claim.  The Court of Appeals in *Foster* held that there was sufficient evidence that Foster remained mentally ill and posed an imminent risk of harm to himself or others and that the statute did not violate the Fourteenth Amendment's Equal Protection Clause because acquittees are not similarly situated to civilly committed patients.

The ADA "provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1), *see also Helen L. v. DiDario*, 46 F.3d 325, 331 (3d Cir. 1995) (*quoting* S. Rep. No. 101-116, at 20 (1989) (Senate Report); H.R. Rep. No. 101-485, pt. II, at 50 (1990) (House Report (Part II)), *cert. denied sub nom.*, *Sec'y of Pub. Welf. v. Idell S.*, 516 U.S. 813 (1995); H.R. Rep. No. 101-485, pt. IV, at 23 (1990).

Congress acknowledged prior to the ADA's passage that "then current laws were 'inadequate' to combat 'the pervasive problems of discrimination that people with disabilities are facing.'" *Helen L.*, 46 F.3d at 331 (*quoting* Senate Report at 18; House Report (Part II) at 47). Forms of discrimination that concerned Congress included segregation of people with disabilities in institutions and their concomitant exclusion from the community and society at large. Senate Report at 5-6 ("One of the most debilitating forms of discrimination is segregation imposed by others."); House Report (Part II) at 29 ("Discrimination against people with disabilities includes segregation[] [and] exclusion . . . .").

In enacting the ADA, Congress recognized that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"; that "discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization"; and that "the Nation's proper goals regarding individuals with disabilities are to assure . . . full participation[] [and] independent living." 42 U.S.C. § 12101(a)(2)-(3), (7); *see also* House Report (Part III) at 49-50 ("The purpose of [T]itle II is to continue to break down barriers to the integrated participation of people with disabilities in all aspects of community life."). Congress further found that "individuals with disabilities continually

encounter various forms of discrimination, including . . . segregation."  42 U.S.C. § 12101(a)(5).

Thus, the ADA specifies that discrimination against people with disabilities includes "segregation"

and "institutionalization."  42 U.S.C. § 12101(a)(3),(5).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42

U.S.C. § 12132.  Title II "incorporates the 'non-discrimination principles' of [S]ection 504 of the

Rehab Act and extends them to state and local governments," whether or not they receive federal

funding.  *Helen L.*, 46 F.3d at 331 (footnote omitted) (quoting *Easley v. Snider*, 36 F.3d 297, 300

(3d Cir. 1994)); *see also* 42 U.S.C. § 12131.

A plaintiff can bring several disability discrimination claims under Title II. These claims

include: disparate treatment (intentional discrimination), disparate impact, or failure to make a

reasonable modification. *See Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009); *accord Nunes v.*

*Mass. Dep't of Corr.*, 766 F.3d 136, 144-45 (1st Cir. 2014)(detailing the theories).

To state a claim under Title II of the ADA, a plaintiff must allege that: that (1) he or she is

a "qualified individual" with a disability; (2) that the defendants are subject to the ADA; and (3)

that the plaintiff was denied the opportunity to participate in or benefit from defendants' services,

programs, or activities, or were otherwise discriminated against by defendants, by reason of

plaintiff's disabilities. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003). Here, for

example, Plaintiffs have alleged that they are qualified individuals with disabilities. *See infra*, at

pp. 18-22. They have also alleged, and Defendants do not dispute, that Defendants are subject to

the ADA. Am. Complt., ¶¶ 23 (DMHAS); 24 (PSRB); 27 (Whiting Forensic Hospital (WFH)).

And Plaintiffs have alleged that they were denied the opportunity to participate in or benefit from

Defendants' transition planning and community mental health services or otherwise were discriminated against by Defendants by reason of their disabilities. *See Id.* ¶¶ 6, 9, 67-78. As further explained below in this Section, Plaintiffs have alleged facts sufficient to state their ADA claims.

B.    *The Integration Mandate under the ADA and Rehab Act*

One form of disability discrimination under Title II is a violation of the "integration mandate." This mandate—arising out of the statute itself, the regulations of the U.S. Attorney General implementing Title II, and the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)—requires that, when a state provides services to people with disabilities, it must do so "in the most integrated setting appropriate to [their] needs." *Olmstead*, 527 U.S. at 592, 607; 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

The Supreme Court in *Olmstead* explicitly held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Olmstead*, 527 U.S. at 597. The Court noted that "in findings applicable to the entire statute, Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination.'" *Id.* at 600. The Court held that unnecessary institutionalization violates the ADA because it "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-01.

The Supreme Court concluded that the ADA requires public entities to provide community services in the most integrated setting when: (a) such services are appropriate, (b) the affected persons do not oppose community-based treatment, and (c) community services can reasonably be

accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities. *Id.* at 607.

A public entity violates Title II of the ADA when it segregates people with disabilities in public or private facilities or promotes the segregation of people with disabilities in such facilities through its planning, system design, funding choices, or service implementation. *See, e.g.*, 28 C.F.R. § 35.130(d); *Steimel v. Wernert*, 823 F.3d 902, 911 (7th Cir. 2016)(explaining that a state may "violate the integration mandate if it operates programs that segregate individuals with disabilities or through its planning, service system design, funding choices, or service implementation practices, promotes or relies upon the segregation of individuals with disabilities in private facilities or programs") (internal quotation marks and alterations omitted.

In addition, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability," including unnecessary institutionalization. 28 C.F.R. § 35.130(b)(3), (d); 28 C.F.R. § 41.51(b)(3),(d); 45 C.F.R. § 84.4(b)(2),(4); *see also State of Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Conn.*, 706 F. Supp. 2d 266, 277-78 (D. Conn. 2010) (plaintiffs stated a violation of the ADA where defendants' methods of administration failed to adequately assess and identify the long-term needs of people with disabilities in nursing facilities and denied them the right to choose to live in the community instead of an institution); *Kathleen S. v. Dep't of Pub. Welfare of Pa.*, 10 F. Supp. 2d 460, 471 (E.D. Pa. 1998) (finding violation of ADA by state defendants whose methods of administration at state institution caused 88 people to be unnecessarily segregated in the hospital even though they were able to live in the community with appropriate supports).

The U.S. Attorney General is required to issue regulations implementing Title II of the ADA. 42 U.S.C. § 12134(a). The Attorney General's integration regulation implementing Title II of the ADA provides, *inter alia*, that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) ("the integration mandate"). An integrated setting is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B. at 693 (2016); *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 320 (E.D.N.Y. 2009)(concluding that "the proper interpretation of the regulations' definition of 'most integrated setting' is set forth in the regulations themselves: whether a particular setting 'enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible'")(quoting 28 C.F.R. § 35.130(d), App. A). Accordingly, the ADA and its integration regulation reflect a preference for community placement. "In short, where appropriate for the patient, both the ADA and [Section 504 of the Rehab Act] favor integrated, community-based treatment over institutionalization." *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 379 (3d Cir. 2005) (citation omitted); *see also Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 337 (D. Conn. 2008)("The ADA's preference for integrated settings is not consistent with a procedure in which remaining at [the institution] is the default option for residents."); 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

Because DOJ is the agency charged with the responsibility to promulgate regulations under the law, it is afforded deference in its interpretation of the ADA. 42 U.S.C. § 12134(a); 28 C.F.R. Part 35 (delegating to the Department of Justice authority to promulgate regulations under Title II); *see, e.g., City of Arlington v. Fed. Commc'ns Comm'n*, 569 U.S. 290, 296 (2013) ("Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but

by the administering agency."). Numerous courts, including the Second Circuit, have relied on DOJ's Guidance when interpreting Title II and *Olmstead. See Davis v. Shah,* 821 F. 3d 231, 262-63 (2d Cir. 2016). The Court should defer to DOJ's interpretation and apply it here.

        C.        *Defendants' Attempt to Argue that No Integration Mandate Claim Has Been Stated is Unavailing*

Defendants assert that Plaintiffs have failed to state an ADA claim, contending that Plaintiffs have not alleged that Defendants discriminated against Plaintiffs by reason of their disabilities and therefore cannot raise an ADA claim under any theory of liability. MTD at 11-12. Specifically, they argue that Plaintiffs have not alleged facts demonstrating that they are "qualified individuals with disabilities" under the ADA (Counts 1,3,4,6 & 8). MTD at 13. Defendants are incorrect.

Defendants argue that because Plaintiffs availed themselves of a plea of not guilty by reason of mental disease or defect (NGMDD) under Conn. Gen. Stat. §53a-13, they have admitted to "committing serious crimes," and therefore cannot be "otherwise qualified individuals" with disabilities because they are subject to a different commitment process than those who are civilly committed. MTD at 13. In making this argument, Defendants invent a distinction based on the fact Plaintiffs have not been civilly committed and are forensically committed. But nothing in *Olmstead* or the ADA precludes a person with a disability from bringing an *Olmstead* claim because of their legal status or the commitment process to which they are subject (or, indeed, even if they have admitted to crimes and been convicted and sent to prison). *See Disability Advocates,* 598 F.Supp.2d at *316 *quoting Yeskey*, 524 U.S. at 209 ("Title II covers all programs, services, and activities of a state or local government entity '*without* any exception.'") Courts have broadly applied *Olmstead,* and most certainly have not limited its applicability to only civilly committed individuals like the Plaintiffs in *Olmstead*. *See e.g.,*

*Henderson v. Thomas*, 913 F.Supp.2d 1267 (M.D. Ala. 2012)(discriminatory segregation of prisoners with HIV), *Lovely H. v. Eggleston*, 235 F.R.D. 248, 261 (S.D.N.Y 2006) (*Olmstead* applied to access public benefits); *Lane v. Kitzhaber*, 841 F.Supp.2d 1199 (D. Or. 2012) (Olmstead applied to employment services)[6]

It is also notable that Defendants cite **no** ADA cases to support their position. *See generally*, MTD. Instead, they rely on *Jones,* 463 U.S. at 362, and *State v. Harris*, 277 Conn. 378, 385, n. 11 (2006), to argue that, because the Constitution permits two different commitment processes: one for civil patients and another for forensic patients, Plaintiffs here cannot bring their *Olmstead* claims. MTD at 14. These cases, however, do not support the proposition that the ADA, including *Olmstead,* does not apply to acquittees such as Plaintiffs. Defendants cite no authority to support their novel theory, based on a distinction which is not relevant to the ADA.

Plaintiffs have alleged that they are qualified individuals with disabilities under Title II of the ADA.  Amended Complt., ¶¶ 2, 3, 18- 22 (Plaintiffs Dyous, Lindia, Morales, Wu and Mueller meet the "essential eligibility requirements to receive, and to participate in, Defendant DMHAS' community mental health services"), *see also* ¶¶ 82, 86, 87, 89 (Plaintiff Dyous has been at a full level 4 privilege level with all pass times for over two years, does not need psychiatric inpatient hospital level of care, and can handle and benefit from community placement, and is a qualified individual with a disability who meets the essential eligibility requirements to receive in DMHAS' community mental health services); ¶¶ 92-95, 99, 101 (Plaintiff Lindia); ¶¶ 103, 105-107, 109; ¶¶ 112, 117-118, 120 (Plaintiff Carson); ¶¶ 123, 129-131, 133.[7]

---

[6] Moreover, the State's own commitment process for individuals committed to the jurisdiction of the PSRB recognizes that at least some people will be able to progress to a lesser restrictive setting and some discharged from its jurisdiction altogether. (Conn. Gen. Stat. §§ 17a-587 (temporary leave), 17a-588 (conditional release), and 17a-593 (discharge)).

[7] Defendants state that they do not concede that Plaintiffs have sufficiently alleged that they have disabilities as defined by the ADA. MTD at 13 n. 4. They do not, however, argue that they do *not* have disabilities. Plaintiffs have alleged facts sufficient to show that they are people with disabilities under the ADA.  A person with a disability under the ADA is a person who has "a physical or mental impairment that substantially limits one or more major life

In their MTD, Defendants suggest that, in asserting their claims in Count 3 of the Amended Complaint which alleges that Defendant PSRB[8] does not comply with the ADA's "direct threat" regulation when interpreting the public safety mandate of Connecticut law, Plaintiffs are somehow asserting that the "direct threat" regulation removes the "qualified individual" requirement of the ADA. (MTD at 20). This is incorrect as Plaintiffs have never made such an assertion.  As discussed above, Plaintiffs are qualified individuals with disabilities.

   1. <u>Plaintiffs need not allege that the State's professionals or any treatment professionals have determined that community-based treatment is appropriate for them to state an *Olmstead* claim.</u>

Defendants also incorrectly contend that to successfully plead an *Olmstead* claim, a plaintiff must allege that the state's own treatment professionals must have determined that community-based treatment is appropriate for the person. MTD at 13, 14.[9]  Numerous courts have held that a person asserting an *Olmstead* claim need not rely on a public entity's own treatment professionals to determine whether the person is qualified and appropriate to participate in a state's community service system. *See, e.g., Joseph S.*, 561 F. Supp.2d 280, 290-91, 2008 WL 24036998 (E.D.N.Y., May 23, 2008)(it is not clear whether *Olmstead* even requires a specific determination by any medical professional that individual with mental illness may receive services in a less restrictive setting); *see also Day v. District of Columbia*, 894 F. Supp. 2d 1, 23-24 (D.D.C. 2012) ("lower courts have universally rejected the absolutist interpretation proposed by defendants");

---

activities of [an] individual." 42 U.S.C. § 12102(1)(A).  Plaintiffs alleged that they have disabilities that affect at least one major life function. *See e.g.*, ¶¶ 18, 89 (Dyous), 19, 101 (Lindia), 20, 109 (Morales), 21, 120 (Mueller), 22, 125, 133 (Wu).

[8] Defendants incorrectly state that Plaintiffs allege that the Connecticut Superior Court decisions that consider the public's safety as a primary concern violate the ADA's direct threat regulation.  As discussed in Section IX, *infra*, Plaintiffs have asserted no claims against the Superior Court.  Plaintiffs' claims with respect to Count 3 are only against the PSRB.

[9] In support of their argument, they rely on *Buchanan v. Maine*, 469 F.3d 158, 174 (1st Cir. 2006), which cites *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 288 (1987).  This reliance, however, is misplaced. *Arline* was decided before the ADA was enacted in 1990. *Olmstead* and *Buchanan* were both decided before the DOJ issued its Olmstead Guidance.

*Frederick L. v. Dep't of Pub. Welfare (Frederick L. I)*, 157 F. Supp. 2d 509, 540 (E.D. Pa. 2001)

(rejecting argument that Olmstead "require[s] a formal recommendation for community

placement").

Defendants also overlook the U.S. Department of Justice's (DOJ) interpretation of

*Olmstead* and Title II's integration mandate.  DOJ's *Olmstead* Guidance states that "the ADA and

its regulations do **not** require an individual to have had a state treating professional make such a

determination." Statement of the Department of Justice on Enforcement of the Integration Mandate

of Title II of the Americans with Disabilities Act and Olmstead v. L.C.,"(DOJ Guidance), Q and

A #4  available at <u>Statement of the Department of Justice on Enforcement of the Integration</u>

<u>Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C. (ada.gov)</u>

(emphasis added).  The DOJ Guidance also makes clear that there is **no** requirement that a plaintiff

allege or show that even their own treatment providers have determined that community placement

is appropriate. *See id*. The DOJ Guidance instead states that individuals with disabilities "may rely

on a variety of forms of evidence to establish that an integrated setting is appropriate." *Id*.

Specifically, the DOJ Guidance notes that:

> [p]eople with disabilities can also present their own independent evidence of the appropriateness of an integrated setting, including, for example, that individuals with similar needs are living, working and receiving services in integrated settings with appropriate supports.  This evidence may come from their own treatment providers, from community-based organizations that provide services to people with disabilities outside of institutional settings, or from any other relevant source.

*Id*.  The DOJ Guidance also explicitly rejects limitations, as Defendants attempt to impose, on

what evidence would satisfy a showing that community placement is appropriate. *Id*. ("Limiting

the evidence on which *Olmstead* plaintiffs may rely would enable public entities to circumvent

their *Olmstead* requirements by failing to require professionals to make recommendations

regarding the ability of individuals to be served in more integrated settings.").

Furthermore, Plaintiffs have alleged facts sufficient to state an *Olmstead* claim, as codified in the ADA and U.S. DOJ regulations promulgated under it.  First, they have alleged that they are qualified individuals with disabilities. Amended Compl. ¶¶ 2, 89 (Dyous); ¶101 (Lyndia); ¶ 109 (Morales); ¶120 (Mueller); ¶133 (Wu).[10]  They have also alleged that they do not oppose treatment in the community. *See e.g. id.,* ¶ 88 (Dyous), ¶100 (Lindia), ¶109 (Morales), ¶119 (Mueller), ¶132 (Wu).

The Named Plaintiffs have also alleged facts that they are appropriate for Defendants' assessments, transition planning services, including temporary leave, so that they may timely participate in Defendants' community mental health service system.  For example, Plaintiff Wu has alleged that his treatment team at WFH, Dutcher Service, has recommended to the PSRB that he be allowed to leave the hospital on temporary leaves overnight in the community, although the PSRB rejected this recommendation. *Id.,* ¶ 131. Similarly, Plaintiff Mueller was deemed by his WFH treatment team and the Consulting Forensic Psychiatrist (CFP) to be appropriate for temporary leave, even though the PSRB terminated his leave contrary to the professional judgment of his treating professionals at WFH. *Id.,* ¶ 115. Plaintiff Morales' treatment team has determined that she is appropriate for temporary leave. *Id.,* ¶ 103. Plaintiff Lindia's treatment team has determined that he is appropriate for transition planning so that he can move to an integrated setting in the community, as he has been in transitional temporary planning for over a year. *Id.,* ¶ 94. Plaintiff Lindia's transition to the community has been delayed indefinitely due to being on a waiting list for community residential services. *Id.* ¶ 94.

Plaintiffs have also alleged additional facts to support a showing that they are appropriate for community placement. For example, they have all been assigned a Level 4 privilege level with

---

[10] *See* footnote 7 above at pp. 18-19.

full privileges, meaning that their treating professionals at WFH have determined that they all can have unescorted grounds passes on the hospital campus throughout the day for fifty minutes at a time. *Id.*[11], ¶¶ 87 (Dyous); 92, 99 (Lindia); 103, 107 (Morales); 118 (Mueller); and 131 (Wu).

These facts are precisely the type of evidence sufficient to support an *Olmstead* claim under the DOJ Guidance that explicitly states that "an individual may rely on a variety of forms of evidence to establish that an integrated setting is appropriate." DOJ Guidance at 1. Such evidence includes: "that individuals with similar needs are living, working, and receiving services in integrated settings with appropriate supports. This evidence may come from their own treatment providers, from community-based organizations that provide services to people with disabilities outside of institutional settings, or from any other relevant source." *Id.* Plaintiffs have adequately pled facts to support their *Olmstead* claims.

2.  Plaintiffs are not required to plead that their community placement "could be accomplished taking into account the resources available to the state and the needs for others with similar disabilities."

Defendants' contention that Plaintiffs' ADA claims must be dismissed because they did not plead that their community placement "could be accomplished taking into account the resources available to the state and the needs for others with similar disabilities" also fails. A plaintiff need not allege such facts to state an *Olmstead* claim because the question of whether a plaintiff's needs for community placement can be met considering the resources available to the state and the needs of others with disabilities is part of a fundamental alteration *affirmative defense* for which Defendants bear the burden of proof. It is not appropriate to dismiss *Olmstead* claims because such facts have not been pled by a plaintiff. *See Mental Disability Law Clinic v. Hogan*, No. CV–06–6320 (CPS)(JO), 2008 WL 4104460, at *15 (E.D.N.Y., Aug. 28, 2008), *citing Joseph*

---

[11] When a person obtains a Full Level 4 privilege level, pursuant to WFH policy, the individual may go outside on the hospital grounds unescorted. See Am. Complt., ¶ 63.

*S. v. Hogan,* 2008 WL 2403698, at *8*, (citing cases); *see also Townsend v. Quasim,* 328 F.3d 511, 518-20 (9th Cir. 2003)("Although plaintiff has not alleged the placement can be reasonably accommodated, taking into account (a) the resources available to the State and (b) the needs of others with mental disabilities, it would be inappropriate to dismiss on these claims on this ground as defendants bear the burden of establishing "fundamental alteration" as a defense.").[12]

> ### D.  Plaintiffs Have Sufficiently Pled Denial of Reasonable Accommodations/Modifications

The failure to provide reasonable modifications can constitute discrimination under Title II of the ADA.  *Goord*, 591 F.3d at 42. The ADA requires that public entities make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, including the unnecessary segregation or institutionalization of people with disabilities, unless the public entity can demonstrate that such modifications would fundamentally alter the nature of the service, program, or activity.  28 C.F.R. § 35.130(b)(7); *see also Olmstead*, 527 U.S. at 597 (holding that unjustified isolation is discrimination).

A plaintiff may meet his or her burden of showing that a modification is reasonable through a *prima facie* showing, by suggesting the existence of a plausible accommodation.  *Frederick L. II*, 364 F.3d at 492 n.4 (plaintiff has burden of "articulating a reasonable accommodation" that would allow institutionalized persons with disabilities to move to the community); *Henrietta D.*, 331 F.3d at 280 (once the plaintiff suggests "the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits . . . she has made out a *prima facie* showing

---

[12] Defendants' reliance on *Duffy v. Velez*, Civ. No. 09-5539, 2010 WL 503037 (D.N.J. Feb. 8, 2010) *Vinson v. Thomas* 288 F.3d 1145 (9th Cir. 2002), and *Messier*, 562 F. Supp. 2d 294, 344-45 (D.Conn. 2008), is misplaced. Neither *Velez* nor *Messier* require a plaintiff to allege facts that their community placement could be accomplished taking into account the resources available to the state and the needs for others with similar disabilities. Both cases recognize that these facts are part of the fundamental alteration affirmative defense. *See Velez*, 2010 WL 503037, at *3 (a plaintiff need only allege a plausible reasonable accommodation), *Messier*, 562 F.Supp. at 344-45. *Vinson* is a failure to accommodate discrimination case involving a request for employment services from a state vocational rehabilitative agency unrelated to *Olmstead*. *See generally, Vinson v. Thomas*, 288 F.3d 1145 (9th Cir. 2002).

that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant") (quoting *Borkowski v. Valley Cent. Sch. Dist*., 63 F.3d 131, 138 (2d Cir. 1995)).  If the plaintiff makes that showing, then the public entity may assert as an affirmative defense, and bears the burden to prove, that the proposed modification would constitute a "fundamental alteration" of its services, programs, or activities.  *Olmstead*, 527 U.S. at 603-06; *Henrietta D.*, 331 F.3d at 280-81; *Frederick L. II*, 364 F.3d at 492 n.4.

Defendants assert that Plaintiffs have failed to state a reasonable modification claim because that they did not allege that they requested specific accommodations or modifications for their disabilities. MTD at 17.  To the contrary, Plaintiffs specifically alleged in their Amended Complaint that Plaintiffs' Counsel sent Defendants a demand letter requesting reasonable modifications including, for example: "increase capacity in DMHAS mental health community services and supports; provide acquittees timely movement through the PSRB system in the most integrated setting; and provide for reasonable modifications to the PSRB's policies, procedures, and practices so that qualified individuals with disabilities can participate in the State's community-based mental health services."  Am. Complt., ¶ 79; *see also* Cardella Aff., Ex. A. to MTD. Defendants say that this request was insufficient because the letter did not include the Plaintiffs' names. The letter, however, clearly sets forth the systemic relief requested by Plaintiffs, including the above-described specific systemic reasonable modifications requested by Plaintiffs, and describes the individual Plaintiffs' circumstances. *See* Cardella Aff., Ex. A at pp. 5-6. This case seeks only systemic relief.

Defendants also wrongly contend that Plaintiffs really seek an accommodation or modification to "eliminate from consideration Plaintiffs' criminal conduct admissions." MTD at 17.  This is a gross mischaracterization since acquittees have in fact been acquitted of any "criminal

conduct," (see section I above) and an inaccurate assertion. Plaintiffs request that the Court order Defendants to comply with federal disability anti-discrimination law. Am. Complt., Prayer for Relief ¶ 6.a. Such modifications are both appropriate and required under Title II. *See Mary Jo C. v. N. Y. State and Loc. Ret. Sys.*, 707 F. 3d 144, 163-65 (2013); *see also* Discussion at Section IX, *infra* at pp. 38-39.

Plaintiffs, for example, have also articulated proposed plausible systemic modifications so that they and the Class can timely participate in Defendants' transition planning services in order to move an integrated setting at a reasonable pace. Plaintiffs   allege that WFH and DMHAS delay the transition planning process until a community mental health provider is available to serve Plaintiffs. *Id.*, ¶¶ 67, 70, 72 (describing the transition planning process and concomitant delays). These delays, as Plaintiffs allege, are due to Defendant DMHAS' failure to administer its community mental health system in a manner that ensures there is sufficient capacity so that Plaintiffs and the Plaintiff class members can transition from WFH to the community at a reasonable pace. *Id.*, ¶¶ 67, 70.

To address these delays, Plaintiffs have proposed changes to how DMHAS contracts with providers to prevent them from refusing to serve individuals committed to the jurisdiction of the PSRB. *See id.*, ¶ 79; *see also* Affidavit of Vanessa Cardella, Ex. 2, filed in Support of Defendants' MTD (ECF No. 36).   Plaintiffs have proposed modifications to how Defendant DMHAS administers its community mental health system, including increasing funding. *Id.*, ¶¶ 73, 74-77.

Plaintiffs also ask the Court to order Defendants to "reasonably modify their privilege level policy and the risk management policy so that Plaintiffs and members of the Plaintiff Class are moving through WFH at a pace that ensures treatment in the most integrating setting." *Id.*, Prayer for Relief, ¶ 6.c.

Defendants also contend that Plaintiffs' reasonable modification claims seeking placement of class members in the community within 90 days of being given Level 4 privileges by their WFH treatment teams would represent a fundamental alteration of Defendants' programs and therefore such claims should be dismissed for failure to state a claim. MTD at 20. Any fundamental alteration defense asserted by Defendants is not a basis to dismiss any of Plaintiffs' claims. *See* Section IV.C.2, above. Also, as explained in Section VI, each person's treatment team would have to determine the most integrated setting and whether a 90-day transition is appropriate.

Defendants also wrongly assert that Plaintiffs have not pled any facts about the specifics of their disabilities. That too is inaccurate. *See* Am. Complt., ¶¶ 7-9 and 31-44.

     E.    *Plaintiffs Have Alleged Facts Sufficient to State Their ADA Methods of Administration Claim.*

Title II of the ADA prohibits public entities, such as Defendants, from "directly, or indirectly or through contractual or other arrangements, utiliz[ing] criteria or other methods of administration: (1) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (2) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities…" 28 C.F.R. § 35.130(b)(3).

Defendants concede that Plaintiffs have alleged facts supporting a "methods of administration claim" against Defendant DMHAS. MTD at 22 *citing* Am. Complt, ¶¶ 183(a)-(d).[13] They inaccurately contend that Plaintiffs have failed to allege facts to support a "methods of administration claim" against Defendants WFH and PSRB. *Id.*   In doing so, Defendants ignore Plaintiffs' allegations that "Defendants have developed and utilize criteria and methods of

---

[13] Other allegations in the Amended Complaint supporting Plaintiffs ADA methods of administration claim against Defendant DMHAS include paragraphs 73-77, 181-82.

administration of Connecticut's mental health system, including the PSRB, that have a tendency and effect subjecting the Plaintiffs and the members of the Plaintiff Class to unnecessary and unjustified segregation on the basis of their disability by, *inter alia*, failing to reasonably modify Defendants' service system to avoid discrimination against qualified acquittees with mental health disabilities in violation of 42 U.S.C. §12132 and 28 U.S.C. §35.130(b)(3)." Amended Complt., ¶¶ 181; 183. Plaintiffs also allege that WHF and DMHAS "have failed to develop and implement a plan to effectively address service gaps that impede prompt transition of qualified acquittees from WFH and prevent unnecessary readmission of acquittees to WFH." *Id.*, ¶ 183.b; *see also id.*, ¶ 188.

## V. PLAINTIFFS' AMENDED COMPLAINT DOES NOT MAKE ANY CLAIM AGAINST THE PSRB FOR VIOLATION OF THE REHAB ACT.

Plaintiffs' Amended Complaint does not make any claims for Rehab Act violations against the PSRB. Plaintiffs' Rehab Act claims in the Amended Complaint are only against DMHAS and WFH. Defendants' motion to dismiss the Rehab Act claims against the PSRB should be denied because no such claims are made in the Amended Complaint.

## VI. A FEDERAL *HABEAS* PETITION IS NOT PLAINTIFFS' ONLY REMEDY AS THEY HAVE REMEDIES UNDER THE ADA AND REHAB ACT

Defendants' argument that Plaintiffs may not bring their *Olmstead* claims for care and treatment in the most integrated setting incorrectly asserts that Plaintiffs' only remedy is through a s *habeas corpus* petition. MTD at 29. Plaintiffs do **not** seek immediate release from custody or to challenge the fact or duration of their confinement, but instead seek only reasonable modifications in Defendants' policies and procedures to enable Plaintiffs to progress through Defendants' already-established service system so that they may be treated in the most integrated setting pursuant to the ADA's integration mandate. Am. Complt., ¶¶ 4,8, 9 and 64-70.

Defendants mainly hinge their argument on several cases[14] including *Bogovich v. Sandoval*, 189 F.3d 999 (9th Cir. 1999); *Heath v. Hanks*, 433 F.Supp.3d 221 (D.N.H. 2019); *Beam v. Madigan*, Case No. 16-cv-1211-MJR, 2017 WL 679950 (S.D. Illinois, 02/21/2017); and *Clemons v. Williams*, Case No. 2:14-cv-02195-APG-NJK (March 29, 2016).[15]  These cases do not support dismissal of Plaintiffs' *Olmstead* claims.

*Bogovich* establishes the *lack* of relevance of the supposed habeas corpus remedy to ADA cases like this seeking systemic relief not tied to any particular individual. In *Bogovich*, two disabled prisoners brought ADA claims seeking prospective injunctive relief only challenging a parole board's policy of considering substance abuse history in making parole decisions. The Court held that the plaintiffs' claims could proceed and were not limited to only a remedy through a habeas action because, in bringing their ADA claims, they did not challenge the validity or duration of their prison confinement. *Id*. at 1003-04.  Instead, the court found that the plaintiffs attacked "the Board's decision-making process" and that "success on their claim would not guarantee their parole or shortening of their sentences because the parole board would still have the authority to deny their parole." *Id*. at 1003, quoting *Neal v. Shimoda*, 131 F.3d 818, 824 (9th Cir. 1977).  The court noted that the prisoners had not alleged that they had been improperly denied parole and that they did not seek to "upset any previous decisions denying parole." *Id*. at 1003.

*Hanks* is distinguishable from this case. In *Hanks*, the court dismissed the ADA claims of a civilly committed man seeking to invalidate a prior administrative order confining him to a secure

---

[14] Defendants also inappropriately rely on the Second Circuit's decision in *Dyous v. Psychiatric Sec. Review Bd.*, 708 App'x 39, 40 (9th Cir. 2018), to assert that Plaintiffs' exclusive remedy is federal habeas petition. MTD at 31. However, in *Dyous*, the plaintiff sought to challenge the validity of his confinement. Plaintiffs do not bring such a challenge here.  Likewise other cases cited by Defendants to support their argument that Plaintiffs' sole remedy is a habeas petition, including *Wolf v. Diaz*, Case No. 2:20-cv-0206 KIM BBP, 2020 U.S. LEXIS 175866, at *2 (E.D. Cal. Sept. 24, 2020) also does not support dismissal because Plaintiffs here do not seek release.

[15] These decisions stem from the Supreme Court's decision in *Prieser v. Rodriquez*, 411 U.S. 475, 489 (1973), in which the Court held that individuals in a state's custody could not challenge the fact or duration of their confinement through 42 U.S.C. § 1983 and instead must bring such challenges through a habeas action.

psychiatric unit at a hospital and ordering his release. Similarly, in *Beam*, a prisoner's ADA claims were dismissed, in part, because relief sought included "immediate release" from prison, and, in *Williams*, a disabled prisoner brought an ADA claim seeking a reduction in sentence because he was denied the ability to work and earn credits towards a sentence reduction because of his disability. Both of these cases cited by Defendants are also distinguishable and thus inapplicable, because both involved ADA challenges by the plaintiffs seeking relief in the form of release and/or shortening of their sentences.

Here, similar to the plaintiffs in *Bogovich*, and *unlike* the plaintiffs in *Hanks*, *Madigan*, and *Williams*, Plaintiffs challenge systemic practices -- in this case, the PSRB's system of making decisions regarding the provision of temporary leave and the allowance for acquittees to transition to less restrictive settings to receive care and treatment. Nothing in the Plaintiffs' Amended Complaint challenges the fact of their commitment or the duration of the commitment, nor do they request that any of the Plaintiffs or putative Class Members actually be released at some time in the future from the PSRB's jurisdiction or WFH or DMHAS' custody, if the Court grants their requested relief. *See generally* Amended Complaint. Plaintiffs explicitly allege in their Complaint that they do **not** seek to challenge their commitments, request final discharge from the PSRB's custody, or seek individualized relief. *See* Amended Compl., ¶ 4, *see also* Prayer for Relief, ¶ 6. This relief differs significantly from that of a *habeas* petition. Were the Court to grant Plaintiffs' requested relief, not one Named Plaintiff or Class member would be released from the jurisdiction of the PSRB or have his/her/their orders of confinement invalidated. By contrast, if a Named Plaintiff or class member filed and were to be successful on a *habeas* petition, and their NGRI plea were to be vacated, they would be released from the hospital and no longer under the jurisdiction of the PSRB. *See* 28 U.S.C. § 2254.

More fundamentally, the relief that Plaintiffs seek in this case is simply unavailable through a habeas petition. The scope of the relief that could be obtained through a habeas petition is limited and does not encompass the class-wide relief that Plaintiffs seek.  Rather, the purpose of a habeas is narrow as its objective is to invalidate the state court's judgment of conviction in a particular case. *Rodriguez v Mitchell*, 252 F.3d 191, 198 (2d Cir. 2001)("The habeas motion under 28 U.S.C. § 2254 seeks to invalidate the state court's judgment of conviction."). Thus, Plaintiffs could not obtain systemwide changes to policies, practices and procedures so as to stop, and avoid *future*, disability discrimination if they were limited to only seeking relief through a habeas petition.

Defendants incorrectly assert that the Complaint's *Olmstead*-related allegations, such as that the Plaintiffs are "unnecessarily isolated, segregated and institutionalized at WFH" (Am. Complt., ¶ 1), that they all reside at the Dutcher building at WFH (*Id*. at ¶¶ 18-22), and that they can handle and benefit from living in the most integrated setting such as an apartment in the community, a group home, or supportive housing," are indicative of a claim seeking a "quantum change in the level of custody" that can only be remedied through a habeas petition.  To the contrary, Plaintiffs' allegations and relief sought do not in any way guarantee that any Plaintiffs or Class members will receive a reduction in the time that they are committed to the custody of WFH or DMHAS and the jurisdiction to the PSRB.[16] Rather, Plaintiffs ask the Court to issue prospective declaratory and injunctive relief including an order directing Defendants to: "Ensure Defendants apply state statutes, policies, practices, and methods of administration in a manner that complies with Title II of the ADA and Section 504, including a requirement that each Plaintiff and Plaintiffs Class member receives treatment and services in the most integrated setting and, ensure

---

[16] Similarly, the relief sought in Plaintiffs' Demand letter was also limited to systemic, non-individualized relief. Aff'd of Cardella, Ex. A (ECF No. 36).

that where in conflict, that federal antidiscrimination law control over state law." *Id*., Prayer for Relief ¶ 6 (a).

Plaintiffs ask the Court to direct Defendants to "[i]ncorporate the ADA and the Rehab Act's 'direct threat' review of risk so as to ensure that each Named Plaintiff and member of the Plaintiff Class is being provided reasonable accommodation and reasonable modification to the Defendants' programs, policies, and practices so as to ensure that Plaintiffs and the members of the Plaintiff Class are receiving treatment in the most integrated setting." *Id*., Prayer for Relief ¶ 6(b). Plaintiffs ask the Court to direct Defendants to "[r]easonably modify the privilege level policy and the risk management policy so that Plaintiffs and members of the Plaintiff Class are moving through WFH at a pace that ensures treatment in the most integrated setting." *Id*., Prayer for Relief ¶ 6(d). Defendants do not dispute that these Prayers for Relief, if granted by the Court, would result in a change of policies and practices only and would not afford individualized relief such as reduction of confinement, for the Named Plaintiffs or any Class members. The only Prayer for Relief that Defendants assert seeks individualized relief in the form of the Plaintiffs' release is Prayer for Relief ¶ 6(c), which asks the Court to order Defendants to "[r]easonably modify the State's community services system so that each Plaintiff and member of the Plaintiff Class is being treated and receiving services in the most integrated setting within ninety days [of] reach[ing] a Full Level 4 [privilege level]." Defendants' assertion is incorrect.

Plaintiffs do not ask the Court to order that they be discharged from the PSRB's jurisdiction or from the custody of WFH or DMHAS, either within 90 days -- or ever. Instead, they seek reasonable modifications to Defendants' transition services and the DMHAS's methods of administering its community mental health service system so that there is sufficient capacity in the community to allow Plaintiffs to move at a reasonable pace to the most integrated setting

appropriate to their needs.  Plaintiffs allege that DMHAS has failed to adequately fund its community mental health service system, resulting in unnecessary delays in starting transition planning. Am. Complt., ¶ 73-77; *see also* Counts IV and V. Plaintiffs also allege that, due to DMHAS's decision to use contracts with community mental health providers that allow providers to refuse to serve acquittees, Plaintiffs' ability to timely transition to the community is further impeded. *Id.*, ¶¶ 67, 70, 74-77. Were the Court to order the relief sought, WFH's treatment teams would still need to make individualized decisions as to *what* the most integrated setting is for each Plaintiff—not the Court.  Whether 90 days is an appropriate time to transition a Plaintiff to a more integrated setting is an individualized fact-intensive inquiry for each person's WFH treatment team—not the Court.

Finally, even if the Court were to find that Prayer for Relief 6(c) is relief that could only be sought through a *habeas* petition, the Court need not, and should not, dismiss the entire case. Rather, the Court should dismiss or strike that one prayer for relief but allow the other claims to proceed. Defendants' contention that Plaintiffs' sole remedy is a federal habeas action should be rejected.

## VII.   PLAINTIFFS HAVE STANDING TO BRING CLAIMS UNDER THE ADA AND THE REHAB ACT

Plaintiffs all have standing to bring claims for declaratory and prospective injunctive relief against Defendants. Plaintiffs have all suffered an injury-in-fact that is fairly traceable to Defendants' wrongful acts and omissions, and that can be redressed by a favorable judicial decision and order of the Court.  At the motion to dismiss stage, "standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003).

A.      *Plaintiffs have Suffered Injury-in-Fact*

Defendants predicate their assertion of lack of standing and injury-in-fact on the mischaracterization of Plaintiffs' claims as challenging their initial commitment by the Superior Court or the failure of the Superior Court to discharge them pursuant to Conn. Gen. Stat. § 17a-593.  Plaintiffs do not challenge their initial commitments and Plaintiffs do not request relief from this Court to substitute its judgment for that of the Superior Court and order final discharge in place of a § 17a-593 discharge order.  All of Plaintiffs' claims exist chronologically in between the Superior Court's jurisdiction to commit pursuant to § 17a-582 and to discharge pursuant to § 17a-593.

Plaintiffs' injury-in-fact is best explained in the context of the roles of each Defendant. WFH takes physical custody of the acquittee upon commitment by the Superior Court, provides treatment, transfers patients to Dutcher, monitors and manages stabilization of patients, and gives patients increased Privilege Levels as the patient recovers and stabilizes. *See* Am. Complt., ¶¶ 58-68 Almost all patients eventually recover, their mental illness moves into various stages of remission or full remission, and their risk of dangerousness to themselves or society substantially decreases or is completely alleviated.  Once the patient is at a Full Level 4 privilege level, WFH is also responsible for working with each patient to determine a catchment area, contacting the local mental health authority (LMHA), contacting a community mental health provider, sending out a packet to them with all the important medical records, getting acceptance from the LMHA and the community provider to take the patient, getting approval of the treatment team for a temporary leave plan, presenting the proposed temporary leave plan to the WFH Forensic Review Committee (FRC), presenting the proposed temporary leave plan to the CFP, formulating a proposed formal temporary leave plan with the LMHA and the community provider, getting the

33

final proposed temporary leave plan approved by the FRC and the CFP, and then filing an application for temporary leave to the PSRB for a hearing and order. Amended Complt., ¶¶ 67. WFH also submits six-month reports to the PSRB pursuant to § 17a-586, and testifies at all hearings set by the PSRB, including mandatory two-year reviews pursuant to § 17a-585.

The PSRB holds hearings, takes evidence, and makes orders as authorized by §§ 17a-584 17a-587 (temporary leave), 17a-588-591, 17a-594 (conditional release and modifications of conditional release or termination of conditional release), 17a-592 (recommendation for discharge to Superior Court), 17a-593 (recommendation for or against discharge), and 17a-599 (transfers from WFH Max to Dutcher).

DMHAS's role is to provide overall management of WFH, provide and manage the Consulting Forensic Psychiatrists under a contract with Yale University, provide and maintain local mental health authorities which provide community mental health treatment (both state-operated and private nonprofit), provide, maintain and contract for community mental health providers providing residential and community mental health services and supports, and administer its community mental health service system. Am. Complt., ¶¶ 73-77.

The Plaintiffs suffer injury-in-fact by being unnecessarily institutionalized and not being provided treatment in the most integrated setting under this system due to Defendants' failure to provide them with timely transition planning services and ensuring that there is sufficient capacity in their community mental health service system so that Plaintiffs can transition to the community at a reasonable pace and to ensure that DMHAS' contractors do not discriminate against Plaintiffs in the provision of community mental health services. *Id.*, ¶¶ 13, 73-77, 183.d.  DMHAS provides for a continuum of placements for treatment of acquittees from most restrictive to most integrated, as follows: WFH Max; Dutcher; temporary leave; and finally conditional release.  Each step

toward the least restrictive, more integrated, setting represents significant progress in treatment; an increase in liberty, dignity and respect for the acquittee; and an eventual result of stabilization, recovery and a safer hospital and a safer community. The failure to timely move a person to the next step represents a significant restriction on liberty, privileges, work opportunities, more integrated treatment options, and socialization, thus compromising recovery and decreasing safety. The focus of this case is limited to the point in the progression when, after a person attains a Full Level 4 privilege level through their own treatment team, the FRC, and CFP, the acquittee nevertheless remains in Dutcher for years before a temporary leave plan is approved. *Id.*, ¶¶ 58, 64, 67-70. Temporary leave is the first step in community mental health services for an acquittee. The difference between being confined to Dutcher and WFH grounds and going out into the community for mental health treatment, services and support is profound, especially after many years of being confined in WFH Max and Dutcher.

Each Plaintiff has been denied timely transition services which in turn has resulted in delays and unnecessary institutionalization and the denial services in the most integrated setting, resulting in injury-in-fact. *Id.*, ¶13.  Plaintiff Dyous has been at a Full Level 4 privilege level for over two years and has not been provided with a temporary leave. Am. Complt., ¶ 82. Plaintiff Lindia has had a Full Level 4 privilege level and has waited in Dutcher with no temporary leave plan for over a year. *Id.*, ¶¶ 92-93. Plaintiff Morales obtained a Full Level 4 privilege level in April 2021 and was not granted temporary leave by the PSRB until December 2, 2022, over twenty months. *Id.*, ¶ 103. Plaintiff Mueller had a prior temporary leave in 2020, had it revoked, has maintained his Full Level 4 privilege level throughout and did not have a temporary leave as of the date of the filing of the Amended Complaint, March 3, 2023. *Id.*, ¶¶ 115,118. Plaintiff Wu had a prior temporary leave in January 2019 and, after a short period of time, his leave was put on hold

when it was discovered that a staff person borrowed money from him. Mr. Wu has maintained his Full Level 4 privilege level for a majority of the time since 2020 and did not have temporary leave as of the date of the filing of the Amended Complaint, March 3, 2023. *Id*., ¶¶ 123-131.

The ADA, the Rehab Act and *Olmstead* make clear that unnecessary segregation in state institutions is *per se* discrimination and thus, constitutes harm. See *Olmstead,* 527 U.S. at 600.  A state that unnecessarily confines, segregates and institutionalizes people with disabilities subjects those persons to discrimination and the inherently harmful and injurious effects of institutionalization. *See id*. at 600 – 601.

In *State of Connecticut Office of Protection and Advocacy v. Connecticut*, 706 F. Supp. 2d 266 (D. Conn. 2010), the plaintiff brought a putative class action under the ADA and Rehab Act on behalf of people with mental illness needlessly placed in nursing facilities. The State argued that the institutional plaintiff lacked standing to bring its claims asserting it failed to allege that nursing home residents suffered an injury-in-fact because they did not actually apply for community-based services or identify programs to which they were denied access, and thus their claims were based on their mere residence. Rejecting this argument, the court held that the residents had standing and had suffered an injury-in-fact by the State's failure to provide community-based services. *Id*. at 284.

B.    *Plaintiffs Have Standing to Bring Claims Against DMHAS and WFH*

While Defendants are correct that DMHAS and WFH do not have authority to grant temporary leave or conditional release, the PSRB will not order it without months, if not years, of temporary leave planning, formulation and an application brought by WFH, and without appropriate and available community mental health services and supports created, provided and maintained by DMHAS. *See* Am. Complt., ¶¶ 9, 28.  Declaratory and injunctive relief against

36

WFH, DMHAS and the PSRB are therefore all necessary in order to remedy the Article III injury-in-fact of unnecessary institutionalization of Plaintiffs and substantially delayed temporary leave and conditional release.

Defendants cite to *Summers v. Louisiana*, 2022 WL 4490161 (M.D. La. September 27, 2022)[17], wrongly asserting that Plaintiffs have no standing and have not suffered an injury-in-fact, arguing that their injury is speculative because they have not alleged that a treatment professional has recommended that they could be safely treated in the community. MTD at 37. As discussed above, courts and the US DOJ have stated that such allegations are not required to state an *Olmstead* claim. In any event, Plaintiffs' Complaint alleges facts that their state treatment teams have determined that they are eligible for Defendants' transition planning services so that they could be treated in more integrated settings on temporary leave. *See supra*, at pp. 18-22.[18]

Plaintiffs have alleged Article III injury-in-fact by asserting that they are unnecessarily institutionalized and segregated from the community, family, friends, churches, schools and work opportunities, and are deprived of the freedom of living in the community and receiving mental health services and supports in the community.

## VIII. PLAINTIFFS' CLAIMS ARE NOT MOOT

Defendants claim that all of Plaintiffs' claims are moot because the legislature amended Conn. Gen. Stat. § 17a-584.  From 1985 until October 1, 2022, § 17a-584 stated the standard to be

---

[17] Summers is currently on appeal before the 5th Circuit, *Summers v. State of Louisiana*, Dec. 1, 2022 (No. 22-30763) 2022 WL 4490161.  This case, as Defendants concede, is also not binding on this Court.
[18] *Summers* is also inapposite to Connecticut. Louisiana does not have a PSRB and thus, the state court with jurisdiction of the acquittee makes all orders for temporary leave, conditional release and discharge. The *Summers* court held "[D]efendants have not 'warehoused' Plaintiffs at ELMHS because Defendants played no role in their commitment to ELMHS and have no ability to release them."  Here, Defendants *do* have the ability and the legal duty to move acquittees into community-based services through orders for temporary leave (TL) and conditional release (CR). Connecticut's system differs sharply from Louisiana's as the Connecticut Superior Court has no legal authority over TL and CR.

used by the Superior Court, and by the PSRB when making orders for initial commitment, temporary leave and conditional release, to be ". . .considering that its primary concern is the protection of society. . ."  In Public Act 22-45 Sections 3 and 4, the legislature amended § 17a-584 to, ". . .considering that its primary concerns are the protection of society and the safety and well-being of the acquittee. . ."

These legislative changes do not address the ADA and Rehab. Act claims against WFH or DMHAS, as they do not incorporate the ADA's standards.  The amendments to state law in Public Act 22-45, therefore, do not moot out Plaintiffs' claims.  Defendants cannot moot out the challenges to their whole system without making changes to the system congruent with the relief sought in this case.

### IX. THE COURT SHOULD NOT ABSTAIN FROM THIS CASE UNDER THE *YOUNGER* ABSENTION DOCTRINE

This Court should not abstain from hearing this case under the abstention doctrine in *Younger v. Harris*, 401 U.S. 37 (1971), as Plaintiffs do not ask this Court to "interfere" with any state proceeding, including Defendants' review and oversight of commitment and integration. *See* MTD at 41. *Younger* abstention should be used rarely and only in narrow exceptional circumstances. *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) ("Circumstances fitting within the *Younger* doctrine, we have stressed, are "exceptional").  Federal courts should only abstain from deciding cases in "exceptional circumstances" including: (1) 'ongoing state criminal prosecutions," (2) "certain civil enforcement proceedings," and (3) "civil proceedings involving certain orders uniquely in furtherance of the state's ability to perform their judicial functions." *Id.*

This case does not warrant *Younger* abstention as it does not fall into any of the *Sprint* exceptions. Defendants incorrectly argue that this case falls into the second and third exceptions. MTD at pp. 43-45.  First, relying on *Justice v. Woodlock*, No. 9:13-CV-252 (NAM/TWD) 2015

WL 145643 (N.D.N.Y. 2015), and *Davy v. Comm'r of Mental Health*, 19-cv-2074(BMC), 2019 WL 2269968 (E.D.N.Y. 05/28/2019), Defendants claim that the Court would interfere with the PSRB's proceedings if it granted Plaintiffs' sought relief.  However, unlike *Justice* and *Davy*, both of which involved challenges by the Plaintiffs to their mental health treatment recommitments, Plaintiffs here bring federal disability discrimination claims under the ADA and Rehab Act seeking exclusively systemic relief—not individualized relief or release. Any relief ordered by this Court would not prevent the PSRB from carrying out its duties set forth in state law. Rather, it would require Defendants to "apply state statutes and laws, policies and methods of administration in a manner that complies with Title II of the ADA and Section 504, including a requirement that each Plaintiff and Class member receives treatment and services in the most integrated setting and, ensure that where in conflict, that federal anti-discrimination law control over state law." Am. Complt., ¶ 6.a. Compelling Defendants to comply with a prophylactic federal disability anti-discrimination law is not an unlawful "interference" with any state court proceeding and can be an appropriate remedy to avoid disability discrimination. *Mary Jo C.*, 707 F. 3d at 163 ("We conclude that the ADA's reasonable modification requirement contemplates modification to state laws, thereby permitting preemption of inconsistent state laws, when necessary to effectuate Title II's reasonable modification provision.") This is particularly true given "the broad scope and purpose of the ADA." *Id*. at 162.

Defendants also argue that the third *Sprint* exception — "civil proceedings involving certain orders uniquely in furtherance of the state's ability to perform their judicial functions"— is met because they have an important state interest in administering the state's criminal justice system and public safety. MTD at 44.  While Plaintiffs acknowledge these interests, they will not

be impeded if the Court orders relief in this case, as Plaintiffs' sought relief here is not release, but instead systemic compliance with the ADA and Rehab Act.

Finally, the relief that Plaintiffs seek—all of which is systemic— cannot be obtained in Plaintiffs' PSRB administrative proceedings or, for that matter, in their Superior Court commitment proceedings. The text of the Connecticut statute setting forth the PSRB's responsibilities and authority shows that it lacks jurisdiction over group or class cases and that each case it hears is an individual case, as the language throughout the statute refers to the individual acquittee. *See e.g.*, § 17a-584 ("At any hearing before the Board considering discharge, conditional release, or confinement *of the acquittee*…)(emphasis added); § 17a-585 (the Board shall "conduct a hearing and review *of the acquittee*")(emphasis added). Thus, while the PSRB can make *individual* determinations whether an acquittee can receive community services while under its jurisdiction and recommendations to the Superior Court regarding release, nothing in the statute allows it to hear class-wide, non-individualized ADA and Rehab Act claims, such as those raised by Plaintiffs. *See generally*, Conn. Gen. Stat., §§17a-580 - 603.

Defendants note that it is ultimately up to the Connecticut Superior Court whether to release an acquittee from the PSRB's jurisdiction. MTD at 43. That does not support *Younger* abstention here. Plaintiffs have asserted no claims or requests for relief against the Connecticut Superior Court. Nothing in their Complaint implicates, or interferes with, that court's ability to carry out its statutory authority to commit (§ 17a-582) and discharge (§ 17a-593) acquittees. Thus, *Younger* abstention need not, and should not, be applied to preserve the Superior Court's prerogatives in these matters.

## X.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Dated: May 30, 2023

Respectfully submitted,

/s/Kirk W. Lowry
Kirk W. Lowry, ct27850
Legal Director
Kathleen M. Flaherty, ct19344
Executive Director
Connecticut Legal Rights Project
CVH-Beers Hall 2nd Floor
P.O. Box 351-Silver Street
Middletown, CT 06457
Phone (860) 262-5017
Fax (860) 262-5035
klowry@clrp.org
kflaherty@clrp.org

/s/Deborah Dorfman
Deborah   Dorfman,   (*Admitted   Pro   Hac Vice*)
Juris No. 442946
Executive Director
Sheldon Toubman, ct08533
Litigation Attorney
Disability Rights Connecticut
75 Charter Oak Avenue. Suite 1-101
Hartford, CT 06106
Phone (860) 469-4463
Fax (860) 296-0055
deborah.dorfman@disrightsct.org
sheldon.toubman@disrightsct.org

## CERTIFICATION

I hereby certify that on May 30, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF system.

/s/Kirk W. Lowry
Kirk W. Lowry

41