## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANTHONY DYOUS, LING XIN WU, VINCENZO LINDIA, TAINA MORALES, and CARSON MUELLER, on behalf of themselves and all others similarly situated, *Plaintiffs*, | ) ) ) ) ) ) ) | 3:22-CV-1518 (SVN) |
| v. | ) ) | March 15, 2024 |
| DEPARTMENT OF MENTAL HEALTH AND ADDICTION SERVICES, WHITING FORENSIC HOSPITAL, and PSYCHIATRIC SECURITY REVIEW BOARD, *Defendants*. | ) ) ) ) ) ) | |

## RULING AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS AND STAY DISCOVERY AND PLAINTIFFS' MOTION FOR LEAVE TO AMEND

Sarala V. Nagala, United States District Judge.

Plaintiffs, individuals who were acquitted by the Connecticut state courts after pleading the affirmative defense of not guilty by reason of mental disease or defect in their criminal cases, have brought this action asserting disability discrimination under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 701.  First Am. Compl., ECF No. 29.  The Amended Complaint names three state entity Defendants—the Department of Mental Health and Addiction Services ("DMHAS"), Whiting Forensic Hospital ("WFH" or "Whiting"), and the Psychiatric Security Review Board ("PSRB"), *id.* ¶¶ 23, 24, 27—and alleges, generally, that Plaintiffs no longer need hospital-level care, and should instead be treated in a more integrated community setting, *id.* ¶ 2.

Defendants have moved to dismiss Plaintiffs' First Amended Complaint ("FAC") for lack of subject matter jurisdiction and failure to state a claim, and have also moved to stay discovery.

ECF Nos. 35, 37. Defendants make six primary arguments: (1) Eleventh Amendment sovereign immunity bars Plaintiffs' ADA claims brought against state entities; (2) federal habeas corpus is Plaintiffs' exclusive remedy; (3) Plaintiffs lack standing; (4) Plaintiffs' claims are moot due to statutory amendments; (5) the Court should abstain from this case because it interferes with various state processes and procedures; and (6) Plaintiffs fail to state claims under the ADA and RA. ECF No. 35.

Shortly before the scheduled oral argument on Defendants' motion to dismiss the FAC, Plaintiffs sought leave to file a Second Amended Complaint ("SAC"). ECF No. 55. Plaintiffs seek to replace the lead Plaintiff; to substitute individual Defendants for state entity Defendants (thus obviating the need for the Court to evaluate Defendants' Eleventh Amendment argument); and to clarify that Plaintiffs do not intend to bring Section 504 claims against the PSRB. SAC, ECF No. 55-3. Defendants have adopted nearly all of their arguments for dismissal of the FAC in opposing Plaintiffs' motion for leave to amend, ECF No. 60 at 5, except they conceded in oral argument that their Eleventh Amendment immunity argument would not apply to the individual Defendants named in the SAC. Accordingly, the Court will address Defendants' arguments as applied to the SAC.

For the reasons that follow, the Court DENIES Plaintiffs' motion for leave to amend, GRANTS Defendants' motion to dismiss the FAC, and DENIES as moot Defendants' motion to stay discovery, in light of these decisions. The Court will, however, allow Plaintiffs leave to amend to attempt to cure the deficiencies identified in this decision.

I.      **BACKGROUND**[1]

A.  Plea of Not Guilty by Reason of Mental Disease or Defect

Proposed Lead Plaintiff Isaiah Lindsay and Plaintiffs Ling Xin Wu, Vincenzo Lindia, Taina Morales, and Carson Mueller were acquitted by the Connecticut state courts after pleading the affirmative defense of not guilty by reason of mental disease or defect in their underlying criminal cases.  SAC ¶¶ 7, 18–22, 49; *see also* Conn. Gen. Stat. § 53a-13.  Through this type of plea, a "defendant effectively admits his commission of the crime, and bears the burden of establishing the affirmative defense of mental disease or defect." *Sastrom v. Mullaney*, 286 Conn. 655, 663 (2008) (cleaned up) (quoting *State v. Connelly*, 46 Conn. App. 486, 495 (1997), *cert. denied*, 244 Conn. 907, *cert. denied*, 525 U.S. 907 (1998)).  Essentially, a "verdict of not guilty by reason of mental disease or defect establishes two facts:  (1) the person committed an act that constitutes a criminal offense; and (2) he committed the act because of mental illness." *State v. Long*, 268 Conn. 508, 540 (2004).  If the defendant successfully advances the affirmative defense, he or she "'is not criminally responsible for his unlawful conduct,' and any confinement that follows is not punitive in nature and is designed 'to treat the individual's mental illness and protect him and society from his potential dangerousness.'" *Sastrom*, 286 Conn. at 663 (quoting *Connelly v. Comm'r of Corr.*, 258 Conn. 374, 387 (2001)).

If a defendant is found not guilty by reason of mental disease or defect, the Connecticut Superior Court must order the acquittee[2] confined in the custody of the Commissioner of DHMAS pending an order from the court for an examination to determine his or her mental condition.  Conn. Gen. Stat. § 17a-582(a).  Nancy Navarretta, the Commissioner of DHMAS, is a named Defendant

---

[1] Unless otherwise noted, the following facts are taken from Plaintiffs' SAC and assumed to be true for purposes of this ruling.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] For purposes of this ruling, the Court uses the term "acquittee" to refer to criminal defendants who have been found not guilty by reason of mental disease or defect under Conn. Gen. Stat. § 53a-13.

in the SAC in her official capacity.  Then, within sixty days, the hospital or DHMAS Commissioner sends its findings back to the court.  *Id.* § 17a-582(b).  Within twenty-five days of this report, the court must hold a hearing and make a finding as to the acquittee's mental condition. *Id.* § 17a-582(d)–(e).

Thus begins an acquittee's entry into a complex administrative system that is the focus of this suit.

### B.  The Psychiatric Security Review Board

The PSRB, created pursuant to Conn. Gen. Stat. § 17a-581, plays a central role in administering Connecticut's system of confinement and treatment for acquittees.  The PSRB is "an autonomous body" within DHMAS.  *Id.* § 17a-581(a).  The PSRB consists of individuals[3] appointed by the Governor on the advice and consent of either house of the Connecticut General Assembly.  *Id.*  John Bonetti, Mark Kirschner, Cheryl Abrams, Cecily Pacheco, and Renesha Nichols, members of the PSRB, are named as Defendants in their official capacities in the SAC. The PSRB is responsible for monitoring the confinement, temporary leave, conditional release, and discharge of acquittees.  Conn. Gen. Stat. §§ 17a-584 to 17a-588; 17a-593(d); 17a-596.

After the court makes its finding as to the acquittee's mental condition, it can take one of three actions:  (1) order the acquittee committed to the jurisdiction of the PSRB; (2) recommend to the PSRB that the acquittee be considered for "conditional release," which is explained further below; or (3) discharge the acquittee from custody.  *Id.* § 17a-582(e)(1) & (e)(2).  If the Court commits the acquittee to the PSRB for treatment, it must fix the maximum term of commitment,

---

[3] "The membership shall be composed of:  (1) A psychiatrist experienced with the criminal justice system and not otherwise employed on a permanent basis by the state . . .; (2) a psychologist experienced with the criminal justice system and not otherwise employed on a permanent basis by the state . . .; (3) a person with substantial experience in the process of probation; (4) a member of the general public; (5) an attorney who is a member of the bar of this state; and (6) a member of the general public with substantial experience in victim advocacy."  Conn. Gen. Stat. § 17a-581(b).

which cannot exceed the maximum sentence that could have been imposed if the acquittee had been convicted of the offense, pending a status review hearing with the PSRB within ninety days. *Id.* §§ 17a-582(e)(1); 17a-583(a).  At such status review hearings, the PSRB can order the acquittee confined in a hospital or with the Commissioner of DHMAS for "custody, care, and treatment"; order the acquittee "conditionally released subject to such conditions as are necessary to prevent the acquittee from constituting a danger to himself or others"; or recommend discharge of the acquittee to the court. *Id.* § 17a-584.  For confined acquittees, the PSRB receives status reports as to the mental condition of an acquittee from the hospital every six months and conducts hearings to review the status of an acquittee at least once every two years. *Id.* §§ 17a-585; 17a-586.

Prior to October 1, 2022, upon application by the hospital or the Commissioner of DHMAS, the PSRB could grant a confined acquittee temporary leave from the hospital. *Id.* §§ 17a-587(a).  Beginning October 1, 2022, the acquittee or a person acting on the acquittee's behalf could also apply to the PSRB for an order of temporary leave. *Id.* § 17a-587(b).  If temporary leave is granted, the acquittee is permitted to leave the hospital "temporarily, under the charge of his guardian, relatives or friends, or by himself or herself, at such times and under such conditions" as the hospital or DHMAS Commissioner deems appropriate, unless the PSRB orders otherwise. *Id.* §§ 17a-587(a), (b).  The PSRB can designate a person or agency to supervise an acquittee granted temporary leave. *Id.* §§ 17a-587(c).

The hospital, the Commissioner of DHMAS, or the acquittee may also petition the PSRB for an order of conditional release, which allows the acquittee to remain in the community for treatment. *Id.* § 17a-588.  As with temporary leave, the PSRB can designate a person or agency to supervise an acquittee granted conditional release. *Id.* § 17a-589.  The PSRB can also require the acquittee to report to a treatment facility for examination while on conditional release, *id.*

§ 17a-590, and may modify the conditions of conditional release after a hearing, *id.* § 17a-591. The PSRB may also terminate the conditional release if the acquittee has violated its terms and return the person to the hospital, pending a hearing as to their mental condition. *Id.* § 17a-594.

Only the Connecticut Superior Court may ultimately order an acquittee discharged from confinement. Conn. Gen. Stat. §§ 17a-582(e)(2); 17a-593. The PSRB can recommend discharge, or the acquittee can apply to the court for discharge not more than once every six months. *Id.* §§ 17a-592, 17a-593(a).

An acquittee may appeal an adverse decision of the PSRB concerning confinement, conditional release, and temporary leave, to the Connecticut Superior Court. Conn. Gen. Stat. § 17a-597.

### C. Whiting Forensic Hospital

Whiting Forensic Hospital is a state-run inpatient psychiatric facility managed by DMHAS, where acquittees are sent for custody and treatment. SAC ¶¶ 36, 58. Jose Crego, the Executive Director of WFH, is a named Defendant in the SAC in his official capacity.

Whiting is Connecticut's only forensic psychiatric inpatient facility. *Id.* ¶ 47. The facility is comprised of two buildings: WFH Max and Dutcher. *Id.* WFH Max is Whiting's facility for handling patients under the most restrictive settings. *See id.* ¶ 62. The building contains five units of around fifteen to twenty patients each, roughly nineteen of whom are acquittees under the PSRB's jurisdiction. *Id.* ¶¶ 47, 56. While at WFH Max, acquittees follow a "step-by-step, highly-structured" progression through the acquittee system. *Id.* ¶ 62. The primary consideration for moving an acquittee to a less restrictive setting is public safety. *Id.* Accordingly, acquittees can spend years in WFH Max. *Id.* ¶ 64. After "stabilization, cooperation with treatment, and

mitigation and management of any substantial risk," an acquittee may request that Whiting petition the PSRB for his or her transfer to Dutcher.  *Id.* ¶¶ 64, 66.[4]

Dutcher is a facility for lower-security-risk acquittees, where an acquittee can receive individual and group mental health therapy and limited vocational services, among other treatment. *Id.* ¶ 65.  Dutcher has six units, each with roughly between twenty to twenty-four patients at any one time.  *Id.* ¶ 67.  There are roughly eighty-six acquittees in Dutcher.  *See id.* ¶ 56 (noting numbers for Fiscal Year 2021/2022).  Plaintiffs and the members of the putative class are patients at Dutcher.  *Id.* ¶ 65.

While undergoing treatment at Dutcher, a patient may earn "privilege level[s]" that provide increasingly less-restrictive treatment settings.  *Id.* ¶ 67.  Dutcher's privilege system is governed by WFH's Operational Policy and Procedures ("OPP").  *Id.* ¶¶ 69, 72.  The privilege system ranges from "Level 1A" to "Full Level 4 with all pass times."  *Id.* ¶ 72 (citing OPP 2.17).  For a patient to increase their privilege level, the patient must submit a written request.  *Id.* ¶ 69 (citing OPP 5.6).  Each week, staff at Dutcher review applications and make determinations.  *Id.* ¶ 69.  These weekly meetings are held between WFH and a consulting psychiatrist.  *Id.*  Staff determinations are next reviewed by the Hospital Review Committee and the Forensic Review Committee, which are comprised of WFH administrators and clinical leadership.  *Id.* ¶ 70 (citing OPP 5.6, IV.).

At Level 1A, a patient is confined to their unit at Dutcher except for "fresh air."  *Id.* ¶ 72. At Level 1B, a patient is no longer confined to their unit, and they may move freely between their unit and Dutcher's courtyard and dining hall.  *Id.*  Level 2 grants a patient access to the entirety of the Dutcher building and courtyard with supervision.  *Id.*  Level 3A allows a patient access to the

---

[4] Following amendments to the relevant statute effective October 1, 2022, a superintendent may transfer an acquittee from WFH Max to Dutcher after a review by a hospital risk management review committee and forty-eight hours advance notice to the PSRB.  SAC ¶ 66; *see* Conn. Gen. Stat. § 17a-599(c).

Dutcher building with a 1:6 staffing ratio and to the facility grounds with a 1:3 staffing ratio.  *Id.*

At Level 3B, patients may leave the facility's grounds with 1:2 staffing or go on community trips.

*Id.*  Then, once a patient reaches Level 4, the patient may move about the Dutcher building and

grounds without staff supervision and receive on-grounds passes that require checking in each

hour.  *Id.*  Within Level 4, a patient can again increase their privileges to include various hour-

long, unsupervised on-grounds passes from 9 a.m. to 7 p.m. ("Full Level 4").  *Id.*

After Level 3A, a patient must undergo detailed risk management.  *Id.* ¶ 74 (citing OPP

2.17 & 5.6).  These steps include:  "1) WFH Daily Morning Report; 2) Treatment Team review

and recommendation; 3) [psychiatric] review; 4) Hospital Review Committee; 5) [Forensic

Review Committee]; 6) PSRB hearings for transfers to Dutcher, temporary leave, or conditional

release; and, finally, (7) the Superior Court for petitions for discharge from the jurisdiction of the

PSRB."  *Id.*

### D.  Temporary Leave and Conditional Release

After a patient has maintained Full Level 4 for a period of months or years, staff begin the

process of transitioning patients to temporary leave.  *Id.* ¶ 73 (citing Conn. Gen. Stat. § 17a-587).

Temporary leave is a statutory privilege that allows patients to leave WFH for community

treatment while still under PSRB custody.  *See id.* ¶ 76; *see also* Conn. Gen. Stat. § 17a-587.  While

temporary leave is a creature of Connecticut statutes, WFH, "at the insistence of and in

collaboration with the PSRB," has split it into two phases.  SAC ¶ 77.  Phase 1 involves day trips

for leave to participate in community health services.  *Id.*  Phase 2 involves overnight leave for

community health services.  *Id.*  Because temporary leave involves coordination with community

health services, who are not obligated to accept patients under their contracts with DHMAS, there

are often delays in transitioning patients from Full Level 4 to temporary leave.  *Id.* ¶ 76.

As of October 1, 2022, Full Level 4 acquittees may themselves request temporary leave, *id.* ¶ 73 (citing Public Acts 2022, No. 22-45, § 7), but it can only be granted after review by a patient's treatment team, the privileges review team, the Forensic Review Committee, and an order from the PSRB after a hearing with a victim statement and attendance by a state's attorney, *id.* ¶ 78.

After successful participation in Phase 1 and Phase 2 temporary leave, an acquittee can apply to the PSRB for conditional release. *Id.* ¶ 80 (citing Conn. Gen. Stat. § 17a-588). Patients with conditional release status live in a community setting under conditions set by the PSRB. SAC ¶ 80; *see also* Aff. of Vanessa Cardella attached to Defs.' Memo. of Law, ECF No. 36, Ex. A at 61. Just as with orders for temporary leave, conditional release is often slowed by the unavailability of community treatment centers—under contract with DMHAS—who will accept acquittees for treatment. SAC ¶¶ 81–86. According to Plaintiffs, in determining whether a patient is eligible for conditional release, the PSRB does not consider the most integrated setting appropriate for treatment. *Id.* ¶ 80.

### E.   Plaintiffs' Claims

Plaintiffs allege that each of the five named Plaintiffs are qualified individuals with a disability who have achieved Full Level 4 privileges and, in some cases, have been in the planning stages for temporary leave or are on temporary leave status. Plaintiffs contend they and members of the putative class are ready for conditional release and that Defendants are violating the ADA and RA by not affording them such release.

Plaintiff Isaiah Lindsay is a 23-year-old man who was committed to WFH on December 6, 2018. *Id.* ¶ 90. In April 2023, although Mr. Lindsay had been on Full Level 4 status for nearly a year, WFH had not made a request for temporary leave. *Id.* ¶¶ 96–97. Mr. Lindsay has been

recommended for community mental health services as part of transitional planning, but one such facility was full, and he has not yet heard back from another. *Id.* ¶¶ 98–99.

Plaintiff Vincenzo Lindia has been confined to WFH for almost 20 years. *Id.* ¶ 107.  In 2018, Mr. Lindia transitioned to Full Level 4 status, and has been in transitional temporary leave planning for more than a year. *Id.* ¶¶ 108–110.  Mr. Lindia is currently on a waiting list for community mental health services. *Id.* ¶ 109.

Plaintiff Taina Morales is a 34-year-old woman who has been in PSRB custody for more than ten years. *Id.* ¶ 119.  Ms. Morales achieved Full Level 4 privileges in April 2021, engaged in temporary leave planning in February 2022, and has been in Phase 1 temporary leave since December 2022. *Id.*

Plaintiff Carson Mueller was committed to the PSRB more than thirteen years ago. *Id.* ¶ 126.  He achieved Full Level 4 privileges and temporary leave by 2019, but his leave was revoked in October 2020. *Id.* ¶¶ 127–30.  Mr. Mueller is now back to the beginning of temporary leave planning but remains on Full Level 4 status. *Id.*

The final named Plaintiff, Ling Xin Wu, was committed to the PSRB more than eight years ago. *Id.* ¶ 137.  Mr. Wu achieved Full Level 4 and was on Phase 1 temporary leave by January 2019. *Id.* ¶ 138.  While his temporary leave was revoked sometime thereafter, he remains on Full Level 4 privileges. *Id.* ¶¶ 139, 146.

Plaintiffs all allege that they have few opportunities to go anywhere, participate in community religious, leisure, and recreational activities, or interact with individuals without disabilities, except for hospital staff. *Id.* ¶¶ 101, 112, 120, 132, 144.  They do not oppose community-based treatment and aver that, with reasonable modifications to Defendants' policies, programs, and services, they can be served in integrated settings in the community. *Id.* ¶¶ 104–

05, 115–16, 124–25, 34–135, 147–48.  No named Plaintiff has any pending state court actions related to commitment to the jurisdiction of the PSRB.  *Id.* ¶¶ 107, 118, 126, 137, 150.

Plaintiffs' nine counts essentially boil down to two categories of claims.  First, Plaintiffs assert they are ready for community treatment, and that Defendants are violating the ADA and RA by unnecessarily keeping them institutionalized.  *See* SAC Counts One (violation of the ADA's Integration Mandate), Two (violation of the Integration Mandate under Section 504 of the RA), Three (violation of Integration Mandate under Title II of the ADA), Four (failure to ensure treatment in the most integrated setting, in violation of Title II of the ADA), Five (failure to ensure treatment in the most integrated setting, in violation of Section 504 of the RA), Six (a Title II reasonable modifications claim seeking services for Plaintiffs "to live in the most integrated setting"), Seven (same for a Section 504 reasonable modifications claim), Eight (a Title II methods of administration claim that Plaintiffs should live in the most integrated setting), and Nine (same for a Section 504 methods of administration claim).  The crux of these claims is that Defendants refuse to issue orders for the conditional release of Plaintiffs because of an unfounded fear for public safety, the intentional delaying of transitional planning, and a lack of capacity in community treatment centers.

The second category additionally requests that the Court order that DMHAS and WFH alter their privileges, temporary leave, and conditional release procedures, thus allowing Plaintiffs to more quickly advance through WFH's privilege levels to render themselves eligible for conditional release.  The Court interprets this category of claims as effectively seeking relief short of immediate conditional release for full-time community treatment, even though these claims also reference Defendants' failure to treat Plaintiffs in the most integrated settings possible.  *See id.* Counts Six (naming "Defendants" for failure to make reasonable modifications to ensure

acquittees have timely access to services), Seven (naming Defendants Navarretta and Crego for failure to make reasonable modifications), Eight (naming "Defendants" but focusing on Defendant Navarretta's alleged use of discriminatory methods of administration under Title II of the ADA) and Nine (naming "Defendants" but focusing on Defendant Navarretta's and Crego's alleged use of discriminatory methods of administration under Section 504 of the RA).

Plaintiffs seek only injunctive and declaratory relief.  They request that the Court declare Defendants have violated the ADA and RA, and issue injunctive orders restraining Defendants from:  (a) failing to provide appropriate, integrated community services; (b) failing to make reasonable modifications to community-based mental health services, which exclude Plaintiffs from services needed to reside in the most integrated setting; (c) failing to provide equal access to community-based mental services; and (d) discriminating against class members by failing to provide them with community-based services in the most integrated setting appropriate to their needs.  SAC, Prayer for Relief.  Plaintiffs also seek injunctive orders requiring Defendants to comply with the ADA and RA, including those statutes' "direct threat" review of risk, and to reasonably modify the privilege level policy and risk management policy at WFH so that members of the class can move through WFH at a pace that ensures treatment in the most integrated setting. *Id.*

As noted above, Defendants moved to dismiss Plaintiffs' FAC both for lack of subject matter jurisdiction and for failure to state a claim for relief, and most of their arguments apply equally to Plaintiffs' motion for leave to file the SAC.  The Court addresses the arguments pertaining to subject matter jurisdiction first.

## II.     SUBJECT MATTER JURISDICTION

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a case for lack of subject matter jurisdiction.  A case is properly dismissed for lack of subject matter jurisdiction if the Court lacks the "statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

### A.  Abstention

The Court first holds that it need not abstain from hearing this matter.

A motion to dismiss based on an abstention doctrine is properly styled as a motion to dismiss for lack of jurisdiction under Rule 12(b)(1).  *Sojitz Am. Cap. Corp. v. Keystone Equip. Fin. Corp.*, 88 F. Supp. 3d 59, 61 (D. Conn. 2015).  Generally, "federal courts have a virtually unflagging obligation to exercise the jurisdiction given to them."  *Cavanaugh v. Geballe*, 28 F.4th 428, 430 (2d Cir. 2022) (cleaned up) (quoting *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976)).  On occasion, "comity and other interests may sometimes require a district court to abstain from exercising its jurisdiction over a matter out of respect for certain state court functions," but "abstention is 'the exception, not the rule.'"  *Id.* at 432 (quoting *Sprint Comm'ns., Inc. v. Jacobs*, 571 U.S. 69, 77, 82 (2013)).

Defendants argue that the Court must decline to exercise jurisdiction under *Younger v. Harris*, 401 U.S. 37 (1971) and related cases.  Defs.' Mot. to Dismiss, ECF No. 36 at 41; *see also* Defs.' Opp. to Pls.' Mot. for Leave to Amend, ECF No. 60 at 11 (citing *O'Shea v. Littleton*, 414 U.S. 488 (1974)); Defs.' Supp. Br., ECF No. 67 at 1 (citing *Rizzo v. Goode*, 423 U.S. 362 (1976)).  However, the present action does not fit neatly into *Younger*, which Defendants acknowledge, because there are no ongoing state proceedings.  Further, the principles underlying *Younger*—as articulated in *O'Shea* and *Rizzo*—do not warrant abstention.

### 1. Younger Abstention

Under *Younger*, federal courts must refrain from interfering with certain pending state proceedings that "implicate a State's interest in enforcing the orders and judgments of its courts . . . ." *Sprint*, 571 U.S. at 72–73. *Younger* traditionally applies when a plaintiff seeks to enjoin ongoing state proceedings. *Disability Rights N.Y. v. New York*, 916 F.3d 129, 134 (2d Cir. 2019). A court should abstain under *Younger* "only in three exceptional circumstances involving (1) ongoing state criminal prosecutions, (2) certain civil enforcement proceedings, and (3) civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Cavanaugh*, 28 F.4th at 432 (quoting *Falco v. Justs. Of the Matrimonial Parts of Sup. Ct. of Suffolk Cnty.*, 805 F.3d 425, 427 (2d Cir. 2015) (cleaned up) (quoting *Sprint*, 571 U.S. at 78)). Importantly, "just as there is 'no doctrine that the availability or even the pendency of state judicial proceedings excludes the federal courts,' *Younger* abstention does not prevent a federal court from exercising its jurisdiction simply because its decision might contradict a state court decision." *Id.* at 434 (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 373 (1989) ("*NOPSI*")).

As an initial matter, *Younger* normally applies in the context of an ongoing state proceeding. Defendants cannot point to any ongoing state proceeding involving Plaintiffs because there are none. Recognizing as much, Defendants argue that the Court should instead consider the Connecticut Superior Court's oversight and review of the PSRB's custody over Plaintiffs as equivalent to an ongoing proceeding. Under this theory, because the Connecticut courts maintain oversight of the process and the ability to grant Plaintiffs discharge from custody, this Court's exercise of jurisdiction over Plaintiffs' suit would unduly interfere with a court-reviewed state administrative system.

14

The Court is not convinced that *Younger* goes so far.  As the Second Circuit has noted, *Younger* abstention is "narrow" in scope, *Cavanaugh*, 28 F.4th at 430, 433, and is not aimed at avoiding interference with state systems generally.  Rather, a federal court must abstain from adjudicating a case where granting the requested relief would interfere with an ongoing case that falls into one of *Younger*'s "exceptional" categories.  Defendants cannot point to an ongoing case that an order granting injunctive relief would disrupt, and the Court will not expand *Younger* absent authoritative guidance.

The Connecticut acquittee system also is not analogous to either the second or third categories of cases in which *Younger* applies.  First, the system does not resemble civil enforcement proceedings, as the Supreme Court has described them.  "The *Sprint* Court explained that enforcement actions within this second category resemble criminal prosecutions in 'important respects':  they 'characteristically . . . sanction the federal plaintiff . . . for some wrongful act'; they are 'routinely' initiated by a state actor; and they are 'commonly' preceded by investigations that culminate in the 'filing of a formal complaint or charges.'"  *Mir v. Shah*, 569 F. App'x 48, 51 (2d Cir. 2014) (summary order) (alterations in original) (quoting *Sprint*, 571 U.S. at 79–80).  Here, none of the Defendants take on even a quasi-prosecutorial role in the management of acquittees, sanctions are never sought, and formal charges are never filed.

Finally, granting Plaintiffs' requested relief would not interfere with an ongoing civil proceeding involving orders uniquely in furtherance of the state courts' ability to perform their judicial functions.  Two types of orders "clearly fall" within this category:  civil contempt orders and orders requiring the posting of bonds pending appeal.  *Cavanaugh*, 28 F.4th at 433.  These types of orders "vindicate[] the regular operation" of state judicial proceedings.  *Id.* (citing *Juidice v. Vail*, 430 U.S. 327, 335 (1977)).  An order from this Court requiring Defendants to comply with

the ADA or RA by allowing Plaintiffs to be treated in community settings and altering the policies and procedures that apply to WFH's privilege system would not interfere with the state courts' ability to perform their judicial function, let alone an essential function like contempt and the posting of bonds.  This case does not raise the specter of *Younger*'s third category of cases.

For these reasons, *Younger* does not require abstention.

### 2.  *O'Shea Abstention*

At the Court's request, and in response to Plaintiffs' motion for leave to amend, the parties also briefed whether abstention might be warranted under *O'Shea*, 414 U.S. 488, and *Disability Rights*, 916 F.3d 129.  *O'Shea* held that the federal courts should abstain from a suit seeking to enjoin a county magistrate and judge from allegedly racially discriminatory practices for setting bond and other matters in state criminal cases.  414 U.S. at 500.  *Disability Rights*, in reliance on *O'Shea*, held that the federal courts should abstain from a suit seeking to enjoin the State of New York, its court system, and its chief judge and chief administrative judge from appointing legal guardians for individuals with intellectual and developmental disabilities under a certain state statute.  916 F.3d at 136.

As *Disability Rights* explains, in *O'Shea*, the Supreme Court "held that 'an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials' would amount to 'nothing less than an ongoing federal audit of state . . . proceedings which would indirectly accomplish the kind of interference that [*Younger*] and related cases sought to prevent.'"  *Disability Rts.*, 916 F.3d at 134 (alterations in original) (quoting *O'Shea*, 414 U.S. at 500).  *O'Shea* and *Disability Rights* thus both recognize that *Younger* abstention may still apply where there is no ongoing proceeding, but where granting federal relief would involve a "substantial invasion of [the] state courts' domain."  *Disability Rts.*, 916 F.3d at

136.  Abstention is warranted in these circumstances because granting relief "would offend the principles of comity and federalism."  *Id.*  However, neither *O'Shea* nor *Disability Rights* map neatly onto this case.

The Court cannot find that the relief Plaintiffs have requested here would amount to an ongoing audit of Connecticut's state judicial system.  Initially, and importantly, the present case is distinguishable because Plaintiffs have not sued any state court judges to attempt to affect their administration of state court procedures.  Plaintiffs have instead sued individuals at the helm of DHMAS, WFH, and the PSRB, and do not seek an injunction that would interfere with any aspect of the state courts' limited role in overseeing this complex, state administrative system.  While certain decisions of the PSRB relating to conditional release, confinement, and temporary leave are reviewable by the Connecticut Superior Court, *see* Conn. Gen. Stat. § 17a-597, Plaintiffs' requested relief does not seek an injunction limiting or otherwise affecting the state courts' authority in this area.  For example, an order that Defendants should place Plaintiffs in the most integrated setting possible would not involve overturning the statutes Connecticut Superior Courts rely on to initially hospitalize or discharge acquittees.  *Cf. Disability Rts.*, 916 F.3d at 136–37 (noting that the plaintiffs sought to have the guardianship statute declared unconstitutional, resulting in a "preemptive review of state court procedure").  Rather, the requested injunction would require that DHMAS, WFH, and the PSRB adjust their policies and procedures to afford Plaintiffs' greater and quicker access to community treatment.  This would not involve ongoing monitoring of the Connecticut state courts.

### 3.  *Rizzo Abstention*

Finally, the Court declines to abstain under *Rizzo*.  *Rizzo* involved a suit brought by individuals and organizations against the mayor and police commissioner of Philadelphia, alleging

a pattern of unconstitutional police treatment of minority citizens in the city.  423 U.S. 362.  After factual findings, the district court directed the plaintiffs to draft a program for the court's approval to revise police manuals and the procedures for dealing with citizen complaints.  *Id.* at 362–63. The Supreme Court held that such an order was "an unwarranted federal judicial intrusion into the discretionary authority" of the defendants to perform their official functions.  *Id.* at 363.

*Rizzo* cautions federal courts from fashioning injunctive relief that will restrain "the activity of a government agency."  423 U.S. at 378.  As the Supreme Court explains, "federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'"  *Id.* at 378 (citing *Stefanelli v. Minard*, 342 U.S. 117, 120 (1951)).  Thus, the principles of federalism and comity animating *O'Shea* and *Younger* abstention "likewise have applicability where injunctive relief is sought, not against the judicial branch of the state government, but against those in charge of an executive branch of an agency of state or local governments . . . ."  *Id.* at 380.

Courts have also applied *Rizzo* based on the more abstract federalism and comity principles animating *Younger* abstention.  For instance, the Seventh Circuit has observed that, where "no abstention doctrine is an exact fit, to insist on literal perfection would risk a serious federalism infringement."  *J.B. v. Woodard*, 997 F.3d 714, 723 (7th Cir. 2021) (cleaned up); *accord Wang v. Foote School Ass'n Inc.*, No. 3:22-cv-1127 (SRU), 2023 WL 5206910, at *9 (D. Conn. Aug. 14, 2023) (citing *J.B.*, 997 F.3d at 723).  These cases suggest that, even where a particular abstention doctrine is inapplicable, states should be "left free to perform their separate functions in their separate ways."  *NOPSI*, 491 U.S. at 364 (quoting *Younger*, 401 U.S. at 44).  Circuits disagree, however, about the extent to which *Rizzo* counsels in favor of a wide-reaching abstention doctrine, and the Second Circuit has not yet expressed a view.  *Compare Courthouse News v. Brown*, 908

18

F.3d 1063, 1071–75 (7th Cir. 2018) (abstaining from entering an injunction against a state court clerk because it would "impose a significant limit on the state courts and their clerk in managing the state courts' own affairs") *with Courthouse News Service v. Schaefer*, 2 F.4th 318, 324 (4th Cir. 2021) (explaining in *dicta* that the court would not abstain on *Rizzo* grounds); *see also Campbell v. McGruder*, 580 F.2d 521, 526 (D.C. Cir. 1978) (holding "a federal court should refrain from assuming a comprehensive supervisory role . . . over broad areas of local government").

Given the lack of Second Circuit guidance as to how broadly *Rizzo* should be applied, and given that federal courts have a virtually unflagging duty to accept cases with proper jurisdiction, the Court declines to abstain on *Rizzo* grounds.  The Court cannot conclude that granting Plaintiffs relief would lead to the type of inappropriate federal oversight animating *Rizzo*.  Instead, as the Court has already discussed in the context of *O'Shea*, requiring Defendants to craft new procedures and provide greater access to community treatment would not demand this Court to sit as a supervisor of DHMAS, WFH, and the PSRB.

For these reasons, the Court will not abstain.  Doing so would inappropriately dispose of a case that is properly before this Court.

B.  Standing

Next, the Court rejects Defendants' arguments that Plaintiffs lack standing to pursue their claims.

The doctrine of standing is "rooted in the traditional understanding of a case or controversy" and serves to "ensure that federal courts do not exceed their authority as it has been traditionally understood."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).  To establish Article III standing, a plaintiff must demonstrate:  "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was

caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief."  *Thole v. U. S. Bank N.A.*, 590 U.S. ___, 140 S. Ct. 1615, 1618 (2020); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

*1.  Injury in Fact*

Injury in fact is the "first and foremost" of standing's three elements.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  Plaintiffs seeking injunctive relief must prove that the identified injury presents a "real and immediate threat of future injury."  *Bernstein v. City of New York*, 621 F. App'x 56, 57 (2d Cir. 2015) (summary order) (quoting *Shain v. Ellison*, 356 F.3d 211, 215–16 (2d Cir. 2004)).

Defendants argue that Plaintiffs' alleged injuries are purely speculative, principally because Plaintiffs do not allege that "any treatment professional has recommended that they may be safely treated in the community."  ECF No. 36 at 38.  As discussed further below, the crux of Defendants' argument is that under either the ADA's or RA's integration mandate as explained in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 607 (1999), Plaintiffs must allege that a treatment professional has recommended Plaintiffs for community treatment before they are eligible for such treatment.  But this argument confuses the merits of an *Olmstead* claim with the constitutional requirement for standing:  Plaintiffs need not *demonstrate* an *Olmstead* claim for standing purposes.  Plaintiffs need only allege that their injuries are "real and immediate."

As Plaintiffs explain, their injuries stem from "being unnecessarily institutionalized and not being provided treatment in the most integrated setting . . . ."  ECF No. 44 at 34.  Accepting as true Plaintiffs' allegations that they are unnecessarily institutionalized, the allegedly unlawful discriminatory practices of Defendants present a "real and immediate" injury that supports constitutional standing.  Whether Plaintiffs' allegations state a claim for relief under the legal

standard for establishing an integration mandate claim is a separate question. Allegations of discriminatory institutionalization, at the very least, meet the minimum threshold for alleging the injury in fact element of Article III standing.

### 2. Redressability

Next, the Court holds that Plaintiffs' injuries are redressable. Defendants argue that Plaintiffs lack standing to pursue their claims against DHMAS and WFH because those Defendants—as opposed to the PSRB—do not have the authority to order Plaintiffs conditionally released for community treatment. ECF No. 36 at 38. Essentially, Defendants contend that these Defendants lack authority to redress Plaintiffs' alleged injuries because only the PSRB has the authority to order Plaintiffs conditionally released.

Redressability "focuses on whether a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)). "A plaintiff 'satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself.'" *Id.* (quoting *Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982)).

While only the PSRB Defendants may have the ultimate authority to order that Plaintiffs be treated in the community on conditional release, the SAC alleges that DMHAS provides the contracts for treatment centers and WFH ensures Plaintiffs are prepared for community treatment. A favorable outcome that would "relieve" Plaintiffs of their discrete injury of unnecessary institutionalization would necessarily require orders against the PSRB, DHMAS, and WFH. Accordingly, all Defendants would properly be subject to a court order granting Plaintiffs' requested relief, and Defendants' redressability arguments are unavailing.

C. Mootness

Defendants next argue that the Court should dismiss Plaintiffs' complaint as moot because the Connecticut General Assembly has amended portions of the relevant statutes. ECF No. 36 at 39–41. Specifically, as of October 1, 2022, the acquittee system was revised in three major respects. First, the Connecticut General Assembly revised the factors the Connecticut Superior Court must consider before committing an individual to the custody of the PSRB. P.A. 22-45 § 3. Prior to the revision, courts were directed primarily to consider the public welfare, and now courts must consider the public welfare *and* the well-being of the acquittee when considering an order of confinement. *Id.* Second, the General Assembly likewise amended the factors the PSRB must consider before ordering the discharge, conditional release, or confinement of an acquittee. P.A. 22-45 § 4. Before the amendment, the PSRB only had to consider the protection of society—after the amendment, the PSRB, too, must consider the protection of society "and the safety and well-being of the acquittee . . . ." *Id.* Finally, the General Assembly amended the statute so that an acquittee, or someone on the acquittee's behalf, may apply to the PSRB for an order of temporary leave. P.A. 22-45 § 7(b). Prior to the amendment, there was no mechanism for an acquittee to apply for temporary leave. *Id.*

Courts routinely find challenges to statutes moot where the statute is amended during the challenge. *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 61 (2d Cir. 1992). However, an action "challenging a statute does not become moot if it is 'replaced with one that differs only in some insignificant respect.'" *Chrysafis v. Marks*, 15 F.4th 208, 214 (2d Cir. 2021) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993)) (cleaned up).

The Court will not dismiss the complaint on mootness grounds based on these changes to the statute.  In this instance, it is unclear that the changes to the Act currently, or ever will, address the core of Plaintiffs' claims.  Plaintiffs seek relief such that they may be released into community treatment and that Defendants alter their policies and procedures for treatment, which the statutory revisions do not affect.  Under the current regime and the new regime as amended, the PSRB is empowered to grant conditional release for patients to enter community-based treatment.  Not only does the new statute not address conditional release or treatment options in meaningfully different ways, *see* Connecticut Public Act No. 22-45, it is unclear how, if at all, the changes address Plaintiffs' claims.  In particular, while the changes to the statute alter the factors the PSRB and Connecticut Superior courts must consider while initially institutionalizing an individual—and also allow an acquittee to apply for temporary leave—a change in emphasis as to how courts and the PSRB consider these issues is not the same as an order from this Court under the integration mandate that would require the PSRB to grant conditional release to acquittees who are ready for community treatment.  Likewise, while an acquittee may apply for temporary leave, this ability does not change the fact that Plaintiffs claim that WFH purposefully delays the opportunity for Plaintiffs to be ready for community treatment on conditional release.  In this context, the statute has not changed meaningfully, and does not render Plaintiffs' claims moot.

For these reasons, the Court rejects Defendants' challenges to the Court's exercise of subject matter jurisdiction.

### III.    AVAILABILITY OF HABEAS CORPUS REMEDY

Defendants also contend that Plaintiffs effectively seek release from custody, which can only be secured through a habeas corpus petition.  ECF No. 36 at 30.  Because Plaintiffs do not request release from PSRB custody, however, the Court cannot accept this argument.

As the Supreme Court has explained, habeas corpus is the exclusive federal remedy for a prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release from custody.  *See Heck v. Humphrey*, 512 U.S. 477, 481 (1994) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 488–90 (1973)); *see also Poventud v. City of New York*, 750 F.3d 121, 128–29 (2d Cir. 2014) (*en banc*).  The "essence of habeas corpus is an attack by a person in custody upon the legality of that custody."  *Preiser*, 411 U.S. at 484.

As the Court has already explained, Plaintiffs' claims fall into two categories:  (1) claims seeking conditional release to community treatment settings; and (2) claims seeking changes to how WFH evaluates Plaintiffs, provides treatment, and grants privileges.  Because Plaintiffs do not seek full discharge from PSRB custody—or otherwise challenge the legality of their commitment to PSRB custody—habeas corpus is not the exclusive remedy.  Conditional release into community treatment would not discharge Plaintiffs from the PSRB's custody, as, by statute, only the Superior Court is authorized to discharge an acquittee.  Conn. Gen. Stat. §§ 17a-582(e)(2); 17a-593.  Indeed, Plaintiffs affirmatively allege that they do not seek to challenge their commitments or request final discharge from the PSRB's custody.  *See* SAC ¶ 4.  Accordingly, the Court will not grant Defendants' motion to dismiss on the grounds that habeas corpus is the exclusive remedy available to Plaintiffs.

## IV.    FAILURE TO STATE A CLAIM

Having rejected Defendants' jurisdictional and habeas corpus arguments, the Court next turns to Defendants' arguments that Plaintiffs' complaints fail to state claims for relief under the ADA and RA.  For the reasons that follow, the Court grants Defendants' motion to dismiss on these grounds.

A.  <u>Legal Standard</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a case or cause of action for failure to state a claim upon which relief can be granted.  When determining whether a complaint states a claim upon which relief can be granted, highly detailed allegations are not required, but the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This plausibility standard is not a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully."  *Id.*  In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).

However, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678.  Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550 U.S. at 555).  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

The standards for dismissing a complaint under Rule 12(b)(6) and denying leave to amend under Rule 15 on futility grounds are the same.  Relevant here, "[a] proposed amendment to a

complaint is futile when it 'could not withstand a motion to dismiss.'" *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164–65 (2d Cir. 2015) (quoting *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)). That is, "a proposed claim is futile if, accepting the facts alleged by the party seeking amendment as true and construing them in the light most favorable to that party, it does not 'plausibly give rise to an entitlement to relief.'" *Brach Fam. Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-CV-740 (JMF), 2018 WL 1274238, at *1 (S.D.N.Y. Mar. 9, 2018) (quoting *Ashcroft*, 556 U.S. at 679). If, however, "the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief," the plaintiff "ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davi*s, 371 U.S. 178, 182 (1962). Therefore, "[t]he Court should dismiss claims for futility 'only where it is beyond doubt that the plaintiff can prove no set of facts in support of his amended claims.'" *Richard Mfg. Co. v. Richard*, 513 F. Supp. 3d 261, 290 (D. Conn. 2021) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 70–71 (2d Cir. 1999) (cleaned up)). The party opposing amendment bears the burden of establishing that the amendment would be futile. *Amaya v. Roadhouse Brick Oven Pizza, Inc.*, 285 F.R.D. 251, 253 (E.D.N.Y. 2012).

## B. ADA and RA Act Frameworks

"The ADA was enacted to 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (quoting 42 U.S.C. § 12101(b)(1)). Title II of the ADA ensures that no individual is discriminated against in access to public services on the basis of their disability. *Id.* at 272.

"The Rehabilitation Act establishes a comprehensive federal program aimed at improving the lot of the handicapped." *Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 157 n.4 (2d Cir. 2013) (cleaned up) (quoting *Consol. Rail v. Darrone*, 465 U.S. 624, 626 (1984)). Like

Title II of the ADA, Section 504 of the RA prohibits discrimination on the basis of disability by programs receiving federal financial assistance. *Id.* (citing 29 U.S.C. § 794). "Although its terms are broadly drawn, the Rehabilitation Act incorporates the standards of the Americans with Disabilities Act." *Kelly v. New York State Off. of Mental Health*, 200 F. Supp. 3d 378, 390 (E.D.N.Y. 2016) (cleaned up) (quoting *Cheung v. Donahoe*, No. 11-cv-122 (ENV) (RLM), 2016 WL 3640683, at *5 (E.D.N.Y. June 29, 2016)).[5]

To state a claim under either Title II of the ADA or Section 504 of the Rehabilitation Act, Plaintiffs must demonstrate: "(1) that they are qualified individuals with disabilities; (2) that the defendants are subject to the Acts; and (3) that the plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of their disabilities." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir.), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004) (cleaned up) (quoting *Henrietta D.*, 331 F.3d at 272). A plaintiff may show that the state discriminates against "persons with mental disabilities" by unnecessarily institutionalizing them. *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016) (describing how a plaintiff may prove an "integration mandate" theory of disability discrimination). A plaintiff may also meet the discrimination requirement by demonstrating that they are being treated unequally when compared to non-disabled persons and that "equal access [to services] can be achieved through, among other things, reasonable modifications to policies, practices, and procedures" and "changes in methods of administration." *M.F. by & through Ferrer v. New York City Dep't of Educ.*, 582 F. Supp. 3d 49, 58 (E.D.N.Y. 2022). In this vein, the RA and Title II of the ADA "prohibit discrimination against qualified

---

[5] Unless one of the "subtle distinctions" between Title II of the ADA and Section 504 of the RA applies, courts generally "treat claims under the two statutes identically." *Henrietta D.*, 331 F.3d at 272. The RA, unlike the ADA, requires that the alleged discrimination take place "solely" due to the individual's disability. *Kelly*, 200 F. Supp. 3d at 390. Because this causation standard is not at issue here, the Court treats the ADA and RA claims similarly.

disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations." *Powell*, 364 F.3d at 85.

Defendants do not dispute they are subject to the ADA and RA, in satisfaction of the second element of a disability discrimination claim under either statute.  Accordingly, the Court addresses only whether Plaintiffs are qualified individuals under the statutes and Plaintiffs' various theories of discrimination.

    C.  <u>Discussion</u>

        *1.  Qualified Individuals*

The Court first finds that Plaintiffs are "qualified individuals" under the ADA.

To be considered disabled for purposes of the ADA, a plaintiff must have a "physical or mental impairment that substantially limits one or more major life activities" or "be[] regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1)(A), (C).  Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  *Id.* § 12102(2)(A).  Such activities may also include major bodily functions, such as "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  *Id.* § 12102(2)(B).  An individual meets the requirement of "being regarded as having such an impairment" if the individual "establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment."  *Roggenbach v. Touro Coll. of Osteopathic Med.*, 7 F. Supp. 3d 338, 344 (S.D.N.Y. 2014) (quoting 42 U.S.C. § 12102(3)(A)).  In 2008, Congress amended the ADA to instruct the courts to construe the

definition of disability "in favor of broad coverage of individuals."  *Woolf v. Strada*, 949 F.3d 89, 94 (2d Cir. 2020) (*per curiam*) (quoting 42 U.S.C. § 12102(4)(A)).

Plaintiffs have adequately alleged that they are qualified individuals.  *See, e.g.*, SAC ¶¶ 18–23.  Plaintiffs all asserted the affirmative defense of not guilty by reason of mental defect or disease in their criminal trials.  Plaintiffs have also alleged, albeit generally, that they are qualified individuals with requisite physical or mental impairments, and they point to their continued hospitalization and treatment by the PSRB as a basis for finding that they are qualified individuals under the disability statutes.  Accepting as true Plaintiffs' allegations, and given Plaintiffs' long-term hospitalization for mental defect or disease, Plaintiffs have adequately pleaded that they are qualified individuals under the ADA and RA.

### 2. *Integration Mandate Claims (Counts One through Five)*

The Court next holds that Plaintiffs have not plausibly stated an integration mandate claim in Counts One through Five of either of their complaints.

In Count One, Plaintiffs claim all Defendants, in their official capacities, violate the ADA by "denying [class members] access to existing community programs, by failing to provide them with reasonable modifications to their policies, practices, and/or procedures, and by requiring them to be unnecessarily confined in a segregated institutional setting."  SAC ¶ 158.  In Count Two, Plaintiffs make essentially the same allegations against only the Commissioner of DHMAS and CEO of Whiting under the RA.[6]  *Id.* ¶ 165.  In Count Three, Plaintiffs claim the PSRB members violate the ADA's regulations by deciding whether Plaintiffs can transition to community settings

---

[6] In their SAC, Plaintiffs make clear that their RA claims in Counts Two, Five, Seven, and Nine are alleged only against the Commissioner of DHMAS and CEO of Whiting, not against the PSRB or its members.  *See* Mot. For Leave to Amend, ECF No. 55-1 at 16; SAC ¶¶ 164, 180, 191, 204.  The Court's ruling as to these counts is therefore limited to the claim as alleged against those two Defendants, and the Court need not address Defendants' arguments that the RA does not apply to the PSRB because it does not receive any federal funds, ECF No. 36 at 24.

by considering only state law's public safety mandate, without making an individualized assessment of whether Plaintiffs pose a "direct threat to the health and safety of others," as required by 28 C.F.R. 35.139(b).  *Id.* ¶¶ 169–171.  Count Four alleges that Defendants unnecessarily segregating Plaintiffs in violation of ADA by failing to "assess and plan for the need for" their discharge, *id.* ¶¶ 175–176, and Count Five alleges that the Commissioner of DHMAS discriminates against Plaintiffs in violation of the RA in the same manner, *id.* ¶¶ 180–181.  All of these counts are framed as integration mandate claims and reference *Olmstead v. L.C. ex rel. Zimring*.

The regulations implementing Title II of the ADA require a "public entity to administer programs in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (cleaned up).  The integration mandate arises out of the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, in which a plurality of the Court recognized that the "unjustified institutional isolation of a person with disabilities" is, in and of itself, a prohibited "form of discrimination."  527 U.S. at 600; *see also Davis*, 821 F.3d at 260. *Olmstead* held that qualified individuals must be placed in community treatment if:  "the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."  527 U.S. at 587; *see also Davis*, 821 F.3d at 262–63 (recognizing *Olmstead* applies to both the ADA and RA).  To bring an *Olmstead* claim, a plaintiff need not demonstrate that the state unnecessarily institutionalizes the disabled as compared to the non-disabled.  *Id.* at 260–63.

a.   Counts One, Two, Four, and Five

Counts One, Two, Four, and Five appear to state relatively straightforward *Olmstead* claims for unnecessary institutionalization, but all fail to adequately allege *Olmstead*'s first prong. Defendants contend that *Olmstead* requires a state treatment professional to opine that community placement is appropriate before an individual can be deemed suitable for such treatment, and that Plaintiffs have made no such allegation.  *See Olmstead*, 527 U.S. at 602 (recognizing that "the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual" meets the requirements to live in a community setting and that, "[a]bsent such qualification, it would be inappropriate to remove a patient from the more restrictive setting"). Plaintiffs effectively concede that no state doctor has deemed them ready for conditional release, but respond that guidance from the U.S. Department of Justice ("DOJ") suggests that an opinion from an individual's own treatment professionals—as opposed to the state's treatment professionals—is sufficient to meet *Olmstead*'s first prong.  Defendants are correct that Plaintiffs have not identified why DOJ guidance should supplant the U.S. Supreme Court's holding.

In any event, even if *Olmstead* does not require a *state* treatment professional to make a finding about the suitability of the individual for community treatment, *some* treatment professional must make such a finding.  *See Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 291 (E.D.N.Y. 2008) (quoting *Fisher v. Ok. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003) ("[U]nder *Olmstead* . . . when treatment professionals have determined that community placement is appropriate for disabled individuals, those individuals do not oppose the placement, and the provision of services would not constitute a 'fundamental alteration,' states are required to place those individuals in community settings rather than institutions.")); *see also Day v. District of Columbia*, 894 F. Supp. 2d 1, 23–24 (D.D.C. 2012) ("[T]o allow the District to rely on the absence

of an assessment by its own professionals as grounds for dismissal would 'eviscerate' the Integration Mandate.  Accordingly, the Court concludes that Plaintiffs' allegation that 'health-care professionals' have determined that community-based treatment is appropriate is sufficient to survive a motion to dismiss.") (internal citations omitted).  The problem for Plaintiffs is that they have not alleged that any treatment professional—state or otherwise—has determined Plaintiffs suitable for conditional release.

The Court notes that, while a treatment professional may have recommended some Plaintiffs, such as Ms. Morales, for community treatment in the *temporary leave* context, *e.g.*, SAC ¶¶ 97–98, the crux of Plaintiffs' allegations is that Plaintiffs should be ordered *conditionally released* for community treatment.  As described above, the process of transitioning from temporary leave to conditional release requires materially different findings as to the readiness of an acquittee for community treatment.  Temporary leave involves two phases that increase from short trips for community treatment to overnight stays—but an acquittee always remains hospitalized at WFH for treatment.  Conditional release, on the other hand, would allow the acquittee to live and be treated in the community, outside of a hospital setting.  Some Plaintiffs' readiness for temporary leave, therefore, does not equate to a finding of readiness for conditional release.  Nor does an acquittee's Full Level 4 privilege status equate to a finding that the acquittee is ready for non-hospitalized treatment.  *See* ECF 44 at 21.  At Full Level 4, an acquittee is granted permission to walk WFH's grounds unsupervised for fifty minutes at a time, but must sign back in at the end of that period.  The acquittee not only remains hospitalized during these unsupervised walks, they remain *on-grounds*.  That an acquittee has Full Level 4 privileges is far from demonstrating that a treatment professional has found that the acquittee is ready for full-time community treatment.  Without an allegation that a treatment professional has determined that

Plaintiffs are capable of living and being fully treated outside of a hospital setting—*i.e.*, that conditional release is medically appropriate—Plaintiffs cannot state a claim for relief under the ADA's or RA's integration mandates.[7]

For these reasons, the Court dismisses Counts One, Two, Four, and Five of the FAC and finds that Counts One, Two, Four, and Five of the SAC would be futile, as currently stated.

### b.   Count Three

The Court also finds that Plaintiffs fail to state a claim under Count Three, alleging a violation of the ADA's "direct threat" regulation.  This regulation, 28 C.F.R. § 35.139, is an affirmative defense, not a standalone ADA discrimination claim.

As an initial matter, Plaintiffs do not dispute Defendants' argument that the ADA's direct threat regulation is not an independent ADA claim.  Plaintiffs only argue that they do not bring their direct threat claim for the purpose of avoiding the ADA's "qualified individual" requirement. ECF No. 44 at 28; *see also* ECF No. 50 at 8 ("Plaintiffs do not dispute that an alleged violation of the 'direct threat regulation' is not a basis to state an ADA claim.").

Defendants have correctly stated the law:  Plaintiffs cannot base an ADA claim on an alleged violation of 28 C.F.R. § 35.139.  *See, e.g.*, *Watley v. Dep't of Child. & Fams.*, No. 3:13-

---

[7] There is no dispute that Plaintiffs satisfy *Olmstead*'s second prong, in that none of them oppose community treatment. The Court notes, however, that Plaintiffs' allegations of *Olmstead*'s third prong—that community placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities—are, at best, slim.  This prong has been characterized as a "burden-shifting paradigm," where the plaintiff must first articulate a reasonable accommodation, which the state can rebut by showing that the requested relief would "fundamentally alter" the nature of the program.  *Duffy v. Velez*, Civ. No. 09-5539, 2010 WL503037, at *2 (D.N.J. Feb. 8, 2010).  Aside from a single conclusory paragraph stating that it "would not fundamentally alter Defendants' programs, services, or activities to provide the Plaintiffs and the Plaintiff Class with the services necessary to allow them to live in the community," SAC ¶ 173, Plaintiffs have done little to plausibly plead that community placement can be reasonably accommodated.  For instance, Plaintiffs do not point to particular OPPs and suggest rules or standards that, if reasonably modified, could achieve their aims of integration.  Nor have they identified particular community treatment programs or services that could reasonably accommodate their requested release for treatment. Finally, Plaintiffs have not endeavored to allege *any* information about the cost to Defendants in implementing any potential policy changes.  *Cf. Olmstead*, 527 U.S. at 603–04 (eschewing certain types of cost analyses).  Plaintiffs' complaints are therefore deficient in this regard, as well.

CV-1858 (RNC), 2019 WL 7067043, at *10–12 (D. Conn. Dec. 23, 2019), *aff'd*, 991 F.3d 418 (2d Cir. 2021) (explaining that the direct threat analysis is a defense asserted by a public entity that it need not provide services to a particular individual); *Wright v. New York State Dept. of Corr.*, 831 F.3d 64, 78 (2d Cir. 2016) (explaining that the direct threat analysis is a defense to "a non-frivolous accommodation" request); *accord Wood v. Md. Dept. of Trans.*, 732 F. App'x 177, 181 (4th Cir. 2018) (unpublished) ("Title II of the ADA and Section 504 of the Rehabilitation Act allow for certain affirmative defenses" like the direct threat regulation) (citing 28 C.F.R. § 35.139).

Thus, the Court dismisses Count Three of the FAC and finds that Count Three of the SAC would be futile.

### 3. *Reasonable Modifications (Counts Six and Seven)*

Plaintiffs have also alleged that Defendants have violated Title II and Section 504's requirements that public entities make reasonable modifications to their discriminatory policies, practices, or procedures. *See* SAC (Counts Six and Seven). For the reasons that follow, the Court also dismisses Counts Six and Seven of the FAC and finds those counts of the SAC would be futile.

Public entities generally have an obligation to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," 28 C.F.R. § 35.130(b)(7)(i), and to provide "meaningful access" to their services, *Bernstein*, 621 F. App'x at 59–60 (citing *Wright v. Guiliani*, 230 F.3d 543, 548 (2d Cir. 2000) (*per curiam*)). As with the third prong of the *Olmstead* inquiry, "[a] modification is reasonable if it would not 'fundamentally alter the nature of the service provided or impose an undue financial or administrative burden.'" *Parks v. Blanchette*, 144 F. Supp. 3d 282, 338 (D. Conn. 2015) (quoting *Disabled in Action*, 752 F.3d at 197). Accordingly, "modifications are not required if a public

entity can demonstrate that the requested accommodations 'would fundamentally alter the nature of the service, program or activity,' or 'impose an undue hardship on the operation of [the] program.'" *Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 657 (S.D.N.Y. 2013) (first quoting 28 C.F.R. § 35.130(b)(7), and then quoting 28 C.F.R. § 41.53) (internal citations omitted) (alterations in original).

Plaintiffs argue that Defendants have violated Title II's and Section 504's reasonable modifications requirements by failing to implement policies and procedures that timely place Plaintiffs in treatment settings adequate to address their mental health conditions—in other words, to timely move Plaintiffs through WFH's privilege levels and into conditional release. ECF No. 44 at 44. For example, in their demand letter to Defendants, Plaintiffs suggest that Defendants develop and implement a plan for DMHAS to increase community forensic mental health capacity and for the PSRB and WFH to provide an avenue for Plaintiffs to participate in community treatment through more streamlined evaluation practices and procedures. ECF. No. 36 at 68.

The Court holds that Plaintiffs have not suggested "the existence of a plausible accommodation, the costs of which, facially, do not exceed its benefits . . . ." *Henrietta D.*, 331 F.3d at 280 (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)). As an initial matter, the Court cannot discern what specific accommodation(s) Plaintiffs seek. Perhaps Plaintiffs seek an entire overhaul of the policies and procedures WFH, the PSRB, and DMHAS have enacted to treat patients. Perhaps Plaintiffs seek only small changes to the OPPs identified in their Second Amended Complaint. Because Plaintiffs have provided the Court with no specificity as to their requested modifications, the Court necessarily cannot discern either the benefits of such changes nor the approximate costs. While Plaintiffs need not plead with exacting particularity the costs and benefits of their proposed changes, they must plead enough specificity

such that the Court can assess the nature of their proposed modifications and, on a general level, weigh the costs and benefits of those proposals. *See Louis*, 152 F. Supp. 3d 151–52. As currently stated, Plaintiffs' allegations are highly conclusory and lack even the basic details necessary to evaluate their merit. *See* SAC ¶¶ 185 ("Defendants have failed to make reasonable modifications to their programs, services, and activities to ensure" that Plaintiffs "can have timely access to services need for them to live in the most integrated settings"); 186 ("Defendants force all plaintiffs to strictly comply" with the privilege system "without consideration of, and regardless of whether they can be provided with reasonable modifications in order to safely receive services in the most integrated setting in the community.").[8] With few clues as to what specific reasonable modifications are requested, the Court has no ability to evaluate Plaintiffs' claims.

Further, to the extent that Plaintiffs seek an increase in the availability of community placements, the Court tends to agree with Defendants that Plaintiffs do not permissibly seek a reasonable modification of Defendants' policies and procedures. Rather, Plaintiffs impermissibly seek an increase in the quality of their care. Neither a request for an increase in the adequacy of services nor access to new services is cognizable under the ADA or RA because they do not "establish an obligation to meet a disabled person's particular needs vis-à-vis the needs of other handicapped individuals." *Doe v. Pfrommer*, 148 F.3d 73, 83 (2d Cir. 1998); *see also Tardif v. City of New York*, 991 F.3d 394, 405 (2d Cir. 2021) (finding that the plaintiff's ADA claim failed because it related "solely to whether she received adequate medical treatment in police custody *for* her disability," rather than whether she was denied medical services "*because* she has a disability")

---

[8] The most specific request the Court can discern is that Plaintiffs should be placed in community treatment within 90 days of being given Level 4 privileges. *See* ECF No. 44 at 35; FAC Prayer for Relief ¶ 6(c). Plaintiffs have stricken this requested relief from their SAC, however. *See* ECF No. 55-2 at 69 (redline of SAC showing former paragraph 6(c) as stricken). In any event, the request that Plaintiffs be placed in community treatment within a specific timeframe is an *Olmstead* claim, and the Court has already explained the deficiencies in Plaintiffs' *Olmstead* claim.

(emphasis in original).   As far as the Court can tell, what Plaintiffs seek is not merely a modification of services, but rather an increase in the adequacy of the services provided by Defendants.   For example, Plaintiffs' demand letter to Defendants states that they seek "increased capacity in DMHAS mental health community services and supports . . . ."   SAC ¶ 88.   Plaintiffs cannot simply request an increase in services, *carte blanche*, and label that request a reasonable modification.

For these reasons, Plaintiffs have not stated reasonable modifications claims in the FAC, and their proposed amendments to Counts Six and Seven would be futile.

### 4.   *Methods of Administration (Counts Eight and Nine)*

Plaintiffs also allege that Defendants discriminate against them in their "methods of administration."   SAC (Counts Eight & Nine).   Count Eight claims that Defendant Navarretta, in her official capacity as the Commissioner of DHMAS, has failed to:   (1) conduct regular analyses of the adequacy, sufficiency, and availability of and identify service gaps and deficiencies in community mental health services; (2) develop a plan to effectively address such service gaps; (3) develop additional provider capacity; and (4) require private nonprofit community mental health providers to accept qualified acquittees for community mental health services, in violation of the ADA.   SAC ¶ 198(a)–(d).   Count Nine also alleges more generally that Defendants Navarretta and Crego, in their official capacities as DHMAS Commissioner and CEO of Whiting, have "adopted criteria and methods of administrating their system of mental health services" in a manner that subjects Plaintiffs to "illegal discrimination and unnecessary segregation," in violation of Section 504 of the ADA.   *Id.* ¶ 203.   Essentially, what Plaintiffs seek is an increase in community placements available to them.

"The ADA's and the Rehabilitation Act's prohibition on discriminatory methods of administration provides that a public entity may not utilize methods of administration that (1) subject disabled individuals 'to discrimination on the basis of disability' or (2) have the 'purpose or effect of defeating or substantially impairing the accomplishment of the objectives' of the program or activity with respect to individuals with disabilities." *State of Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 277 (D. Conn. 2010) (cleaned up) (citing 28 C.F.R. §§ 35.130(b)(3), 45.51(b)(3)).  A methods of administration claim extends beyond formal polices to include "the actual practices of the public entity."  28 C.F.R. pt. 35 app. B, § 35.130 (2018).

Plaintiffs' methods of administration claims fail for several reasons.  First, Defendants are correct to point out that the only allegations of discriminatory methods of administration relate to DHMAS's alleged failures to identify service gaps and implement additional provider capacity— including by requiring community providers to accept acquittees into their programs—and Plaintiffs do not identify allegedly discriminatory methods of administration utilized by WFH or Crego, or the PSRB or its members.  *See* SAC ¶ 198.  To the extent Plaintiffs are attempting to state these claims against WFH, Crego, the PSRB, or its members, then, they are plainly deficient.

As to their allegations against Defendant Navarretta as the Commissioner of DHMAS, Plaintiffs cannot base a methods of administration claim on an allegation of deficiencies in the level of services provided.  *See Olmstead*, 527 U.S. at 603 n.14 (declining to hold that the ADA imposes "on the States a 'standard of care' for whatever medical services they render" or that it "requires States to provide a certain level of benefits to individuals with disabilities").  Plaintiffs' allegations, which relate specifically to service gaps in community treatment options,  SAC ¶ 198, run afoul of this rule.

Relatedly, Plaintiffs' allegations amount to a request to increase DHMAS's capacity to provide community treatment, so that they can be conditionally released. *Id.* However, Plaintiffs cannot use a methods of administration claim as an end-run around *Olmstead*'s pleading requirements, when they seek only the type of community integration authorized by *Olmstead*. SAC ¶¶ 199, 204 (methods of administration claim referencing *Olmstead*); *id.*, Prayer for Relief ¶ 6(b) (requesting injunction to ensure that Defendants Navarretta and Crego apply methods of administration to allow Plaintiffs to receive "treatment and services in the most integrated setting"); *see also Day*, 894 F. Supp. 2d at 21–25 (analyzing the plaintiffs' methods of administration claim within the context of *Olmstead*'s requirements). In *Day*, the court found that the plaintiffs had adequately pleaded a methods of administration claim where they had also pleaded that some treatment professional had approved them for community treatment in a non-hospitalized setting—*i.e.*, where plaintiffs had adequately pleaded an *Olmstead* claim. Here, as discussed above, Plaintiffs have not adequately pleaded an *Olmstead* claim, but seek to achieve the same remedy *Olmstead* would allow through their methods of administration claim; this is impermissible.

For these reasons, Counts Eight and Nine of the FAC are dismissed, and those counts of the SAC would be futile.

## V.      CONCLUSION

For the reasons described herein, Plaintiffs' motion for leave to amend to file the SAC, ECF No. 55, is DENIED, and Defendants' motion to dismiss the FAC, ECF No. 36, is GRANTED. Defendants' motion to stay discovery, ECF No. 38, is DENIED as moot.

39

The Court will grant Plaintiffs leave to amend for a third time, to attempt to remedy the deficiencies identified in this order.[9]  Any Third Amended Complaint shall be filed by **April 5, 2024**.  Defendants will be allowed a commensurate period of 21 days in which to answer or otherwise respond to the Third Amended Complaint, making their response due **April 26, 2024**.


      **SO ORDERED** at Hartford, Connecticut, this 15th day of March, 2024.


        */s/ Sarala V. Nagala*_____
        SARALA V. NAGALA
        UNITED STATES DISTRICT JUDGE

---

[9] Leave is granted only as to the claims alleged in the FAC and SAC; to the extent Plaintiffs seek to add any new claims—a practice the Court would discourage at this stage given that Plaintiffs have already had two bites at the apple—they must file a separate motion for leave to amend to include those claims.  Any such motion for leave to amend will be governed under Federal Rule of Civil Procedure 15, since no scheduling order has yet issued.  *See Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021).