# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ISIAH LINDSAY, LING XIN WU, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NANCY NAVARETTA, in her official capacity as the Commissioner of the Connecticut Department of Mental Health and Addiction Services, et al.<br><br><br>Defendants. | Civil Action No. 3:22-CV-1518-SVN<br><br><br><br>June 28, 2024 |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT

**Oral Argument Requested**

# Table of Contents

I.   INTRODUCTION ................................................................................................ 1

II.  BACKROUND AND RELEVANT FACTS ........................................................ 4

III. OVERVIEW OF TITLE II AND SECTION 504. ............................................... 5

   A. Title II of the ADA ..................................................................................6

   B. The "Integration Mandate" Under Title II and Section  504.............................7

IV. LEGAL ARGUMENT.............................................................................   11

   A. Legal Standard for a Motion to Dismiss under Fed R. Civ. P. 12(b)(6) and 12(b)(1) ................................................................................................11

   B. Plaintiffs Wu and Lindsay Have Standing to Bring Their Claims, and Their Claims are Ripe and Not Moot.........................................................................13

      1. Standard of Review.............................................................................13

      2. Wu and Lindsay Have a Case and Controversy.......................................14

      3. Wu and Lindsay's Claims are Not Moot..................................................15

         a. Plaintiffs' Claims are Capable of Repetition Yet Evading Review..............16

         b. The "Voluntary Cessation" Doctrine Prevents a Finding of Mootness for Wu..17

         c. Mr. Lindsay's Claim is Ripe...............................................................18

   C Plaintiffs Have Stated Title II and Section 504 Claims......................................19

      1. Plaintiffs Have Alleged Discrimination on the Basis of Their Disabilities.........20

      2. Plaintiffs Have Sufficiently Pled Denial of Reasonable Modification Claims....22

         a. Plaintiffs Have Sufficiently Pled Facts That They Have Been Discriminated Against by Defendants on the Basis of Their Disabilities.......................23

         b. The Request in the TAC for Increased Provider Capacity is a Classic Accommodation Recognized by the Supreme Court in Olmstead as Cognizable to Enforce the Integration Mandate of the ADA and Section 504...............................................................................27

      3. Plaintiffs Have Alleged Facts Sufficient to State Their ADA Methods of Administration Claims....................................................................36

      4. Plaintiffs Have Stated a Claim for Violations of Title II's and Section 504's Integration Mandate........................................................................37

         a. Plaintiffs Have Stated Facts Sufficient to Allege That Their State Treating Professionals Have Determined That Community-Based Treatment is Appropriate for Them.................................................................38

         b. Plaintiffs Have Alleged That Community Treatment Can Be Reasonably Accommodation Taking into Account the Resources Available to the State and the Needs of Others with Disabilities...................................40

X.  CONCLUSION.................................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acheson Hotel, LLC v. Laufer,*
   601 U.S. 1, 144 S.Ct. 18, 217 L.Ed. 2d 155(2023)(J. Thomas concurring) ...........................14

*Amidax Trading Corp. v. S.W.I. F.T.S.C.R.L.,*
   671 F.3d 140, 145 (2d. Cir. 2011)(per curium) ...............................................................12

*APWU v. Potter,*
   343 F.3d 619, 627 (2d. Cir. 2003).................................................................................12

*Armstrong v. Schwarzenegger,*
   622 F.3d 1058 (9th Cir. 2010) .............................................................................21, 38

*Ashcroft v Iqbal,*
   556 U.S. 662, 678 (2009).............................................................................................11

*Auer v. Robbins,*
   519 U.S. 452, 461 (1977).............................................................................................12

*B.C. v. Mt. Vernon Sch. Dist..,*
   837 F. 3d 152, 158 (2d Cir. 2016)..................................................................................20

*Bagile v. Levittan United Teachers,*
   17 F.Supp.3d 195, 204 (E.D.N.Y. 2014.........................................................................12

*Bell Atlandtic Corp. v. Twombly,*
   550 U.S. 544,579, 592 (2007).......................................................................................11

*Borkowski v. Valley Cent. Sch. Dist.,*
   63 F.3d 131, 138 (2d Cir. 1995).....................................................................................23

*Buchanan v. Maine,*
   469 F.3d 158, 174 (1st Cir. 2006)..................................................................................32

*Chance v. Armstrong,*
   143 F.3d 698, 701 (2d Cir. 1998)...................................................................................11

*City of Arlington v. Fed. Commc'ns Comm'n.,*
   569 U.S. 290, 296 (2013).............................................................................................9

*City of Mesquite v. Aladdin's Café, Inc.*
    455 U.S. 283 (1982)...................................................................................18

*Chambers v. Times Warner,*
    282 F.3d 147, 154 (2d. Cir. 2002)...................................................12, 13

*Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Conn.,*
    706 F.Supp. 2d 266, 277-78 (D.Conn. 2010) ...................................8, 36

*Davis v. Shah,*
    821 F.3d 231, 262-63 (2d Cir. 2016) ........................................... passim

*Disability Advocates, Inc. v. Paterson,*
    598 F.Supp.2d 289, 320 (E.D.N.Y. 2009) .......................................2, 9

*Disability Advocates, Inc. v. Paterson,*
    653 F. Supp. 2d 184, 227 (E.D.N.Y. 2009), vacated on other grounds,
    *Disability Advocates, Inc. v. N.Y. Coalition for Quality Assisted Living, Inc.,*
    675 F.3d 149 (2d Cir. 2012) ..........................................................10, 11

*Doe v. Pfrommer,*
    148 F.3d 73 (2d Cir. 1998)................................................................30

*Dyous v. Dep't of Mental Health and Addiction Services,*
    22-cv-1518, 2024 WL 1141856 (D. Conn. March 15, 2024) ...........20, 34

*Doxzon v. Dep't of Human Services,*
    20-cv-00236, 2020 WL 3989651 (M.D. Pa. July 15, 2020) ............31, 32

*Easley v. Snider,*
    36 F.3d 297, 300 (3rd Cir. 1994) ......................................................7

*E.G., ex rel. M.B. v. Cuomo,*
    16-cv-735 (W.D.N.Y. Nov. 15, 2001) ...........................................21, 22

*E.I. Dupont de Nemours & Co. v. Invista B.V.,*
    473 F.3d 44, 47 (2d Cir. 2006)...........................................................18

*Frederick L. v. Dep't of Public Welfare,*
    364 F.3d 487 (3d Cir. 2004).................................................................23

*Friends of the Earth, Inc. v. Laidlaw Env. Serv., Inc.,*
    528 U.S. 167, 189 (2000)...................................................................18

*Fulton v. Goord,*
    591 F.3d 37, 43 (2d Cir. 2009)..........................................................22

*Greater Chautugua Fed. Credit Unioun v. Marks*,
  22-cv-2753, 2023 WL 2744499 (S.D.N.Y. March 31, 2023)..................................................13

*Heath v. Hanks*,
  433 F.Supp. 3d 221 (D.N.H. 2019)..................................................................................28, 29

*Helen L. v. DiDario*,
  46 F.3d 325, 331 (3d Cir. 1995)..........................................................................................12, 13

*Henderson v. Thomas*,
  289 F.R.D. 506 (M.D. Ala. 2012)..........................................................................................18

*Henrietta D. v. Bloomberg*,
  331 F.3d 261, 276 (2d Cir. 2003)..........................................................................................13, 23

*Jaghony v. New York State Dep't of Educ.*,
  131 F.3d 326, 329 (2d Cir. 1994).........................................................................................11

*Jones v. United States*,
  463 U.S. 354 (1983),.............................................................................................................23

*Joseph S. v. Hogan*,
  561 F. Supp.2d 280, 2008 WL 24036998 (E.D.N.Y., May 23, 2008)........................25, 39, 40

*Los Angeles v. Lyons*,
  461 U.S. 95 (1983).................................................................................................................16

*Mental Disability Law Clinic v. Hogan*,
  No. CV-06-6320, 2008 WL 4104460, (E.D.N.Y Aug. 28, 2008)) ....................................25, 40

*Messier v. Southbury Training Sch.*,
  183 F.R.D. 350 (D. Conn. 1998).............................................................................................9

*M.G. v. New York State Office of Mental Health*,
  572 F. Supp. 3d 1 (S.D.N.Y. 2021) ...........................................................................21, 33, 35, 38

*Mhany Mgmt., Inc.  v. County of Nassau*,
  819 F.3d 581, 603 (2d Cir. 2016)...........................................................................................15

*Moore v. PaineWebber, Inc.*,
  189 F.3d 165, 169, n. 3 (2d Cir. 1999).................................................................................11

*Olmstead v. L.C. ex rel. Zimring*,
  527 U.S. 581 (1999)........................................................................................................ passim

*Pa. Prot. & Advocacy, Inc. v. Pa Dep't. of Pub. Welfare*,
  402 F3d 374, 379 (3d Cir. 2005)..............................................................................................9

iv

*Penn. Dept. of Corrections. v. Yeskey*,
　524 U.S. 206 (1998) ..............................................................................2, 15, 21

*Price v. Shibinette*,
　21-cv-25, 2021 WL 5397864 (D.N.H. Nov. 18, 2021) ..................................32, 33

*Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*
　260 F.3d 114, 120 (2d Cir. 2001) .........................................................16

*Rodriguez v. City of New York*,
　197 F.3d 611, 619 (2d Cir. 1999) ......................................................29, 33

*School Bd. of Nassau Co. v. Arline*,
　480 U.S. 273, 288 (1987) ....................................................................19

*Schine by Short v. New York State Off. Of People with Devlop. Disabilities*,
　15-cv-5870, 2017 WL 1232539 (E.D.N.Y. March 31, 2017) .........................24

*Sec'y of Pub. Welfare v. Idell S.*,
　516 U.S. 813 (1995) ...........................................................................12

*Sheppard v. Beerman*,
　18 F.3d 147 (2d Cir. 1994) ..................................................................11

*Spencer v. Kemna*,
　523 U.S. 1, 16 (1998) ..........................................................................16

*State of Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut*,
　706 F. Supp. 2d 266 (D. Conn. 2010) ......................................................8

*State v. Metz*,
　230 Conn. 400 (1994) ........................................................................2, 3

*Steimel* v. *Wernert*,
　823 F/3d 902, 911 (7th Cir. 2016) ..........................................................8

*Tardiff  v. City of New York*,
　991 F.3d 394, 405 (2d Cir. 2021) ..........................................................29

*Timothy B. v. Kinsely*,
　1:22-cv-1046, 2024 WL 1350071, at *14 (M.D.N.C. March 24, 2024) ................40

*Townsend v. Quasim*,
　328 F. 3d 511 (9 th Cir. 2003) .............................................................25

*Vitek v. Jones*,
　445 U.S. 480, 485-87 (1980)(2d Cir. 1994) ..............................................11

## Statutes

§§ 794a ......................................................................................................................1, 20

42 U.S.C. § 12101(a)(2)-(3) .................................................................................... 6-7

42 U.S.C. § 12101(a)(3) ...............................................................................................7

42 U.S.C. § 12101(a)(5) ...............................................................................................7

42 U.S.C. § 12101(a)(7) .......................................................................................... 6-7

42 U.S.C. § 12101(b)(1) ...............................................................................................6

42 U.S.C. § 12131 .....................................................................................................1, 7

42 U.S.C. § 12131(2) .................................................................................................10

42 U.S.C. § 12132 ....................................................................................................7, 9

42 U.S.C. § 12134(a) ...................................................................................................9

CT Gen. Stat. §53a-13 ..........................................................................................21, 22

CT Gen. Stat. §17a-587 ..............................................................................................17

CT Gen. Stat. §17a-593 ................................................................................................2

## Regulations

28 C.F.R. Part 35 .........................................................................................................9

28 C.F.R. Part 35, App. B (2011) ..............................................................................38

28 C.F.R. Part 35, App. B at 693 .................................................................................9

28 C.F.R. § 35.130(b)(3) .......................................................................................8, 36

28 C.F.R. § 35.130(b)(7) ...........................................................................................23

28 C.F.R. § 35.130(d) ..........................................................................................7, 8, 9

28 C.F.R. § 41.51(b)(3) .........................................................................................8, 36

28 C.F.R. § 84.76(d) ............................................................................................28, 35

45 C.F.R. § 84.4(b)(2) ..........................................................................................8, 36

45 C.F.R. § 84.68(b)(1) ..............................................................................................10

45 C.F.R. § 84.68(b)(8)...................................................................................................10

45 C.F.R. § 84.76(b) .....................................................................................................10

89 Fed. Reg. § 84.76(c), ...............................................................................................38

89 Fed. Reg. 40118 (May 9, 2024), .............................................................................38

89 Fed. Reg. 40066 (May 9, 2024), .............................................................................35

89 Fed. Reg. 40118 (May 9, 2024), .............................................................................38

89 Fed. Reg. 401121 (May 9, 2024), ...........................................................................35

**Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................................11, 12, 13

Fed. R. Civ. P. 12(b)(1)......................................................................................11, 12, 13

Fed. R. Civ. P. 56 ...........................................................................................................12

**Other Authorities**

Statement of Dept. of Justice Enforcement of the Integration Mandate of Title II
    of the ADA and Olmstead v. L.C. ............................................................................39

## I.      INTRODUCTION

This case is about disability discrimination against Plaintiffs Isiah Lindsay and Ling Wu and the class they seek to represent—**not** legal status.  Specifically, Plaintiffs seek timely access to Defendant Navaretta's community mental health services while on Temporary Leave (TL) for which they have been deemed appropriate by Defendants' own professionals and clinical team, in order to avoid unnecessary segregation based upon their disabilities, as required by Title II of the Americans with Disabilities Act (Title II), 42 U.S.C. § 12131, *et seq*., and Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794a. Plaintiffs bring quintessential disability discrimination claims under Title II and Section 504, including claims alleging that Defendants have violated the ADA's integration mandate, failed to provide reasonable modifications, and engaged in discriminatory methods of administration.

At the heart of Defendants' Motion to Dismiss (MTD) Plaintiffs' Third Amended Complaint (TAC) is Defendants' baseless assertion that Plaintiffs' claims are based entirely on their legal status, rather than their disability.  MTD at 14.  Defendants are wrong for three reasons. First, regardless of legal status, Plaintiffs are entitled to mental health services in the most integrated setting, provided they are qualified for such services.  Second, Defendants have failed to provide such services in integrated settings as a result of Plaintiffs' disability, not their legal status, when their own professionals deem Plaintiffs qualified for such services and recommend them for TL as a pathway to the community.  Third, Plaintiffs' legal status is directly due to their disability (their mental illness), thus making the very condition for their discriminatory treatment solely attributable to their disability.

Plaintiffs assert their federal civil rights under Title II and Section 504 requesting treatment in the most integrated setting while on TL—for which they have been deemed appropriate, do not

oppose, and can be accommodated. Plaintiffs do not challenge their initial commitment by the Superior Court pursuant to Conn. Gen. Stat. § 17a-582 or the duration of the commitment, and do not request conditional release or final discharge from the jurisdiction of the PSRB pursuant to Conn. Gen. Stat. § 17a-593. TAC, ¶ 6.  Defendants' MTD is based on assertions neither pled nor asserted by Plaintiffs.

"Title II covers all programs, services, and activities of a state or local government entity '*without* any exception.'" *Disability Advocates, Inc. v.  Paterson,* 598 F. Supp. 2d 289, 316 (*quoting Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 209 (1998)). Congress excluded neither prisoners nor acquittees from the ADA or Section 504. *See Yeskey*, 524 U.S. at 209.  In *Yeskey*, the Supreme Court rejected the almost identical argument that Defendants make here: that the failure to provide accommodations to *Yeskey*'s disability was due to his status as a prisoner.

Furthermore, as explained more fully herein in Section IV.C.2.b, the remedies that Plaintiffs seek in no way constitute an impermissible increase in level of services or the quality of services. Rather, among other remedies, they seek an expansion of *existing* residential and any treatment services to serve Plaintiffs and the Plaintiff Class.

Defendants' reliance on *Jones v. U.S.*, 463 U.S. 354, 362 (1983); *State v. Metz*, 230 Conn. 400, 414 (1994), to support their arguments is unavailing. First, as Plaintiffs allege in the TAC, they do not challenge their commitments or the statutory scheme under which they have been committed to the custody of the PSRB. TAC, ¶ 6 ("…Plaintiffs do not challenge their initial commitments, do not seek conditional release, and do not request final discharge from the jurisdiction of the PSRB.").

Plaintiffs also do not seek any individualized relief from this Court. Rather, Plaintiffs seek only systemic declaratory and prospective injunctive relief for care, treatment and services in the most integrated setting during the term of their commitment. ¶ 6. Plaintiffs also clearly allege that they have been discriminated against by Defendants **by reason of their disabilities** and **not** their commitment status under Conn. Gen. Stat.§ 17a-582, in violation of the ADA and Section 504 in several respects. *See e.g.,* TAC, ¶¶ 14, 15, 16.  Nowhere in the TAC do Plaintiffs allege that the discrimination is based on their forensic commitments. *See generally* TAC.

Second, Plaintiffs have alleged sufficient facts to support their claims that Defendants violate Title II of the ADA by subjecting them to unnecessary segregation, failing to reasonably modify their policies, procedures and practices to avoid discrimination against plaintiffs based on their disabilities, and by planning, funding, designing, administering, and implementing their community-based mental health service system in a manner that unnecessarily segregates qualified individuals with disabilities at WFH (1) for whom Defendant Navaretta's community mental health settings are appropriate and (2) who do not oppose living in those settings.  These claims plainly have nothing to do with their status of or fact of their commitments under Conn. Gen. Stat. § 17a-582. Thus, the holdings in *Jones* and *Metz*, which address constitutional due process rights of acquittees and are not disability discrimination cases, are irrelevant to Plaintiffs' ADA and Section 504 claims.[1]

---

[1] Defendants inappropriately invoke the *Roe v. Hogan* consent decree, which addresses Fourteenth and First Amendment Constitutional protections for individuals committed as acquittees to WFH, as a shield to prevent them from being compelled to comply with different rights under Title II and Section 504.  *Roe* is irrelevant to Plaintiffs' claims and the relief sought in this instant case, does not conflict with or in any way interfere with the *Roe* consent decree or the State's ability to comply with it. If the court were to grant all the relief requested in this case, none of that relief would conflict with the relief under the *Roe* consent decree. [2] Plaintiffs do not believe that Defendants' MTD should be converted to a motion for summary judgment. If, however, the Court decides otherwise, Plaintiffs respectfully request the opportunity to conduct fact and expert discovery and additional briefing.

Plaintiffs have affirmatively pled and stated claims under Title II and Section 504. Plaintiffs have stated claims for which relief can be granted on all counts; Plaintiffs all clearly have an injury-in-fact and have standing to request declaratory and injunctive relief; Plaintiffs' claims are not moot; and Mr. Lindsay's claim is ripe. The Court has jurisdiction to hear all of Plaintiffs' claims and therefore Defendants' MTD the Plaintiffs' TAC should be denied.

## II.  BACKGROUND AND RELEVANT FACTS

Plaintiffs' treatment teams have determined that they are ready for community-based treatment in the form of TL from WFH. TAC ¶¶ 1, 4, 14, 21, 22, 129, 150, 162. Following this type of determination by a treatment team, Plaintiff class members face several barriers to actually realizing community-based treatment: WFH's forensic review committee ("FRC") must approve the drafting of a TL application; WFH must draft a TL application with a community provider; the application must be physically signed by each participating provider; the application must be sent to the PSRB; the PSRB must schedule and hold a hearing on the application; the PSRB must issue a memorandum of decision ("MOD").

Plaintiffs and members of the Plaintiff Class must generally spend years at WFH before community-based treatment in the form of TL is even considered. TAC ¶¶ 74- 86; Ruot Decl. ¶ 7. Once a Class Member's treating psychiatrist determines they are ready for TL, Class Members face the process of identifying an appropriate community-based treatment provider that has the capacity to serve them. TAC ¶ 86 and 87; Nolan Aff. ¶¶ 8(c) -(f); Ruot Decl. ¶¶ 8-10. Once a community provider has agreed to work with a Class Member, the Class Member's treatment team and provider will present a case to the Forensic Review Committee (FRC) as to why the Class Member is ready for community-based treatment. TAC ¶ 91; Nolan Aff.  ¶ 8(f); Ruot Decl. ¶ 11.

The above process results not in community-based treatment, but in the drafting of a TL application. TAC ¶ 89; Nolan Aff.  ¶ 8(f); Ruot Decl. ¶¶ 11-12. Once a TL application is drafted

it must be physically signed by all participating providers. TAC ¶ 89. If approved, in whole or part, the PSRB generates a detailed MOD, such as the one attached to the Nolan Affidavit.

Earning increased time in the community is a gradual process that must comply with the explicit terms of the MOD. Ruot Decl. ¶¶ 12, 15. Progress is subject to the community provider's capacity to provide the services prescribed by the MOD. TAC ¶¶ 140-142. Revocation can happen at any time a Class Member, knowingly or unknowingly, violates the terms of the MOD or for any other reason determined to be appropriate by the Class Member's treatment team or community provider. TAC ¶ 137; Ruot Decl. ¶¶ 15-16.

A.    Mr. Lindsay

Defendants incorrectly assert that Mr. Lindsay's "treatment team has **not** determined that he is presently appropriate for temporary leave." MTD at 7. Mr. Lindsay's WFH treatment records reflect otherwise. For example, a October 17, 2023 note written by Mr. Lindsay's treating psychiatrist stated, ███████████████████████████████████████████ Krupa Decl., Exhibit B. Mr. Lindsay's treatment team first referred him to community-based services in March 2023. TAC ¶ 121. After several months of engagement, Mr. Lindsay was referred to a second provider in July 2023 because the first did not have adequate available housing. TAC ¶ 124. Defendants admit that Mr. Lindsay's treatment team recently presented his case as "clinically appropriate and safe" to the FRC. MTD at 10, His treatment team has determined that he is ready for TLs. TAC ¶¶ 1, 4, 14, 21, 129; *see also* Krupa Decl., Exhs. A, B, & C; Ruot Decl., ¶ 17.

B.    Mr. Wu

In March 2023, WFH began drafting an application for Mr. Wu to transition to overnight community-based treatment after Mr. Wu's treatment team presented his case to the FRC. TAC ¶ 144; Krupa Decl., Exhs. D & E. The PSRB approved the application per the MOD supplied by

Defendants. The MOD requires that Mr. Wu engage in day trips to the community for a minimum of three months before commencing overnights. In a monthly psychiatry update written for April and May, 2024, Mr. Wu's treating psychiatrist wrote, ███████████████████████████

████████████████████████████████████████████████████████████████████

████ Krupa Decl., Exh. F. Mr. Wu continues to wait for overnight TL; his progress is stalled due to lack of bed availability Wu Decl. ¶¶ 5-7.

## III.    OVERVIEW OF TITLE II AND SECTION 504

### A.  Title II of the ADA

The ADA "provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1), *see also Helen L. v. DiDario*, 46 F.3d 325, 331 (3d Cir. 1995), cert denied *sub nom*. *Pa. Sec'y of Pub. Welf. v. Idell* S., 516 U.S. 813 (1995) (internal citations omitted).

Congress acknowledged prior to the ADA's passage that "then current laws were 'inadequate' to combat 'the pervasive problems of discrimination that people with disabilities are facing.'" *Helen L.*, 46 F.3d at 331 (internal citations omitted). Forms of discrimination that concerned Congress included segregation of people with disabilities in institutions and their concomitant exclusion from the community and society at large. S. Rep. at 5-6 ("One of the most debilitating forms of discrimination is segregation imposed by others."); House Report (Part II) at 29 ("Discrimination against people with disabilities includes segregation[] [and] exclusion . . . .").

In enacting the ADA, Congress recognized that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"; that "discrimination against individuals with disabilities persists in such critical areas

as . . . institutionalization"; and that "the Nation's proper goals regarding individuals with disabilities are to assure . . . full participation[] [and] independent living."  42 U.S.C. § 12101(a)(2)-(3), (7).  Congress further found that "individuals with disabilities continually encounter various forms of discrimination, including . . . segregation."  42 U.S.C. § 12101(a)(5).  Thus, the ADA specifies that discrimination against people with disabilities includes "segregation" and "institutionalization."  42 U.S.C. § 12101(a)(3), (5).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Title II "incorporates the 'non-discrimination principles' of [S]ection 504 of the Rehabilitation Act and extends them to state and local governments," whether or not they receive federal funding.  *Helen L.*, 46 F.3d at 331 (footnote omitted) (*quoting Easley v. Snider*, 36 F.3d 297, 300 (3d Cir. 1994)); *see also* 42 U.S.C. § 12131.

### B.    The "Integration Mandate" under Title II and Section 504

One form of disability discrimination under Title II is a violation of the "integration mandate."  This mandate—arising out of the statute itself, the regulations of the U.S. Attorney General implementing Title II, and the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)—requires that, when a state provides services to people with disabilities, it must do so "in the most integrated setting appropriate to [their] needs." *Olmstead*, 527 U.S. at 592, 607; 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

The Supreme Court in *Olmstead* explicitly held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Olmstead*, 527 U.S. at 597.  The Court noted that "in findings applicable to the entire statute, Congress explicitly identified unjustified 'segregation'

of persons with disabilities as a 'for[m] of discrimination.'" *Id.* at 600. The Court held that unnecessary institutionalization violates the ADA because it "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-01.

The Supreme Court concluded that the ADA requires public entities to provide community services in the most integrated setting when: (a) such services are appropriate, (b) the affected persons do not oppose community-based treatment, and (c) community services can reasonably be accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities. *Id.* at 607.

A public entity violates Title II of the ADA when it segregates people with disabilities in public or private facilities or promotes the segregation of people with disabilities in such facilities through its planning, system design, funding choices, or service implementation. *See, e.g.*, 28 C.F.R. § 35.130(d); *Steimel v. Wernert*, 823 F.3d 902, 911 (7th Cir. 2016). In addition, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability," including unnecessary institutionalization. 28 C.F.R. § 35.130(b)(3), (d); 28 C.F.R. § 41.51(b)(3),(d); 45 C.F.R. § 84.4(b)(2),(4); *see also State of Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Conn.*, 706 F. Supp. 2d 266, 277-78 (D. Conn. 2010) (plaintiffs stated a violation of the ADA where defendants' methods of administration failed to adequately assess and identify the long-term needs of people with

disabilities in nursing facilities and denied them the right to choose to live in the community instead of an institution).

The Attorney General is required to issue regulations implementing Title II of the ADA. 42 U.S.C. § 12134(a). The Attorney General's integration regulation implementing Title II of the ADA provides, *inter alia*, that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) ("the integration mandate").  An integrated setting is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. pt. 35, App. B. at 693 (2016); *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d at 320 (concluding that "the proper interpretation of the regulations' definition of 'most integrated setting' is set forth in the regulations themselves: whether a particular setting 'enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible'") (*quoting* 28 C.F.R. § 35.130(d), App. A).  Accordingly, the ADA and its integration regulation reflect a preference for community placement.  "In short, where appropriate for the patient, both the ADA and [Section 504 of the Rehabilitation Act] favor integrated, community-based treatment over institutionalization." *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 379 (3d Cir. 2005) (citation omitted); *see also Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 337 (D. Conn. 2008)("The ADA's preference for integrated settings is not consistent with a procedure in which remaining at [the institution] is the default option for residents."); 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

Because DOJ is the agency charged with the responsibility to promulgate regulations under the law, it is afforded deference in its interpretation of the ADA. 42 U.S.C. § 12134(a); 28 C.F.R. Part 35 (delegating to the Department of Justice authority to promulgate regulations under Title

II); *see, e.g., City of Arlington v. Fed. Commc'ns Comm'n*, 569 U.S. 290, 296 (2013) ("Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency."). Numerous courts, including the Second Circuit, have relied on DOJ's Guidance when interpreting Title II and *Olmstead.  See Davis v. Shah,* 821 F. 3d 231, 262-63 (2d Cir. 2016).  The Court should defer to DOJ's interpretation and apply it here.

Courts in the Second Circuit, including the District of Connecticut, have construed Section 504 as being virtually identical to Title II and thus have analyzed them as such.  *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).  Additionally, Title II and Section 504 are remedial statutes and thus are to be construed broadly to effectuate their remedial purpose. *See id.* at 279. The recently promulgated Section 504 regulations confirm and expand on the ADA's non-discrimination requirements and integration mandate, making clear that recipients of federal funding may not deny a qualified person with a disability an opportunity to participate in a benefit or service, an equal opportunity to participate in a benefit or services as that afforded to others, a service that is not as effective as that afforded to others, or a different benefit or service to a class of individuals with disabilities. 45 C.F.R. §84.68(b)(1). It also may not establish eligibility criteria that tend to screen out qualified persons with disabilities. 45 C.F.R. §84.68(b)(8).  Finally, it must administer its programs and activities in the most integrated setting and may not impose conditions that deny qualified individuals access to integrated settings. 45 C.F.R. §84.76(b) & (d)(1).

People with disabilities are qualified and appropriate for community-based programs, like Defendants' existing community-based mental health services, for which they meet the essential eligibility requirements. *Olmstead*, 527 U.S. at 602 (qualified individuals are persons with disabilities who "'mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity'") (quoting 42 U.S.C. §

12131(2)); *Disability Advocates, Inc. v. Paterson,* 653 F. Supp. 2d 184, 227 (E.D.N.Y. 2009),

vacated on other grounds, *Disability Advocates, Inc. v. N.Y. Coalition for Quality Assisted Living*,

*Inc.,* 675 F.3d 149 (2d Cir. 2012)("[T]he Supreme Court held that a setting is 'appropriate' for

individuals if those individuals meet 'the essential eligibility requirements for habilitation in a

community based program.'") (*quoting Olmstead*, 527 U.S. at 603).

## IV.   LEGAL ARGUMENT

### A. Legal Standards for a Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) and 12(b)(1)

Defendants have brought their motion to dismiss Plaintiffs' TAC pursuant to Fed. R. Civ.

P. 12(b)(6) and 12(b)(1). When a defendant challenges the sufficiency of a claim by a 12(b)(6)

motion, the court must assume the truth of all factual allegations made in the complaint and

construe those allegations in favor of plaintiffs. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

572, 592 (2007). A complaint need not set forth detailed factual allegations; rather it must only

plead "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.

Despite this liberal pleading standard, to survive a motion to dismiss, a complaint "must

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when the facts

pled in the complaint allow the court to "draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id.*

 A court may dismiss the suit only where it is "beyond doubt that plaintiffs can prove no

set of facts to support their claim." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

Furthermore "[t]his rule applies with particular force where the plaintiff[s] alleg[e] civil rights

violations." *Jaghory v. New York State Dep't. of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997); *see also*

*Sheppard v. Beerman*, 18 F.3d 147 (2d Cir. 1994). The standards governing motions to dismiss

"under 12(b)(1) and 12(b)(6) are identical." *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169 n.3 (2d Cir. 1999).

In resolving Defendants' Rule 12(b)(1) motion, the Court must accept as true all uncontroverted facts alleged by Plaintiffs and must draw all reasonable inferences in their favor. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam). Further, "[t]he court may not dismiss a complaint unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Id*. (quotations omitted). But, only under Fed. R. 12(b)(1) can the Court consider evidence outside the pleadings and resolve factual disputes by reference to that evidence. *See APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003). On a 12(b)(1) motion to dismiss challenging the court's jurisdiction to hear a case, where there is a dispute over facts, the plaintiff must show by a preponderance of the evidence that the facts alleged in the complaint are true. *Basile v. Levittown United Teachers*, 17 F.Supp.3d 195, 204 (E.D.N.Y. 2014). A plaintiff may therefore submit evidence, including declarations and other evidence, to meet this burden. *Id*. Here, Plaintiffs submit the declarations of Ling Xin Wu, Eric Krupa, and Melissa Ruot and the exhibits attached thereto to support their opposition to Defendants' MTD the TAC under 12(b)(1).

Finally, when determining whether a plaintiff has stated a claim sufficient to avoid dismissal under Fed. R. Civ. 12(b)(6), courts must take these allegations as true. Defendants improperly rely on the Nolan Affidavit in support of their arguments on their Motion to Dismiss made under 12(b)(*6*) to argue that Mr. Lindsay's treatment professionals have not determined that he is appropriate for community services. *See* MTD at 7-10. Such reliance is improper on a 12(b)(6) motion and should be stricken. *Chambers v. Times Warner*, 282 F.3d 147, 154 (2d Cir. 2002)(where a defendant submits evidence outside of the complaint in support of a 12(b)(6)

motion, the court must either strike evidence or convert the motion to a motion for summary judgment under Fed. R. Civ. P. 56 with notice to the parties to allow for discovery). If a court converts the motion to a summary judgment motion, the Second Circuit strictly requires that the court provide notice to the parties and provide the parties with the opportunity to conduct discovery and submit additional evidence. *Id*. (holding that the conversion requirement is "strictly enforced.").[2]

Additionally, where a defendant submits affidavits or other evidence in support of a motion to dismiss under 12(b)(1) but also makes arguments to dismiss under 12(b)(6), the court may not rely on those affidavits and/or other evidence in evaluating Defendants' arguments under 12(b)(6). *Greater Chautugua Federal Credit Union v. Marks*, 22-cv-2753, 2023 WL 2744499, at *1 (S.D.N.Y., March 31, 2023). Here, Defendants impermissibly relied on the Nolan Affidavit and attached exhibits in making some of their 12(b)(6) arguments in their MTD. For example, Defendants improperly rely on the Nolan Affidavit to dispute the facts in the TAC regarding the point in the TL application process an acquittee is deemed ready for community treatment by WFH treating professionals. The Court should strike the Nolan Affidavit and the attached exhibits with respect to Defendants' arguments under the 12(b)(6) portion of the MTD. For the reasons explained herein, Defendants have failed to meet their burden to demonstrate that Plaintiffs' TAC should be dismissed under either Fed. R. Civ. P. 12(b)(6) or 12(b)(1) and, thus, their motion should be denied.

   B.  *Plaintiffs Wu and Lindsay Have Standing to Bring Their Claims and Their Claims are Ripe and Not Moot.*

      1.  <u>Standard of Review</u>

---

[2] Plaintiffs do not believe that Defendants' MTD should be converted to a motion for summary judgment. If, however, the Court decides otherwise, Plaintiffs respectfully request the opportunity to conduct fact and expert discovery and additional briefing.

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).  The same standard applies for ripeness and mootness.

### 2.   Wu and Lindsay Have a Case and Controversy

"Article III of the Constitution extends the 'judicial power' to all 'Cases' and 'Controversies.' Standing doctrine serves to limit the judicial power to cases and controversies of the sort traditionally amendable to, and resolved by, the judicial process." *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 10 (2023)(Thomas, J., concurring)(internal quotation marks omitted).  Mr. Wu and Mr. Lindsay, two men committed to a state-operated psychiatric hospital, have brought an actual case and controversy to the Court: to enforce their right to mental health treatment in the most integrated setting as provided for by Title II and Section 504.

The relief Plaintiffs seek is timely access to Defendants' existing community mental health treatment while on TL for which they have been determined to be appropriate. Their case is bounded at the beginning by the moment that their treating psychiatrist reasonably determines that their mental health condition has stabilized to the extent that they are ready for TL. Plaintiffs' claims end when their TL is fully realized, when they have seven overnights in the community and are at full Phase 2 TL, assuming that their TL is not revoked and returned to WFH.  Plaintiffs make no claims regarding conditional release or discharge from the PSRB in this case. TAC, ¶ 6.

Plaintiffs were acquitted and then committed by the Superior Court to the state-operated forensic psychiatric hospital because they have psychiatric disabilities and were a danger to themselves or others. DMHAS and WFH provide custodial care and psychiatric treatment to patients committed to their facilities.  DMHAS offers and provides community mental health

services to acquittees who progress through treatment and are approved for TL by WFH and ultimately by the PSRB. Title II's and Section 504's integration mandate and other provisions apply to all public entities. *Yeskey*, 524 U.S. 206 (1998). *Olmstead* requires that qualified individuals with disabilities, such as Plaintiffs (see discussion in Section C, below) receive mental health care and treatment in the most integrated setting. *Olmstead* 527 U.S. at 597, 607. Plaintiffs allege they are qualified individuals with disabilities, and that their treating psychiatrist has determined that they are recovered, stable and safe to the extent that they can receive community mental health treatment outside of WFH on TL. TAC, ¶¶ 21, 22, 115-129, 144-153.  Plaintiffs claim that they nevertheless have been denied timely community mental health treatment on TL. *Id*., ¶ 125-129, 152-154.  That claim raises a case or controversy over the violation of their federal civil right to treatment in the most integrated setting. Plaintiffs, therefore, have standing to obtain both declaratory and injunctive relief, and, as discussed below, their claims are ripe and not moot.

    3.   <u>Wu's and Lindsay's Claims are Not Moot.</u>

"The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).... This principle, however, is 'not comprehensive,' as it fails to capture exceptions to mootness, particularly voluntary cessation cases and cases capable of repetition but evading review… By contrast, the burden of showing mootness logically falls on a defendant. . ." *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016)(citations omitted). Defendants incorrectly assert that Plaintiffs' Title II *Olmstead* claims are moot because the Defendants are already providing them with some of the community mental health services outside of an institution. MTD at 24-25.  Mr. Wu's claims are not moot even though he has been receiving Phase 1 TL mental health treatment in the form of day trips from WFH to the community because he has been unnecessarily waiting on Phase 2 of

his TL, which involves residential community mental health services at a group home in Bridgeport.  Mr. Wu has not yet started Phase 2 of his TL. Wu Decl., ¶¶ 4-6.  Defendants' assertion that he will be placed in the community by July 1, 2024 (Nolan Aff'd.) is merely speculative as Mr. Wu has been told by his treatment team that his bed in the community is not yet available.  *Id*., ¶¶ 5-6.

Mr. Lindsay's claims are also clearly not moot.  He has never been out on TL.  Dr. Lenane, the state's treating professional as attending psychiatrist on WFH DN2 for Mr. Lindsay, has determined, on June 22, 2023, October 17, 2023, and March 28, 2024, that Mr. Lindsay meets the eligibility criteria for TL. *See* Krupa Decl., Exhs. A, B & C; *see also* TAC, ¶¶ 123-127; Ruot Decl., ¶ 17. Dr. Lenane then sought and obtained approval of the FRC. *Id*. WFH DN2 has started TL formulation for a Phase 2 TL application. Mr. Lindsay's claims are not moot because he has not received any community mental health services and supports. TAC ¶¶ 115-130.

     *a.*     *Plaintiffs' Claims are Capable of Repetition Yet Evading Review.*

Even if Plaintiffs' claims were moot at the moment, his claims would not be moot because they are "capable of repetition yet evading review."  Cases are generally deemed not to be moot by courts when the disputes are "capable of repetition, yet evading review." *Los Angeles v. Lyons,* 461 U.S. 95, 109 (1983). This exception is limited to "exceptional situations," where, "1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and 2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998). For the exception to apply, "there must be at least 'a reasonable expectation of repetition." *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet,* 260 F.3d 114, 120 (2d Cir. 2001)(quoting *Spencer,* 523 U.S. at 17.

In *Olmstead*, the Supreme Court has held that Plaintiffs' claims were capable of repetition yet evading review, even though they had been discharged from the hospital. Specifically, the court found the plaintiffs' claims were not moot because the issues were "capable of repetition, yet evading review" even though the plaintiffs were receiving treatment in the community and had been discharged from the institution. *Olmstead*, 527 U.S. at n. 6; *see also Vitek v. Jones*, 445 U.S. 480, 485-487 (1980).[3]

Here, both Plaintiffs, who have mental health disabilities, remain institutionalized.  Both currently spend every night at WFH. TAC ¶¶ 127-128 and 150. Wu has three Day TLs and comes back to WFH every day.  Lindsay currently has no day TL at all, although he has been deemed appropriate for TL. TAC ¶ 127; *see also* Krupa Decl., Exs. A, B, & C; Ruot Decl, ¶ 17.

TL is also not static and it is not always linear. Patients go back and forth in the system progressing through steps and sometimes going backwards. Sometimes the reason is the nature of their mental health condition and the effectiveness or lack thereof of the treatment. Other times it is the lack of staffing or available community mental health services. They also always risk setbacks in their mental health or behavior that violates their PSRB MOD.  The PSRB has authority to terminate an acquittee's TL for any violation of the MOD covering the TL.  Conn. General Statutes § 17a-587. In any event, even though Mr. Wu has been fully approved to begin his Phase 2 residential TL at Quince House, a residential community mental health provider, the bed has **not** opened as of the time of filing this brief on June 28, 2024. Wu Decl., ¶¶ 5-6. Thus, like L.C. and E.W. in *Olmstead*, Plaintiffs' claims here are capable of repetition but evading review.

---

[3] In *Vitek*, a convicted person's claim that his constitutional right not to be involuntarily transferred to a state psychiatric hospital from a prison without a pre-deprivation due process hearing was held to be not moot, even after his parole was revoked and he was sent back and forth between the state hospital and back to corrections while the litigation was ongoing. *Id.*

>   b. *The "Voluntary Cessation" Doctrine Prevents a Finding of Mootness*
>      *for Mr. Wu.*

Defendants argue Mr. Wu's claims are moot because they have a plan for him to begin Phase 2 TL in the near future, "on or about July 1, 2024." MTD at 24. However, apart from the applicability of the capable of repetition yet evading review doctrine, Defendants' promise of a future opportunity for community integration does not equate to the mootness of Mr. Wu's claims. Rather, Defendants attempt to assert what essentially is "voluntary cessation of allegedly illegal conduct" is not enough to render this case moot. It is well settled law that, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).

The "voluntary cessation" exception to mootness does not apply where "the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env. Serv. (TOC), Inc.,* 528 U.S. 167, 189 (2000) (internal citations omitted). Here, however, Defendants have already promised that Phase 2 TL was imminent— only to withdraw the plan— so it is entirely foreseeable that this could happen again. [4]

*Future* plans for Mr. Wu to receive treatment in the most integrated setting are speculative But, even ignoring this uncertainty, "voluntary cessation" is usually not enough to moot a case: "Otherwise, a defendant might 'strategically alter its conduct in order to prevent or undo a ruling adverse to its interest.'" *Exxon Mobil Corp. v. Healey,* 28 F.4th 383, 395 (2d Cir. 2022), (quoting *E.I. Dupont de Nemours & Co. v. Invista B.V.,* 473 F.3d 44, 47 (2d Cir. 2006). All Mr. Wu has is a hope for future community integration: "[Mr. Wu] will begin Phase II TL in (sic) few weeks." MTD at 24.

---

[4] Even if Mr. Wu were fully discharged from WFH and receiving treatment in the community, his case would also not be moot because Title II and Section 504 protect[s] people with disabilities who are not currently institutionalized but have a serious risk of institutionalization. *See Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016).

       c.     *Mr. Lindsay's Claim is Ripe*

Defendants incorrectly assert that Mr. Lindsay's *Olmstead* claims are not ripe for adjudication against the PSRB because WFH has not filed an application for TL to the PSRB, no hearing has occurred and the PSRB has neither denied nor granted Mr. Lindsay TL at the time of the filing of the TAC on April 5, 2024. MTD at 25.

Mr. Lindsay's claim for unnecessary institutionalization and segregation against Defendants is ripe because the State's treating professional, Dr. Lenane, the attending psychiatrist on WFH DN2, determined that Mr. Lindsay was ready for TL on October 17, 2023.  Krupa Decl., Exh. 1.A (Oct. 17, 2023 Lenane Progress Note stating Mr. Lindsay █████████████ ████████████████████████).  On June 22, 2023, Dr. Lenane also wrote that, █████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████  *Id*., Exh. B. In March 28, 2024, Dr. Lenane wrote ███████████████ ████████████████████████████████████████████████████████████████

*Id*., Exh. C. These notes make clear that, as of June 23, 2023, and at least by October 17, 2023, and March 28, 2024, Mr. Lindsay's treating professionals determined he was eligible and ready for TL.  Therefore, his claims against the PSRB are ripe and Defendants do not dispute that Mr. Lindsay's claims are ripe with respect to Defendants Navaretta and Crego. *See generally* MTD.

    C.    *Plaintiffs Have Stated Title II and Section 504 Claims*

To state a claim under Title II of the ADA, a plaintiff must allege that: that (1) he or she is a "qualified individual" with a disability; (2) that the defendants are subject to the ADA; and (3)

that the plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiff's disabilities. *B.C. v. Mt. Vernon Sch. Dist*., 837 F.3d 152, 158 (2d Cir. 2016); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003).

Defendants do not dispute that Plaintiffs are people with disabilities as defined under Title II and Section 504 or that they have alleged facts as such. *See* MTD at 15, TAC, ¶¶ 4, 21, 22. They also do not dispute that Plaintiffs have alleged that Defendants are subject to Title II and that Defendants Navaretta and Crego are also subject to Section 504. *See generally*, MTD, *see also* TAC, ¶ 26, 27. The Court has also held that Plaintiffs are qualified individuals with disabilities. *Dyous v. Dept's of Mental Health and Addiction Services*, 22-cv-1518, 2024 WL 1141856, at *14 (D. Conn., March 15, 2024).

1.    Plaintiffs have alleged discrimination on the basis of their disabilities.

Defendants argue that Plaintiffs have not stated ADA and Section 504 claims because they claim that Plaintiffs have not alleged facts to support the last prong of a Title II and Section 504 claim, which requires that a plaintiff allege facts that they are "qualified individuals with disabilities" who have "been denied the opportunity to participate in or benefit from the Defendants' programs, services and/or activities by reason of their disabilities." *See* MTD at 14-15. In doing so, Defendants mischaracterize Plaintiffs' claims as not being about disability discrimination but rather about the processes under state law that resulted in their legal status as insanity acquittees. *Id*.

First, *nothing* in the ADA or Section 504 excludes individuals with disabilities because of their legal status or otherwise from protection against disability discrimination. *See generally*, 42 U.S.C. § 12131, *et seq*.; 29 U.S.C.§ 794a. To the contrary, the Supreme Court and courts in the

Second Circuit have made clear that Title II and Section 504 apply to qualified individuals with disabilities "without any exception" including, but not limited to, convicted prisoners, parolees, and acquittees. *Yeskey*, 524 U.S. at 209 (in holding that Title II applies to prisoners, Supreme Court stated that Title II covers all programs, services, and activities of a state or local government entity "*without* any exception."); *see also M.G. v. New York State Office of Mental Health*, 572 F.Supp.3d 1 (S.D.N.Y. 2021)(parolees), *Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010)(prisoners and parolees).

Here, Plaintiffs' claims are based upon their disabilities in that they are being unnecessarily segregated because of their disabilities—**not** because of their legal status as acquittees.  Plaintiffs are institutionalized at WFH to receive treatment for their mental illnesses after being found NGRI.  The fact that they are there pursuant to a forensic commitment under Conn. Gen. Stat. §53a-13 does not diminish their ability to bring integration mandate and other Title II and Section 504 claims.  Plaintiffs here are qualified individuals with disabilities who seek to receive services in the most integrated setting to meet their needs (*see* TAC, ¶¶ 4, 5, 21, 22; *see also* Section IV, below at 20-22); at least one of their state treating professionals has determined that the most integrated setting for Plaintiffs is in the community receiving mental health services on TL, *see* TAC, ¶¶ 4, 21,22, 115-31, 132-55; they do not oppose community mental health services (*see* TAC, ¶¶ 130, 154); *see also* Section IV, below at 38; and they alleged that, taking into account the states' existing program and resources, their accommodation needs can be met. TAC, ¶¶ 4, 102-114; *see also* Section IV, below at 40. The standard for a claim under Title II, including but not limited to *Olmstead* and Plaintiffs' other Title II and Section 504 claims, is the same regardless of the setting in which the person with a disability lives or the group to which they belong.

21

Furthermore, it is well established that the ADA and Section 504 are remedial statutes that must be broadly construed to effectuate their purpose. *E.G., ex rel. M.B. v. Cuomo*, 16-CV-735, 2020 WL 3893928, at *10 (W.D.N.Y. Nov. 15, 2021). Defendants' interpretation of the ADA and Section 504 directly contravenes the purpose and intent of these statutes and, if adopted, would be contrary to Congress' intent to protect and provide broad remedies for such discrimination to all qualified individuals with disabilities and render the protections of Title II and Section 504 virtually meaningless for acquittees.

Nowhere in the TAC do Plaintiffs challenge the commitment process under Conn. Gen. Stat. §53a-13 under which they are committed as NGRI. *See generally* TAC. In fact, Plaintiffs have made plain that they do not do that. *See* TAC, ¶ 6. Plaintiffs have clearly alleged sufficient facts that Defendants have in fact discriminated against them based upon their disabilities. *See e.g.,* TAC, ¶¶ 4-5.  For example, Plaintiffs have alleged that, although their treating professionals have found them to be appropriate for community mental health services on TL, they continue to be segregated in WFH and denied the opportunity to interact with non-disabled individuals to the greatest extent possible. TAC, ¶¶ 4-8, 115-31, 132-55. Such allegations are clearly allegations of unnecessary institutionalization and segregation, which is disability discrimination under Title II's and Section 504's integration mandates. *Olmstead*, 527 U.S. at 597. Defendants' assertions that Plaintiffs have not alleged disability discrimination should be rejected.

2.    Plaintiffs have sufficiently pled denial of reasonable modification claims.

The failure to provide reasonable modifications can constitute discrimination under Title II. *Fulton v. Goord*, 591 F.3d 37, 42 (2d Cir. 2009). Title II requires that public entities make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, including unnecessary segregation or institutionalization

of disabled people, unless the public entity can demonstrate that such modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7); *see also Olmstead*, 527 U.S. at 597 (holding that unjustified isolation is discrimination).

A plaintiff may meet his or her burden of showing that a modification is reasonable through a *prima facie* showing, by suggesting the existence of a plausible accommodation. *Frederick L. v. Dept's of Public Welfare of Pa.*, 364 F.3d 487, 492 n.4 (3d Cir. 2003)(plaintiff has the burden of "articulating a reasonable accommodation" that would allow institutionalized persons with disabilities to move to the community); *Henrietta D.*, 331 F.3d at 280 (once the plaintiff suggests "the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits . . . she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant") (*quoting Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)). If the plaintiff makes that showing, then the public entity may assert as an affirmative defense, and bears the burden to prove, that the proposed modification would constitute a "fundamental alteration" of its services, programs, or activities. *Olmstead*, 527 U.S. at 603-06; *Henrietta D.*, 331 F.3d at 280-81; *Frederick L.,* 364 F.3d at 492 n.4.

> a. *Plaintiffs have sufficiently pled facts that they have been discriminated against by Defendants on the basis of their disabilities.*

Defendants incorrectly argue that Plaintiffs have not adequately alleged their denial of reasonable modification claim based on Defendants' faulty argument that Plaintiffs have not alleged discrimination based upon their disabilities. *See* MTD at 14, 15-16. In doing so, they mischaracterize Plaintiffs' request for reasonable modifications as seeking to eliminate "consideration from Plaintiffs' prior criminal conduct." *Id.* As discussed above in Section IV.C.1, that is not true. Plaintiffs have alleged integration mandate claims under Title II and Section 504 against Defendants for unnecessary segregation, regardless of being found NGRI, *i.e.*, *not* to be

23

responsible for any criminal conduct.  Additionally, nowhere in the TAC do Plaintiffs allege any facts that they are being discriminated against on any basis other than their disabilities. Therefore, Plaintiffs have sufficiently alleged discrimination based upon their disabilities. *See Schine by Short v. New York State Off. for People with Develop. Disabilities*, 15-cv-5870, 2017 WL 1232530, at *4 (E.D.N.Y., March 31, 2017)(Court held plaintiff had stated a plausible *Olmstead* claim because he alleged he was unnecessarily segregated and did not "claim that he is required and/or was denied a reasonable accommodation  for any other reason than his disability.").

Defendants also ignore that, in the TAC, Plaintiffs allege, in detail, a host of plausible reasonable modifications that Defendants could make to their policies, practices, and procedures to address the disability discrimination alleged in the TAC. *See e.g.*, TAC ¶¶ 103-112. For example, Plaintiffs have alleged that Defendant Navaretta could modify DMHAS's policies, practices, and procedures with respect to its contracts with mental health services providers to ensure that discriminatory eligible criteria are eliminated from their contracts. TAC, ¶ 103. While this is not required to survive a motion to dismiss, Plaintiffs further alleged that such a modification would not be an undue burden or a fundamental alteration of Defendant Navaretta's community mental health service system. *Id*.

Plaintiffs have alleged that another reasonable modification that Defendant Navaretta could make is to reasonably modify DMHAS's policies, procedures, and practices to require WFH staff to request a hearing with the PSRB within 90 days, absent good cause, once the treatment team has determined that a class member is ready for TL. TAC, ¶ 104. Plaintiffs have also alleged that Defendant Navaratta should reasonably modify DMHAS's policies, procedures and practices to make DMHAS' contracting process with community mental health providers less cumbersome to ensure that the process is timely. TAC, ¶ 105. Plaintiffs have alleged that these modifications also

would not be an undue burden on or a fundamental alteration of Defendant Navaretta's community mental health service system. TAC, ¶¶ 104, 105.

Plaintiffs have also alleged that Defendant Navaretta could make a reasonable modification to DMHAS's existing community mental health system by expanding the existing residential and day treatment community mental health services to service acquittees who are recommended for TL. TAC, ¶106. Plaintiffs have also alleged that this modification would not be an undue burden on or a fundamental alteration of Defendant Navaretta's community mental health service system. TAC, ¶¶ 106, 109. Additionally, although not their burden, out of an abundance of caution, Plaintiffs have alleged sufficient facts related to the costs of implementing this proposed modification to demonstrate that it would not be a fundamental alteration or undue burden for Defendant Navaretta to modestly expand capacity in DMHAS's existing community mental health services so that Plaintiffs can receive the community mental health services while on TL.[5] Specifically, Plaintiffs alleged "…the cost of expanding existing services to serve the named Plaintiffs and the putative Class is minimal in comparison to the financial resources available to DMHAS. The Governor has requested $744,312,647 for DMHAS in his FY 2025 budget request. The cost of expanding community-based services for the Named Plaintiffs and the approximately 20 putative Class Members would be miniscule in comparison to the DMHAS budget…" TAC, ¶109. Plaintiffs further allege that they estimate that the cost of implementing the proposed

_____

[5] A plaintiff need not allege such facts to state an *Olmstead* claim because the question of whether a plaintiff's needs for community placement can be met considering the resources available to the state and the needs of others with disabilities is part of a fundamental alteration *affirmative defense* for which Defendants bear the burden of proof. It is not appropriate to dismiss *Olmstead* claims because such facts have not been pled by a plaintiff. *See Mental Disability Law Clinic v. Hogan,* No. CV–06–6320 (CPS)(JO), 2008 WL 4104460, at *15 (E.D.N.Y., Aug. 28, 2008), *citing Joseph S. v. Hogan,* 2008 WL 2403698, at *8, (citing cases); *see also Townsend v. Quasim,* 328 F.3d 511, 518-20 (9th Cir. 2003)("Although plaintiff has not alleged the placement can be reasonably accommodated, taking into account (a) the resources available to the State and (b) the needs of others with mental disabilities, *it would be inappropriate to dismiss on these claims on this ground as defendants bear the burden of establishing "fundamental alteration"* as a defense.")(emphasis added).

25

modification would "account for less than 1% of the DMHAS budget." *Id*.  Plaintiffs further alleged that they estimated that, "on information and belief, the cost to DMHAS of providing community-based services to individuals on TL is less than or closely equal to the cost of institutionalizing them at WFH…" TAC, ¶ 110; *see also* TAC, ¶ 111.

Defendants argue that Plaintiffs did not allege that they requested specific accommodations or modifications for their disabilities. MTD at 16.  To the contrary, Plaintiffs specifically alleged in their TAC that prior to filing their initial Complaint, Plaintiffs' Counsel sent Defendants a 12-page letter requesting reasonable modifications including, for example: "increase capacity in DMHAS mental health community services and supports; provide acquittees timely movement through the PSRB system in the most integrated setting; and provide for reasonable modifications to the PSRB's policies, procedures, and practices so that qualified individuals with disabilities can participate in the State's community-based mental health services." TAC., ¶ 113; *see also Nolan Aff'd,* Cardella Aff., Ex. A. Defendants argue this was insufficient because they contend that it did not request specific accommodations for the Plaintiffs and that it was more of a generic assertion that the Defendants were violating Title II and Section 504. MTD at 16.  The letter, however, clearly sets forth the specific systemic relief requested by Plaintiffs, including the above-described specific systemic reasonable modifications, and describes the individual Plaintiffs' circumstances. See Nolan Aff'd., Cardella Aff., Ex. A at pp. 5-6. This case seeks only systemic relief.

Defendants further incorrectly assert that there is no nexus between the reasonable modifications that Plaintiffs seek and their disabilities. MTD at 17.  In doing so, Defendants ignore the clear allegations in the TAC. For example, Plaintiffs alleged that the lengthy delays to transition to community services on TL are in large part due to the limited supply of Defendant Navaretta's existing community mental health services. TAC, ¶¶ 94, 102, 178. It is this shortage of Defendants'

existing community mental health services that Plaintiffs allege "impairs their ability to participate in TL. Consequently, the Plaintiffs Class Members do not transition to integrated TL services in the community at a reasonable pace." TAC, ¶ 89 94, 96, *see also* TAC, ¶ 170(c). Thus, there can be no doubt that the delays are in fact related to their disabilities. Numerous courts evaluating *Olmstead*, reasonable modification and methods of administration claims involving a lack of sufficient community services resulting in delays in transition to the community have made such a finding.

Finally, as explained in Section IV.C.2.b immediately below, these proposed modifications do not constitute an impermissible request for new services or a different quality of services, but simply an increase in the capacity of existing services that are already being provided by Defendant Navaretta.  Defendants' argument that Plaintiffs have not adequately pled plausible reasonable modifications should therefore be rejected.

> ### b. The Request in the TAC for Increased Provider Capacity is a Classic Accommodation Recognized by the Supreme Court in Olmstead as Cognizable to Enforce the Integration Mandate of the ADA and Section 504

In their brief, Defendants assert that what Plaintiffs request as a reasonable accommodation in the form of increased capacity of community providers, so that they can be treated with recommended services in the most integrated setting as provided under the integration mandate, is not actionable.  Under the heading "Plaintiffs Are Seeking Increased Level of Services Which is not a Cognizable Claim Under the ADA or Section 504," they argue:

> [Plaintiffs'] reasonable accommodation claims … are really claims for increased service levels and increased quality of care.  This Court has already held that such claims are insufficient because the ADA and Section 504 do not guarantee any level of care for disabled individuals
> * * *
> Instead of seeking to rectify disability discrimination, these claims seek increased levels of care. As also discussed above, an increased level of care claim is not cognizable under the ADA and Section 504.

MTD at 18-19.  This is the same basis for their argument to dismiss the Discriminatory Methods of Discrimination claim. *Id*.

Defendants get the law of the ADA, as interpreted by the U. S. Supreme Court as well as the Second Circuit, and as very recently reaffirmed in the U.S. Dept. of Health and Human Services new regulations under Section 504, see 42 C.F.R. § 84.76(d), effective July 8, 2024, exactly wrong. In *Olmstead,* 527 U.S. at 594, which involved two recently institutionalized plaintiffs with mental health disabilities who had been found to be appropriate for community placement, the district court found that "existing state programs provided community-based treatment of the kind for which [the plaintiffs] qualified," but those services were not sufficiently available based on the state's funding concerns. First affirming that "unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II" of the ADA, *id*. at 596, the Court rejected the dissent's view that disparate treatment relative to a group of non-disabled individuals was necessary to establish prohibited discrimination, *Id*. at 598 n. 10. The Court's opinion, affirming that segregation of such individuals in institutions was actionable under Title II, nevertheless allowed that a state could potentially defeat a claim for desegregation as being a fundamental alteration in certain limited circumstances: "States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determined that such placement is appropriate, the affected persons do not oppose treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 607.

Defendants, however, grossly distort a commonsense footnote in this decision into a massive exception which would gut its entire holding.  Footnote 14 in *Olmstead* noted that "We

28

do not in this opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to "provide a certain level of benefits to individuals with disabilities." *We do hold, however, that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide*."  527 U.S. at 603 n.14 (emphasis added)(citations omitted).

Cases since *Olmstead* have consistently made clear that this footnote simply means that the integration mandate does not require any <u>new</u> types of services not already being provided by the state or that any particular <u>quality</u> or intensity of services must be provided to any given individual, while it <u>does</u> require states to provide a sufficient <u>*amount*</u> of services generally to meet the needs of individuals with mental health disabilities <u>if</u> it is already endeavoring to provide that very level of services to other individuals.   The few post-*Olmstead* cases where courts have declined to find a request for services under the ADA to be actionable based on Footnote 14 involved either (1) a request for *entirely new services* which the state was not providing to anyone, *see, e.g. Rodriguez v.  City of New York*, 197 F.3d 611,619 (2d Cir. 1999) (plaintiffs on Medicaid sought safety monitoring for individuals with mental disabilities, a new type of service not provided by the defendant to anyone; court found city did not discriminate in violation of the ADA's integration mandate in failing to provide this service to plaintiffs because "*Olmstead* reaffirms that the ADA does not mandate the provision of new benefits …. Because New York does not [provide] safety monitoring as a separate benefit for anyone, it does not violate the ADA by failing to provide this benefit to appellees"), or (2) a complaint about the particular level of services being provided to an individual (independent of an integration mandate claim), *see Tardiff v. City of New York*, 991 F.3d 394, 405 (2d Cir. 2021) (individual in police custody denied medication for epilepsy did not state an ADA violation because "her claim relates solely to

whether she received adequate medical treatment in police custody *for* her disability, and such a claim is not cognizable under the ADA. To hold otherwise would allow inmates to litigate in federal court virtually every medical malpractice claim arising in a custodial setting under the auspices of the ADA").  Neither one of these issues is involved in this case.

In contrast with these exceptional cases, in *Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016), a case in which plaintiffs challenged the failure of New York state Medicaid officials to provide coverage of orthopedic footwear and compression stockings except for certain diagnoses, threatening institutionalization for those unable to access these services, the Second Circuit, noting that "the ADA reflects a national mandate for the elimination of discrimination against individuals with disabilities,"' " *id*. at 264, cited to Footnote 14 in *Olmstead*:

> [A]lthough the ADA cannot and does not "require[ ] States to provide a certain level of benefits to individuals with disabilities," it can and does require states to "adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide.". As we noted in *Rodriguez,* "it is not our role to determine what Medicaid benefits New York must provide," but rather to "determine whether New York discriminates on the basis of a ... disability with regard to the benefits it does provide."

> So long as New York continues to provide coverage of orthopedic footwear and compression stockings under its Medicaid plan, it cannot deny such services only to certain disabled beneficiaries, with the effect of placing those disabled persons at substantial risk of institutionalization, because such a denial subjects plaintiffs to unjustified isolation on the basis of their disabilities in violation of the integration mandate.

821 F.3d at 263. (citations omitted)[6]

Lower courts, including in this Circuit, routinely apply the ADA/Section 504's integration mandate to require states that are *already providing* types of community-based services to some individuals to prevent institutionalization to also provide the same services to others.

---

[6] Defendants cite *Doe v. Pfrommer*, 148 F.3d 73 (2d Cir. 1998). This case, however, does not involve the integration mandate or a claim that services were needed to avoid institutionalization, and in any event predates *Olmstead*.  It is not relevant to the application of *Olmstead's* footnote 14.

For example, in *Haddad v. Arnold*, 784 F. Supp. 2d 1284 (M.D. Fla. 2010), an adult with a diagnosis of quadriplegia due to a motorcycle accident was completely dependent on others to help her perform most of her activities of daily living. The defendants were responsible for administering Florida's in-home services waiver programs, including the Traumatic Brain Injury/Spinal Cord Injury Waiver ("TBI/SCI Waiver") program, through which the state delivered in-home services to Medicaid eligible persons with traumatic brain or spinal cord injuries so they can remain in the community. The plaintiff had not received any TBI/SCI Waiver services despite having been on the waiting list for approximately two and a half years. Defendants explained to the plaintiff in a letter that "Presently, the [state agency] does not have funds available (or available openings) to serve additional individuals through these programs....Funding is very limited in these programs, and the amount of funding allocated to these programs has not been increased in many years." 784 F. Supp. 2d at 1291. The Court rejected the defendants' attempt to avert a preliminary injunction under the ADA and Section 504, as follows:

> The ADA does not require states to provide a level of care or specific services, but once states choose to provide certain services, they must do so in a nondiscriminatory fashion. *Here, Defendants have elected to provide the services that Plaintiff requests through the TBI/SCI Waiver program. Having done so, they must provide them in accordance with the ADA's anti-discrimination mandate*. Therefore, if Plaintiff is entitled to Medicaid services and is otherwise qualified for, desires, and requires TBI/SCI Waiver services in order to avoid unnecessary institutionalization, the ADA may, indeed, require Defendants to provide Plaintiff with such services if doing so would not result in a fundamental alteration of its programs.

*Id*. at 1301-02 (emphasis added)(citations omitted).

Similarly, in *Doxzon v. Dept. of Human Services*, 20-CV-00236, 2020 WL 3989651 (M.D. Pa. July 15, 2020), an adult with cerebral palsy, depression and epilepsy, who was forced into a skilled nursing facility to receive needed care, challenged the failure to provide services to her in the community. As in this case, the defendants there contended "that Doxzon's claims are

'standard of care' and 'level of benefits'" type claims that the Supreme Court in *Olmstead* held were not cognizable." *Id*. at *10.  The court roundly rejected this argument:

> [T]he defendants misconstrue Doxzon's claims. Doxzon is not claiming that the defendants violated a standard of care as to medical services that were provided to her. Nor is she claiming that the defendants should provide benefits in addition to those that it already provides under the Medicaid Act and the CHC waiver. Rather, she contends that she is eligible for numerous services that the defendants *do* provide but have not provided to her. *Having provided these services to some, the defendants "must provide them in accordance with the ADA's anti-discrimination mandate."*

*Id.* at 10 (emphasis added)(citation omitted).

In *Price v. Shibinette*, 21-cv-25, 2021 WL 5397864 (D.N.H. Nov. 18, 2021), plaintiffs were disabled individuals enrolled in a Medicaid waiver who sought relief under the ADA over significant gaps in services rendering them at risk of institutionalization, including defendants' having "allegedly failed to attract or recruit a sufficient number of providers for some waiver services." *Id*. at *6.  The defendants argued that plaintiffs merely sought to recover for a "standard of care violation which *Olmstead* rejected," in that:

> [P]laintiffs' allegations concerning gaps in their authorized waiver services challenge the quality of care that plaintiffs receive. To improve that quality of care, plaintiffs purportedly seek "new" or "better" services that are not alleged to be provided to anyone else, such as recruitment of new service providers and better monitoring of the service delivery. These types of claims, defendants say, amount to standard of care claims that the Supreme Court has disclaimed as a basis for liability under the integration mandate.

*Id.* at *11 (*citing Olmstead, 527 U.S. at* 603 n. 14).  The district court rejected this argument:

> Plaintiffs do not quibble with the quality of services they actually received. Nor do they allege that they are entitled to additional services beyond those that DHHS has authorized. For these reasons, this case is distinguishable from *Buchanan v. Maine,* where the First Circuit construed the plaintiff's claim to concern "the adequacy of treatment." … Here, by contrast, plaintiffs are not dissatisfied with the services they received but instead challenge defendants' failure to deliver services in the amount and frequency that DHHS has determined they need.

*Id*. at *11. The district court in *Price* also viewed the plaintiffs' request for monitoring of waiver services and "provider recruitment and training" not be a request for "new" services:

> To the extent the complaint alleges that defendants must implement new measures such as monitoring of the waiver services and provider recruitment and training, plaintiffs are merely seeking changes to the way in which the waiver program is administered to ensure that they are provided with the services that DHHS has already agreed they should receive. Because plaintiffs seek services that exist and are given to others, this case is distinguishable from the cases defendants cite in support of their argument [including *Rodriguez v. City of New York*].

*Id*. at *12.

Finally, in *M.G. v. New York State Off. of Mental Health*, 572 F. Supp. 3d 1 (S.D.N.Y. 2021), a class of formerly incarcerated individuals with a history of serious mental health disabilities challenged the failure of the state to provide community-based mental health housing and supportive services upon their release. They alleged that "Defendants fail to adequately fund and administer state programs that provide community-based housing and supportive services, Discharge Class members such as S.D., W.P., and D.H. must stay on lengthy waiting lists for the housing and supportive services they need and for which they are eligible, causing them to remain in segregated settings and/or placing them at an increased risk for institutionalization in violation of the Americans with Disabilities Act ('ADA') and Rehabilitation Act ('RA')." 572 F. Supp. at 6-7.

Denying a motion to dismiss under the ADA over the failure to administer community-based mental health services and housing, the district court, relying heavily upon the Second Circuit's *Davis* opinion, emphasized what had been alleged in the complaint:

> Plaintiffs allege that Defendants, while controlling where Plaintiffs live as parolees or post-release supervisees, unnecessarily place them in segregated settings or fail to provide needed community-based housing and services, thus putting them at risk for institutionalization in a segregated setting. In other words, even though Defendants recognize that Plaintiffs could function with community-based services, Defendants ***do not provide sufficient such services***, so Plaintiffs either receive services in a segregated setting or receive inadequate services likely to lead to decompensation and reentry to a segregated setting."

*Id.* at 14 (emphasis added). The court therefore denied the motion to dismiss, noting that the argument raised by defendant that its "waitlists are sufficiently reasonable to be permitted under *Olmstead*" raised factual issues which were "better reserved for summary judgment on a fully developed record." *Id*. at 14-15.

As in *Olmstead*, *Davis* and *M.G.,* and all of these other cases, Defendants' attempt to mischaracterize Plaintiffs' claims as being about the *quality* of services they are receiving or a request for *new* services is unavailing — all Plaintiffs seek here is more services of the kind already being provided to many others but which are being denied to *them* simply due to a lack of sufficient providers, a claim clearly actionable under the integration mandate, *Olmstead* (and its footnote 14), and its progeny.

To the extent Defendants attempt to hang their "level of services" hat on the Court's ruling on their earlier motion to dismiss, that ruling was hardly definitive on this point. There, the Court said "to the extent that Plaintiffs seek an increase in the availability of community placements, the Court tends to agree with Defendants that Plaintiffs do not permissibly seek a reasonable modification of Defendants' policies and procedures. Rather, Plaintiffs impermissibly seek an increase in the quality of their care*.*" *Dyous*, slip op at 36-37.

In fact, a request for "increased capacity" is precisely what is sought here but, per the long line of cases since *Olmstead*, this is right down the middle of actionable integration mandate claims because, as in *Olmstead* itself, the chief complaint in those cases and this one is that, while the Defendants *do* already provide the precise kinds of services needed to prevent unnecessary segregation to some people, they do not provide sufficient capacity to meet the needs of Plaintiffs. Expanding the *amount* of services to cover *other* eligible individuals is precisely what was countenanced under *Olmstead* to be required under the integration mandate, absent a fundamental

alteration of the defendants' systems -- a matter that, as in *M.G.*, cannot be resolved at the motion to dismiss stage. Indeed, if, as asserted by Defendants, both the quality and level of services for an individual cannot be challenged under the ADA's integration mandate, and *neither* can be the failure of the state to increase the number of people receiving community-based services instead of institutional care, it is very difficult to understand *what* any court could order to implement the *Olmstead* Court's clear holding that "unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II." 527 U.S. at 596-97.

Finally, plaintiffs note that the extensive case law confirming the actionability of these ADA and Section 504 claims has been very recently reaffirmed by the U.S. Department of Health and Human Services. On May 9, 2024, HHS issued final regulations under Section 504, including new 45 C.F.R. § 84.76(d), and, mirroring *Olmstead* Footnote 14, reaffirmed that a recipient of federal funds "is not required to create 'new' programs to assist people with disabilities, nor is it required to provide a particular standard of care or level of benefits" for the people it serves, but that "recipients must comply with section 504's nondiscrimination requirements—including the integration mandate—for the services they do in fact provide." 89 Fed. Reg.40066, 40121 (HHS commentary). HHS made clear in its commentary that, even if a certain kind of service is <u>not</u> being provided at all in the community, it may still be required where those services are currently being provided only in an institutional setting: "Recipients may be required to offer services in an integrated setting that they have only been offering in segregated settings; that is generally not offering a 'new service,' but instead is ensuring the service is offered in integrated settings." *Id*. The Court need not parse the outer limits of these new regulations, however, because here the Defendants already provide these services both in the institutional setting and in the community,

but do not provide a sufficient *quantity* of these services to meet the needs of plaintiffs who have been found to be eligible to receive them.[7]

       3. <u>Plaintiffs Have Alleged Facts Sufficient to State Their ADA Methods of Administration Claim</u>.

Defendants inaccurately contend that Plaintiffs have failed to allege facts to support a "methods of administration claim" against Defendants WFH and PSRB. MTD at 18-19. Under Title II and Section 504, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability," including unnecessary institutionalization.  28 C.F.R. § 35.130(b)(3), (d); 28 C.F.R. § 41.51(b)(3), (d); 45 C.F.R. § 84.4(b)(2), (4); *see also Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Conn.*, 706 F. Supp. 2d 266, 277-78 (D. Conn. 2010) (plaintiffs stated a violation of the ADA where defendants' methods of administration failed to adequately assess and identify the long-term needs of people with disabilities in nursing facilities, in order to determine whether they could be served in the community).

Here, Plaintiffs have alleged sufficient facts to state a methods of administration claim under Title II and Section 504. Specifically, Plaintiffs have alleged that Defendant Navaretta, "operates a community mental health system that unduly tends to exclude number of acquittees due the failure to develop and arrange for a sufficient quantity of community mental health services, of the types already being provided within DMHAS's existing community mental health

---

[7] To the extent the Court has already found that what Plaintiffs seek in the way of increased capacity among community-based providers is not actionable under the ADA's integration mandate, Plaintiffs respectfully request reconsideration of that part of its March 15, 2024 (ECF No. 70) ruling as contrary to the great weight of authority in the Supreme Court and its progeny, including in the Second Circuit.  Besides the case law establishing that this is right in the mainstream of integration mandate cases which require additional capacity for services already being rendered (subject to a fundamental alternation defense), the intervening May 9, 2024 final HHS regulations serve as an additional reason to reconsider that part of the Court's ruling.

system, to the meet for sufficient programs and services to afford acquittees the opportunity for TL." TAC, ¶¶ 95, 96, *see also* TAC¶ 170 (c). Furthermore, contrary to Defendants' contentions and as explained in detail in Section IV.C.2.b, above, an increase in capacity does not run afoul of *Olmstead*. Plaintiffs have also alleged that Defendant Navaretta has developed and utilized discriminatory methods of administration in the way DMHAS contracts with community mental health providers that allow them to exclude Plaintiffs on the basis of the severity of their disabilities. *See e.g.,* TAC, ¶¶ 86, 97, 98, 100, 101. These are precisely the types of allegations that courts have held state methods of administration claims. Thus, Plaintiffs have clearly stated their methods of administration claim.

### 4. Plaintiffs Have Stated a Claim for Violations of Title II's and Section 504's Integration Mandate.

Title II of the ADA provides that "'qualified individual[s] with a disability' may not 'be subjected to discrimination.'" *Olmstead*, 527 U.S. at 602 (quoting 42 U.S.C. § 12132). Under *Olmstead*, a person is a qualified individual with a disability for community services, such as Defendant Navaretta's community mental health services, if a state's treating professional determines that community placement is appropriate." *Id*. at 607; *Davis*, 821 F.3d at 263 *quoting Olmstead*, 527 U.S. at 60 ("To avoid such damaging repercussions, the integration mandate thus requires a state to provide community-based treatment for disabled persons when (1) "the State's treatment professionals determine that such placement is appropriate," (2) "the affected persons do not oppose such treatment," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [similar] disabilities." *Id.* at 607).

The comments to newly promulgated Section 504 regulations make clear that the integration requirements apply to *all* programs or activities that receive Federal financial

assistance from the Department *without exception*. 89 Fed. Reg. 40118 (May 9, 2024)(emphasis added). The integration mandate has also been applied to a range of qualified individuals with disabilities, including prisoners and parolees. *See e.g, Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010) (prisoners and parolees)*; M.G.*, 572 F. Supp. 3d 1 (S.D.N.Y. 2021) (parolees). There is no legal basis to apply a different *Olmstead* standard or to deny *Olmstead* protections to Plaintiffs as Defendants appear to suggest when they differentiate between Plaintiffs here and civil committees. *See* MTD at 2, 14-17.

Furthermore, the intent of the integration mandate applies even where the most integrated setting for the individual does not involve full discharge. *See* 89 Fed. Reg. § 84.76(c).  [T]he most integrated setting appropriate" is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. Pt. 35, App. B (2011).

Thus, Plaintiffs allegations are sufficient to state an integration mandate claim.

> a. *Plaintiffs have alleged facts sufficient to allege that their treating professionals have determined that community-based treatment is appropriate for them.*

The court in *Olmstead* held that, to state a claim for violations of the integration mandate, a plaintiff must show that: "(1) "the State's treatment professionals determine that such placement is appropriate," (2) "the affected persons do not oppose such treatment," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [similar] disabilities." *Olmstead*, 527 U.S.at 607. Here, Defendants challenge the sufficiency of Plaintiffs' *Olmstead* claim arguing that they have not pled facts sufficient to show that "the State's treatment professionals determine that such placement is appropriate," and that "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [similar] disabilities." *Id.* at 607; *see also* MTD at 19-20. They do not, however, dispute that Plaintiffs have alleged sufficient facts that that they do not

oppose community-based mental health treatment while on TL. *See* TAC ¶¶ 130 ("Mr. Lindsay does not oppose community-based treatment");154 ("Mr. Wu does not oppose community-based treatment…"); *see also* Court's Order. As discussed below, Plaintiffs here have sufficiently alleged their *Olmstead* claims.

After *Olmstead*, many courts have held that a person asserting an *Olmstead* claim need not rely on a public entity's own treatment professionals to determine whether the person is qualified and appropriate to participate in a state's community service system. *See e.g., Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 290-91 (E.D.N.Y 2008); *DAI II*, 653 F. Supp. 2d at 258-59. Also, after *Olmstead* was decided, the U.S. Department of Justice's issued guidance interpreting *Olmstead* and Title II's integration mandate. The Guidance states that "the ADA and its regulations do not require an individual to have had a state treating professional make such a determination." Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.,"(Guidance), Q and A #4  available at [Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C. (ada.gov)](). The Guidance states that individuals with disabilities "may rely on a variety of forms of evidence to establish that an integrated setting is appropriate." *Id*.  The Second Circuit has afforded deference to the Guidance consistent with *Auer v. Robbins*, 519 U.S. 452, 461 (1977). *Davis*, 821 F.3d at 263 (*citing Auer* at 461)(internal quotations omitted).

Here, however, Plaintiffs have alleged sufficient facts that even the State's own treating professionals have determined that they are appropriate to participate in Defendants' community-based mental health programs, services, and activities while on TL. *See e.g,* TAC, ¶14, *see also* TAC,¶¶ 150-152 (alleging that Mr. Wu's WFH treatment team  determined that he was appropriate

to go on TL Phase 2 to Quince Street House but no bed is available and thus he continues to wait at WFH until a bed opens at Quince Street); TAC, ¶¶ 21 ("…Mr. Lindsay's treating psychiatrist at WFH and his treatment team have determined that he is ready for TL and TL formulation and referred him to the Forensic Review Committee for TL formulation…), *see also* TAC ¶¶ 123, 124, 129. Plaintiffs also allege that Mr. Lindsay is ready for TL, but his treatment team cannot yet seek approval from the PSRB to place him in the community because no bed is available for him and it is unknown when one will be. *See* TAC, ¶ 123, 128 Plaintiffs also allege that they have had very few, if any, opportunities to have interactions with people without disabilities, and to participate in community activities while waiting for the community mental health services for their TL. *See* TAC, ¶¶ 126, 151; *see also Hogan*, CV-06-6320, 2008 WL 4104460. These allegations are more than sufficient to state that Plaintiffs are appropriate for community mental health services on TL to support an *Olmstead* claim. *See e.g.*, *Jospeh S.*, 561 F.Supp.2d at 292 (internal citations omitted); *Timothy B. v. Kinsely*, 1:22-cv-1046, 2024 WL 1350071, at *14 (M.D.N.C., March 24, 2024).

      b.    *Plaintiffs have alleged that community treatment can be reasonably accommodated, taking into account the resources available to the State and the needs of others with disabilities.*

Plaintiffs have also alleged that community-based mental health treatment "can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [similar] disabilities." *Olmstead*, 527 U.S. at 607 TAC ¶¶ 4, 103, 108. Plaintiffs requested reasonable modifications include, but are not limited to, expanded community capacity of Defendant Navaretta's existing community mental health services system—not for new services, or a higher level or greater quality of services. *See* Discussion in Section IV.C.b.1, above.

## X.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the TAC should be denied.

Dated: June 28, 2024

Respectfully submitted,

/s/Kirk W. Lowry
Kirk W. Lowry, ct27850
Legal Director
Kathleen M. Flaherty, ct19344
Executive Director
Connecticut Legal Rights Project
CVH-Beers Hall 2nd Floor
P.O. Box 351-Silver Street
Middletown, CT 06457
Phone (860) 262-5017
Fax (860) 262-5035
klowry@clrp.org
kflaherty@clrp.org

/s/Deborah Dorfman
Deborah Dorfman, (*Admitted Pro Hac Vice*)
Juris No. 442946
Executive Director
Sheldon Toubman, ct08533
Litigation Attorney
Virginia M. Teixeira, ct#29213
Staff Attorney
Disability Rights Connecticut
75 Charter Oak Avenue. Suite 1-101
Hartford, CT 06106
Phone (860) 469-4463
Fax (860) 296-0055
deborah.dorfman@disrightsct.org
sheldon.toubman@disrightsct.org
gina.teixeira@disrightsct.org

## **CERTIFICATION**

I hereby certify that on June 28, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF system.

/s/Kirk W. Lowry
Kirk W. Lowry

41