## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ISAIAH LINDSAY, LING XIN WU, on behalf of themselves and all others similarly situated, *Plaintiffs*, | ) ) ) ) | 3:22-CV-1518 (SVN) |
| | ) | |
| v. | ) ) | |
| NANCY NAVARRETTA, in her official capacity as the Commissioner of the Connecticut Department of Mental Health Services, *et al.* *Defendants*. | ) ) ) ) ) | December 16, 2024 |

## JOINT RULING ON DEFENDANTS' MOTION TO DISMISS AND PLAINTIFFS' SECOND MOTION FOR CLASS CERTIFICATION

Sarala V. Nagala, United States District Judge.

Plaintiffs, individuals who were acquitted by the Connecticut state courts after pleading the affirmative defense of not guilty by reason of mental disease or defect in their criminal cases, have brought this action asserting disability discrimination under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.  Third Am. Compl. ("TAC"), ECF No. 72.  The TAC names eight Defendants:  Nancy Navarretta, in her official capacity as the Commissioner of the Connecticut Department of Mental Health and Addiction Services ("DMHAS"); Jose Crego, in his official capacity as Chief Executive Officer of Whiting Forensic Hospital ("WFH"); Michael Pepper, in his official capacity as chair of the Psychiatric Security Review Board ("PSRB"); and John Bonetti, Mark Kirschner, Cheryl Abrams, Wakana Hirota, and Renesha Nichols, in their official capacities as members of the PSRB.  *Id.* ¶¶ 23, 29, 33.  The TAC alleges, generally, that Plaintiffs no longer need hospital-level care, and should instead be treated in a more integrated community setting.  *Id.* ¶ 4.

Defendants have moved to dismiss the TAC for lack of subject matter jurisdiction and failure to state a claim. Defs.' Mot. to Dismiss, ECF No. 86 at 1. Separately, Plaintiffs have moved for certification of a class defined as "all acquittees[1] who (1) are, or will be in the future, committed to the jurisdiction of the [PSRB], (2) are assigned Full Level 4 privileges, and (3) have been determined by a WFH treatment professional as being ready for Temporary Leave." Pls.' Second Mot. for Class Cert., ECF No. 102 ¶ 1.

The Court indicated at the oral argument on these motions that it intended to deny Defendants' motion to dismiss the TAC and grant Plaintiffs' motion for class certification. This opinion clarifies and explains these rulings. In particular, Defendants' motion to dismiss the TAC is largely denied, with respect to their subject matter jurisdiction arguments and their challenges to Plaintiffs' integration mandate claim against all Defendants, reasonable modifications claim against Defendants Navarretta and Crego, and methods of administration claim against Defendant Navarretta. Defendants' motion to dismiss is granted in part to the extent Plaintiffs bring a methods of administration claim against Defendant Crego and the PSRB Defendants. Plaintiffs' motion for class certification is granted.

## I.    FACTUAL BACKGROUND

The facts of this case are discussed at length in this Court's ruling and order granting Defendants' motion to dismiss Plaintiffs' First Amended Complaint, denying Plaintiffs' motion for leave to amend, and granting Plaintiffs leave to file the TAC. *See Dyous v. Dep't of Mental Health & Addiction Servs.*, No. 3:22-cv-1518 (SVN), 2024 WL 1141856 (D. Conn. Mar. 15, 2024). The Court summarizes below the relevant factual allegations.

---

[1] For purposes of this ruling, the Court uses the term "acquittee(s)" to refer to criminal defendants who have been found not guilty by reason of mental disease or defect under Conn. Gen. Stat. § 53a-13.

A. <u>Background</u>

Named Plaintiffs Isaiah Lindsay and Ling Xin Wu, on behalf of themselves and a putative class of similarly situated acquittees, bring this putative class action for declaratory and injunctive relief to enforce the civil rights of acquittees committed to the jurisdiction of the PSRB and in the custody of WFH.  TAC ¶ 6.  Plaintiffs define the proposed class as consisting of "all acquittees who (1) are, or will be in the future, committed to the jurisdiction of the PSRB, (2) are assigned Full Level 4 privileges, and (3) have been determined by their WFH treatment team to be ready for temporary leave."  *Id.* ¶ 37.

To briefly recap, Temporary Leave ("TL") is a statutory privilege that allows patients to leave WFH for community treatment while still under PSRB custody.  *Dyous*, 2024 WL 1141856, at \*4.  TL is available only to acquittees who have reached Full Level 4 privileges.[2]  *Id.*  The staff or the acquittees themselves may request TL.  *Id.*  Plaintiffs allege that approximately 20 acquittees housed at WFH are qualified for TL, "having been found by their respective WFH state treatment teams to be ready for temporary leave."  TAC ¶ 5.  According to Defendants, the process of being granted TL proceeds as follows:

(1) *The TL exploration or community exploration stage*.  The acquittee's treatment team and WFH explore whether a specific community provider may be interested in providing services to a particular acquittee and generally assess whether the community provider will be capable of serving the acquittee when the treatment team determines they are ready for non-hospital care, which includes sending the proposed community provider the acquittee's "forensic packet," containing relevant reports about the person;

---

[2] Full Level 4 privileges include various hour-long passes from 9 a.m. to 7 p.m. during which an acquittee can be unescorted on the grounds of the Dutcher building, a WFH facility for lower-security risk acquittees, outside of scheduled activities.  *See* TAC ¶¶ 72, 74, 81.

(2) *The community engagement stage.*  After a community provider agrees to accept an acquittee as a candidate, the community provider and the acquittee's treatment team continue to evaluate the acquittee's risk and needs, including by the community provider's staff meeting with the acquittee and attending the person's treatment planning meetings;

(3) *The TL formulation meeting.*  The acquittee's treatment team and the proposed community provider then recommend to the Forensic Review Committee ("FRC") that the acquittee is clinically appropriate and safe to begin developing the TL application.[3]

*See* Redacted Nolan Aff., ECF No. 86-2 ¶ 8(c)–(f)[4]; Defs.' Redacted Opening Br., ECF No. 90 at 6.

Plaintiffs contend that the following additional steps are required:  (4) after TL formulation and receiving FRC approval, the acquittee and their treatment team draft the TL application, which must then be physically signed by all providers participating in the acquittee's treatment; (5) the TL application is then sent to the PSRB, which must schedule and hold a hearing on the application; and (6) the PSRB must issue a memorandum of decision.  Pls.' Redacted Opp'n Br., ECF No. 94 at 12–13.  Plaintiffs allege that it takes months or even years for an acquittee to be able to bring their TL application before the PSRB.  *See* TAC ¶¶ 86, 88.

Following PSRB approval of the TL application, the acquittee's TL is typically broken up into Phase 1 TL and Phase 2 TL, a process that was created by the PSRB and not by statute.  *Id.* ¶ 90.  At Phase 1, the acquittee gets day trips to a community provider for groups and social club activities from one to five days a week; at Phase 2, the acquittee gets overnight temporary leave into residential services of a community provider, which progresses from one overnight to seven

---

[3] Plaintiffs allege that "TL formulation" is a "meeting of the WFH treatment team, Local Mental Health Authority (LMHA), and the community service providers to write the temporary leave plan."  TAC ¶ 21.
[4] Heather Nolan is Director of Social Services at WFH.

overnights a week.  *Id.*  At each step of the process, the acquittee must receive approval from their treatment team, the DMHAS consulting forensic psychiatrist, and the FRC, along with an order from the PSRB after a hearing attended by a state's attorney and a victim statement.  *Id.* ¶ 91.

Plaintiffs allege that the two named Plaintiffs and members of the proposed class are qualified individuals with a disability who have achieved Full Level 4 privileges and have been deemed ready for TL by their respective treatment teams.  *Id.* ¶¶ 4, 5.  Plaintiffs contend that they and members of the putative class no longer need to be restricted to hospital level of care twenty-four hours a day, can be reasonably accommodated with TL in the community, and should be receiving much of their treatment in a more integrated setting, but that Defendants unnecessarily segregate them long after their treatment teams have determined that they are ready for TL.  *Id.* ¶¶ 1, 4, 13.  To be clear, in bringing this action, Plaintiffs are not seeking conditional release or requesting final discharge from the jurisdiction of the PSRB.  *Id.* ¶ 6.  Instead, they seek timely access to community mental health services while on TL in order to avoid unnecessary segregation based on their disabilities, as required by the ADA and Section 504.  *See id.*; *see also* Pls.' Redacted Opp'n Br. at 9.

Plaintiff Lindsay is a 24-year-old man who was committed to the jurisdiction of the PSRB on February 22, 2019.  TAC ¶ 21.  He began TL exploration in March of 2023, community engagement in September of 2023, and TL formulation in April 2024, and received FRC approval on May 21, 2024.  Defs.' Unredacted Opening Br., ECF No. 86-1 at 8–10; Unredacted Nolan Aff.,

ECF No. 89 ¶¶ 8(g)–(j).[5]  On September 20, 2024, the PSRB approved Mr. Lindsay's Phase 1 and

Phase 2 TL application.  Hr'g Tr., ECF No. 123 at 32–33.  As of October 21, 2024, Mr. Lindsay

had not started Phase 1 TL.  *Id.* at 33.

Plaintiff Wu is a 34-year-old man who was committed to the jurisdiction of the PSRB in

2014.  TAC ¶ 22.  Mr. Wu was granted Phase 1 TL in January 2019.  *Id.* ¶ 133.  Due to various

setbacks and the COVID-19 pandemic, *id.* ¶¶ 134–49, Mr. Wu was not approved for Phase 2 TL

until May 20, 2024.  Unredacted Nolan Aff. ¶ 7(k).  Counsel informed the Court at oral argument

that Mr. Wu began Phase 2 at Quince Street House on July 24, 2024.  *See* Hr'g Tr. at 31, 53.  As

of October 21, 2024, Mr. Wu had progressed to three overnights per week.  *Id.* at 32.

B.  Plaintiffs' Claims

Plaintiffs bring two counts against Defendants.  In Count One, Plaintiffs bring claims for

violations of Title II of the ADA, which are broken down as follows:  (1) failure to provide timely

access to the most integrated setting, brought against all Defendants; (2) failure to provide

reasonable modifications, brought against all Defendants; and (3) discriminatory methods of

administration, brought against Commissioner Navarretta.[6]  *See* TAC ¶¶ 158–72.  In Count Two,

Plaintiffs bring similar claims for violations of Section 504 of the RA against Commissioner

Navarretta for discriminatory methods of administration, and against Commissioner Navarretta

---

[5] Defendants redacted the dates concerning Plaintiffs' progression through the TL process from their publicly-available brief and the Nolan Affidavit.  *See* ECF No. 90 at 8–11.  While the Court appreciates Defendants' caution, the Court *sua sponte* revisits its order approving sealing of this information in Defendants' filings, because the timing of the progression is central to Plaintiffs' allegations here and Plaintiffs have themselves put the timing at issue.  *See* Order, ECF No. 91 (noting that the Court may revisit particular redactions when addressing Defendants' motion).  By January 6, 2025, Defendants shall file public versions of their opening and reply briefs in support of their motion to dismiss (including any supporting exhibits and affidavits), unredacting any information that the Court has disclosed in this ruling.  As for Plaintiffs' filings, since their redacted opposition brief redacts only specific treatment providers' notes about Plaintiffs, the Court finds that those redactions remain proper, and need not be unsealed.

[6] As discussed below, to the extent this claim is brought against Defendant Crego and the PSRB Defendants, it is inadequately pleaded.

and Defendant Crego for failure to provide reasonable modifications and failure to provide timely access to the most integrated setting.  *Id.* ¶¶ 173–84.

Plaintiffs seek only injunctive and declaratory relief.  They request that the Court certify this case as a class action, declare Defendants have violated the ADA and Section 504, and issue injunctive orders restraining Defendants from:  (a) failing to provide timely, appropriate, integrated community services; (b) failing to make reasonable modifications to community-based mental health services, which exclude Plaintiffs and members of the proposed class from services they need to reside in more integrated settings; (c) failing to provide equal access to community-based mental health services; and (d) discriminating against Plaintiffs and the proposed class by failing to provide them with community-based mental health services in the most integrated setting appropriate to their needs.  *See id.* at 67–68.  Plaintiffs also seek injunctive orders requiring:  (a) Commissioner Navarretta and Defendant Crego to administer DMHAS and WFH policies and procedures in a manner that ensures timely access to the most integrated setting for Plaintiffs and proposed class members who are on TL; (b) Commissioner Navarretta and Defendant Crego to make certain reasonable modifications to their policies and procedures to streamline the process of obtaining TL, including to allow for digital signatures instead of wet signatures, to make a simultaneous request to the PSRB for both Phase 1 and Phase 2 TL, and to complete TL formulation within 90 days absent significant justification documented in the patient's chart; (c) Commissioner Navarretta to expand existing residential and day treatment services and reasonably modify DMHAS policies and procedures with respect to contracts with community providers to ensure the use of non-discriminatory criteria in assessing the eligibility of acquittees and to streamline the contracting process with such providers; (d) Commissioner Navarretta and Defendant Crego to ensure that Plaintiffs and members of the proposed class receive treatment in

the most integrated setting and move on to TL at a reasonable pace; and (e) the PSRB Defendants to ensure that Plaintiffs and proposed class members timely receive TL in the most integrated setting. *See id.* at 69–72.

\* \* \*

## DEFENDANTS' MOTION TO DISMISS

For the reasons described below, the Court denies Defendants' motion to dismiss. First, the Court rejects Defendants' arguments that Plaintiffs lack standing and that their claims are either moot or unripe. Second, the Court concludes that Plaintiffs have sufficiently alleged ADA and Section 504 claims.

## I.    SUBJECT MATTER JURISDICTION

The Court first addresses Defendants' subject matter jurisdiction arguments. Defendants argue that Plaintiffs lack standing because they are seeking declaratory and injunctive relief for past conduct that is not an ongoing violation of law; that Plaintiffs' claims are moot, as both Plaintiffs are currently receiving all services deemed clinically appropriate for them at this time; and that Plaintiff Lindsay's claims against the PSRB Defendants are not ripe for adjudication, as his TL application was not yet before the PSRB at the time of filing the TAC. Defs.' Unredacted Opening Br. at 3–4. For the reasons that follow, the Court finds that it has subject matter jurisdiction over Plaintiffs' claims.

A.    <u>Legal Standard</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a case for lack of subject matter jurisdiction. A case is properly dismissed for lack of subject matter jurisdiction if the Court lacks the "statutory or constitutional power to adjudicate it." *Makarova*

*v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.  *Id.*

Defendants do not mount a facial attack to the Court's jurisdiction; instead, they place "jurisdictional facts in dispute" concerning Plaintiffs' standing and the ripeness and mootness of Plaintiffs' claims.  *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). Therefore, the Court can appropriately consider evidence outside the pleadings to resolve the jurisdictional dispute.  *Id.*; *see also Rent Stabilization Ass'n of N.Y.C. v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993) (recognizing that resolution of questions of standing may require findings of fact).

B.  Standing

The doctrine of standing is "rooted in the traditional understanding of a case or controversy" under Article III and serves to "ensure that federal courts do not exceed their authority as it has been traditionally understood."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Standing is determined at the time the suit is commenced.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992).  To establish Article III standing, a plaintiff must demonstrate:  "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief."  *Thole v. U. S. Bank N.A.*, 590 U.S. 538, 540 (2020); *see also Lujan*, 504 U.S. at 560.  Injury in fact is the "first and foremost" of standing's three elements.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  Plaintiffs seeking injunctive relief must prove that the identified injury presents a "real and immediate threat of future injury," rather than simply alleging a past injury.  *Shain v. Ellison*, 356 F.3d 211, 215–16 (2d Cir. 2004); *see also Bernstein v. City of New York*, 621 F. App'x 56, 57 (2d Cir. 2015).

At its core, the parties' dispute over whether the TAC states a justiciable case or controversy arises from their differences in framing. On one hand, Plaintiffs view the injury in fact as just *one* injury resulting from the lack of timely access to the most integrated setting, which begins at the moment that an acquittee's treatment team decides that they are ready for TL, continues throughout the entire TL process until the acquittee spends every night of the week in the community, and resumes if the acquittee's TL is revoked and must return to WFH for hospital-level care (presumably for a reason other than the acquittee's adequacy for TL). Pls.' Redacted Opp'n Br. at 22–23. Defendants, on the other hand, view the injury in fact as a series of injuries that correspond with each step of the TL process and are resolved as the acquittee is given access to the services that they have been deemed clinically appropriate to receive at that step. For instance, Defendants believe that if Mr. Wu's rights were violated due to the suspension of his TL in March of 2020 and the subsequent three-year period for him to receive approval of his second TL application by the PSRB, those injuries have since been resolved because the PSRB approved Mr. Wu's TL application on October 6, 2023. *See* Defs.' Redacted Opening Br. at 27 (citing TAC ¶¶ 136–46). As to Mr. Lindsay, Defendants contend that if Mr. Lindsay's rights were violated because he had to wait almost a year and a half between receiving Full Level 4 privileges, starting TL exploration, and moving on to community engagement, those injuries have since been resolved because a community provider accepted him and placed him on its waiting list in October of 2023. *Id.* (citing TAC ¶¶ 120–27). Thus, Defendants argue, Plaintiffs' injuries are not ongoing.

The Court holds that Plaintiffs have sufficiently alleged standing. The Court accepts Plaintiffs' framing of their injury, as beginning when their treatment teams deem them ready for community mental health services but they are not timely placed in such services, and ending only when they achieve full Phase 2 TL, with seven overnight stays in the community. Because neither

named Plaintiff has reached that milestone, and because they allege Defendants' policies and practices will prevent them from achieving it in a timely fashion, they are suffering ongoing injury. The injury as alleged does not end simply because a plaintiff is placed on a waiting list for a community placement or approved for TL by the PSRB, as neither of these events constitute integration into the community. Similarly, even Mr. Wu's more recent progression to three overnight stays in the community per week does not mean his injury occurred solely in the past, as he has not yet achieved the full Phase 2 status of seven community overnight stays per week, and therefore he is still suffering present injury.

Defendants' focus on cases involving plaintiffs whose injuries occurred solely in the past and were not likely to recur is misplaced. In *O'Shea v. Littleton*, 414 U.S. 488 (1974), for example, the plaintiffs alleged that two state court judges (among other defendants) engaged in selectively discriminatory enforcement and administration of criminal justice in their county and sought prospective injunctive relief. The plaintiffs argued that they had been subjected to illegal conduct by the judges in the past. *Id.* at 495. In finding that the plaintiffs lacked standing to assert claims against the judges, however, the Supreme Court found that any alleged injuries from the judges' conduct occurred fully in the past, and that the plaintiffs' "prospect of future injury" was speculative and conjectural, since they may not be arrested again and tried before those particular judges. *Id.* at 495–97. Here, by contrast, Plaintiffs are currently suffering the injury of delayed full seven-night placement in the most integrated setting and, based on their allegations, will continue to suffer this injury unless and until Defendants change their policies and practices to accommodate them fully in a community placement in a timely fashion. Defendants' contention that Plaintiffs have not alleged an injury in fact sufficient to confer standing is therefore meritless.

C.  Mootness and Ripeness

The Court also holds that Plaintiffs' claims are neither moot nor unripe.

With respect to mootness, "[w]hile standing focuses on the status of the parties when an action is commenced, the mootness doctrine requires that the plaintiffs' claims remain alive throughout the course of the proceedings." *Etuk v. Slattery*, 936 F.2d 1433, 1441 (2d Cir. 1991). A case becomes moot when it is "impossible for a court to grant any effectual relief whatever to the prevailing party." *Hassoun v. Searls*, 976 F.3d 121, 128 (2d Cir. 2020) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)). When a case becomes moot, a federal court no longer has subject matter jurisdiction over the action. *Id.* at 127.

As to Mr. Wu, Defendants argue that his ADA and Section 504 claims are moot as to all Defendants because he was slated to begin Phase 2 TL on or about July 1, 2024. Defs.' Unredacted Opening Br. at 24. As to Mr. Lindsay, Defendants assert that his ADA and Section 504 claims against Commissioner Navarretta and Defendant Crego are moot because he had moved to the stage of TL formation, which is as far as his treatment team believes he should have progressed given his needs. *Id.* at 25. At oral argument, the parties informed the Court that Mr. Wu in fact began Phase 2 TL on July 24, 2024, and had progressed to three overnights per week, and that Mr. Lindsay's two-phase TL application was approved by the PSRB on September 20, 2024, but he had not yet started Phase 1 TL. *See* Hr'g Tr. at 31–33. Thus, Defendants argue, Plaintiffs have received all of the relief they should have been afforded given their present clinical status, and the Court cannot grant them any more relief.

For the reasons explained above, the Court agrees with Plaintiffs that their injuries are ongoing until they reach seven overnights on Phase 2 TL. As the record currently stands, neither Mr. Wu nor Mr. Lindsay had achieved that status—Mr. Wu was on Phase 2 TL at three overnights

per week and Mr. Lindsay had not started Phase 1 TL, despite receiving approval from the PSRB a month prior. Because there is no indication that Mr. Wu and Mr. Lindsay's TLs have been fully realized, the Court finds that Mr. Wu's ADA and Section 504 claims against all Defendants and Mr. Lindsay's ADA and Section 504 claims against Commissioner Navarretta and Defendant Crego are not moot.

Finally, Defendants' argument that Mr. Lindsay's claims against the PSRB members are unripe because he had not yet submitted his TL application to the PSRB when the TAC was filed is now moot, given that Mr. Lindsay later submitted a two-phase TL application to the PSRB, which it granted on September 20, 2024. *See* Hr'g Tr. at 32–33.

Accordingly, the Court rejects Defendants' challenges to the Court's exercise of subject matter jurisdiction over Plaintiffs' claims.

## II.    FAILURE TO STATE A CLAIM

The Court next turns to Defendants' arguments that Plaintiffs fail to state a claim for relief under either the ADA or Section 504 of the RA. Defendants contend that Plaintiffs have not sufficiently alleged that Defendants are discriminating against them by reason of their disabilities; that Plaintiffs' claims are based on their acquittee status rather than their disability status; and that Plaintiffs improperly seek an increased level of services and increased quality of care from Defendants. Defs.' Redacted Opening Br. at 1–2. Underlying each of Defendants' 12(b)(6) arguments is the assertion that Plaintiffs "are attempting to use their mental disabilities as an end run around the TL process, which is tied to their criminal conduct." Defs.' Redacted Reply, ECF No. 107 at 6. For the reasons described below, the Court concludes that Plaintiffs have sufficiently stated claims for relief under both the ADA and Section 504 of the RA.

A. Legal Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a case or cause of action for failure to state a claim upon which relief can be granted. When determining whether a complaint states a claim upon which relief can be granted, highly detailed allegations are not required, but the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This plausibility standard is not a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.* In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).

However, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678. Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

B.  Statutory Framework

Title II of the ADA prohibits discrimination against individuals in accessing public services by reason of their disability.  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).  Section 504 of the RA similarly prohibits discrimination on the basis of disability by programs receiving federal financial assistance.  *Mary Jo C. v. N.Y. State & Loc. Ret. Sys.*, 707 F.3d 144, 157 n.4 (2d Cir. 2013).

To state a claim under either Title II of the ADA or Section 504 of the Rehabilitation Act, Plaintiffs must demonstrate:  (1) that they are qualified individuals with disabilities; (2) that the defendants are subject to one of the Acts; and (3) that the plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of their disabilities.  *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir.) (citing *Henrietta D.*, 331 F.3d at 272), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004).  A plaintiff may show that the state discriminates against "persons with mental disabilities" by unnecessarily institutionalizing them.  *Davis v. Shah*, 821 F.3d 231, 260–61 (2d Cir. 2016) (describing how a plaintiff may prove an "integration mandate" theory of disability discrimination).  A plaintiff may also meet the discrimination requirement by demonstrating that they are being treated unequally when compared to non-disabled persons and that "equal access [to services] can be achieved through, among other things, reasonable modifications to policies, practices, and procedures" and "changes in methods of administration." *M.F. by & through Ferrer v. N.Y.C. Dep't of Educ.*, 582 F. Supp. 3d 49, 58 (E.D.N.Y. 2022).  In this vein, Section 504 of the RA and Title II of the ADA "prohibit discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them

to have access to and take a meaningful part in public services and public accommodations." *Powell*, 364 F.3d at 85 (quoting *Henrietta D.*, 331 F.3d at 273).

Defendants do not dispute that Plaintiffs are qualified individuals with disabilities, in satisfaction of the first element of a disability discrimination claim under the ADA and RA, or that they are subject to the ADA and RA, in satisfaction of the second element. Accordingly, the Court addresses only Plaintiffs' various theories of discrimination.

C. <u>Integration Mandate</u>

The Court first holds that Plaintiffs have plausibly stated an integration mandate claim under both the ADA and Section 504 of the RA.

In Count One, Plaintiffs claim that all Defendants, in their official capacities, violate Title II of the ADA by, among other things, "denying Plaintiffs and the Plaintiff Class with access to existing community programs, . . . and by requiring them to be unnecessarily confined in a segregated institutional setting in order to receive the care that they require." TAC ¶ 164. Count Two similarly alleges that Commissioner Navarretta and Defendant Crego, in their official capacities, have violated Section 504 of the RA by "denying Plaintiffs and the Plaintiff Class with timely access to existing community mental health programs, . . . and by requiring them to be unnecessarily confined in segregated institutional settings in order to receive the care that they require." *Id.* ¶ 178.

The regulations implementing Title II of the ADA require a public entity to "administer programs in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The integration mandate arises out of the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, in which a plurality of the Court recognized that the "unjustified institutional isolation of a person with disabilities" is, in and of itself, a prohibited

"form of discrimination." 527 U.S. 581, 600 (1999); *see also Davis*, 821 F.3d at 260. *Olmstead* held that qualified individuals must be placed in community treatment if: (1) "the State's treatment professionals have determined that community placement is appropriate"; (2) "the transfer from institutional care to a less restrictive setting is not opposed by the affected individual"; and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." 527 U.S. at 587; *see also Davis*, 821 F.3d at 262–63 (recognizing *Olmstead* applies to both the ADA and RA). To bring an *Olmstead* claim, a plaintiff need not demonstrate that the state unnecessarily institutionalizes the disabled as compared to the non-disabled. *Davis*, 821 F.3d at 260–63.

The Court rejects Defendants' argument that neither Mr. Lindsay nor Mr. Wu have pleaded facts sufficient to demonstrate the first *Olmstead* prong—that their treatment professionals have determined that community placement is appropriate. Several paragraphs of the TAC allege exactly that. *See* TAC ¶¶ 4 ("their treating professionals have determined that they are ready for [TL]"), 5 (alleging that approximately 20 acquittees are unnecessarily institutionalized because they have "been found by their respective WFH state treatment teams to be ready for temporary leave"), 21 (alleging that "Mr. Lindsay's treating psychiatrist at WFH and his treatment team have determined that he is ready for TL and TL formulation and referred him to the Forensic Review Committee for TL formulation"); *see also id.* ¶ 22 (alleging that Mr. Wu has been approved for Phase 1 and Phase 2 TL by the PSRB). Defendants decry Plaintiffs' allegations as conclusory and contend that, with respect to Mr. Lindsay, an allegation that his treatment team has determined he is ready for TL formulation does not equate with readiness for TL itself; and with respect to Mr. Wu, that the PSRB's approval of his Phase 2 TL application simply authorized him to begin TL at a future time, if and when his treatment team determines it is clinically appropriate.

In making these arguments, Defendants improperly urge the Court to rely on an affidavit and exhibits from the Director of Social Services at WFH, Heather Nolan. *See Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (where the district court is evaluating a 12(b)(6) motion, it ordinarily does not look beyond the complaint and its attached documents). When pressed at oral argument, Defendants conceded that Ms. Nolan's affidavit should not be considered in the context of their Rule 12(b)(6) motion. Hr'g Tr. at 13. Thus, the Court disregards the information in Ms. Nolan's affidavit for purposes of its analysis of whether the TAC should be dismissed for failure to state a claim for relief. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) (in analyzing a 12(b)(6) motion, the district court may either exclude the extraneous material or convert the motion to one for summary judgment).

Even without the Nolan affidavit, Defendants contend that the first *Olmstead* prong is satisfied only when Plaintiffs "allege that their treatment professionals have determined that they are presently appropriate for Temporary Leave," Defs.' Redacted Opening Br. at 20, which they clarified at oral argument occurs "once the PSRB has actually granted the [Phase 2] TL application." Hr'g Tr. at 22. To Defendants, being determined clinically appropriate to start TL formulation—or even receiving the PSRB's approval of Phase 2 TL—means only that the acquittee is clinically appropriate for that specific step in the process and nothing more. In Defendants' view, Plaintiffs are attempting to skip over the community placement processes that are in place because of Plaintiffs' *acquittee* status, not their disability status. *See* Defs.' Redacted Opening Br. at 20.

Defendants' arguments fail for several reasons. First, it bears emphasis that, at this stage, the Court need only assess whether Plaintiffs have plausibly alleged the elements of an integration mandate claim in their TAC. It concludes they have done so. It is clear there is a factual dispute

between the parties about whether the State's treating professionals have actually determined that community placement is appropriate for Plaintiffs, the first element of an *Olmstead* claim. But that factual dispute is not suitable for resolution on a motion to dismiss. The parties are free to explore this issue during discovery, and present it again at the summary judgment stage.

Second, insofar as Defendants believe an acquittee is ready for community treatment only after the PSRB approves a Phase 2 TL application, Defendants improperly conflate the PSRB with the "treatment professionals" whose determination is relevant to the first *Olmstead* factor. The PSRB is "an autonomous body" within DHMAS composed of political appointees who must possess certain credentials and experience.[7] Conn. Gen. Stat. § 17a-581. While one member must be a "psychiatrist experienced with the criminal justice system" and another member must be a "psychologist experienced with the criminal justice system," the other members of the PSRB are not required to be behavioral health practitioners. *Id.* § 17a-581(b). At oral argument, Defense counsel even acknowledged that the physicians on the PSRB are "not the treating physicians" of the acquittees they review. Hr'g Tr. at 23. In *Olmstead*, the "treatment professionals" in question were the actual treatment teams of the plaintiffs. *See* 527 U.S. at 593. Here, it is clear that the PSRB's approval of an acquittee's TL application is not required to satisfy the first *Olmstead* factor. Rather, Plaintiffs have sufficiently pleaded that their treatment professionals have determined that community placement is appropriate, such that their integration mandate claim survives Defendants' motion to dismiss.[8]

---

[7] "The membership shall be composed of:  (1) A psychiatrist experienced with the criminal justice system and not otherwise employed on a permanent basis by the state . . .; (2) a psychologist experienced with the criminal justice system and not otherwise employed on a permanent basis by the state . . .; (3) a person with substantial experience in the process of probation; (4) a member of the general public; (5) an attorney who is a member of the bar of this state; and (6) a member of the general public with substantial experience in victim advocacy."  Conn. Gen. Stat. § 17a-581(b).

[8] Even if PSRB approval was required, as to Mr. Wu, the TAC alleges that he has progressed past the TL formulation stage and received the PSRB's approval of his two-phase TL plan.  TAC ¶¶ 144–46.  So it is unclear why Mr. Wu's integration mandate claim would not survive even Defendants' (incorrect) reading of the first *Olmstead* prong.

The Court also disagrees with Defendants' characterization of Plaintiffs' claim as an attempt to use their disabilities as an "end run around the TL process" to excuse their past criminal history. *See* Defs.' Redacted Reply at 4, 6. While this argument may have been applicable to dismiss Plaintiffs' earlier iteration of their *Olmstead* claim insofar as they alleged that having Full Level 4 privileges entitled them to conditional release, *see Dyous*, 2024 WL 1141856, at *16–17, it no longer applies where Plaintiffs allege they have been deemed ready for TL and are simply not receiving timely access to it. *See* TAC ¶¶ 6, 8. As Plaintiffs have clarified in their TAC, they are not challenging their initial commitments, do not seek conditional release, and do not request final discharge from PSRB jurisdiction. *Id.* ¶ 6. For the reasons stated below in the Court's evaluation of Plaintiffs' reasonable modifications claim, the Court cannot discern how Plaintiffs' requested relief would allow them to entirely skip over the TL process.

Drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs have sufficiently pleaded facts suggesting Defendants discriminated against Plaintiffs by reason of their disabilities for denying them access to community services in the most integrated setting while on TL.

D. Reasonable Modifications

Next, Plaintiffs allege that Defendants have violated the reasonable modification requirement of Title II of the ADA and that Commissioner Navarretta and Defendant Crego have violated the reasonable modification requirement of Section 504 of the RA by failing to make reasonable modifications to their policies, practices, or procedures that would ensure timely access to community mental health services and treatment in the most integrated setting for acquittees who are deemed ready for TL. *See id.* ¶¶ 166, 181. Defendants argue: (1) that Plaintiffs have failed to state a reasonable modification claim on the grounds that Plaintiffs do not allege that they

requested specific accommodations for their disabilities; (2) that Plaintiffs' requests pertain to their acquittee status rather than their disability status; and (3) that Plaintiffs improperly request an increased level of services. *See* Defs.' Redacted Opening Br. at 16–18. For the reasons explained below, the Court holds that Plaintiffs have sufficiently alleged facts to support their reasonable modifications claim.

Public entities generally have an obligation to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," 28 C.F.R. § 35.130(b)(7)(i), and to provide "meaningful access" to their services, *Bernstein*, 621 F. App'x at 59–60 (citing *Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir. 2000) (*per curiam*)). A plaintiff makes a *prima facie* showing that a reasonable accommodation is available once they "suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Henrietta D.*, 331 F.3d at 280 (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)). A modification is reasonable if it would not "fundamentally alter the nature of the service provided or impose an undue financial or administrative burden." *Disabled in Action v. Bd. of Elections in N.Y.C.*, 752 F.3d 189, 197 (2d Cir. 2014) (cleaned up; quoting *Tennessee v. Lane*, 541 U.S. 509, 532 (2004)). Accordingly, "modifications are not required if a public entity can demonstrate that the requested accommodations 'would fundamentally alter the nature of the service, program or activity,' . . . or 'impose an undue hardship on the operation of [the] program.'" *Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 657 (S.D.N.Y. 2013) (first quoting 28 C.F.R. § 35.130(b)(7); and then quoting 28 C.F.R. § 41.53).

As an initial matter, the Court finds that Plaintiffs have proposed plausible accommodations in their TAC.[9]  Plaintiffs request that Commissioner Navarretta modify DMHAS's policies, procedures, and practices with respect to its contracts with community providers to ensure that the providers use nondiscriminatory criteria to evaluate the eligibility of potential TL applicants and to ensure that the process is timely.  *See* TAC ¶¶ 103, 105.  They also request that Commissioner Navarretta "expand existing residential and day treatment services in order to serve" acquittees recommended for TL.  *Id.* ¶ 106.  Plaintiffs further propose requiring WFH hospital staff to request the PSRB hearing within 90 days of an acquittee's recommendation for TL, requiring WFH hospital staff to simultaneously request both Phase 1 and 2 TL, and eliminating the requirement of wet signatures in an acquittee's TL application.  *See id.* ¶¶ 104, 107–08.  Each of these proposals focus specifically on the TL process.

The Court disagrees with Defendants' efforts to cast the reasonable modifications Plaintiffs seek as "eliminat[ion] from Defendants' consideration Plaintiffs' prior criminal conduct."  Defs.' Redacted Opening Br. at 16–18.  It is unclear to the Court whether Defendants' argument pertains to the proposed modifications in the TAC, as Defendants fail to cite to even one accommodation listed in the TAC as part of this argument.  *See id.*  Instead, Defendants characterize Plaintiffs as trying to bypass the complex administrative system in place to govern their progression from commitment to the PSRB through community placement.  But Plaintiffs are not seeking to circumvent the system; they are simply alleging that, having been deemed medically ready for the statutory privilege of TL, they should be entitled to avail themselves of it in a timely fashion, and

---

[9] To the extent that Defendants take issue with Plaintiffs' proposed accommodations because they had not been previously requested from Defendants, *see* Defs.' Redacted Opening Br. at 16, the Court notes that Defendants have cited to no legal authority requiring Plaintiffs to provide Defendants with such notice.  While the Court agrees with Defendants that Plaintiffs' March 23, 2022, demand letter directed to Defendants generally failed to suggest reasonable modifications specific enough for the Court to assess, *see Dyous*, 2024 WL 1141856, at *18, Plaintiffs have now given Defendants notice of their specific requested modifications by including them in their TAC.  *See* TAC ¶¶ 104, 107–08.

that Defendants can make reasonable accommodations to allow them to do so.  Whether these requested accommodations would somehow diminish the TL process, inhibit full consideration of Plaintiffs' prior criminal conduct, or otherwise fundamentally alter the nature of the services Defendants provide are factual issues that are better reserved for summary judgment on a fully developed record.  *See M.G. v. N.Y. State Off. of Mental Health*, 572 F. Supp. 3d 1, 14–15 (S.D.N.Y. 2021).

Further, to the extent that Plaintiffs seek an increase in the availability of community placements, the Court finds that such a request is cognizable under the ADA and RA.  Defendants argue that Plaintiffs are essentially bringing claims for increased service levels and increased quality of care, which the Court had previously found to be impermissible.  *See Dyous*, 2024 WL 1141856, at *18.  It is true that a request for an increase in the *quality* of services or for access to *new* services is not cognizable under the ADA or RA.  *Olmstead*, 527 U.S. at 603 n.14; *Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir. 1999) (noting that "*Olmstead* reaffirms that the ADA does not mandate the provision of new benefits"); *Tardif v. City of New York*, 991 F.3d 394, 405 (2d Cir. 2021) (claims for adequacy of medical treatment not cognizable under the ADA); *Wright*, 230 F.3d at 548 (collecting cases holding that the ADA and RA "do not guarantee any particular level of medical care for disabled persons" and only require "covered entities [to] make 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not"); *id.* (a demand for additional or different substantive benefits is not cognizable under the ADA and RA).

In their TAC, however, Plaintiffs are now seeking an expansion of *existing* residential and day treatment services so that acquittees ready for TL may access community mental health services in a timelier manner.  TAC ¶ 106.  Similar to the plaintiffs in *Price v. Shibinette*, Plaintiffs

here "are not dissatisfied with the services they received but instead challenge [D]efendants'
failure to deliver services in the *amount* and *frequency*" for which their treatment teams have
deemed them ready.  No. 21-cv-25 (PB), 2021 WL 5397864, at *11 (D.N.H. Nov. 18, 2021)
(emphases added) (collecting cases from other district courts); *see also M.G.*, 572 F. Supp. 3d at
14 (finding that plaintiffs stated an integration mandate claim regarding defendants' failure to
provide sufficient community-based services).  Plaintiffs here seek more services of the kind
already being provided to others but denied to them due to a lack of sufficient provider capacity,
which is actionable under the ADA and Section 504.[10]

Defendants' argument that Plaintiffs' request for increased capacity is not about disability
discrimination misses the mark.  *See* Defs.' Redacted Reply at 9–10.  In particular, Defendants
take issue with Plaintiffs' request for nondiscriminatory eligibility criteria and claim that Plaintiffs
have failed to show that a lack of provider capacity prevents Plaintiffs from receiving services.  *Id.*
First, as the Court explained earlier, Plaintiffs have sufficiently alleged that their requested
accommodations seek to streamline the TL process for acquittees who are deemed ready for TL.
Thus, it appears unlikely that requiring community providers to use nondiscriminatory criteria to
determine an acquittee's eligibility for their services would create a loophole for acquittees to
artfully dodge consideration of their past criminal conduct.  In any case, whether
nondiscriminatory eligibility criteria would end up forcing community providers to ignore an
acquittee's past criminal conduct presents a factual issue that should be resolved at summary
judgment on a fully developed record.  Second, the Court finds that Plaintiffs have sufficiently
alleged that a dearth of providers impedes timely access to treatment in the most integrated setting.

---

[10] To the extent the Court's opinion on Defendants' motion to dismiss Plaintiffs' original complaint held otherwise,
the Court, after review of the cases cited by Plaintiffs in connection with the present motion, now understands that
Plaintiffs' request for expansion of existing services is a permissible request under *Olmstead* and its progeny.

For example, in their TAC, Plaintiffs state that although Community Health Resources had accepted Mr. Lindsay for community mental health services, their only option for him was a group home that likely would not have an opening for one to two years.  TAC ¶ 123.  Mr. Lindsay was thus advised to choose a new catchment area and restart his community exploration there.  *Id.* ¶¶ 123–24.  Plaintiffs have therefore adequately pleaded a claim for lack of adequate community placement capacity.

Accordingly, the Court holds that Plaintiffs have stated a reasonable modifications claim in their TAC.

### E.  Methods of Administration

Finally, Plaintiffs allege that Commissioner Navarretta's methods of administering DMHAS's community mental health system discriminates against Plaintiffs by subjecting them to unnecessary segregation in violation of Title II of the ADA and Section 504 of the RA.  TAC ¶¶ 169–72, 180.  Specifically, Plaintiffs claim that Commissioner Navarretta has failed to reasonably modify DMHAS's policies, practices, and procedures to require contracted community providers to use nondiscriminatory eligibility criteria and to develop and arrange for a sufficient quantity of community mental health services that would allow timelier access to less restrictive community services while on TL.  *Id.* ¶ 169.

It is unclear to the Court whether Plaintiffs also bring their methods of administration claim against Defendant Crego and the PSRB Defendants.  *See* TAC ¶¶ 15–16, 169–72, 180 (methods of administration claim mentioning only Commissioner Navarretta's administration of DMHAS community mental health programs); *see also* ECF No. 102 ¶ 4 (listing questions of law common to the proposed class, in which Plaintiffs' methods of administration claim is brought against only Commissioner Navarretta); Pls.' Opening Br., ECF No. 102-1 at 19 (describing methods of

administration claim in TAC by mentioning only Commissioner Navarretta's administration of DMHAS programs). *But see* TAC, Prayer for Relief ¶ 6(a) (requesting the Court to require both Defendants Navarretta and Crego to "apply DMHAS and WFH policies, practices, and methods of administration in a manner that complies with Section 504"); Pls.' Redacted Opp'n Br. at 44 (arguing that Plaintiffs have alleged facts to support a methods of administration claim against Defendant Crego and the PSRB Defendants, but citing to TAC allegations referencing only Commissioner Navarretta).

To the extent Plaintiffs intended to allege a methods of administration claim against Defendant Crego and the PSRB Defendants, such a claim is dismissed because Plaintiffs have not adequately pleaded facts suggesting Defendant Crego and the PSRB Defendants' administrations of WFH and PSRB programs, respectively, discriminate against Plaintiffs on the basis of their disabilities.  The TAC fails to identify which WFH and PSRB policies or practices are challenged as discriminatory methods of administration, and Plaintiffs' opposition brief does not clarify this issue.  The Court therefore proceeds to analyze whether Plaintiffs have adequately stated a methods of administration claim against Commissioner Navarretta alone.

"The ADA's and the Rehabilitation Act's prohibition on discriminatory methods of administration . . . provides that a public entity . . . may not utilize methods of administration that (1) subject disabled individuals 'to discrimination on the basis of disability' or (2) have the 'purpose or effect of defeating or substantially impairing the accomplishment of the objectives' of the program or activity with respect to individuals with disabilities." *Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 277 (D. Conn. 2010) (citing 28 C.F.R. §§ 35.130(b)(3), 45.51(b)(3)).  A methods of administration claim extends beyond formal

polices to include "the actual practices of the public entity." 28 C.F.R. pt. 35 app. B, § 35.130 (2023).

Defendants again contend that Plaintiffs' methods of administration claim fail because they seek increased service levels and increased quality of care, which are not cognizable under the ADA or RA, and they challenge medical treatment methods. *See* Defs.' Redacted Opening Br. at 18. The Court finds these arguments unconvincing for several reasons.

First, as the Court has already explained in its assessment of Plaintiffs' reasonable accommodation claim, Plaintiffs are seeking an expansion of *existing* residential and day treatment services which courts have found cognizable under the ADA and RA. *See, e.g.*, *Price*, 2021 WL 5397864, at *11 (collecting cases). Second, Defendants once again mistake Plaintiffs' claims as efforts to eliminate the TL process under the guise of disability discrimination. *See* Defs.' Redacted Opening Br. at 19. Defendants, however, fail to recognize that Plaintiffs' methods of administration claim targets their alleged *unnecessary segregation* by reason of their disability, which is *per se* discrimination and violation of the ADA and Section 504 under *Olmstead*. *See Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 290 (E.D.N.Y. 2008) (citing cases). In addition, Plaintiffs' methods of administration claim challenges Commissioner Navarretta's alleged failure to operate a community mental health system that uses nondiscriminatory eligibility criteria and has a sufficient supply of providers to meet the demand for community services while on TL. *See* TAC ¶¶ 169–72, 180. Defendants conclusorily assert that this claim challenges medical treatment methods, without explaining how attacks on Commissioner Navarretta's administrative decisions pertain to medical treatment decisions.

For these reasons, Plaintiffs have stated a plausible methods of administration claim against Commissioner Navarretta only.

As a result, Defendants' motion to dismiss the TAC is denied except to the extent Plaintiffs seek to bring a methods of administration claim against Defendant Crego and the PSRB Defendants.

* * *

## PLAINTIFFS' SECOND MOTION FOR CLASS CERTIFICATION

Having found that Plaintiffs' claims should not be dismissed, the Court next addresses Plaintiffs' motion for class certification. Plaintiffs move pursuant to Federal Rule of Civil Procedure 23 for certification of a class consisting of: "all acquittees who (1) are, or will be in the future, committed to the jurisdiction of the PSRB, (2) are assigned Full Level 4 privileges, and (3) have been determined by a WFH treatment professional to be ready for TL." Pls.' Opening Br. at 14.

For the reasons that follow, the Court finds that certification of a class is appropriate and accordingly GRANTS Plaintiffs' Second Motion for Class Certification.

### I.    LEGAL STANDARD

"The class-action device was designed as an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (internal quotation marks and citation omitted). Federal Rule of Civil Procedure 23 generally permits one or more members of a class to sue as representatives for all members of the class if certain requirements are met.

First, the Second Circuit has held that Rule 23 contains an "implicit threshold requirement" that the members of the proposed class be readily identifiable, which is often characterized as an "ascertainability" requirement. *In re Petrobras Secs.*, 862 F.3d 250, 264 (2d Cir. 2017) (internal quotation marks and citation omitted). In particular, the court must determine that the proposed

class is "defined using objective criteria that establish a membership with definite boundaries." *Id.* at 269.  The purpose of this "modest" requirement is to "preclude certification if a proposed class definition is indeterminate in some fundamental way."  *Id.*

Once the court has determined that the proposed class is properly defined, Rule 23(a) permits class certification if four primary requirements are met:  (1) if "the class is so numerous that joinder of all members is impracticable," (2) if "there are questions of law or fact common to the class," (3) if the claims of the representative parties are "typical" of the claims of the class, and (4) if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  Those four requirements, respectively dubbed "numerosity, commonality, typicality, and adequate representation," serve to "limit the class claims to those fairly encompassed by the named plaintiff's claims."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation marks and citation omitted).

Finally, after those four prerequisites have been met, the action must also "qualify under at least one of the categories provided in Rule 23(b)."  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007) (cleaned up; citation omitted).  Rule 23(b)(2), which would govern the proposed class here, requires the court to find "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(2) applies "only when a single injunction or declaratory judgment would provide relief to each member of the class," and does not authorize class certification if "each individual class member would be entitled to a *different* injunction or declaratory judgment."  *Dukes*, 564 U.S. at 360–61.  Rule 23(b)(2) classes are mandatory, with no opportunity for class members to opt out, because the "relief sought . . . perforce affect[s] the entire class at once."  *Id.*

at 361–62.  Civil rights cases against defendants alleged to have committed unlawful, class-based

discrimination are "'prime examples' of what [Rule 23](b)(2) is meant to capture."  *Id.* at 361

(quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).

Rule 23 "does not set forth a mere pleading standard." *Id.* at 350.  Rather, plaintiffs seeking

class certification must "affirmatively demonstrate" that they have met the requirements of Rule

23 by a preponderance of the evidence.  *Id.*; *id.* at 352 n.7; *Teamsters Loc. 445 Freight Div. Pension

Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

## II.    DISCUSSION

For the reasons that follow, the Court finds that the Rule 23 class certification requirements

are met here.  The named Plaintiffs have standing to act on behalf of the class; Plaintiffs have

demonstrated, by a preponderance of the evidence that the numerosity, commonality, adequacy,

and typicality requirements of Rule 23(a) are met; and Plaintiffs have likewise demonstrated by

the same standard that injunctive or declaratory relief would be appropriate for the class as a whole.

A.  <u>Class Standing</u>

Only one of the named plaintiffs in a class is required to establish standing to seek relief

on behalf of the entire class.  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco

Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007).  For a named plaintiff to have standing

to request injunctive or declaratory relief, they must allege that the defendant was "engaging in the

unlawful practice against the plaintiff at the time of the complaint."  *Robidoux v. Celani*, 987 F.2d

931, 938 (2d Cir. 1993); *see also Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991).

In arguing that the named Plaintiffs lack standing, Defendants largely echo arguments from

their motion to dismiss, which the Court has rejected.  Specifically, Defendants argue that Mr.

Lindsay and Mr. Wu lacked standing to bring their claims because they were not approved for

overnight TL at the time the TAC was filed, and that because Mr. Wu's claims are moot because he began Phase 2 overnight TL before a decision on class certification was rendered.  Defs.' Opp'n Br., ECF No. 114 at 6–7.  Having found for the reasons explained above that the named Plaintiffs indeed have standing because they sufficiently allege that Defendants' discriminatory conduct is ongoing, the Court also finds here that both Mr. Lindsay and Mr. Wu have standing to seek relief on behalf of the proposed class.  Additionally, because Mr. Wu has not yet reached seven overnights per week while on TL, the Court finds that his claims are not moot.  Accordingly, both of the named Plaintiffs may bring their ADA and RA disability discrimination claims against Defendants on behalf of the proposed class.

B.  Class Definition (Ascertainability)

Plaintiffs define the proposed class as consisting of individuals who (1) "have been committed to the PSRB or will be so committed in the future," (2) are "assigned Full Level 4 privileges," and (3) "have been determined by their WFH treatment team to be ready for TL."  Pls.' Opening Br. at 39.  Defendants are silent on the issue of whether the class is appropriately ascertainable.

The Court finds that this proposed class is adequately defined as it uses "objective criteria that establish[es] a membership with definite boundaries."  *In re Petrobras Secs.*, 862 F.3d at 269.  As Plaintiffs note, Defendants would be fully aware of which acquittees qualify as class members at all times because Defendants know whether an acquittee is committed to the custody of the PSRB, has been assigned Full Level 4 privileges, and is ready for TL.  The class is defined based on a specific privilege level and specific medical and administrative determinations that require extensive documentation.  It is therefore "administratively feasible . . . to determine whether a

particular individual is a member." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015).

    C.  Rule 23(a) Requirements for Class Certification

    Having determined that Plaintiffs' proposed class is ascertainable, the Court turns to whether Plaintiffs have satisfied the four requirements of Rule 23(a).  Plaintiffs argue that they have met these requirements, as all proposed class members are suffering or will suffer harm from Defendants' allegedly unlawful practices that can be redressed by a common remedy.  Defendants oppose class certification, primarily arguing that a one-size-fits-all approach would not work with acquittees who have such varying and complex mental health issues.  The Court agrees with Plaintiffs, and concludes that Plaintiffs have satisfied the class certification requirements of Rule 23(a).

    *1.  Numerosity*

    The numerosity element is satisfied where "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Courts presume numerosity at a level of forty potential class members.  *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014); *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 263 n.20 (2d Cir. 2021).  This inquiry is not just about numbers, however; courts must look at all the circumstances surrounding the particular case to determine whether joinder is impracticable.  *Robidoux*, 987 F.2d at 936.  The relevant factors to consider, which have come to be known as the *Robidoux* factors, include:  (1) judicial economy; (2) geographic dispersion; (3) the financial resources of class members; (4) their ability to sue separately; and (5) requests for injunctive relief that would involve future class members.  *Id.*

As an initial matter, the Court finds that Plaintiffs are not entitled to the presumption that joinder is impracticable because there are at least forty members of the class. Plaintiffs estimate that there are at least twenty current class members, and assert that number combined with "an unknown number of *future* class members far in excess of hundreds" equals a class in excess of forty members. Pls.' Opening Br. at 28–29. It is true that the exact number of eligible persons is within Defendants' control, which makes it permissible for Plaintiffs to rely on "reasonable inferences drawn from the available facts." *Conn. Off. of Prot. & Advocacy*, 706 F. Supp. 2d at 287. But the Court cannot reasonably infer from the evidence presented by Plaintiffs that there are at least forty members of the class.

Plaintiffs primarily rely on a declaration from Melissa Ruot, a social worker in the Division of the Public Defender Services, Psychiatric Defense Unit, stating that there are eight to ten acquittees who are identified for the New Haven, Connecticut catchment area "vying for a bed" at one of two New Haven residential facilities. Ruot Decl., ECF No. 102-4 ¶ 18. The Court acknowledges that Ms. Ruot, who attests to having guided dozens of acquittees through the TL process, would have firsthand personal knowledge of the process. *See id.* ¶¶ 1–7. And while there are "approximately one dozen" catchment areas across the state that currently serve acquittees, *see id.* ¶ 18, the Court has no basis, aside from speculation, to estimate how many acquittees may be ready for community placement in the other approximately eleven catchment areas, given that Ms. Ruot's supplemental declaration adds only that "[m]ultiple other catchment areas have one or more acquittees on waiting lists." Ruot Suppl. Decl., ECF No. 115 at 17 ¶ 6. Without a more concrete estimate of how many other catchment areas have acquittees on their waiting lists and how many acquittees are awaiting placement in each catchment area, the Court cannot reasonably infer from Plaintiffs' evidence that there are forty acquittees who currently qualify as class members.

Nor have Plaintiffs put forth any evidence to justify their prediction that the number of future class members would number in the hundreds.  For instance, Plaintiffs have not provided the Court with the historical number of people each year who would meet even the first criteria of their class definition—being committed to the jurisdiction of the PSRB—much less any explanation of how they derive their estimate about who would meet all of the class definition criteria in the future.  The declarations from Mr. Wu, Mr. Lindsay, and two other acquittees do not appreciably help Plaintiffs' case for numerosity.  *See* Wu Decl., ECF No. 102-5; Lindsay Decl., ECF No. 102-6; Lindia Decl., ECF No. 102-7; Ramsey Decl., ECF No. 115 at 24–29.  Mere anecdotes about the long waiting periods for community beds do not provide sufficient details from which the Court can reasonably infer the estimated number of current or future class members.

As noted, however, numerosity is not a "strictly mathematical" inquiry; the context of each particular case matters.  *Pa. Pub. Sch. Empls.' Ret. Sys.*, 772 F.3d at 120.  The Court finds that Plaintiffs' estimate of twenty current class members to be supportable, based on the evidence in the record.  For instance, if there are ten acquittees awaiting beds in the New Haven catchment area and each of the other eleven catchment areas has even one acquittee awaiting a bed, the Court can reasonably infer there are more than twenty current class members.  Additionally, it stands to reason that additional acquittees will become eligible for TL over time and therefore meet the class definition.  Cases involving between twenty-one and forty potential class members are considered to be within a "gray area," where factors other than class size should be considered.  *Grant v. N.Y. Times Co.*, 329 F.R.D. 27, 31 (S.D.N.Y. 2018).  In this case, the Court's analysis of the *Robidoux* factors counsels in favor of certifying the class, as Plaintiffs satisfy Rule 23(a)(1) by showing "the difficulty or inconvenience of joining all members of the class."  *Cent. States*, 504 F.3d at 244–

45; *see also Robidoux*, 987 F.2d at 935–36 (citing case stating that a class may be certified even if it is composed of as few as fourteen members).

First and most importantly, the members of the proposed class suffer from mental health disabilities that have resulted in their involuntary commitment at WFH, and they are unlikely to be able to engage attorneys to challenge alleged systematic disability discrimination in individual suits. Courts routinely certify classes in these types of suits. *See Lane v. Kitzhaber*, 283 F.R.D. 587, 595 (D. Or. 2012) ("[I]n almost every case involving a challenge under Title II of the ADA and/or Section 504 of the Rehabilitation Act to discriminatory governmental policies and practices, courts have certified a class." (citing 7 Newberg on Class Actions § 23:10 (4th ed. 2011))). Indeed, the recommended ruling cited by Defendants that declined to certify a class in such a case was recently rejected upon review by the district court. *See H.A. v. Hochul*, No. 1:16-cv-735 (LJV) (JJM), 2024 U.S. Dist. LEXIS 34764 (W.D.N.Y. Feb. 28, 2024), *report and recommendation rejected by C.H. v. Hochul*, No. 16-cv-735 (LJV), 2024 U.S. Dist. LEXIS 211365 (W.D.N.Y. Nov. 20, 2024). Defendants' suggestion that Plaintiffs' assertion of poverty is misleading because many of their living expenses are paid by the State is unconvincing. Defs.' Opp'n Br. at 14. Just because an acquittee is not responsible for basic living expenses does not mean that they have ready access to funds to pay an attorney to bring suit. In addition, as Plaintiffs explain, most of the proposed class members are represented in their forensic mental health cases by the State Public Defender, which only represents indigent individuals. Pls.' Reply, ECF No. 115 at 9. And due to the named Plaintiffs' and the proposed class members' mental health disabilities and involuntary confinement, the Court similarly finds that they possess a limited ability to bring their individual claims for relief. Even if it were true that they have ready access to legal services through the Connecticut Legal Rights Project, the firm has limited resources that would preclude the

acceptance of every case that an acquittee would like to bring. *See* Lloyd Decl., ECF No. 115 at 20–21 ¶¶ 5–8. Other than state-funded legal services with limited capacity, an acquittee who is confined at WFH would have a difficult time retaining legal counsel.

Additionally, the named Plaintiffs and the proposed class request only systemic declaratory and injunctive relief that implicate the interests of future class members, as their requested modifications seek to ensure timelier access to TL for all eligible acquittees under PSRB jurisdiction. *See* TAC at 67–72. This weighs in favor of classwide resolution, as an injunction here "would affect all potential class members, and individual suits could lead to potentially inconsistent results." *Robidoux*, 987 F.2d at 936; *Westchester Indep. Living Ctr., Inc. v. State Univ. of N.Y., Purchase Coll.*, 331 F.R.D. 279, 291 (S.D.N.Y. 2019) (finding numerosity largely because the plaintiffs sought "injunctive relief that will benefit numerous present and future class members" and "to avoid potentially inconsistent rulings across multiple suits").

Moreover, the membership of the class may fluctuate. When class membership is fluid but the "nature of the wrong and the basic parameters of the group affected remain constant," a finding that joinder would be impracticable is appropriate. *Dean v. Coughlin*, 107 F.R.D. 331, 332–33 (S.D.N.Y. 1985); *see also Reynolds v. Giuliani*, 118 F. Supp. 2d 352, 388 (S.D.N.Y. 2000) (joinder impracticable where the identities of class members are unknown and the pool of prospective plaintiffs is fluctuating); *Arthur v. Starrett City Assocs.*, 98 F.R.D. 500, 505–06 (E.D.N.Y. 1983) (noting that "the fluctuating nature of the pool of prospective plaintiffs" supports a finding of numerosity). Plaintiffs have shown that the proposed class is fluid, as the identities of class members will change as acquittees may be newly deemed ready for TL, some other acquittees on TL may achieve conditional release, and still other acquittees may have their TL status revoked.

That no other competing suits have currently been filed and that there is little geographic dispersion do not carry the day here. Plaintiffs are not required to meet all five *Robidoux* factors— the Second Circuit described them as "[r]elevant considerations," rather than prerequisites. *Robidoux*, 987 F.2d at 936. Considering the record as a whole, the Court finds that the numerosity requirement of Rule 23 is met.

### 2. Commonality

The Court next finds that Plaintiffs have established commonality because they identify a common contention and common injury. Plaintiffs have identified the following questions of law and fact common to all members in the proposed class: (1) whether acquittees with Full Level 4 privileges and have been deemed ready for TL are not being provided with timely access to treatment in the most integrated setting; (2) whether DMHAS has a sufficient amount of community mental health services and supports so that members of the proposed class are timely served in the most integrated setting; (3) whether Defendants discriminate against members of the proposed class based upon their disabilities by failing to reasonably modify their policies, practices, and procedures so that proposed class members can timely receive mental health treatment and services in the most integrated setting while on TL; (4) whether Commissioner Navarretta's administration of DMHAS's community mental health system discriminates against members of the proposed class based upon their disabilities by failing to require the use of nondiscriminatory eligibility criteria by community mental health services providers; and (5) whether Commissioner Navarretta's administration of DMHAS's community mental health system discriminates against members of the proposed class by failing to develop and arrange for a sufficient quantity of existing community mental health services to meet the needs of acquittees deemed ready for TL. *See* Pls.' Opening Br. at 32–33.

"The commonality requirement is met if plaintiffs' grievances share a common question of law or fact." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). This common question of law or fact must "be of such a nature that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. A single common question is sufficient. *Id.* at 359.

The Court finds that Plaintiffs have identified questions common to the class.[11] All members of the proposed class are subject to the same policies and procedures that dictate their progression from Full Level 4 privileges to TL; each of the five common issues Plaintiffs identify relate to whether these policies and procedures violate Plaintiffs' rights under the ADA and Section 504 of the RA by failing to timely provide them with treatment in the most integrated setting. While it is true that there is a diversity of mental health issues, varying severity of mental health issues, and varying treatment needs throughout the proposed class, the Court is not being asked to independently assess whether an individual acquittee is ready for TL; nor is such an inquiry necessary for the Court to rule on Plaintiffs' claims. Plaintiffs bring claims that require the Court to address only the broad issue of alleged procedural defects in the TL process and request systemic declaratory and injunctive relief that is applicable to any proposed class member who has already been or will in the future be deemed ready for TL by their treatment team.

---

[11] Plaintiffs label their common questions both questions of "law and fact," without specifying which questions are, in their view, questions of law and which are questions of fact. Pls.' Opening Br. at 32–33. In the Court's view, none of the questions Plaintiffs identify turn on any pure questions of law. Therefore, at best, Plaintiffs have identified common mixed questions of law and fact.

### 3. *Typicality*

Next, the Court finds that the typicality requirement is satisfied. Defendants' argument against typicality is identical to their argument against commonality, which the Court rejects for similar reasons articulated above.

"Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux*, 987 F.2d at 936. "[M]inor variations in the fact patterns underlying individual claims" do not undermine typicality "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented." *Id.* at 936–37.

The named Plaintiffs' claims are typical of those of the class they seek to represent. As explained above, the differences between members in the proposed class are irrelevant to the issues that the Court must assess in addressing Plaintiffs' claims. Plaintiffs challenge conduct by Defendants that is broadly applicable to any acquittee who qualifies as a member of the proposed class.

### 4. *Adequacy of Representation*

Finally, the Court finds that the adequacy of representation requirement is met here. Adequacy of representation is demonstrated when "it appears that plaintiff's interests are not antagonistic to those of the class it seeks to represent and plaintiff's counsel is qualified to conduct the litigation." *Macedonia Church v. Lancaster Hotel Ltd. P'ship*, 270 F.R.D. 107, 118 (D. Conn. 2010) (citation omitted). Here, the named Plaintiffs' interests align with those of the proposed class. Again, Defendants contend that members of the proposed class have conflicting interests due to the varying "range of treatment and non-treatment needs and wants among PSRB patients,

and funding and community provider limitations." *See* Defs.' Opp'n Br. at 18–19.  As an example, they represent that "the interests of less resource intensive PSRB patients are antagonistic to those of more resource intensive patients," such that a less resource-intensive patient would be forced to wait longer for TL services because a more resource-intensive acquittee has become eligible for TL.  *Id.* at 19.  Defendants' adequacy of representation argument, like their commonality and typicality arguments, once again focus on differences among the class that the Court need not consider when addressing Plaintiffs' claims.  Here, Plaintiffs' requested relief is broad and seeks to ensure that the TL process *overall* is more efficient.

Defendants do not contest that Plaintiffs' counsel is adequate to represent the class.  The Court independently finds that that they are qualified, experienced, and able to conduct the litigation. *See Westchester Indep. Living Ctr.*, 331 F.R.D. at 298.

D.  Rule 23(b)(2)

Having found the requirements of Rule 23(a) met, the Court considers whether the requirements for Rule 23(b)(2) class certification are met.  It concludes they have been.

Rule 23(b)(2) provides that a class may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. . . .  In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360 (internal citation omitted).

Rule 23(b)(2) is satisfied here because Plaintiffs allege Defendants have acted (and, in some instances, refused to act) on grounds that apply generally to the entire class, such that injunctive or declaratory relief would be appropriate for the entire class. This suit is of the exact nature contemplated by Rule 23(b)(2): a civil rights class action seeking classwide declaratory and injunctive relief. Once again, Defendants argue that Rule 23(b)(2) is not satisfied by asserting that the Court would be required to inquire into each member's individual circumstances to determine whether the TL process has afforded them reasonable and timely access to community placement. Defs.' Opp'n Br. at 20. And for the same reasons articulated above, the Court finds this argument unpersuasive.

Defendants then raise a new argument: a class is unnecessary because a generic order requiring them to change their policies would affect all class members anyway. *Id.* This assertion quite literally cuts against their repeated contention that the Court would need to undergo individualized inquiries of each member in order to resolve Plaintiffs' claims. Defendants cannot have it both ways.

Accordingly, the Court finds that the elements of Rule 23(b)(2) are satisfied.

E. Appointment of Class Counsel

Having certified a class as defined above, the Court appoints as joint class counsel Connecticut Legal Rights Project and Disability Rights Connecticut. Federal Rule of Civil Procedure 23(g) requires the Court to consider "the work counsel has done in identifying or investigating potential claims in the action," counsel's "experience in handling class actions," the "types of claims asserted in the action," counsel's "knowledge of the applicable law," and the "resources that counsel will commit to representing the class." In addition, class counsel must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

Here, Connecticut Legal Rights Project and Disability Rights Connecticut have been jointly litigating the claims in this action since 2022.  It is clear that they are familiar with the legal and factual issues of the case.  Plaintiffs have also alleged that the attorneys staffed on the matter are all experienced litigators in the field of disability law, and that there is no conflict among counsel.  *See* Pls.' Opening Br. at 44–50 (describing each attorney's litigation experience).  Accordingly, Connecticut Legal Rights Project and Disability Rights Connecticut are appointed as joint class counsel in this action.

## CONCLUSION

For the reasons described herein, Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint is DENIED in part and GRANTED in part.  The motion is denied in part, with respect to Defendants' subject matter jurisdiction arguments and their challenges to Plaintiffs' integration mandate claim against all Defendants, reasonable modifications claim against Defendants Navarretta and Crego, and methods of administration claim against Defendant Navarretta.  Defendants' motion to dismiss is granted in part to the extent Plaintiffs bring a methods of administration claim against Defendant Crego and the PSRB Defendants.

Plaintiffs' Second Motion for Class Certification is GRANTED.  The Court appoints as joint class counsel Connecticut Legal Rights Project and Disability Rights Connecticut.

Defendants must file unredacted versions of their filings, as discussed herein, by January 6, 2025.

**SO ORDERED** at Hartford, Connecticut, this 16th day of December, 2024.

 /s/ Sarala V. Nagala
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE