**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| Isaiah Lindsay, et al., | ) | |
|    Plaintiffs, | ) | |
|   v. | ) | Civil No.: 3:22-CV-1518-SVN |
| | ) | |
| NANCY NAVARRETTA, et al., | ) | |
|    Defendants. | ) | March 27, 2026 |

**Memorandum of Law in Support of Class Counsels' Unopposed Motion for
Preliminary Approval of Settlement**

TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 3

II. BACKGROUND OF THE LITIGATION ............................................................. 4

III. ARGUMENT.............................................................................................................. 6

 A. Standard for Preliminary Approval of the Class Action Settlement Agreement ...... 6

 B. THE SETTLEMENT AGREEMENT SATISFIES THE FED. R. CIV. P. 23(e)(2) AND
 RELEVANT GRINNELL FACTORS ................................................................... 11

  1. Fed. R. Civ. P. 23(e)(2)(A): Class Representatives Have Adequately Represented
  the Class.......................................................................................................... 11

  2. Fed. R. Civ. P. 23(e)(2)(A): Class Counsel Have Adequately Represented the
  Class ................................................................................................................ 13

  3. Fed. R. Civ. P. 23(e)(2)(B): The Settlement was Negotiated at Arm's Length ....... 16

  4. Fed. R. Civ. P. 23(e)(2)(C): The Settlement Provides Adequate Relief to the Class
  ......................................................................................................................... 17

   (i) Fed. R. Civ. P. 23(e)(2)(C)(i): the costs, risks, and delay of trial and appeal..... 18

   (ii) Fed. R. Civ. P. 23(e)(2)(C)(ii): The Proposed Method of Distributing Relief to
   the Class is Effective ................................................................................... 21

   iii. Fed. R. Civ. P. 23(e)(2)(C)(iii): Attorneys' Fees and Expenses ......................... 23

   iv. Fed. R. Civ. P. 23(e)(2)(C)(iv): The Parties Have No Additional Agreements. 24

   v. Release of Liability.......................................................................................... 24

  5. Fed. R. Civ. P. 23(e)(2)(D): Settlement Class Members are Treated Equitably ..... 27

IV. NOTICE TO CLASS MEMBERS......................................................................... 29

V. CONCLUSION ........................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*Amigon v. Safeway Constr. Enters. LLC*, No. 20-cv-5222, 2024 WL 5040436, at *6 (E.D.N.Y.
    Dec. 9, 2024) ................................................................................................................ 10

*C.K. through P.K v. McDonald*, No. 2:22-cv-1791 (NJC) (JMW), 2025 WL 2406399, at 13
    (E.D.N.Y. August 19, 2025) ......................................................... 17, 18, 20, 21, 24, 27

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) ................................ 10, 18

*Cordes & Co. Fin. Servs.* v. *AG. Edwards& Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) ......... 12

*Doe* v. *Hogan*, No. 2:88cv00293-EBB (D. Conn. filed May 5, 1988) ................................... 13

*Handschu v. Special Servs. Div.*, 787 F.2d 828, 833 (2d Cir. 1986) ..................................... 29

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 27
    (E.D.N.Y. 2019) ...................................................... 6, 7, 9, 10, 11, 12, 22

*Kurtz v. Kimberly-Clark Corp.*, 142 F.4th 112, 117 (2d Cir. 2025) ......................................... 6

*LoCurto v. AT&T Mobility Servs. LLC*, No. 13-cv-4303, 2020 WL 13859604, at *4 (S.D.N.Y.
    June 22, 2020) .................................................................................................................. 9

*McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009) ................................... 10

*Moses v. New York Times Co.*, 79 F.4th 235, 242 (2d Cir. 2023) ........................................... 8

*Oladipo* v. *Cargo Airport Servs. USA, LLC*, No 16-cv-6165, 2019 WL 2775785, at *10
    (E.D.N.Y. July 2, 2019) ................................................................................................. 29

*Olmstead* v. *L.C.*, 527 U.S. 581 (1999) ................................................................................ 20

*Phillips Petroleum Co.*, v. *Shutts*, 472 U.S. 797, 812 (1985) ............................................... 28

*United States v. New York*, Nos. 13-cv-4165 & 13-cv-4166, 2014 WL 1028982, at *8
    (E.D.N.Y. Mar. 17, 2014)............................................................................................... 11

*Whelan v. Diligent Corp.*, 349 F.R.D. 79, 84 (S.D.N.Y. 2025) ........................................... 6, 7

**Statutes**

Conn. Gen. Stat. § 3-125a.................................................................................................. 24

Fed. R. Civ. P. 23(e)(2) .................................................................................................... 6, 8

Fed. R. Civ. P. 23(e)(2)(B)................................................................................................. 16

Fed. R. Civ. P. 23(e)(2)(C) ............................................................................................... 17

Fed. R. Civ. P. 23(e)(2)(C)(iii).......................................................................................... 23

Fed. R. Civ. P. 23(e)(2)(C)(iv)........................................................................................... 23

Fed. R. Civ. P. 23(e)(2)(D) ............................................................................................... 27

Rule 23(e)(2)(A) ............................................................................................................... 12

## I. INTRODUCTION

The Settlement Agreement (Attachment 1) provides significant relief to class members by establishing criteria, structure and funding timely to move class members through the treatment system while in the hospital and to transition to the most integrated setting for residential and community mental health services and supports.

The Settlement Agreement provides for clear standards, frequent reviews for movement within the system, timelines, and, most importantly, increased capacity for community mental health and residential services. The Settlement Agreement also acknowledges that each patient is an individual and that class members have nonlinear trajectories of recovery. The Settlement Agreement provides for clinical judgment and exceptions to linear recovery. Each class member will progress at their own pace with standards of readiness and a structure that respects a class member's right to treatment in the most integrated setting.

The Settlement Agreement provides for an Independent Reviewer, Dr. Madelon Baranoski, who will have full access to the hospital, the class members, their units, staff and all records and documents. Class Counsel, the Connecticut Legal Rights Project (CLRP) which represent all patients pursuant to a preexisting consent decree in *Doe* v. *Hogan*, and Disability Rights Connecticut (DRCT), will continue their representation of all patients and have full access to all class members on a daily basis. The Parties agree to utilize best efforts to implement the terms of the Settlement Agreement, compliance with which requires the Defendants to adhere to every time limit and requirement in the Settlement Agreement.

## II. BACKGROUND OF THE LITIGATION

For many years, acquittees were frustrated with the slow pace of their progression through the treatment system at Whiting Forensic Hospital (WFH). Patients asserted that their treatment at WFH was effective and successful, that they had fully recovered, but that their movement to treatment in the most integrated setting took years after they were clinically stable and ready to transition back into the community. In response, CLRP and DRCT started an investigation in 2021 looking into these concerns. On March 23, 2022, CLRP and DRCT sent a demand letter to the Connecticut Attorney General, the Commissioner of the Department of Mental Health and Addiction Services (DMHAS) and the Chair of the Psychiatric Security Review Board (PSRB) citing violations of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act for failing to provide patient treatment in the most integrated setting. Counsel met with a Deputy Attorney General and representatives from DMHAS and the PSRB but were not able to reach an agreement.

On November 30, 2022, Plaintiffs filed a class action complaint making claims to treatment in the most integrated setting pursuant to Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. On January 31, 2023, Plaintiffs filed their Motion for Class Certification. On March 3, 2023, Plaintiffs filed their First Amended Complaint. On April 17, 2023, Defendants filed a Motion to Dismiss and Motion to Stay Discovery pending the Court's ruling on their Motion to Dismiss. On May 16, 2023, this Court ordered that the Plaintiffs' Motion for Class Certification was moot in consideration of the First Amended Complaint. On May 30, 2023, Plaintiffs

4

objected to Defendants' Motion to Dismiss and Motion to Stay Discovery. On September 18, 2023, Plaintiffs filed a Motion to file a Second Amended Complaint. On November 16, 2023, the Court heard oral arguments on the motions and on March 15, 2024, issued a ruling granting Defendants' Motion to Dismiss without prejudice and granted the motion for stay of discovery. On April 5, 2024, Plaintiffs filed their Third Amended Complaint with class representatives Isaiah Lindsay and Ling Xin Wu against Defendants in their official capacities.

On June 7, 2024, and June 10, 2024, Defendants filed their Motions to Dismiss Plaintiffs' Third Amended Complaint. On July 22, 2024, Plaintiffs filed their Second Motion for Class Certification. On October 21, 2024, this Court heard oral arguments on the motions, denying Defendants' Motion to Dismiss, lifting the stay on discovery and granting Plaintiffs' Motion for Class Certification. This Court issued a written joint order on December 16, 2024.

The parties agreed to mediation with Judge Maria E. Garcia and held their initial mediation session on January 22, 2025. Over the last fourteen months, the parties have had nine more mediation sessions with Judge Garcia and numerous separate sessions with Defense Counsel. On February 26, 2026, the parties came to an agreement in principle and, on March 18, 2026, finalized and executed the agreement with a proposed Order of Dismissal, attached to the Settlement Agreement.

III. ARGUMENT

**A. Standard for Preliminary Approval of the Class Action Settlement Agreement**

Where parties seek to settle claims brought by a plaintiff on behalf of a proposed class, the court must review the proposed class action settlement to ensure it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Kurtz v. Kimberly-Clark Corp.*, 142 F.4th 112, 117 (2d Cir. 2025). Courts apply a three-step process of review. *See* Fed. R. Civ. P. 23(e)(1)–(2). The court first conducts a preliminary evaluation of the fairness of the proposed settlement agreement to determine whether to give notice of the proposal to all class members. Fed. R. Civ. P. 23(e)(1)(A). The second step consists of providing "notice of a hearing ... to class members" and holding a hearing to ensure that "class members and settling parties are provided the opportunity to be heard[.]" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 27 (E.D.N.Y. 2019) (hereinafter "*Payment Card*") (brackets and quotation marks omitted); *see also Whelan v. Diligent Corp.*, 349 F.R.D. 79, 84 (S.D.N.Y. 2025). The court turns to the third step—final approval—only if the court has granted preliminary approval and afforded notice of the hearing and an opportunity to be heard to all class members. *See id.*

During the preliminary approval stage, the court must analyze whether it "will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii)

6

certify the class for purposes of judgment on the proposal." Fed. R. Civ. P.

23(e)(1)(B). The Court in this case certified the class on December 16, 2024. (Doc.

130) "The Court's role in reviewing the proposed settlement 'is demanding …

because the adversariness of litigation is often lost after the agreement to settle.' "

*Whelan*, 349 F.R.D. at 84 (quoting *Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d

297, 308 (W.D.N.Y. 2016)).

A district court cannot grant preliminary approval of a class action

settlement unless it is "likely to able to" grant final approval under Rule 23(e)(2).

Fed. R. Civ. P. 23(e)(1)(B); *see Payment Card*, 330 F.R.D. at 28 ("[C]ourts must

assess at the preliminary approval stage whether the parties have shown that the

court will likely find that the factors weigh in favor of final settlement

approval."). To evaluate the procedural fairness of a proposed class action

settlement, courts in the Second Circuit assess whether "the settlement resulted

from arm's-length negotiations, and [whether] plaintiffs' counsel possessed the

necessary experience and ability, and have engaged in the discovery[ ] necessary

to effective representation of the class's interests." *Id.* at 804 (original quotation

marks and brackets omitted).

Under Fed. R. Civ. P. 23(e)(2), a court must consider whether:

(A) the class representatives and class counsel have adequately

represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). "The first two factors are procedural in nature and the latter two guide the substantive review of a proposed settlement." *Moses v. New York Times Co.*, 79 F.4th 235, 242 (2d Cir. 2023).

In *Moses v. New York Times Company*, the Second Circuit emphasized that district courts "must consider the four factors outlined in Rule 23(e)(2) holistically" in addition to the *Grinnell* factors when evaluating a proposed class action settlement. *Moses*, 79 F.4th at 243. It clarified that:

> [T]he revised Rule 23(e)(2) does not displace our traditional *Grinnell* factors, which remain a useful framework for considering the substantive fairness of a settlement. But the rule now mandates courts to evaluate factors that may not have been highlighted in our prior case law, and its terms prevail over any prior analysis that are inconsistent with its requirements.

*Id.*

The Second Circuit also held that courts may no longer presume a settlement to be substantively fair where it arose from an arms-length bargaining process. *Id.* at 243. *Moses* thus confirmed that courts must consider *both* the Rule 23(e) factors and the *Grinnell* factors — to the extent that they differ — in determining whether to approve the proposed settlement of class action claims. *See, e.g., Payment Card*, 330 F.R.D. at 29; *LoCurto v. AT&T Mobility Servs. LLC*, No. 13-cv-4303, 2020 WL 13859604, at *4 (S.D.N.Y. June 22, 2020).

Courts evaluating the substantive fairness of a proposed class action settlement may also consider nine factors in *City of Detroit v. Grinnell Corporation*, 495 F.2d 448, 463 (2d Cir. 1974):

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in

9

light of all the attendant risks of litigation.

*McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)).

Courts have found that Rule 23(e)(2) does not otherwise address the following *Grinnell* factors: the reaction of the class to the settlement (second factor); the stage of the proceedings and the amount of discovery completed (third factor); the ability of the defendants to withstand a greater judgment (seventh factor); the range of reasonableness of the settlement fund in light of the best possible recovery (eighth factor); and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation (ninth factor). *See, e.g.*, *Payment Card*, 330 F.R.D. at 30 n.22 (discussing the seventh, eighth and ninth *Grinnell* factors); *Amigon v. Safeway Constr. Enters. LLC*, No. 20-cv-5222, 2024 WL 5040436, at *6 (E.D.N.Y. Dec. 9, 2024) (discussing the second, third, seventh, eighth, and ninth *Grinnell* factors).

Accordingly, courts should analyze the *Grinnell* factors in combination with the Rule 23(e)(2) factors in evaluating settlement agreements in class actions whether the actions are brought under Rule 23(b)(2) for declaratory and injunctive relief or under Rule 23(b)(3) for damages. *See, e.g., In re Payment Card*, 2024 WL 3236614, at *1, *13 (considering *Grinnell* factors in the Rule 23(b)(2)

10

context); *Amigon*, 2024 WL 5040436, at \*3, \*6, \*10 (considering *Grinnell* factors in the Rule 23(b)(3) context.).

Named Plaintiffs brought this class action seeking injunctive and declaratory relief to ensure that Defendants comply with federal civil rights laws. Accordingly, the *Grinnell* fifth, seventh, eighth, and ninth factors, which concern monetary damages, need not be analyzed separately from the Rule 23(e)(2) factors and the other relevant *Grinnell* factors. *See In re Payment Card*, 2024 WL 3236614, at \*26 ("In [civil rights] cases, the ability of the defendant to withstand a greater judgment is essentially a non-issue because the defendant need only stop violating the law."); *United States v. New York*, Nos. 13-cv-4165 & 13-cv-4166, 2014 WL 1028982, at \*8 (E.D.N.Y. Mar. 17, 2014) ("When, as here, the settlement offers the class members the most important, most tangible form of relief sought by plaintiffs, these [range of reasonableness] factors," the eighth and ninth *Grinnell* factors, "weigh in favor of approval of the settlement.").

**B. THE SETTLEMENT AGREEMENT SATISFIES THE FED. R. CIV. P. 23(e)(2) AND RELEVANT GRINNELL FACTORS**

**1. Fed. R. Civ. P. 23(e)(2)(A): Class Representatives Have Adequately Represented the Class.**

Prior to certifying the class in this case, the Court determined that the Named Plaintiffs and Class Counsel would adequately and fairly represent the interests of the proposed class. (Doc. No. 130, Joint Ruling, December 16, 2024). To determine whether class representatives and class counsel can adequately represent the class under Rule

11

23(e)(2)(A), courts consider whether (1) plaintiffs' interests are antagonistic to the interests of other members of the class, and (2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation. *Cordes & Co. Fin. Servs.* v. *AG. Edwards& Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007).

In addition to the requirements of Rule 23(e)(2)(A), "[t]he Due Process Clause . . . requires that the named plaintiffs at all times adequately represent the interests of the absent class members." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016) (*quoting Phillips Petroleum Co.* v. *Shutts*, 472 U.S. 797 (1985)).

Class Representatives Isaiah Lindsay and Kai Ming Wu (f.k.a. Ling Xin Wu) have adequately represented the Class. Neither of them have any interests that are antagonistic to the Class. Both Class Representatives are acquittees under the jurisdiction of the PSRB. Mr. Lindsay remains a patient at WFH. Mr. Wu has been discharged from WFH since he is on Conditional Release. Over many years of treatment, both Class Representatives have worked their way through WFH maximum security, transfer to Dutcher, Full Level 4 privileges, temporary leave formulation and approval, Phase I TL, and Phase II TL. Both Mr. Lindsay and Mr. Wu have experienced the movement through the system. Mr. Lindsay is currently on Phase II overnight residential temporary leave. Mr. Wu is on Conditional Release. Both remain under the jurisdiction of the PSRB. Both are subject to return to WFH for violations of their MOD (the PSRB Memorandum of Decision granting TL and/or CR). Their legal interests in improving the system have always been and remain identical to the class members.

12

There is no conflict of interest between the members of the Class and the Class Representatives. Both Class Representatives attended several mediation sessions with Judge Garcia and remain informed of the progression of the Settlement Agreement. For these reasons, Mr. Wu and Mr. Lindsay have adequately represented the Class.

### 2. Fed. R. Civ. P. 23(e)(2)(A): Class Counsel Have Adequately Represented the Class

Class Counsel from the Connecticut Legal Rights Project (CLRP) and Disability Rights Connecticut (DRCT) have adequately represented the Class. Both organizations are private, nonprofit legal services organizations representing people with disabilities.

CLRP was formed as the remedy to another class action lawsuit brought in 1988, *Doe* v. *Hogan*, No. 2:88cv00293-EBB (D. Conn. filed May 5, 1988). The case was certified as a class action and resolved with a consent order on October 24, 1989. The consent order required the Department of Mental Health, now the DMHAS, to fund and implement the creation of a Legal Assistance Program to serve all patients in all state-operated psychiatric facilities. In 1990, CLRP was incorporated as a nonprofit legal services organization. Pursuant to the Consent Order, DMHAS partially funds CLRP pursuant to a state contract. CLRP is a legal services grantee of the Connecticut Bar Foundation and receives funding grants from Interest on Lawyers' Trust Accounts (IOLTA) and the Judicial Branch legal services funding programs.

The *Doe* v. *Hogan* Consent Decree authorizes CLRP to represent all patients at all DMHAS facilities. The Consent Decree requires DMHAS to provide CLRP access to all facilities, patients, staff and records. CLRP has represented patients in WFH for the last

13

thirty-six years.  CLRP's representation is civil representation for issues regarding their civil rights, patients' rights, treatment rights, and discharge. CLRP does not represent patients before the PSRB. The Office of the Chief Public Defender (OCPD) has a psychiatric unit that provides counsel before the PSRB. The OCPD does not provide civil legal services. CLRP and the OCPD have a close collaborative relationship. CLRP has gained deep knowledge of WFH, the staff on each unit and how Class Members move through the system as acquittees.

Disability Rights Connecticut (DRCT) is the state-designated, federally-funded, protection and advocacy organization for the State of Connecticut. One of its federal grants is for Protection and Advocacy for Individuals with Mental Illness, authorized by 42 U.S.C. 10801 et seq. DRCT's predecessor was formed as the State Office of Protection and Advocacy ("OPA") on October 1, 1977, after the first federal statute, Protection and Advocacy for People with Developmental Disabilities, was enacted in 1975. On July 1, 2017, the State Office was dissolved and a stand-alone private non-profit legal services organization was formed and named Disability Rights Connecticut. OPA and DRCT have in total represented people with disabilities for over forty-eight years. CLRP and DRCT have a long and collaborative relationship representing people with mental health conditions.

A common model for class action civil rights actions involving assertions of state violation of the integration mandate is a legal team that includes two local disability rights non-profits, a national disability rights non-profit (such as the Bazelon Center for Mental Health Law or the Center for Public Representation), and a large national law

firm. Due to the extensive and long-standing presence of both CLRP and DRCT at WFH, and the deep knowledge of the acquittee system, Plaintiffs' Counsel were able to prosecute the case with just the two local disability rights non-profit legal service organizations.

CLRP and DRCT have represented the class members since 2021 and have dedicated more than 2,800 hours in their zealous advocacy. Class counsel started to investigate the legal rights of acquittees and their right to treatment in the most integrated setting in 2021. On March 23, 2022, CLRP and DRCT wrote a demand letter to the Attorney General, the Commissioner of DMHAS and the Chair of the PSRB. After several meetings, the parties were unable to resolve the claims of the Class. Five acquittees filed a class-action complaint in this Court on November 30, 2022. With their long history of many years of representing acquittees, CLRP and DRCT had deep knowledge of the law, the facts, and the needs and legal rights of the Class Members. CLRP had represented hundreds of class members over the past 35 years which has resulted in detailed knowledge of the legal needs of the class and the inner workings of the Defendant agencies.

Attorneys with CLRP and DRCT filed a class action complaint and amended the complaint three times. They filed two motions for class certification and objected to two motions to dismiss. On December 16, 2024, this Court denied the Defendants' second motion to dismiss and granted Plaintiffs' Motion for Class Certification. The Court also lifted the stay on discovery. The Parties completed a Report of the Parties Planning Meeting (Doc. 120) on November 12, 2024. The Court entered a scheduling order on

15

December 27, 2024. The Parties exchanged written discovery. Defendants produced some documents subject to objection and the parties began to engage in meet and confer talks prior to motions to compel.

On November 13, 2024, this Court referred the case to United States Magistrate Judge Maria E. Garcia (Doc. 121). The parties continued to work on discovery production and to confer on Defendants' objections to production of documents. The parties held their initial settlement conference with Judge Garcia on January 22, 2025. Since then, Judge Garcia has held ten more mediation sessions and the parties reached a settlement in principle on March 18, 2026.

Class Counsel have zealously represented the class throughout the settlement negotiations. Class Counsel negotiated both structure and timelines to move through the hospital and out to the community for TL with timelines for the provision of community mental health that will require approximately $7.53 million dollars in new contracts from DMHAS with community mental health service providers. The increased capacity will be annualized into the system as new capacity.

### 3. Fed. R. Civ. P. 23(e)(2)(B): The Settlement was Negotiated at Arm's Length

After the Court's denial of Defendants' motions to dismiss and granting of Plaintiffs' Second Motion for Class Certification, the parties agreed to mediation.  Judge Garcia has overseen all mediation and settlement negotiations. Judge Garcia has held eleven separate days of mediation. The parties have met and conferred numerous times in between mediation sessions, both at Judge Garcia's suggestion and on their own. All

16

negotiations have been at arms' length. There has been no collusion or bad faith by any

Class Counsel or counsel for the Defendants. All state entity Defendants are represented

by Assistant Attorneys General.

### 4. Fed. R. Civ. P. 23(e)(2)(C): The Settlement Provides Adequate Relief to the Class

Federal Rule of Civil Procedure 23(e)(2)(C) requires that the Court consider

whether the relief provided to the class is adequate, taking into account: (i) the costs,

risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of

distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment;

and (iv) any agreement required to be identified under Rule 23(e)(3). "Because a

proposed settlement agreement's provision setting forth a release of liability "affects the

determination of the fairness, reasonableness, and adequacy of class relief, the Court

[should] consider the proposed release of liability under this section." *C.K. through P.K*

v. *McDonald*, No. 2:22-cv-1791 (NJC) (JMW), 2025 WL 2406399, at 13 (E.D.N.Y. August

19, 2025).

In assessing the costs, risks, and delay of trial and appeal, courts may need to

forecast the likely range of possible class-wide recoveries and the likelihood of success

in obtaining such results. This assessment implicates several *Grinnell* factors, including

(a) the complexity, expense and likely duration of the litigation; (b) the risks of

establishing liability; and (c) the risks of maintaining the class through the trial. *City of*

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

### (i) Fed. R. Civ. P. 23(e)(2)(C)(i): the costs, risks, and delay of trial and appeal

Courts favor settlement when litigation is likely to be complex, expensive, or drawn out. *C.K.* at *13 (citing *In re GSE Bonds Antitrust Litigation*, 414 F. Supp. 3d 686, 693 (S.D.N.Y. 2019)).

This case involves complex issues of substantive and procedural law relating to the rights of acquittees who are patients in a state psychiatric hospital. The case is an injunctive/declaratory relief class action seeking to balance the hospital's need for flexibility and clinical judgment in assessing the risk management issues in moving patients to treatment in the community with the patients' civil right to receive mental health treatment in the most integrated setting.

The case before this Court involved significant pre-litigation investigation from 2021 through November of 2022 and pretrial motion practice and discovery from November 2024 to August 2025. The investigation and prosecution of the case was made efficient due to the long-time presence and knowledge of both CLRP and DRCT in state psychiatric hospitals. Both non-profit legal service organizations have represented patients at WFH for decades and have a deep understanding of the hospital, the patients, and community mental health providers.

The Parties agree that settling now serves their mutual interest in ensuring that patients move through the hospital at a reasonable and steady pace as allowed by the clinical presentation of each patient and that the State can start increasing capacity for community mental health services and supports necessary to ensure that Class

18

Members receive treatment in the most integrated setting.

### Grinnell Factor: The Complexity, Expense and Likely Duration of the Litigation

The litigation, if taken to trial, would have taken at least two years to get to trial. The Report of the Parties Planning Meeting, Doc. 120, and the Court's Scheduling Order, Doc. 130, anticipated at least two years of discovery before the filing of dispositive motions. Trial would have been at least another year after that and appeals to the Court of Appeals would likely take one to two more years, not including a Petition for Certiorari, for a total of three to five or more years. This anticipated trial schedule and appeals would have further delayed Class Members' access to meaningful and timely relief on the claims before this Court.

Additionally, litigation would have required numerous experts on both sides. The experts would include psychiatrists, forensic hospital experts, and community mental health experts. Expenses would likely range from $100,000 to $200,000 through trial.

The proposed Settlement Agreement provides for meaningful standards and timelines to move Class Members through the hospital after they have been determined to be ready for TL Engagement, provides for most Class Members to have combined Phase I and Phase II TL applications, and provides for timelines and standards to move into Phase II residential overnight community mental health services. The Settlement Agreement provides for an 18-month phase-in which will include significant community service provider contract enhancements to create additional capacity for

Phase II residential temporary leave. The relief is systemic, immediate, substantial and enforceable. The Settlement Agreement provides for an Independent Reviewer with authority for full access to the hospital, Class Members, records and staff. The Court will retain jurisdiction to enforce the Settlement Agreement.

### Grinnell Factor: The risks of Establishing Liability

"A court considering the risks of establishing liability 'need only assess the risks of litigation against the certainty of recovery under the proposed settlement.' " *C.K.* at *14 (citing *In re Payment*, 330 F.R.D. at 36–7).

This case is primarily an *Olmstead* v. *L.C.*, 527 U.S. 581 (1999), integration lawsuit asserting the right of Class Members to treatment in the most integrated setting. There have been many *Olmstead* lawsuits, and they are very well-established causes of action throughout the U.S. What is unusual about this case is that the Class Members are acquittees, civilly committed patients who have been committed after an index event that resulted in charges by the State's Attorney's Office, and Connecticut is only one of two states in the nation that have such an entity as the PSRB involved in this commitment process. The risks of establishing liability remain significant because of the complex interaction of WFH's risk management processes, the individual nature of psychiatric treatment and recovery, the interaction of a forensic hospital, state funding of community mental health services for the forensic population and, finally, the authority of the PSRB, an almost unique entity.

20

**Grinnell Factor: The Risks of Maintaining the Class Through to Trial.**

"The risks of maintaining a class through trial, while "present in every class action . . . nevertheless weigh[ ] in favor of settlement where it is likely that defendants would oppose class certification if the case were to be litigated." *C.K.* at *14, *citing Payment Card*, 330 F.R.D. at 39-40. Defendants opposed Plaintiffs' Motion for Class Certification (Doc. 114) and would likely renew their objection and move to decertify the class if the case were litigated through trial and on appeal. Defendants argued that (1) Plaintiffs lacked standing; (2)the claims were moot and unripe; (3) the class failed numerosity; (4) joinder was practicable; (5) there was no common questions of law or fact; (6) the claims were not typical; and  (7) the Class Representatives claims' were antagonistic to the interests of other class members. Defendants would likely renew those arguments if the litigation continued, and, therefore, this factor weighs in favor of preliminary approval of the Settlement Agreement.

**(ii) Fed. R. Civ. P. 23(e)(2)(C)(ii): The Proposed Method of Distributing Relief to the Class is Effective**

Typically, analysis of the proposed method of distributing relief to the class is limited to class action cases involving monetary relief to the class. *C.K.* at *15, (citing *Johnson*, 333 F.R.D at 321.). In *In re Payment Card*, the Court found that the effectiveness of any proposed method of distributing relief to the class need not be considered in a class action seeking only equitable relief where "relief will be effectuated by the settlement terms alone." *C.K.* at *15 (citing *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-md-1720, 2024 WL 3236614, at *29 (E.D.N.Y. June 28, 2024)).

21

This case is a case for prospective injunctive relief and declaratory relief only. As in the cases cited above, the relief will be effectuated by the terms of the Settlement Agreement. Section IV of the Settlement Agreement provides for regular and ongoing assessments and determinations to be made by treating professionals in good faith and based on six relevant clinical factors related to readiness for TL Engagement, TL Formulation Readiness, and Phase II TL Readiness. Lack of capacity of Phase II residential placement cannot be a factor or delay the determination.

Section IV.E.2.a.iii and Section IV.E.2.b.iv require that Phase II residential overnight temporary leave services be provided within six (6) months of either, respectively, the FRC determination of Phase II TL readiness, or MOD reading on a separated Phase I and Phase II TL application. Prior to the Settlement Agreement, many acquittees were put on waiting lists or made to wait for much longer than six months for a residential Phase II program to open up. The six (6) month limit in the Settlement Agreement helps rectify the delays detailed in the Third Amended Complaint which stall Class Members' ability to reintegrate back into the community.

Section IV.D.4 requires that the PSRB schedule hearings on applications for temporary leave at the next available hearing after the application is filed subject only to the need to comply with other statutory hearing deadlines but in no case more than seventy-five (75) days. Connecticut state law does not require that the PSRB set hearings for applications for temporary leave. This requirement will address the rare case where a Class Member's TL application is delayed due to scheduling issues at the PSRB.

In Section V, DMHAS is required to provide quarterly reports on critical capacity

22

and compliance rates. DMHAS is required to train all relevant DMHAS, WFH, and PSRB staff on the requirements of the agreement. Section V requires DMHAS to provide the IR and Class Counsel with quarterly reports on compliance rates and capacity for Phase II TL in community providers. Section VII requires DMHAS, WFH and the PSRB to train their staff on the requirements and deadlines in the Settlement Agreement.

Section VIII of the Settlement Agreement provides for an Independent Reviewer who will have full access to WFH, Class Members, records, and staff. The Independent Reviewer will review all the requirements of the Settlement Agreement and issue reports at least annually.

Finally, Section X provides detailed provisions regarding enforcement. The Court will retain jurisdiction to enforce the terms of the settlement agreement. The Parties are required to attempt to resolve all assertions of noncompliance informally. Failing that, Class Counsel may file a motion for compliance through specific performance with the Court.

The Settlement Agreement provides clear injunctive relief and enforcement through Class Counsel, the Individual Reviewer and the Court, if necessary.

### iii. Fed. R. Civ. P. 23(e)(2)(C)(iii): Attorneys' Fees and Expenses

The Settlement Agreement provides for a specific attorneys' fee award agreed to by the Parties to be paid entirely by Defendants, and not out of any fund for Plaintiffs as is typical in Rule 23(b)(2) settlement cases. The Parties have negotiated and agreed on attorneys' fees and expenses during mediation with the United States Magistrate Judge. CLRP has waived its attorneys' fees but will be paid $12,000 in expenses. Defendants

have agreed to pay $435,000 in attorneys' fees to DRCT. The fees were negotiated with the United States Magistrate Judge after an agreement in principle on all of the substantive sections of the Settlement Agreement.

### iv. Fed. R. Civ. P. 23(e)(2)(C)(iv): The Parties Have No Additional Agreements

The parties have not made any separate agreements in connection with the proposed Settlement Agreement. There are no agreements to provide any payments to the Class Representatives or Class Counsel other than the above-referenced attorneys' fees settlement.

The Settlement Agreement requires it to be submitted for legislative approval in accordance with Conn. Gen. Stat. § 3-125a. After the Parties, Class Counsel and Assistant Attorneys General sign the agreement it must be delivered to the Clerk of the House and the Clerk of the Senate. The Clerks prepare resolutions for consideration of each chamber. The Speaker of the House and the President of the Senate refer the resolutions to the appropriate committees. The Committees consider and may vote on the resolutions. The resolutions are considered passed unless three-fifths of the House and three-fifths of the Senate vote down the resolution. If no action is taken, the resolution passes and the Settlement Agreement is considered approved. The General Assembly has thirty days to take action or the resolution is deemed passed.

### v. Release of Liability

"It is well-established . . . that class action releases may include claims not presented and even those which could not have been presented as long as the released

24

conduct arises out of the 'identical factual predicate' as the settled conduct." *C.K.* at 16 (citing *Payment Card*, 330 F.R.D. at 42; *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir 2005)).

Section XII provides for the agreed General Release of Claims by the Class Representatives and all Class Members in two separate paragraphs:

> "**XII. General Release of Claims**
>
> A. The Named Plaintiffs, individually and on behalf of Class Members, their heirs, beneficiaries, successors and assigns, in consideration of the benefits of this Settlement Agreement, release and discharge each and every Defendant, all agencies of the State of Connecticut, all present and former officers, employees and agents of the State of Connecticut, including all current and former employees of the State of Connecticut, Department of Mental Health and Addiction Services, and all current and former members of the Psychiatric Security Review Board, and its employees, in both their official and individual capacities, their heirs, successors and assigns, from all actions, causes of action, suits, claims or controversies arising from acts or omissions alleged in the Third Amended Complaint (ECF 72) in *Lindsay et al. v. Navaretta et al.*, Case No. 3:22-CV-1518 (SVN), or based on the identical factual predicate. This release does not apply to any claims brought solely for actions taken or not taken by defendants after this Settlement Agreement has terminated.

B.  All Class Members individually and on behalf of the Class, their heirs, beneficiaries, successors and assigns, in consideration of the benefits of this Settlement Agreement, release and discharge each and every defendant, all agencies of the State of Connecticut, all present and former officers, employees and agents of the State of Connecticut, including all current and former employees of the State of Connecticut, Department of Mental Health and Addiction Services, and all current and former members of the Psychiatric Security Review Board, in both their official and individual capacities, their heirs, successors and assigns, from all actions, causes of action, suits, claims or controversies arising from acts or omissions alleged in the Third Amended Complaint (ECF 72) in *Lindsay et al. v. Navaretta et al.*, Case No. 3:22-CV-1518 (SVN), or based on the identical factual predicate. This release does not apply to any claims brought solely for actions taken or not taken by defendants after this Settlement Agreement has terminated."

Class Counsel negotiated revisions in Defendants' original broad Release of Claims provision by limiting the release of claims to claims "arising from acts or omissions alleged in the Third Amended Complaint or based on the identical factual predicate as the underlying Third Amended Complaint." The general release is also limited in that it does not apply to any claims brought for actions taken or not taken by the Defendants *after* the Settlement Agreement has terminated.

Section XII provides for a General Release of Claims from the Class Representatives and the Class Members against all Defendants and their agents and employees. The release of claims is limited to claims or controversies arising from the acts or omissions alleged in the Third Amended Complaint in this case or based on the identical factual predicate. The release does not apply to any claim brought solely for actions taken or not taken by Defendants after the Settlement Agreement has terminated, any state law administrative appeal rights (for example of a PSRB decision), or any state or federal law claims under the *Roe v. Hogan* consent decree, which covers different legal claims, procedures and remedies.

Since the release of liability is limited to the "identical factual predicate," as provided for in the Second Circuit, this factor weighs in favor of preliminary approval of the proposed Settlement Agreement.

### 5. Fed. R. Civ. P. 23(e)(2)(D): Settlement Class Members are Treated Equitably

Before approving a class settlement, "the court must take into account whether the proposal treats class members equitably relative to each other." *C.K.* at *17 (citing *Moses*, 79 F.4th at 244; Fed. R. Civ. P. 23(e)(2)(D)). When analyzing this Rule 23(e)(2) factor, courts may consider "whether the apportionment of relief among the class members takes appropriate account of differences among their claims, and whether the scope of the release may affect the class members in different ways that bear on the apportionment of relief." *C.K.* at *17 (citing *Payment Card*, 330 F.R.D. at 47). "Rule 23(e)(2)(D) requires that class members be treated equitably, not identically." *C.K.* at *18, *citing Moses*, 79 F.4th at 245. In a Rule 23(b)(2) class action, "different class members

27

can benefit differently from an injunction – but no matter what, they must stand to benefit (it cannot be the case that some members receive no benefit while others receive some.)" *C.K.* at *18 (citing *Payment Card*, 2024 WL 3236614, at *36).

All class members in this case are treated the same and will receive the same benefit to timely movement through the hospital treatment system towards community reintegration. All class members have the same right to treatment in the most integrated setting. The Settlement Agreement adopted the existing structure of movement from WFH Max, to Dutcher, to Full Level 4, to TL readiness. The Agreement also contains definitions to focus clinical discretion, requires most TL applications to be combined Phase I and Phase II TL, and creates capacity in the community for Phase II residential overnight TL. The only patients who may not benefit from the Settlement Agreement are patients who are unable to move from WFH Max to Dutcher for clinical reasons or whose mental health needs are determined not to meet the definition of TL engagement readiness in Section II.Q. There are very few patients who are not able to progress through the hospital.

The proposed Settlement Agreement provides realistic systemic relief to acquittees by recognizing that acquittees have the civil right to receive treatment in the most integrated setting, establishing criteria, assessments, reviews and standards for moving patients through their institutional treatment and into community mental health treatment. Most importantly, the timelines for Phase II residential overnight temporary leave will require a significant initial investment in community mental health services and support by Defendants.

28

## IV. NOTICE TO CLASS MEMBERS

In preliminarily approving a class action settlement, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). The notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Phillips Petroleum Co.*, v. *Shutts*, 472 U.S. 797, 812 (1985). "[T]he court has virtually complete discretion as to the manner of giving notice to class members." *Handschu v. Special Servs. Div.*, 787 F.2d 828, 833 (2d Cir. 1986). "Notice need not be perfect, but must be the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential Class Members." *Oladipo* v. *Cargo Airport Servs. USA, LLC*, No 16-cv-6165, 2019 WL 2775785, at *10 (E.D.N.Y. July 2, 2019).

Class Counsel propose to give notice to all Class Members in four ways: 1) place written notice on each unit in Dutcher Hall with acquittees (DN1, DS1, DN2, DN3, and DS3); 2) hold a community meeting on each unit with acquittees in Dutcher Hall within two weeks of the Court's order for preliminary approval; 3) attend the Dutcher Steering Committee meetings for three consecutive weeks; and, 4) make CLRP attorneys available for individual meetings with any class member who requests a meeting.

Class Counsel's proposed notice is attached as Attachment 2.

## V. CONCLUSION

The Settlement Agreement meets all of the requirements for preliminary

29

approval. The Court should enter an order for preliminary approval and for Notice to the Class.

Respectfully Submitted,

Isaiah Lindsay and Kai Ming Wu
Class Representatives

By: Class Counsel

s/Kirk W. Lowry
Kirk W. Lowry, ct.27850
Kathleen M. Flaherty, ct19344
Simone Lamont, ct31858
Class Counsel
Connecticut Legal Rights Project
CVH-Beers Hall 2nd Floor
22 Harvey Drive
Middletown, CT 06457
(860) 262-5017
klowry@clrp.org

s/Rachel Mirsky
Rachel Mirsky, ct30457
Sheldon Toubman, ct08533
Class Counsel
Disability Rights Connecticut
75 Charter Oak Avenue, Suite 1-101
Hartford, CT 06106
(475) 345-3168
rachel.mirsky@disrightsct.org

**CERTIFICATION**

I hereby certify that on March 27, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/Kirk W. Lowry
Kirk W. Lowry

30

# Attachment 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| Isaiah Lindsay | ) | |
| Ling Xin Wu, | ) | |
| | ) | |
| | ) | |
| On behalf of themselves and | ) | Civil No.: 3:22-CV-1518-SVN |
| all other persons similarly | ) | |
| situated, | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| NANCY NAVARRETTA in her | ) | |
| official capacity as Commissioner | ) | |
| of the Department of Mental | ) | |
| Health and  Addiction Services; | ) | |
| JOSE CREGO, in his official | ) | |
| capacity as Chief Executive | ) | |
| Officer of Whiting Forensic | ) | |
| Hospital; MICHAEL PEPPER, | ) | |
| In his official capacity | ) | |
| as chair of the Psychiatric | ) | |
| Security Review Board; | ) | |
| JOHN BONETTI, MARK | ) | |
| KIRSCHNER, CHERYL ABRAMS, | ) | |
| WAKANA HIROTA,        and | ) | |
| RENESHA NICHOLS, in their | ) | |
| their official capacities as a | ) | |
| members of the Psychiatric | ) | |
| Security Review Board; | ) | |
| | ) | |
| Defendants. | ) | March 26, 2026 |

**SETTLEMENT AGREEMENT**

This Settlement Agreement ("Agreement") is made and entered into as of

March 26, 2026, by and between Plaintiffs Isaiah Lindsay and Kai Ming  Wu (f.k.a.

Ling Xin Wu) and the Plaintiff Class who they represent as ordered and defined by

the Court on December 16, 2024 (ECF No. 130), as "all acquittees who (1) are, or

1

will be in the future, committed to the jurisdiction of the Psychiatric Security Review Board (PSRB), (2) are assigned Full Level 4 privileges, and 3) have been determined by a Whiting Forensic Hospital (WFH) treatment professional as being ready for Temporary Leave" (collectively the "Plaintiffs") and Defendants Nancy Navarretta, Jose Crego, and PSRB Defendants, in their official capacities, Michael Pepper, John Bonetti, Mark Kirschner, Cheryl Abrams, Wakana Hirota and Renesha Nichols, (collectively the "Defendants").

**WHEREAS** on or about November 30, 2022, the Plaintiffs commenced a civil action in the United States District Court for the District of Connecticut (the "Court"), by filing an initial Complaint captioned *Dyous, et al. v. WFH, PSRB and DMHAS*, Docket No. 3:22-CV-1518-SVN.

**WHEREAS** on April 5, 2024, Plaintiffs filed their Third Amended Complaint captioned *Lindsay, et al. v. Navarretta, et al.*, Docket No. 3:22-CV-1518-SVN (hereinafter the "Action")

**WHEREAS** the Plaintiffs in their Third Amended Complaint alleged that the Defendants, in their official capacities, acted or failed to act in violation of Title II of the Americans with Disabilities Act ("Title II"), and that Defendants Navarretta and Crego, in their official capacities also violated Section 504 of the Rehabilitation Act of 1973 ("Section 504") and that the Plaintiffs were irreparably harmed and/or exposed to a risk of irreparable harm as a result of such actions or failures to act.

2

**WHEREAS** the Defendants denied any and all liability for any and all claims set forth in the Plaintiffs' Third Amended Complaint and denied that they were or have been in violation of any state or federal law; and

**WHEREAS**, in consideration of the mutual covenants contained herein, the Parties desire to settle and resolve all differences between them as to the claims set forth in Plaintiffs' Third Amended Complaint, resulting in a stipulated, voluntary Settlement Agreement in compliance with Rule 23 of the Federal Rules of Civil Procedure.

**NOW, THEREFORE,** it is agreed as follows:

### I.    Purpose of the Settlement Agreement

The purpose of this Settlement Agreement is to resolve plaintiffs' claims regarding the timely provision of mental health services in the most integrated setting and to resolve the Action under the following terms:

### II.    Definitions

    A. **"Approval Date"** is date on which Defendants have received authorization for both (1) funding for the requirements of the Settlement Agreement from the Connecticut Office of Policy and Management (OPM); and (2) legislative approval of the Resolution regarding the Settlement Agreement, pursuant to Conn. Gen. Stat. § 3-125a.

3

B. "**Clinical Case Conference**" is a clinical meeting that includes the DMHAS Medical Director, Director of Admissions, Director of Utilization management, WFH administration, WFH treatment team, representatives from the LMHA and CSP and the patient; a patient advocate and conservators are also included if involved. The purpose of a Clinical Case Conference is to address clinical and systems barriers to temporary leave and conditional release.

C. **"Community Service Provider" (also referred to as "CSP") or "Private Nonprofit Provider" (also referred to as "PNP")** means community mental health services providers of services and supports on temporary leave, both day services and overnight residential services.

D. **"Conditional Release ("CR") Readiness"** means a patient who has substantially adhered to all the requirements in the MOD for Phase II TL.

E. "**Dutcher Review Committee**" (**"DRC"**) means the WFH committee that primarily focuses on clinical issues related to changes in patient care, oversight, and privileges, with a particular concentration on community reintegration, including identifying appropriate community resources to meet patients' individual clinical and risk management needs.  The DRC meets weekly.

4

F. **"Forensic Review Committee" ("FRC")** means the WFH committee identified in WFH Operational Policy and Procedure 5.6 which primarily focuses on risk management issues regarding patients committed to the custody of DMHAS/WFH and to the jurisdiction of the PSRB and reviews whether the patient is ready for Full Level 4 privileges, TL engagement, and TL applications, including Day TL and Overnight TL, and Conditional Release. The FRC meets weekly.

G. **"Full Level 4 privileges"** has the same meaning as defined in WFH OPP 2.17, in effect as of June 28, 2021, as periodically amended.

H. **"Grace Period"** means the first eighteen (18) months after the Approval Date.

I. "**Memorandum of Decision" ("MOD")** means the decision of the PSRB regarding temporary leave or conditional release, as applicable, and as provided for in Regs. Conn. State Agencies § 17a-581-46.

J. **"MOD Reading"** means the meeting of the WFH treatment team, the Local Mental Health Authority ("LMHA"), TL or Conditional Release ("CR") Supervisor, community mental health services providers and the patient to read the MOD together to ensure a full understanding of each party's duties, obligations and authority.

K. "**Patient**" means an acquittee who is a Class Member.

L. "**Phase I Day Temporary Leave" ("Phase I TL")** means Temporary Leave (TL) authorized by C.G.S. § 17a-587 and the patient's MOD but

5

is limited to community mental health treatment for a period of hours during the day. The patient on Phase I Day TL returns to Whiting Forensic Hospital each day and sleeps at the hospital.

M. **"Phase II TL Readiness"** is a clinical determination by which the treatment team determines whether a patient who holds Full Level 4 privileges and has substantially adhered to all the requirements included in the MOD for Phase I TL has met the standard for Phase II TL Readiness, based only on the following clinical factors: (1) the patient has demonstrated the ability to develop and maintain a meaningful therapeutic relationship with their treatment team; (2) the patient has demonstrated the ability to meaningfully engage with the TL supervisor and the ability to develop and maintain a meaningful therapeutic relationship with their community-based treatment team; (3) the patient has remained psychiatrically and behaviorally stable; (4) the patient remains substantially adherent with recommended treatment interventions; and (5) the patient's individualized risk factors may be appropriately mitigated and reasonably accommodated in a more integrated setting.

N. "**Phase II Residential Overnight Temporary Leave**" **("Phase II TL")** means Temporary Leave ("TL") authorized by C.G.S. § 17a-587 and the patient's MOD and is a TL where the patient stays overnight in a community mental health residential setting starting with one

6

overnight and progressing up to seven (7) full overnights. The acquittee remains a patient at WFH.

O. **"Temporary Leave" (also known as "TL**") means any family temporary leave, day temporary leave or residential overnight temporary leave, authorized by the Board pursuant to C.G.S. § 17a-587, for any length of time, up to and including seven (7) overnights, during which a person is off the grounds of Whiting Forensic Hospital ("WFH") or Connecticut Valley Hospital ("CVH") for therapeutic purposes. The Class Member on temporary leave remains a patient at the hospital and is not discharged.

P. **"Temporary Leave Engagement"** means face-to-face encounters between the PSRB patient and the proposed TL supervisor or designee and, in some cases, tours of the Local Mental Health Authority (LMHA), psychosocial clubhouse, and residence, as applicable.

Q. **"Temporary Leave Engagement Readiness"** is a clinical determination by which the treatment team determines whether a patient has met the standard for TL Engagement Readiness, based only on the following six (6) clinical factors:  1) the patient has maintained clinical and behavioral stability; 2) the patient remains substantially adherent with recommended treatment interventions; 3) the patient has appropriately used their Full Level Four privileges; 4) the patient's individual risk factors have been well managed in the

7

current treatment setting; 5) the patient's individual risk factors can continue to be appropriately mitigated and reasonably accommodated in a more integrated treatment setting; and 6) the patient demonstrates the ability to develop and maintain a meaningful therapeutic relationship with their treatment team.

R. **"Temporary Leave Formulation and Application Development"** means the process by which the treatment team collaborates with community agencies to develop a TL application to adequately address the patient's clinical and risk management needs. It also includes the timely development of and collection of signatures on community provider forms that specify each agency's agreed-upon obligations, which include, among other things, a special report to the Board summarizing the patient's progress since the last review period regarding the patient.

S. **"Temporary Leave Formulation Readiness"** is a clinical determination by which the treatment team determines whether a patient who holds Full Level Four privileges has met the standard for TL Formulation Readiness for Phase I or Phase I and Phase II, based only on the following five (5) clinical factors: 1) the patient has demonstrated the ability to develop and maintain a meaningful therapeutic relationship with their treatment team; 2) the patient has demonstrated the ability to meaningfully engage with the proposed TL

8

Supervisor or designee for TL engagement; 3) the patient has remained psychiatrically and behaviorally stable; 4) the patient remains substantially adherent with recommended treatment interventions; and 5) the patient has individualized risk factors which may be appropriately mitigated and reasonably accommodated in a more integrated treatment setting.

T. **"Triggering Event"** means any written assertion, by: (1) the Independent Reviewer (IR), of noncompliance or potential noncompliance occurring after the Grace Period, by any Defendant; or (2) Class Counsel of noncompliance or potential noncompliance occurring after the Grace Period that has been endorsed by the IR.

## III.    Beneficiaries of the Settlement

The beneficiaries and obligated parties of this Settlement Agreement are: (1) Named Plaintiffs, Mr. Isaiah Lindsay and Kai Ming Wu; (2) the Court-certified Class (Order, dated December 16, 2024, ECF No. 130) consisting of "all acquittees who (1) are, or will be in the future, committed to the jurisdiction of the PSRB, (2) are assigned Full Level 4 privileges, and (3) have been determined by a WFH treatment professional to be ready for TL" (hereinafter "Class Members");  (3)The current DMHAS Commissioner, in her official capacity as the Commissioner of the Connecticut Department of Mental Health Services ("DMHAS") and her successor in that capacity; (4) The WFH Chief Executive Officer, in his official capacity as Chief Executive Officer of Whiting Forensic Hospital ("WFH"), and his successor in

9

that capacity; (5) The current and successor PSRB Board Members in their official capacities and (6) the State of Connecticut.

## IV.  Development of and/or Modification of Policies & Procedures to Enable Plaintiffs and Members of the Plaintiff Class to Timely Transition to the Community on Temporary Leave

Defendants will take the following steps to create and/or modify their policies, procedures, and practices to ensure that Class Members can timely transition to community mental health services on Temporary Leave:

### A. General review process for Full Level 4 patients through Conditional Release.

1. Patients with Full Level 4 privileges shall continue to be discussed at weekly Risk Management meetings, monthly Treatment Plan Review ("TPR") meetings, and monthly clinical social worker ("CSW") sessions until the patient progresses to Conditional Release.

2. Patients with Full Level 4 privileges will be added to the DRC agenda and reviewed every ninety (90) days until the patient progresses to Conditional Release.

3. Review by the DMHAS Medical Director's Office in a Clinical Case Conference, or review by the FRC because of a failure to move to the next level of readiness in a timely manner, is in addition to any other rights under this agreement, not in lieu of those rights.

**B. Full level 4 to TL Engagement Readiness.**

1. (a) A patient who asserts that he or she meets the standard for TL Engagement Readiness and submits a treatment team request form, shall be reviewed by the treatment team and the Consulting Forensic Psychiatrist ("CFP") for approval of TL Engagement Readiness; and/or (b) Within thirty (30) days of the patient's treatment team and the CFP reaching consensus that a patient should be considered for TL Engagement Readiness, the patient's case shall be presented to the FRC.

2. The FRC will communicate its written decision to the patient's treatment team within ten (10) business days of FRC's meeting about the patient's TL Engagement Readiness. Any denial of readiness by the FRC shall include the reason or reasons for the denial. The treatment team will communicate the FRC's determination both in person and in writing to the patient within two (2) business days of receipt of the decision from the FRC.

3. Absent significant changes in a patient's clinical status, patient choice, or factors beyond WFH's control, including a pandemic, epidemic, changes in patient's desired placement or force majeure, a patient shall begin TL Engagement within fifteen (15) business days after FRC communicates its decision that the patient is ready for TL Engagement. Availability of community mental health services or residential placements, staffing, or other agency resources is not an acceptable reason to deny or delay the start of TL engagement.

4. If a patient with Full Level 4 privileges has not progressed to TL Engagement within six (6) months from attaining Full Level 4 privileges, the treatment team will present the patient's case at the next FRC meeting.

5. If a patient has not progressed to TL Engagement for one (1) year from attaining Full Level 4 privileges, the patient's case will be presented at a Clinical Case Conference with DMHAS Medical Director's Office within thirty (30) days thereof.

## C. TL Engagement to TL Formulation Readiness

1. Each patient meaningfully engaging with TL providers shall be reviewed by the treatment team and the CFP on a monthly basis to determine if the patient meets the standard for TL Formulation Readiness. Additionally, a patient who asserts that he or she meets the standard for TL Formulation Readiness may complete and submit a treatment team request form to review for TL Formulation Readiness.

2. Within thirty (30) days of the patient's treatment team and CFP reaching consensus that the patient has met the standard for TL Formulation Readiness for Phase I or Phase I and Phase II, and that the patient's risks can be appropriately mitigated and reasonably accommodated in a more integrated setting, the treatment team will put the patient's case on the next FRC agenda to determine TL Formulation Readiness. Availability of community mental health services or residential placements,

12

staffing, or other agency resources is not an acceptable reason to deny or delay the start of TL formulation.

3. The FRC will communicate its written decision to the patient's treatment team within ten (10) business days of the FRC's meeting about the patient. Any denial of TL Formulation Readiness by the FRC shall include the reason or reasons for the denial. The treatment team will communicate the FRC's determination both in person and in writing to the patient within two (2) business days of receipt of the FRC's decision.

4. In addition, if a patient on TL Engagement has not progressed to TL Formulation Readiness within six (6) months, the patient's case will be presented to the FRC at the next FRC meeting. The FRC will document the clinical rationale for its decision and communicate their decision to the treatment team within 10 business days. The treatment team will communicate the FRC's determination both in person and in writing to the patient within two (2) business days of receipt of the FRC's decision.

5. If the patient on TL Engagement has not progressed to TL Formulation Readiness for one (1) year the patient's case will be presented at a Clinical Case Conference with DMHAS Medical Director's Office within thirty (30) days. The recommendations and findings from the Clinical Case Conference and their rationale will be documented in the patient's chart by the clinical team within ten (10) business days. The patient will receive a copy of the recommendations, findings and rationale.

13

**D.  TL Formulation Readiness to TL Application Submission**

1. If the FRC determines the patient meets the standard for TL Formulation Readiness for Phase I and Phase II, the treatment team will apply for a combined Phase I and II TL to the PSRB unless there are significant changes in patient's clinical status, patient choice, or the availability of specialized resources in the patient's preferred catchment area suggest this would not be appropriate.  Availability of community mental health services or residential placements, staffing, or other agency resources is not an acceptable reason to deny or delay the start of TL application submission.

2. The finalized TL application shall be signed by wet or digital signature by the Chief Executive Officer or his/her designee of WFH, LMHA, and CSP within ten (10) business days.

3. Whiting Forensic Hospital shall submit the patient's TL application to the PSRB within ninety (90) days of the FRC decision that a patient meets the standard for TL Formulation Readiness, absent significant changes in the patient's clinical status or factors outside of WFH control, including a pandemic, epidemic, changes in a patient's desired placement, or force majeure. Availability of community mental health services or residential placement, staffing or other agency resources is not an acceptable reason to deny or delay submission of the TL application.

4. A PSRB Hearing shall be scheduled to occur at the next available hearing after the TL Application is filed for the patient, subject only to the need to comply with other statutory hearing deadlines and in no case more than seventy-five (75) days from the date of the filing of the TL application.

5. The MOD shall be written and approved within twenty-five (25) days of the conclusion of the hearing pursuant to C.G.S. § 17a-596(h).

6. The MOD reading shall be completed within ten (10) business days of issuance of the MOD.

**E. Receipt of TL services and TL progression.**

1. Once the PSRB has approved a patient's Phase I TL, the services shall begin within ten (10) business days of MOD reading, absent significant changes in a patient's clinical status or factors outside of WFH's control including a pandemic, epidemic, changes in a patient's desired placement or force majeure. Availability of community mental health services or residential placement, staffing or other agency resources is not an acceptable reason to deny or delay the start of Phase I Day TL.

2. TL Progression

   a. **Process for patients for whom a combined Phase I and Phase II TL are approved.**

      i. Once a patient has adhered to the MOD requirements of the Phase I TL and has met the standard for TL Phase II Readiness, the treatment team shall present the patient's case to the FRC for consideration for Phase II TL Readiness

15

within thirty (30) days. Availability of community mental health services or residential placement, staffing or other agency resources is not an acceptable reason to deny or delay presentation to the FRC.

ii. FRC will communicate its written decision to the patient's treatment team within ten (10) business days of FRC's meeting about the patient. Any denial of readiness by the FRC shall include the reason or reasons for the denial. The treatment team will communicate the FRC's determination and its rationale both in person and in writing to the patient within two (2) business days of receipt of the FRC's decision.

iii. Absent significant changes in a patient's clinical status, patient choice, or factors outside of WFH's control (including a pandemic, epidemic, force majeure, changes in a patient's desired placement), but not including a lack of bed availability in the CSP identified in the MOD, that require deviation therefrom, a patient shall start Phase II TL services within six (6) months of the FRC determining that the patient meets the standard for Phase II TL Readiness.

16

iv. If the patient has not started Phase II TL services within six (6) months of FRC approval, the case shall be presented for a DMHAS Clinical Case Conference with the Medical Director's Office within thirty (30) days.  The recommendations, findings and reasons for any denial of Phase II Readiness from the Clinical Case Conference will be documented in the patient's chart by the clinical team within ten (10) business days. The patient will receive a copy of the recommendations, findings and reasons for any denial of Phase II TL Readiness.  Progress towards recommendations will be discussed monthly at the patient's treatment plan and DRC meetings and documented in the patient's chart.

b. **Process for patients for whom Phase I and Phase II are approved separately.**

i. Once a patient has successfully adhered to the MOD requirements of the Phase I TL and met the standard for Phase II TL Readiness, the treatment team shall present the patient's case to the FRC for consideration for Phase II TL Readiness. Availability of community mental health services or residential placement, staffing or other agency resources is not an acceptable reason to deny or delay presentation to the FRC.

17

ii.   FRC will communicate its written decision to the patient's treatment team within ten (10) business days of FRC's meeting about the patient. Any denial of readiness by the FRC shall include the reason or reasons for the denial. The treatment team will communicate the FRC's determination both in person and in writing to the patient within two (2) business days of receipt of the FRC decision.

iii.  Whiting Forensic Hospital shall submit the patient's Phase II TL application to the Board within ninety (90) days of the FRC's decision that a patient meets the standard for TL Phase II Readiness absent significant changes in the patient's clinical status or factors outside of WFH control including a pandemic, epidemic, changes in a patient's desired placement, or force majeure. Availability of community mental health services or residential placement, staffing or other agency resources is not an acceptable reason to deny or delay submission of the TL application.

iv.   Absent significant changes in a patient's clinical status, patient choice, or factors outside of WFH's control (including a pandemic, epidemic, force majeure, changes in a patient's desired placement), but not including a lack of bed availability in the CSP identified in the MOD, that

18

require deviation therefrom, a patient shall start Phase II TL services within six (6) months of the Phase II MOD reading.

v. If the patient has not started Phase II TL services within six (6) months of receipt of the Phase II MOD, the case shall be presented for a DMHAS Clinical Case Conference with the Medical Director's Office within thirty (30) days. The recommendations and findings from the Clinical Case Conference will be documented in the patient's chart by the clinical team within ten (10) business days. The patient will receive a copy of the recommendations and findings. Progress towards recommendations will be discussed monthly at the patient's treatment plan and DRC meetings and documented in the patient's chart.

c. For those patients for whom the treatment team has determined that the patient does not meet the requirements of Phase II TL Readiness and has not:

i. Progressed to Phase II within six (6) months of the commencement of Phase I services, the patient shall have their case presented to the FRC for consideration of progression to Phase II TL or for Phase II TL formulation, as appropriate.

19

ii. Progressed to Phase II within one (1) year of the commencement of Phase I services, the patient shall have their case presented at a Clinical Case Conference with the DMHAS Medical Director's Office within thirty (30) days. The recommendations and findings from the Clinical Case Conference will be documented in the patient's chart by the clinical team within ten (10) business days. The patient will receive a copy of the recommendations and findings.

**F. TL progression to Conditional Release (CR).**

1. Once a patient has adhered to all the requirements in the MOD for Phase II TLs in the community, the treatment team shall have thirty (30) days to present the patient's case to the FRC for Conditional Release Readiness. The patient who meets the standard for Conditional Release readiness shall be recommended for CR absent contrary significant clinical or risk management indicators, including MOD violations and significant changes in a patient's clinical status, or factors outside of WFH's control including a pandemic, epidemic, changes in a Patient's desired placement or force majeure. Availability of community mental health services or residential placements, staffing, or other agency resources is not an acceptable reason to deny or delay the start of conditional release.

20

2. FRC shall communicate decisions regarding CR Readiness to the treatment team no later than ten (10) business days of the FRC presentation. Any denial of readiness by the FRC shall include the reason or reasons for the denial. The treatment team shall communicate the FRC's determination both in person and in writing to the patient within two (2) business days of receipt of the FRC decision.

3. The treatment team will file the CR Application within ninety (90) days of receiving FRC approval, unless there are significant changes in the patient's clinical status or factors outside of WFH control, including a pandemic, epidemic, changes in the patient's desired placement, or force majeure. Present availability of residential CR services and supports is not an acceptable reason to delay the application for CR.

4. The PSRB shall schedule and hold a hearing on the CR Application in accordance with Conn. Gen. Stat. § 17a-588(a).

5. The MOD shall be issued within twenty-five (25) days of the conclusion of the hearing, in accordance with Conn. Gen. Stat. § 17a-596(h).

6. The MOD reading shall be completed within ten (10) business days of the MOD being issued.

7. CR shall start within ten (10) business days of the MOD reading.

V.    **Data Collection & Reporting**

**DMHAS Quarterly Reports**

Defendants agree to provide the IR with compliance reports for all identified class members on a quarterly basis which identifies compliance rates for approval for FRC determination of TL Engagement Readiness (II.Q and IV.B.1), Temporary Leave Formulation Readiness (II.S. and IV.C), Temporary Leave Formulation of combined Phase I and Phase II TL (IV.D.1), and Receipt of TL Services (IV.E.) Defendants further agree to provide Class Counsel with bed availability documentation for all community service providers that may provide  Phase II TL and all DMHAS contracts regarding those CSP's.

VI.    **Education and Training on the Agreement Terms**

DMHAS, Whiting, and the PSRB will adequately train their staff regarding the requirements of this Settlement Agreement and agency-required practices regarding it. The Independent Reviewer shall report on Defendants' compliance regarding adequate training.

VII.   **Implementation of the Settlement Agreement**

  A.    The implementation of this Settlement Agreement shall begin immediately upon Court approval [Effective Date].

  B.    Within one (1) month from the Effective Date, the Defendants shall appoint a Settlement Agreement Coordinator to oversee

22

compliance with this Agreement and to serve as a point of contact for Class Counsel and the Independent Reviewer(s).

C.      The Defendants shall maintain sufficient records to document that the requirements of this Settlement Agreement are being properly implemented and shall make such records available to the Independent Reviewer(s) and upon the occurrence of a Triggering Event, Class Counsel, for inspection and copying on a reasonable basis. Within ten (10) business days after a Triggering Event, Defendants shall provide Class Counsel with access, to the extent permitted by the Court's protective order, to all relevant information and records pertaining to the Triggering Event that it provided to the IR. The IR may request information and records recommended by Class Counsel if the IR deems the request material and reasonable.

## VIII.  Independent Reviewer(s) ("IR")

A.      The Parties have jointly selected Dr. Madelon Baranoski as the IR for the Settlement Agreement.  If at any time the selected IR is unable or unwilling to act as an IR, the Class Counsel and Counsel of the Defendants (Defense Counsel) will select a replacement. If they are unable to agree on a replacement within two (2) months, they shall each submit the names of up to three (3) candidates to the Court, and the Court shall select the replacement.

B.    Annually, or more frequently if deemed necessary in IR's sole discretion, beginning six (6) months after the Approval Date of this Agreement and continuing until termination, the IR shall conduct the factual investigation and verification of data and documentation necessary to determine Defendants' compliance with the terms of this Agreement ("IR Review").

C.    The Parties shall provide the IR with access to any relevant information, documents, persons, employees, residences, facilities, buildings, programs, services, records, and materials that the IR determines, in the IR's sole discretion, is necessary to perform the Review.  The IR, in the IR's sole discretion, may provide any information, documents or data to Class Counsel.

D.    The IR will file with Class Counsel and Defendants a written report on the Defendants' compliance within sixty (60) days of the close of each review period.  The IR will provide both Class Counsel and Defendants a draft of the IR's report at least thirty (30) days before issuing the report.  Class Counsel and Defendants will have ten (10) business days to review and comment on the proposed report.  The IR shall provide the Parties with the final report within twenty (20) days thereafter ("IR Report").

24

E.   The IR may:

   a.   Have ex parte communications with the Counsel for the Parties in the IR's discretion.

   b.   Testify in an enforcement proceeding under Section X of this Settlement Agreement, regarding the IR's findings regarding compliance.

F.   No IR shall be:

   a.   Liable for any claim, lawsuit, or demand arising out of the monitoring of this Settlement Agreement. Notwithstanding the foregoing, this provision shall not limit, pertain to, or affect in any way the IR's state contract for IR services.

   b.   Subject to formal discovery, including, but not limited to, deposition(s), request(s) for documents, request(s) for admissions, interrogatories, or other disclosures.

G.   Payment:

   a.   Defendants shall pay the IR for IR services as provided under this Settlement Agreement. Defendants' failure to pay the IR for any and all services shall constitute noncompliance and be subject to enforcement by the Court.

25

b.  IR shall not contract with the Defendants while serving as an IR without Class Counsel's written consent. An IR may not contract with the Defendants on a matter related to this Agreement for one year after last providing IR services under this Agreement, without the written consent of Class Counsel while this Agreement remains in effect.

c.  This provision shall not be interpreted as altering the role of the IR.

d.  The IR shall not be deemed to be an agent of the Court.

H.  Access to Protected Health Information ("PHI"). As disclosure of PHI may be necessary to enforce this Agreement, the Parties shall file with the Court a separate motion for an order permitting PHI disclosure in adherence with the requirements the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and 42 C.F.R. Part 2.

## IX.  Term, Termination and Dismissal of Class Action

A.  This Agreement shall be in effect for seven (7) years from the Effective Date unless terminated earlier as provided herein or as extended for ongoing substantial noncompliance as provided in Section X.H.

26

B. After the Grace Period, and upon Class Counsels' and Defense Counsels' receipt of three consecutive annual IR Reports of substantial compliance with each and every requirement of the Settlement Agreement, the Defendants may move to terminate the Settlement Agreement early by order of the Court ("Early Termination"). The Grace Period of time, eighteen months, is not included as part of the three consecutive annual IR Reports of substantial compliance. There must be three consecutive annual IR Reports of substantial compliance for the period of time after the Grace Period.

C. Once the Settlement Agreement is conditionally approved by the Parties, the Defendants' will make their best efforts to obtain funding for the requirements of the Settlement Agreement and obtain approval by the General Assembly in accordance with Conn. Gen. Stat. § 3-125a. Class Counsel will file a Motion for Preliminary and Final Approval with the Court. If the Connecticut General Assembly does not approve the Settlement Agreement during the 2026 legislative session, the Settlement Agreement shall become null and void and no part shall thereafter be enforceable by

27

or against either party. The Parties may agree to submission of the Settlement Agreement in the next legislative session.

## X.   Enforcement

A.      Compliance with this Agreement requires Defendants to adhere to every time limit and requirement described in this Settlement Agreement. Substantial compliance is achieved if any violations of the Settlement Agreement are minor and occasional and are not systemic. The Parties agree that 85% compliance with the provision of Phase II Temporary Leave residential overnight services in the community within six (6) months in section IV.E.2.a.iii and IV.E.2.b.iv in this Agreement shall be determined to be substantial compliance on a rolling quarterly basis. The Parties further agree that 90% compliance with all other provisions will be considered the standard for substantial compliance. Notwithstanding the foregoing, the Parties further agree that failure to adhere to a time limit or requirement for up to and including two (2) Class Members during an IR reporting period shall not be a Triggering Event.

B.      Notwithstanding the foregoing provision, Class Members and Class Counsel understand that Defendants will utilize best efforts to implement the terms of this Agreement upon the Approval Date but that the Grace Period will be required to fully implement and comply

28

with its terms. Accordingly, Class Counsel shall not seek to enforce the Settlement Agreement during the Grace Period.

C.      After the Grace Period, if Class Counsel believe that the Defendants have failed to fulfill any obligation under this Settlement Agreement, Class Counsel shall provide Defendants with written notice identifying the factual basis and specific details regarding the alleged noncompliance.

D.      The Defendants shall have forty-five (45) days from the date of such written notice to respond to Class Counsel in writing by (a) denying that substantial noncompliance has occurred; or (b) by accepting (without necessarily admitting) the allegation of noncompliance and proposing steps that the Defendants will take, and by when, to cure the alleged noncompliance.

E.      If the Defendants fail to respond within forty-five (45) days or deny that substantial noncompliance has occurred, Class Counsel may proceed as provided for in section X.I., below.

F.      If the Defendants timely respond by proposing curative action by a specified deadline, Class Counsel shall accept the Defendants' proposal or offer a counterproposal for a different curative action or deadline.

G.      If the Defendants fail to respond within forty-five (45) days to a Class Counsel notice of substantial noncompliance or deny

29

that substantial noncompliance has occurred, or the Parties are unable to resolve any differences through the procedures under this Section X, they may attempt informal and private dispute resolution.

H.        The Parties may, by mutual written agreement, extend the time periods specified in this Section X. In addition, the time periods in this Section X shall be tolled for any period in which there is no serving IR, provided that the lack of IR is not caused by a party's breach of the time requirements in Section VIII.A. Notwithstanding the foregoing, if the tolling period falls within the last six months of the Term of the Settlement Agreement specified in Section IX.A: (1) If the last IR report did not identify any substantial noncompliance, no tolling shall occur; or (2) If the last IR report identified instances of substantial noncompliance, the time periods may be tolled for up to six months or until the replacement IR has provided a report that does not identify any substantial noncompliance, whichever is first.

I.        Class Counsel may seek Court intervention only after all efforts to resolve the dispute through informal and private dispute resolution have been unsuccessful. Thereafter, they may file a motion for enforcement or a motion for compliance with the material provision identified. Class Counsel's motion for compliance will request specific performance only. The Court may, after appropriate notice, filing of moving and opposing papers, submission of evidence and an

30

evidentiary hearing, enter an order to enforce the material provision specified in the notice upon showing that the Defendant at issue is in substantial and systemic non-compliance with that material provision.

J.     The Parties agree that the Court shall retain jurisdiction to enforce this Settlement Agreement. The Parties agree to the proposed Order of Dismissal identified in Section XV below and attached hereto.

K.     No Named Plaintiff, Class Member, or Class Counsel shall seek Court intervention or move to enforce the Settlement Agreement in any manner except as provided for in this Section X or seek attorneys' fees or contempt with any effort to enforce the settlement agreement.

## XI.  No Admission of Liability

A. This Settlement Agreement is a settlement and compromise of disputed claims. It is a settlement and compromise to resolve any and all claims that were raised in this action, or could have been raised based on the identical factual predicate, without any adjudication of rights, claims or defenses. The scope of Plaintiffs' release is limited by law to those claims that were or could have been pled that arise out of the identical factual predicate as the claims actually pled in the Third Amended Complaint.

31

B.  This Settlement Agreement shall not be construed as a consent decree or an admission of liability or of the truth of the allegations, claims, or contentions of any party. There are no covenants, promises, undertakings, or understandings between the Parties outside of this Settlement Agreement, except as specifically set forth herein.

## XII.  General Release of Claims

A.  The Named Plaintiffs, individually and on behalf of Class Members, their heirs, beneficiaries, successors and assigns, in consideration of the benefits of this Settlement Agreement, release and discharge each and every Defendant, all agencies of the State of Connecticut, all present and former officers, employees and agents of the State of Connecticut, including all current and former employees of the State of Connecticut, Department of Mental Health and Addiction Services, and all current and former members of the Psychiatric Security Review Board, and its employees, in both their official and individual capacities, their heirs, successors and assigns, from all actions, causes of action, suits, claims or controversies arising from acts or omissions alleged in the Third Amended Complaint (ECF 72) in *Lindsay et al. v. Navaretta et al.*, Case No. 3:22-CV-1518 (SVN), or based on the identical factual predicate. This release does not apply to any claims brought solely for actions taken or not

32

taken by defendants after this Settlement Agreement has terminated.

B.  All Class Members individually and on behalf of the Class, their heirs, beneficiaries, successors and assigns, in consideration of the benefits of this Settlement Agreement, release and discharge each and every defendant, all agencies of the State of Connecticut, all present and former officers, employees and agents of the State of Connecticut, including all current and former employees of the State of Connecticut, Department of Mental Health and Addiction Services, and all current and former members of the Psychiatric Security Review Board, in both their official and individual capacities, their heirs, successors and assigns, from all actions, causes of action, suits, claims or controversies arising from acts or omissions alleged in the Third Amended Complaint (ECF 72) in *Lindsay et al. v. Navaretta et al.*, Case No. 3:22-CV-1518 (SVN), or based on the identical factual predicate. This release does not apply to any claims brought solely for actions taken or not taken by defendants after this Settlement Agreement has terminated.

## XIII.  General Provisions

A.  No modification of this Settlement Agreement shall be effective unless executed in writing by the Parties.

B. The Settlement Agreement shall be applicable to, and binding upon, all Plaintiffs, Class Members, Class Counsel, Defendants and their employees, heirs, assigns, and successors in office.

C. The Defendants shall make best efforts to have state agents take any actions necessary for the Defendants to comply with provisions of this Settlement Agreement.

D. If an unforeseen circumstance occurs that causes a failure to timely fulfill any requirements of this Settlement Agreement, the Defendants shall notify Class Counsel and the IR in writing within twenty (20) days after the Defendants become aware of the unforeseen circumstance and its impact on the Defendants' ability to perform under the Settlement Agreement. The notice shall describe the cause of the failure to perform, and the measures taken to prevent or minimize the failure. The Defendants shall take all reasonable measures to avoid or minimize any such failure.

E. Failure by any Party to enforce this entire Settlement Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver, including of its right to enforce other deadlines and provisions of this Settlement Agreement.

F.  The Parties shall promptly notify each other of any challenge to this Settlement Agreement or any portion thereof and shall defend against any challenge to it.

G.  Class Counsel and the Defendants release each other from any and all claims and obligations arising out of the allegations set forth in the complaint, other than those expressly provided for in this Settlement Agreement, and shall take all necessary legal action to uphold the validity of this Agreement.

H.  Except as provided in this Settlement Agreement, during the term of this Agreement, Class Members shall not bring a claim arising under Title II of the ADA or Section 504 of the Rehabilitation Act against DMHAS, WFH or the PSRB for claims for any class member as alleged in the Third Amended Complaint (ECF 72) in *Lindsay et al. v. Navaretta et al.*, Case No. 3:22-CV-1518 (SVN) and based on the identical factual predicate.

I.  The Class Counsel, Defense Counsel, and the Parties represent and acknowledge this Settlement Agreement is the result of extensive, thorough, arms-length and good faith negotiations. They further represent and acknowledge that the terms of this Settlement Agreement have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of any and all claims and for the

35

express purpose of precluding any further or additional claims arising out of the allegations set forth in the complaints and pleadings in this action during the period this Settlement Agreement is in effect.

J.  Each Party to this Settlement Agreement represents and warrants that the person who has signed this Settlement Agreement on behalf of the Party's respective entity or entities is duly authorized to enter into this Settlement Agreement and to bind that Party to the terms and conditions of this Settlement Agreement.

K.  The Parties and their Counsel agree that the provisions of this Settlement Agreement are lawful, fair, adequate, and a reasonable resolution of the pending lawsuit.

L.  This Settlement Agreement may be executed in counterparts, each of which shall be deemed an original, and the counterparts shall together constitute one and the same agreement, notwithstanding that each party is not a signatory to the original or the same counterpart.

M.  "Notice" under this Settlement Agreement shall be provided by overnight courier to the following or their successors.

## XIV.  Attorneys' Fees

The parties agree that Defendants will pay reasonable attorneys' fees and expenses to Class Counsel as follows: Defendants will pay

36

reasonable attorneys' fees to the Disability Rights Connecticut in the amount of $435,000. Connecticut Legal Rights Project has waived its claim to attorneys' fees. Defendants agree to pay expenses in the amount of $12,000 to the Connecticut Legal Rights Project. The Defendants shall pay these attorneys' fees and expenses to Class Counsel within a reasonable time after the Approval Date.

XV.    **Proposed Order Incorporating the Settlement Agreement and Retaining Jurisdiction to Enforce it.**

The parties agree to submit the attached proposed Order of Dismissal.

FOR THE PLAINTIFFS AND THE PLAINTIFF CLASS:

Isaiah Lindsay
Class Representative

Kai Ming Wu (f.k.a. Ling Xin Wu)
Class Representative

Kirk W. Lowry, ct.27850
Kathleen M. Flaherty, ct19344
Simone Lamont, ct31858
Class Counsel
Connecticut Legal Rights Project
CVH-Beers Hall 2nd Floor
22 Harvey Drive
Middletown, CT 06457
(860) 262-5017
klowry@clrp.org

March 26, 2026

37

_____
Rachel Mirsky, ct30457
Sheldon Toubman, ct08533
Virginia Teixeira, ct29213
Class Counsel
Disability Rights Connecticut
75 Charter Oak Avenue, Suite 1-101
Hartford, CT 06106
(475) 345-3168
rachel.mirsky@disrightsct.org

38

DEFENDANTS,

NANCY NAVARRETTA, IN HER OFFICIAL CAPACITY AS
COMMISSIONER OF THE DEPARTMENT OF MENTAL HEALTH
AND ADDICTION SERVICES

_____
Nancy Navarretta, Commissioner of the Department of Mental Health
and Addiction Services

Date:__3-26-26_____


JOSE CREGO, IN HIS OFFICIAL CAPACITY AS THE CHIEF
EXECUTIVE OFFICER OF WHITING FORENSIC HOSPITAL

_____
Jose Crego, CEO of Whiting Forensic Hospital

Date_3-26-26_____


ON BEHALF OF DEFENDANTS MICHAEL PEPPER, IN HIS
OFFICIAL CAPACITY AS CHAIRMAN OF THE PSYCHIATRIC
SECURITY REVIEW BOARD, AND JOHN BONETTI, MARK
KIRSCHNER, CHERYL ABRAMS, WAKANA HIROTA, AND
RENESHA NICHOLS, IN THEIR OFFICIAL CAPACITIES AS
MEMBERS OF THE PSYCHIATRIC SECURITY REVIEW BOARD


_____
Michael Pepper, Chairman
Psychiatric Security Review Board

Date:_____

39

DEFENDANTS,

NANCY NAVARRETTA, IN HER OFFICIAL CAPACITY AS
COMMISSIONER OF THE DEPARTMENT OF MENTAL HEALTH
AND ADDICTION SERVICES

_____

Nancy Navarretta, Commissioner of the Department of Mental Health
and Addiction Services

Date:_____

JOSE CREGO, IN HIS OFFICIAL CAPACITY AS THE CHIEF
EXECUTIVE OFFICER OF WHITING FORENSIC HOSPITAL

_____

Jose Crego, CEO of Whiting Forensic Hospital

Date_____

ON BEHALF OF DEFENDANTS MICHAEL PEPPER, IN HIS
OFFICIAL CAPACITY AS CHAIRMAN OF THE PSYCHIATRIC
SECURITY REVIEW BOARD, AND JOHN BONETTI, MARK
KIRSCHNER, CHERYL ABRAMS, WAKANA HIROTA, AND
RENESHA NICHOLS, IN THEIR OFFICIAL CAPACITIES AS
MEMBERS OF THE PSYCHIATRIC SECURITY REVIEW BOARD

_____

Michael Pepper, Chairman
Psychiatric Security Review Board

Date:_March 26, 2026_____

39

# ATTACHMENT

# PROPOSED ORDER OF DISMISSAL

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Isaiah Lindsay, | ) |
| Ling Xin Wu, | ) |
| On behalf of themselves and | ) |
| all other persons similarly situated, | ) |
| | ) |
| Plaintiffs, | )CIVIL ACTION NO. 3:22-CV-1518-SVN |
| v. | ) |
| | ) |
| NANCY NAVARRETTA, in her official) | |
| capacity as the Commissioner of the | ) |
| Connecticut Department of Mental | ) |
| Health and Addiction Services, et al. | ) |
| Defendants. | ) |
| | ) |
| Defendants. | )    April ____, 2026 |

## ORDER OF DISMISSAL

The Court has issued orders for preliminary and final approval pursuant to Fed. R. Civ. P. 23(e).

**IT IS HEREBY ORDERED:**

1. As requested by the parties, the Court shall retain jurisdiction for the purpose of enforcing the terms of the parties' agreement by specific performance only.

2. Except as to paragraph 1, this case is dismissed pursuant to Fed. R. Civ. P. 41(a)(2).

**IT IS SO ORDERED.**

Date:_____                    _____
                                   SARALA V. NAGALA
                                   UNITED STATES DISTRICT JUDGE

# Attachment 2

**\*\*PLEASE READ\*\***

**IMPORTANT NOTICE THAT MAY AFFECT YOUR RIGHTS**

**PROPOSED CLASS ACTION SETTLEMENT**

**This Notice is about a proposed settlement of the class action lawsuit**

# *Isaiah Lindsay and Kai Ming Wu v. DMHAS, WFH and the PSRB*

## PURPOSE OF THIS NOTICE

This notice informs you about the proposed settlement of legal claims in a class action lawsuit against the Commissioner of the Department of Mental Health and Addiction Services (DMHAS), the CEO of Whiting Forensic Hospital (WFH), and the Psychiatric Security Review Board (PSRB) Board members.

DMHAS is the state agency responsible for providing treatment in the most integrated setting to acquittees and for providing a system of community mental health care that is adequate to ensure that acquittees can access Phase II residential overnight Temporary Leave (TL) within a reasonable time of it being authorized. WFH is the hospital that provides treatment to acquittees and makes determinations, through the treatment teams and the Forensic Review Committee (FRC), for readiness for TL Engagement, TL Formulation, Phase I TL, Phase II TL and Conditional Release. The P S R B is the quasi-judicial board that hears motions for Temporary Leave and Conditional Release (CR) and issues Memoranda of Decisions (MOD).

This notice summarizes the Settlement Agreement ("Agreement") and tells you what you must do **if you __object__ to the Agreement**. You are receiving this notice because you may be a member of the Class or a person who may act in the interest of members of the Class.

## BRIEF DESCRIPTION OF THE LAWSUIT

This class action lawsuit is about the right of acquittees to timely access to mental health treatment, services, support and residential services in the most integrated setting. The lawsuit was filed on November 30, 2022, in federal court in Connecticut. It alleges that Defendants fail to provide required services in the most integrated setting in violation of

1

the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

***The lawsuit does not seek to recover any money.***

The parties agreed to settle the lawsuit. They entered into this Agreement to improve the provision of mental health services to acquittees committed to the custody of the Commissioner of DMHAS and to the jurisdiction of the PSRB. The lawsuit also requests that Defendants pay Plaintiffs' counsel reasonable attorneys' fees and costs for their work on this case. On March 11, 2026, an agreement in principle was reached by the Parties after ten mediated sessions with a United States Magistrate Judge. The parties agreed that Defendants would pay reasonable attorneys' fees to Class Counsel.

## DESCRIPTION OF THE CLASS

This case has been certified as a class action against DMHAS, WFH and the PSRB on behalf of a class of individuals represented by two Class Representatives who are both acquittees. The Court certified the following class:

> "All acquittees who (1) are, or will be in the future, committed to the jurisdiction of the Psychiatric Security Review Board (PSRB), (2) are assigned Full Level 4 privileges, and (3) have been determined by a Whiting Forensic Hospital (WFH) treatment professional to be ready for Temporary Leave."

## SUMMARY OF THE SETTLEMENT AGREEMENT

The main objective of the Agreement is to ensure that Class Members move through WFH at an individualized and reasonably paced manner that is tied to their recovery and to ensure that Phase II residential overnight services and supports are available in the community within six months of being authorized.

The proposed Agreement has detailed definitions of key terms, especially Temporary Leave Engagement Readiness, Temporary Leave Formulation Readiness, and Phase II Temporary Leave Readiness. The definition of readiness is limited to six clinical factors only and capacity for a TL spot with the community service provider may not be considered.

Section IV explains the requirement to move Class Members through the system once a Class Member obtains a Full Level 4 privilege status. Once a Class Member obtains a Full Level 4, then the treatment team and the FRC will assess the patient for Temporary Leave Engagement Readiness using only the six factors in the definition. A Class Member who is determined to meet the criteria for Temporary Leave Engagement Readiness "shall begin

2

TL Engagement within fifteen business days after the FRC communicates the decision." The Class Member will then be assessed for TL Formulation Readiness by the same six factors. Once the FRC and the Consulting Forensic Psychiatrist reach consensus that the Class Member meets the criteria for TL Formulation Readiness, the team is required to formulate a two-phase TL plan unless there are exceptional clinical reasons. WFH must submit the Class Members TL application to the PSRB within 90 days of the FRC approval of TL Formulation Readiness. Once the PSRB approves the application, the Phase I TL services shall begin within ten business days. The Class Member who has met all the requirements of the Phase I TL in the MOD and meets the standard for Phase II TL readiness in a combined Phase I and Phase II TL application shall start Phase II residential overnight TL within six months. Once a Class Member has adhered to all the requirements in the MOD for Phase II TL, the treatment team shall have thirty days to present the case to the FRC for conditional release. The Class Member who meets the definition of CR Readiness shall be recommended by the FRC for CR absent significant clinical issues.

Section V requires DMHAS to provide compliance reports for all identified Class Members containing compliance rates for FRC determinations of TL Engagement Readiness, TL Formulation Readiness, TL Formulation of combined Phase I and Phase II TL applications, and Receipt of TL services, and bed availability data for all community service providers who provide Phase II TL services.

Section VI requires DMHAS, WFH and the PSRB to adequately train their staff regarding the requirements of the Settlement Agreement.

Section VII requires Defendants to implement the agreement immediately upon Court approval of the Settlement Agreement. Defendants must appoint a Settlement Agreement Coordinator as a point of contact for Class Counsel and the Independent Reviewer. Defendants must maintain sufficient records to document their compliance with the Settlement Agreement.

Section VIII appoints Dr. Madelon Baranoski as the Independent Reviewer for the Settlement Agreement. She must investigate and review the circumstances of Class Members, their records and other documentation she deems necessary to evaluate the Defendants' compliance with the Settlement Agreement. She will have access to WFH, the Class Members, their records and staff.

Section IX provides that the Settlement Agreement shall be in effect for seven years from the effective date unless terminated earlier by order of the Court for three consecutive findings for three years of substantial compliance. The Settlement Agreement provides that Defendants will have a grace period of eighteen months before a motion for compliance may be brought.

Section X provides that the Court will retain jurisdiction over the Parties and the Settlement

Agreement and enforce it as needed. Defendants must adhere to each and every time limit and requirement described in the Settlement Agreement. The Parties have agreed that an 85% compliance rate will be considered substantial compliance with the six-month deadline to provide Phase II residential overnight services once approved and authorized. Defendants will be held to a 90% compliance rate for substantial compliance with all other timelines and requirements.

Section XI provides that the Settlement Agreement is a compromise settlement between the parties and is not an admission of liability.

Section XII provides for a General Release of Claims from the Class Representatives and the Class Members against all Defendants and their agents and employees. The release of claims is limited to claims or controversies arising from the acts or omissions alleged in the Third Amended Complaint in this case or based on the identical factual predicate. The release does not apply to any claim brought solely for actions taken or not taken by Defendants after the Settlement Agreement has terminated.

Section XIV provides that Defendants agree to pay reasonable attorneys' fees and expenses to Class Counsel. The attorneys' fees were negotiated after the parties reached an agreement on the substantive issues in the Settlement Agreement.

Section XV provides that the parties have agreed to submit an Order of Dismissal in which the Court shall retain jurisdiction of the matter for the purpose of enforcing the Settlement Agreement by specific performance only.

This lawsuit **does not seek money damages** for the Class. The Agreement does *not* include any money for Class Members.

## PROCEDURES FOR OBJECTING TO THE SETTLEMENT

**If you agree with the Agreement between Plaintiffs and DMHAS, WFH and the PSRB, you DO NOT need to do anything.** If you have an adequate privilege level and approval by the FRC, you may request to attend the public hearing on the Agreement (called the "Fairness Hearing") where the Judge will determine whether the Agreement is fair, reasonable, and adequate as to members of the Class. Class Counsel will also request that the Fairness Hearing be available by video link.

**If you have objections to the Proposed Agreement, please mail or email them by the <u>April X, 2026 deadline</u>** to Plaintiffs' counsel at:

Kirk W. Lowry
Legal Director

4

Connecticut Legal Rights Project
CVH-Beers Hall 2nd Floor, 22 Harvey Street, PO Box 351 Silver Street
Middletown, CT 06457
(860) 262-5017
klowry@clrp.org

Or

Rachel Mirsky
Supervisory Attorney
Disability Rights Connecticut
75 Charter Oak Avenue, Suite 1-101
Hartford, CT 06106
(475) 345-3168
rachel.mirsky@disrightsct.org

Your objection should include your name and WFH Unit number. Please be specific about the basis for your objection. It is not required that you provide a written objection to speak at the Fairness Hearing, but it is encouraged that you do so by mailing or emailing your objection by the **April X, 2026 deadline**, You do, however, have to indicate your interest in speaking at the Fairness Hearing, in the manner stated below.

You may also speak at the Fairness Hearing in support of the Settlement Agreement, if you indicate in advance your interest in doing so in the manner stated below.

## HEARING ON THE FAIRNESS OF THE AGREEMENT

The Court will hold the Fairness Hearing to review the proposed Agreement and decide whether it is fair, reasonable, and adequate as to members of the Class and should be approved.

If the Court approves the Agreement after the Fairness Hearing, the Agreement will be binding upon all members of the Class.

The Fairness Hearing will be held on **April XX, 2026** at **10:00 am** in the Courtroom of the Honorable Sarala V. Nagala of the U.S. District Court for Connecticut. The Courtroom address is:

United States District Court
District of Connecticut
450 Main Street, Suite 108

5

Hartford, CT 06103

*If you wish to speak at the Fairness Hearing to support or oppose the Agreement, you must mail or email a letter stating your name, mailing address, and desire to speak at the hearing by **April X, 2026** to Plaintiffs' counsel Connecticut Legal Rights Project at the mail and email addresses provided above.* Plaintiffs' counsel will send your request to the Court.

The Court will either grant or deny your request. You will then receive notice of the Court's decision before the Fairness Hearing.

### OBTAINING ADDITIONAL INFORMATION

If you would like to receive a printed copy of the settlement agreement, please contact CLRP. CLRP will bring you a printed copy at your WFH Unit. If you have questions about this notice or the Agreement, you may also contact the lawyers for Plaintiffs by (1) sending a letter to the address above or (2) sending an email to klowry@clrp.org or Rachel.mirsky@disrightsct.org.

### **PLEASE DO NOT CALL JUDGE NAGALA OR THE CLERK OF THE COURT**

The Court will NOT be able to answer your questions about the class action lawsuit or the Agreement. If you have questions, you may contact the lawyers for Plaintiffs at the email addresses provided above.